**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| National Institute of Family and Life Advocates, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No: 16 C 50310 |
| Governor Bruce Rauner, et al., | ) ) ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

**ORDER**

Defendants' motion to dismiss plaintiffs' complaint [15] is granted in part and denied in part. Counts II, IV, and V are dismissed in their entirety and those portions of Counts I, III, and V that are based upon the Illinois Constitution are dismissed. All claims against Governor Rauner are dismissed and he is terminated as a defendant in this case. The motion to dismiss is denied in all other respects. Plaintiffs' motion for preliminary injunction [35] is granted.

**STATEMENT**

      Plaintiffs, the National Institute of Family and Life Advocates, four non-profit pro-life pregnancy centers, and Dr. Tina Gingrich, M.D., have filed a Verified Complaint for Injunctive and Declaratory Relief against Illinois Governor Bruce Rauner and Secretary of the Illinois Department of Financial & Professional Regulation Bryan A. Schneider challenging the constitutionality of an amendment to the Illinois Healthcare Right of Conscience Act ("HCRCA"), 745 ILCS 70/1 et seq. This court has jurisdiction under 28 U.S.C. § 1331. Before the court are defendants' motion to dismiss plaintiffs' complaint and plaintiffs' motion for a preliminary injunction. For the reasons that follow, the motion to dismiss is granted in part and denied in part and the motion for a preliminary injunction is granted.

**I. BACKGROUND**

      In the wake of Roe v. Wade, 410 U.S. 113 (1973), Illinois and other states enacted laws protecting physicians, hospitals, and others from civil liability arising from the refusal to recommend, perform, or assist in the performance of an abortion. See 745 ILCS 30/1. The HCRCA was enacted in 1977 "to respect and protect the right of conscience of all persons who refuse to . . . act contrary to their conscience or conscientious convictions in providing . . . health care services and medical care." 745 ILCS 70/2. Consistent with this goal, the HCRCA provides that "[n]o physician or health care personnel shall be civilly or criminally liable . . . by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health

care personnel." Id. § 70/4. The HCRCA also makes it unlawful for public officials to discriminate against any person, in any manner, in licensing "because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." Id. § 70/5. "Conscience" is defined as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." Id. § 70/3(e).

Forty years later, the Illinois General Assembly passed Public Act 99-690, signed into law on July 29, 2016 and effective January 1, 2017, also known as SB 1564 ("the amended act"), which now requires physicians and other health care personnel seeking protection under the HCRCA to adopt and follow certain protocols:

> § 6.1. Access to care and information protocols. All health care facilities shall adopt written access to care and information protocols that are designed to ensure that conscience-based objections do not cause impairment of patients' health and that explain how conscience-based objections will be addressed in a timely manner to facilitate patient health care services. The protections of Sections 4, 5, 7, 8, 9, 10, and 11 of this Act only apply if conscience-based refusals occur in accordance with these protocols. These protocols must, at a minimum, address the following:
>
> (1) The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care.
>
> (2) When a health care facility, physician, or health care personnel is unable to permit, perform, or participate in a health care service that is a diagnostic or treatment option requested by a patient because the health care service is contrary to the conscience of the health care facility, physician, or health care personnel, then the patient shall either be provided the requested health care service by others in the facility or be notified that the health care will not be provided and be referred, transferred, or given information in accordance with paragraph (3).
>
> (3) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.
>
> (4) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall provide copies of medical records to the patient or to another health care professional or health care facility designated by the patient in accordance with Illinois law, without undue delay.

Id. § 70/6.1. The amended act also includes an affirmative duty that physicians and other health care personnel inform his or her patient of the patient's "legal treatment options, and risks and benefits of treatment options." Id. § 70/6.

Plaintiffs are health care facilities and health professionals who offer medical services to support women in giving birth and discourage them from seeking abortion. Plaintiffs explain that they treat every unborn child as a human being with inalienable dignity and as a patient along with the child's mother. Consequently, their religious and pro-life beliefs prohibit them from providing women with the names of other health care providers who may perform abortions because that would implicate them in destroying a human life and violate one of the leading principles of the Hippocratic Oath, that doctors do no harm to those under their care. Based on these ethical and religious beliefs, plaintiffs do not consider abortion to have medical "benefits," and do not consider abortion a "treatment option." Plaintiffs maintain that the amended act compels them to tell pregnant women the names of other doctors they believe offer abortions, and compels them to tell pregnant women that abortion has "benefits" and is a "treatment option" for pregnancy. Plaintiffs have religious and moral objections to speaking about abortion in these ways.

In their verified complaint for declaratory and injunctive relief, plaintiffs challenge the amended act in five counts. In particular, plaintiffs allege that it violates the Free Speech Clause of the First Amendment to the U.S. Constitution and Article I, § 4 of the Illinois Constitution (Count I); the Illinois Religious Freedom Restoration Act, 775 ILCS 35/1 et seq. (Count II); the free exercise of religion clause of the First Amendment to the U.S. Constitution and Article I, § 3 of the Illinois Constitution (Count III); the Coats-Snowe Amendment, 42 U.S.C. § 238n (Count IV); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, § 2 of the Illinois Constitution (Count V).

## II. MOTION TO DISMISS

Initially, defendants contend that plaintiffs' state-law claims are barred under the sovereign immunity afforded by the Eleventh Amendment. In response, plaintiffs have agreed to withdraw their state-law claims. Accordingly, Count II, advancing a claim under the Illinois Religious Freedom Restoration Act, as well as those portions of Counts I, III, and V based upon the Illinois Constitution are dismissed.

Next, defendants argue that plaintiffs' First Amendment free speech and free exercise claims in Counts I and III fail to state a claim upon which relief can be granted. Although defendants have cited the applicable Twombly/Iqbal plausibility standard in their memorandum of law filed in support of their motion to dismiss plaintiffs' complaint, they have not incorporated that standard into their arguments seeking dismissal of the First Amendment claims in Counts I and III. Instead, defendants contend, for example, that intermediate scrutiny should be applied, not strict scrutiny, but that the amended act survives either; and that the amended act imposes no substantial burden on plaintiffs' exercise of religion. These are substantive arguments more appropriately made in opposing plaintiffs' request for a preliminary injunction or for a permanent injunction, not arguments that plaintiffs' complaint is somehow insufficiently pleaded. Thus, defendants have advanced an insufficient basis to dismiss Counts I and III. In any event, in light of this court's finding below that plaintiffs have made a substantial showing of a likelihood of success on the merits of their claim

under the Free Speech Clause of the First Amendment, defendants' motion to dismiss Counts I and III is denied.

Next, defendants argue that plaintiffs' Coates-Snowe Amendment claim in Count IV fails because: (1) § 238n prohibits discrimination against any "health care entity" which "includes an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions," 42 U.S.C. § 238n(c)(2), and therefore the only plaintiff afforded protection is Dr. Gingrich; (2) there is no private right of action under § 238n; and (3) even if there were such an action, plaintiffs have failed to state a claim under § 238n. The relevant part of the Coates-Snowe Amendment prohibits health care entities that receive federal financial assistance from discriminating on the basis that the entity refuses to perform or provide training in the performance of abortion or to refer for abortion or such training. Id. § 238n(a). However, because the court agrees that the Coates-Snowe Amendment does not confer a private right of action for such discrimination, it need not reach defendants' other arguments. Section 238n does not contain an express private right of action and a strong presumption exists against creation of an implied right of action. See Endsley v. City of Chi., 230 F.3d 276, 281 (7th Cir. 2000). Instead, enforcement of § 238n is left up to the Department of Health and Human Services which may terminate funding in the event of non-compliance. See 45 C.F.R. § 88.2. Plaintiffs do not cite any legislative history to suggest a private right of action was intended nor do they cite any decision where such an action has been recognized. Therefore, this court, "will not imply a private right of action where none appears in the statute," Endsley, 230 F.3d at 281, and Count IV is dismissed.

Next, defendants argue that plaintiffs' equal protection claim under the Fourteenth Amendment fails because they have not pleaded dissimilar treatment of similarly situated classes. Defendants also argue that Count V should be dismissed because plaintiffs' equal protection claim adds nothing to their First Amendment free exercise claim. Irrespective of whether plaintiff's have identified similarly situated groups that are treated dissimilarly under the amended act, they have pleaded that such differential treatment impairs their fundamental right of freedom of religion. Plaintiffs do maintain that they have stated an Equal Protection claim by pleading dissimilar treatment of similarly situated classes, but they do not dispute the contention that their equal protection claim adds nothing to their First Amendment claims. Consequently, the court agrees that plaintiffs' Fourteenth Amendment Equal Protection claim in Count V is unnecessary and redundant in light of the more specific First Amendment free exercise claim in Count III. See Goodman v. Carter, No. 2000 C 948, 2001 WL 755137, at *7 (N.D. Ill. July 2, 2001) (finding a separate equal protection analysis unnecessary because "the protection afforded religious practice by the Equal Protection Clause is no greater than that granted by the First Amendment"). Accordingly, Count V is dismissed.

Finally, defendants argue that plaintiffs' claims against Governor Rauner should be dismissed because he is not a proper defendant in a case challenging the constitutionality of a state statute. In support of this argument, defendants cite Johnson v. Rauner, No. 15 C 131, 2016 WL 3917372, at *3 (N.D. Ill. July 20, 2016) (dismissing Governor Rauner as defendant in an action challenging the Sex Offender Registration Act on constitutional grounds); Illinois League of Advocates for the Developmentally Disabled v. Quinn, No. 13 C 1300, 2013 WL 5548929, at *4 (N.D. Ill. Oct. 8, 2013) (citing Ex Parte Young, 209 U.S. 123, 157 (1908), in concluding that Governor Quinn was

not a proper defendant because the proper defendant has some connection with the enforcement of the challenged law and the governor's general obligations to enforce the law are insufficient); Weinstein v. Edgar, 826 F. Supp. 1165, 1166 (N.D. Ill. 1993) ("Implicit in the right to sue state officials for prospective injunctive relief, however, is the requirement that the state official bear some connection with the enforcement of the challenged statute."). In response, plaintiffs do not take issue with these authorities or maintain that they are somehow inapplicable or distinguishable. Instead, plaintiffs simply argue that the injunction issued in Morr-Fitz, Inc. v. Quinn, 2012 IL App (4th) 110398, ¶ 84, enjoined "all defendants" which included Governor Pat Quinn. The problem with plaintiffs' argument is that there is no indication that Governor Quinn ever moved to dismiss the claims brought against him in Morr-Fritz. Accordingly, the claims against Governor Rauner are dismissed and he is terminated as a defendant in this case.

### III. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs move, based on their claim under the Free Speech Clause of the First Amendment, for a preliminary injunction enjoining defendants from enforcing the amended act to the extent that enforcement would penalize health facilities or professionals who object to furnishing information about other health care providers who offer abortion or who object to describing abortion as a beneficial treatment option.[1] Defendants' oppose the motion. When bringing a motion for a preliminary injunction, plaintiffs must demonstrate: (1) that they are likely to succeed on the merits of their claim; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "The purpose of [a preliminary injunction] is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Trump v. Int'l Refugee Assistance Project, 582 U.S. ___, No. 16-1436, 2017 WL 2722580, at *5 (U.S. June 26, 2017). The Seventh Circuit has recently explained that in First Amendment cases such as this the likelihood of success on the merits is the lynchpin factor:

> [I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor. That is because even short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. So the analysis begins and ends with the likelihood of success on the merits of the [First Amendment] claim.

Higher Soc'y of Ind. v. Tippecanoe Cty., Ind., 858 F.3d 1113, 1116 (7th Cir. 2017) (citations omitted). "[T]he threshold for demonstrating a likelihood of success on the merits is low." D.U. v. Rhoades, 825 F.3d 331, 338 (7th Cir. 2016). "[P]laintiff's chances of prevailing need only be better

---

[1] Plaintiffs also move for a preliminary injunction based on their claim under the First Amendment Free Exercise Clause. However, because the court grants plaintiffs a preliminary injunction based on their First Amendment Free Speech claim and has enjoined enforcement of the amended act against them, the court need not address plaintiffs' free exercise claim. The parties will have a full and fair opportunity to litigate that claim as this case moves forward.

5

than negligible." Id. The court will therefore address the likelihood of plaintiffs' success on the merits of their First Amendment Free Speech claim.

The First Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, prohibits states from enacting laws "abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause of the First Amendment provides protection from both government suppressed speech and government compelled speech. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., ___ U.S. ___, 133 S. Ct. 2321, 2327 (2013) ("It is . . . a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say."); Knox v. Serv. Employees Int'l Union, Local 1000, 567 U.S. 298, 309 (2012) ("The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves."). Thus, the First Amendment prohibits not only direct burdens on speech, but also indirect burdens that are created when the government conditions receipt of a benefit on compelling or foregoing constitutionally-protected speech. See Perry v. Sindermann, 408 U.S. 593, 597 (1972). This principle, known as the unconstitutional conditions doctrine, acknowledges that the government, having no obligation to furnish a benefit, nevertheless cannot force a citizen to choose between a benefit and free speech. Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 59-60 (2006); Perry, 408 U.S. at 597.

The parties dispute the proper level of scrutiny that should be applied to the amended act. Defendants contend that intermediate scrutiny applies to legislation like the amended act which regulates professional speech. Plaintiffs, on the other hand, contend that the amended act is subject to strict scrutiny because it is a content- and viewpoint-based regulation.

In support of their position, defendants argue that federal courts have generally applied intermediate scrutiny to regulations aimed at medical professionals. For example, defendants cite National Institute of Family and Life Advocates v. Harris, wherein the Ninth Circuit applied intermediate scrutiny to a California law requiring all pregnancy-related clinics to disseminate a notice stating the existence of publicly-funded family-planning services, including contraception and abortion. 839 F.3d 823, 828 (9th Cir. 2016). The Ninth Circuit only did so, however, after concluding that the law, while content-based because it required speech on a particular matter, did not discriminate based on viewpoint because it "applies to all licensed and unlicensed facilities, regardless of what, if any, objections they may have to certain family-planning services." Id. at 835. Thus, neither Harris nor the other cases cited by defendants stand for the proposition that content-based laws that discriminate based on viewpoint are subject to intermediate scrutiny.

In any event, in this court's view, any dispute about the applicable level of scrutiny to be applied to the amended act is resolved by the Supreme Court's recent decision in Matal v. Tam, 582 U.S. ____, No. 15-1293, 2017 WL 2621315 (U.S. June 19, 2017). In Tam, the question of whether trademarks are commercial speech to which the relaxed scrutiny, i.e. intermediate scrutiny, applied was left unanswered in the opinion of the Court because the Court concluded that the regulation under review did not withstand even relaxed scrutiny. Id. at *18-19. Nevertheless, in concurring opinions, five justices agreed that even commercial speech that is viewpoint discriminatory is subject to heightened or strict scrutiny. Id. at *23 ("Commercial speech is no exception, the Court has explained, to the principle that the First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.

Unlike content based discrimination, discrimination based on viewpoint, including a regulation that targets speech for its offensiveness, remains of serious concern in the commercial context." (citations omitted) (Kennedy, J. with Ginsburg, Sotomayor, and Kagan J.J.); id. at *25 ("I also write separately because I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as commercial.") (Thomas, J., concurring in part and concurring in judgment)). Thus, it is clear that the prevailing view of a majority of the Supreme Court is that content-based laws that discriminate based on point of view, even if for the purpose of regulating commercial or professional speech, are still subject to strict scrutiny.

In this case, there is a substantial likelihood that plaintiffs will be successful in demonstrating that the amended act is content-based because it "[m]andat[es] speech that a speaker would not otherwise make" which "necessarily alters the content of the speech." Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 795 (1988). Defendants do not advance a discernible argument that the amended act is not content-based. The parties do dispute, however, whether the amended act is viewpoint discriminatory. A law discriminates based on viewpoint when it regulates speech "based on the specific motivating ideology or the opinion or perspective of the speaker [and] is a more blatant and egregious form of content discrimination." Reed v. Town of Gilbert, Ariz., 576 U.S. ___, 135 S. Ct. 2218, 2230 (2015).

Defendants maintain that the pre-existing ethical standards of informed consent governing the medical profession, which are incorporated into Illinois law, unambiguously require health care providers to disclose all relevant treatment options to their patients. Defendants argue that the HCRCA was amended to ensure that health care providers with conscience-based objections to certain treatments nevertheless provide their patients with certain information to make an informed decision regarding their health, and thus the amended act is not a viewpoint-based law.

However, the HCRCA was enacted to excuse health care providers from performing legal treatment options like abortion because they had conscience-based objections and the HCRCA provided them with protection from any resulting civil liability or professional discipline. 745 ILCS 70/4. The HCRCA also excused such health care providers from referring their patients to other providers who would perform the abortion and excused them from in any way assisting, counseling, suggesting, recommending, or participating in abortion as a legal treatment option. Id. The amended act fundamentally changes the HCRCA by conditioning its protection on a protocol requiring health care providers with conscience-based objections to abortion to now do some of the things the HCRCA formerly excused them from doing. In particular, the amended act now requires plaintiffs to inform their patients about abortion and counsel them on the risks and benefits of abortion. Id. § 70/6.1(1). In addition, if requested by the patient or her legal representative, those with conscience-based objections must now either refer their patient to a provider who will perform the abortion, transfer her to a provider who will perform the abortion, or provide her with the information about other providers who will perform the abortion. Id. § 70/6.1(3). It is clear that the amended act targets the free speech rights of people who have a specific viewpoint. Thus, plaintiffs have demonstrated a better than negligible chance of succeeding in showing that the amended act discriminates based on their viewpoint by compelling them to tell their patients that abortion is a legal treatment option, which has benefits, and, at a minimum and upon request, to give their patients

the identifying information of providers who will perform an abortion. Moreover, in conditioning the protections of the HCRCA on compelled speech, the amended act has potentially violated the unconstitutional conditions doctrine. See Rumsfeld, 547 U.S. at 59-60 (explaining that while the government has no obligation to furnish a benefit it cannot force a citizen to choose between a benefit and free speech); see also United States v. American Library Ass'n, Inc., 539 U.S. 194, 210 (2003).("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.").

A comparison to the regulation under review in Harris demonstrates the viewpoint discrimination present in the amended act. The law being challenged in Harris required that all licensed and unlicensed pregnancy-related clinics disseminate a notice stating the existence of publically-funded family-planning services, including contraception and abortion. Harris, 839 F.3d at 828-29. In concluding that the law did not discriminate based on the point of view or ideology of the compelled speaker, the court in Harris relied on the circumstance that the law applied to all pregnancy-related clinics "regardless of what, if any, objections they may have to certain family-planning services." Id. at 835. In contrast, the amended act under review in this case applies only to health care providers with conscience-based objections to certain legal treatment options such as abortion. Therefore, the court finds that plaintiffs have demonstrated a likelihood of showing that the amended act discriminates against health care providers that are of the point of view that abortion is wrong by compelling only them to speak a message that, from their viewpoint, is abhorrent.

Having found that plaintiffs have demonstrated a likelihood of success in showing that the amended act is content-based and viewpoint discriminatory, the amended act will be subject to strict scrutiny, that is, it must be the least restrictive means of achieving a compelling state interest. See McCullen v. Coakley, 573 U.S. ___, 134 S. Ct. 2518, 2530 (2014). Defendants contend that even if strict scrutiny applies, the amended act survives because it is the least restrictive means of protecting Illinois' compelling interest in protecting the health and autonomy of its citizens by ensuring that they receive information that they need to make informed medical decisions. Plaintiffs argue that defendants have not demonstrated a need for the compelled speech, let alone a compelling state interest in having those with conscience-based objections to make these statements to their patients. Defendants also argue that the requirements of the amended act, particularly the compelled discussion of abortion as a legal treatment option and providing the patient with information about other health care providers who they reasonably believe may offer abortion, are clearly not the least restrictive means to achieve this interest when this information is or could be provided through other means such as telephone directories and internet websites. At this stage of the litigation and on this record, suffice it to say that defendants have yet to satisfy their burden of proving that the compelled speech requirements of the amended act are the least restrictive means of achieving its interest. See St. John's United Church of Christ v. City of Chi., 502 F.3d 616, 646 (7th Cir. 2007) (noting that under strict scrutiny review, the government bears the burden of proving both elements). In contrast, plaintiffs have demonstrated a better than negligible chance of showing that Illinois has multiple options less restrictive than compelling those with conscience-based objections to abortion to communicate to a patient that abortion is a legal treatment option as well as the information she will need to obtain an abortion. Moreover, the special concern of overburdening speech is implicated when, as here, the compelled speech is on a matter of public debate:

> Regardless of whether less restrictive means exist, the Services Disclosure overly burdens Plaintiffs' speech. When evaluating compelled speech, we consider the context in which the speech is made. Here, the context is a public debate over the morality and efficacy of contraception and abortion, for which many of the facilities regulated by Local Law 17 provide alternatives. [E]xpression on public issues has always rested on the highest rung on the hierarchy of First Amendment values. Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. A requirement that pregnancy services centers address abortion, emergency contraception, or prenatal care at the beginning of their contact with potential clients alters the centers' political speech by mandating the manner in which the discussion of these issues begins.

Evergreen Ass'n, Inc. v. City of N.Y., 740 F.3d 233, 249 (2d Cir. 2014) (citations omitted).

The court finds further that even if the intermediate scrutiny applicable to laws regulating professional or commercial speech were applied in this case, see Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York, 447 U.S. 557, 561-62 (1980), plaintiffs have demonstrated a better than negligible chance of showing that the amended act would still likely fail. Once again, at this stage of the litigation and on this record, defendants have not proven that the amended act is narrowly tailored to achieve a substantial government interest. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 71 n.20 (1983) ("The party seeking to uphold a restriction on commercial speech carries the burden of justifying it."). Plaintiffs have, on the other hand, demonstrated a better than negligible chance of showing that a law compelling the health care provider with conscience-based objections to abortion to serve as the source of information about the legal treatment option of abortion and to serve as a directory of health care providers performing abortions is not narrowly tailored to achieve a substantial government interest. For these reasons, plaintiffs have demonstrated a likelihood of success on their First Amendment Free Speech claim and a preliminary injunction will issue.[2]

## IV. CONCLUSION

For these reasons, defendants' motion to dismiss is granted in part and denied in part. Plaintiff's motion for a preliminary injunction is granted. The Secretary of the Illinois Department of Financial & Professional Regulation is hereby enjoined pursuant to Federal Rule of Civil Procedure 65(a) from enforcing the amended act to the extent that enforcement would penalize health care facilities, health care personnel, or physicians who object to providing information about health care providers who may offer abortion or who object to describing abortion as a beneficial

---

[2] Even if the court were to consider the remaining factors, the court would find that they weigh in favor of granting the preliminary injunction. The second factor is satisfied because irreparable harm is presumed. See Christian Legal Soc'y v. Walker, 453 F.3d 853, 867 (7th Cir. 2006) ("Violations of First Amendment rights are presumed to constitute irreparable injuries."). With respect to factors three and four, the court concludes that in balancing the equities in consideration of the public interest, Illinois is not harmed by preliminarily enjoining the enforcement of a law that probably violates the First Amendment. See Higher Soc'y of Ind. 858 F.3d at 1116. Moreover, the legal right to an abortion is widely known and a person desiring such a procedure, except in the most extraordinary circumstances, would have little difficulty in finding a provider.

treatment option. This preliminary injunction is effective until the conclusion of this action or further order of the court.

Date: 7/19/2017                                ENTER:

                                                                                                    _____
                                                                                                     FREDERICK J. KAPALA

                                                                                                     District Judge