# EXHIBIT C

# EXHIBIT B

# Illinois State House: Human Services Committee Hearing on SB 1564

*Committee Hearing on Amendment to the Illinois Healthcare Right of Conscience Act*
Wednesday, May 13, 2015

Order of speakers:
Lori Chaiten, ACLU (proponent)
Mindy Swank (proponent)
Maura Quinlan, OBGYN (proponent)
Anna Paprocki, Americans United for Life (opponent)
Debbie Shulz, Lifetime Pregnancy Help Center (opponent)

**Lori Chaiten:** Healthcare providers can refuse to participate in any service they object to on religious grounds. But, when they do so, their patients must still be told about their legal treatment options in accordance with current standards of medical care. What do we mean by legal treatment options? We've heard much about things like genital mutilation. That is not a legal treatment option. That is not something a doctor would have to talk about with their patient. However, if a pregnant woman's water breaks, at an early point in pregnancy, when the fetus is not viable, and she is at risk of her…her life is at risk, she's at risk of life threatening infection and hemorrhage, the standard of care requires that she be told about all of her treatment options, including the option of ending her pregnancy to prevent infection, to prevent hemorrhage and other harm. This is a legal treatment option.

Opponents claim that the bill imposes a new mandate in Illinois law — they're wrong about that. Illinois law already says that doctors can be sued for malpractice if they fail to get informed consent from their patients, if they fail to give patients information about legal treatment options in accordance with medical standard of care. 1564 simply makes clear that the same standard of care applies when healthcare providers object to providing care on religious grounds. Their patients must still get the information they need. Their patients cannot be left in the dark.

Opponents complain that they should not have to talk about the benefits of healthcare they oppose. But the standard of care requires that an informed consent discussion between a doctor and a patient include a discussion of the risks, the benefits, and the alternatives of the patient's treatment options. Healthcare providers cannot choose to withhold any of that information. If an individual provider does not want to have that conversation with a patient, someone else in their facility can step in and do so. But the patient cannot be denied important medical information. They cannot be left in the dark.

Opponents claim the bill violates federal law and will deprive IL billions of dollars of federal funds. As six members of the IL congressional delegation made clear in their letter to you, these opponents are wrong. The federal laws they're talking about involve penalties for discriminating against healthcare providers who refuse to perform, participate, or refer to abortion. They do some other things as well, but that's the relevant part.

SB1564 is not about discrimination. It is about ensuring that patients get information when healthcare providers object to care on religious grounds. In other words, it's about accommodating religious belief, not discriminating because of it.

Indeed, if a healthcare provider is discriminated against, rather than accommodated under the Healthcare Right of Conscience Act, theres an express provision that permits them to pursue a claim of discrimination, a claim of damages.

In addition, this bill does not require any healthcare provider to perform, participate in, or refer for any healthcare. Illinois is simply not at risk for losing federal funds because it passes a law that gives patients standard of care information and protects them from harm.

Finally, opponents complain that CPCs would have to talk about abortion. If a CPC holds itself out as a healthcare provider, the medical standard of care applies.  That means that they have to accurately have to discuss a patient's treatment options with her. If they don't and the patient suffers harm, they won't be able to use the HEALTHCARE RIGHT OF CONSCIENCE ACT to shield themselves from liability.

They cannot claim to be providing all options to their patients and then just withhold the information they don't like. The notion that patients should be able to count on their healthcare providers to give complete and accurate information about their medical condition should not be controversial.

SB1564 is a reasonable change in the law that creates important protections for Illinois patients. I urge you to vote yes on this bill. Thank you.

**Chair:** Thank you very much. I'd like to note that we're winding down on time in terms of – before session, so let's make sure that testimony is succinct and factual.

**Mindy Swank:** Good morning. My name is Mindy Swank, and I am pleased to be with you today. A few years ago, after my first son was born, my husband Adam and I were happily expecting our second child.

Unlike my first pregnancy, this pregnancy was not to be easy. Weeks into my pregnancy, doctors told us that the baby suffered a number of severe anomalies. At 20 weeks, as we were coping with that news and trying to understand how our lives would change, my water broke.

The doctors told us that the baby was not going to live. We were heartbroken, but our nightmare was just beginning. When we learned that my water had broken, the doctors told me that waiting to miscarry could lead to hemorrhage and infection. I knew that these complications could threaten not only my future fertility, but also my life.

And as the mother of a young son, that worried me. Adam and I prayed together, talked at length, and in the end, decided to terminate the pregnancy. It was a difficult decision for me, as someone raised in a conservative and religious home, but my baby was not going to live and my health was at risk. This was the best decision for my health and for my family.

The doctors responsible for my care couldn't help me end the pregnancy and avoid these risks to my health. The reason for this is because the hospital operated under religious restrictions imposed by the Catholic Church. They could not provide me the care I needed to keep me from getting sick. I could only get help if I was already infected or hemorrhaging. Adam and I were confused and frustrated. We attempted to go to a secular hospital a few hours away for help in terminating the pregnancy, but we could not get the procedure covered by our insurance at that hospital, and we could not afford to pay for the services out of pocket.

We understand that the barrier to our insurance covering the procedure resulted from the religious hospital's failure to provide adequate records showing that the procedure was medically necessary. Had the religious hospital made my health information available, our insurance would have provided coverage. Without any other options, we simply went home to wait.

A few weeks later, I woke up bleeding. Adam took me to our local hospital, a hospital that also follows the Catholic healthcare restrictions. The doctors there told me that I was not sick enough

for them to induce labor and help end the pregnancy. I was told to monitor my bleeding and temperature and come back if i bled more or had a fever. No one offered to help us find somewhere else to go that was not limited by religious restrictions. No one talked to us about options other than waiting to get sick enough for them to help us.

Over the next five weeks, I went to the same hospital four different times. Each time, bleeding and seeking care. At 27 weeks, I woke up bleeding a lot more than I had been. Desperate to prove I was sick enough for them to treat me, I brought to the hospital all the pads and clothing I had bled through. the doctors decided I was sick enough to induce delivery. I gave birth to a baby boy, I regained consciousness, and he died within a few hours.

No one should ever have to go through this. I urge you to pass this bill and ensure that other couples will get the information they need to make informed healthcare decisions and to access the care that they need. Thanks.

Chair: Representative Cassidy moves that SB 1564 do pass

(background conversation) Thank you, we shall be voting now

For the record, Bellock is on the            (inaudible) now.

**Maura Quinlan:** Good morning. My name is Maura Quinlan. I am a board-certified OBGYN with a masters in public health and maternal and child policy. i am the chair of the illinois section of the American College of Obstetricians and Gynecologists, commonly called ACOG, and I am testifying today in support of SB 1564.

SB1564's changes to IL law are needed to protect patients and providers. IL law currently allows doctors, hospitals, and other healthcare providers to not give a patient information that conflicts with the provider's religious beliefs. This is contrary to doctors' basic ethical obligations to deny patients the information patients need in order to understand their medical condition, consider their treatment options, and obtain care. This is also inconsistent with ACOG's policy that prioritizes patient-centered care and autonomous decision making. I have seen patients have to wait for necessary medical care because professionals in a religiously affiliated hospital struggled with whether providing the needed care conflicted with their hospital's religious directives. I have also seen patients who were not told about all their treatment options because of a hospital's religious directive.

By requiring protocols for when healthcare providers object to providing information and care on religious grounds, SB 1564 will improve patient access to essential medical information and will reduce confusion and delay in their accessing care.

Patients seeking healthcare should not have to wonder if they're receiving complete information about all of their treatment options. A patient who delivers or plans to deliver at a Catholic hospital and wants or needs a tubal ligation, needs to be informed about the religious restrictions affecting her care in time for her to ensure that she can deliver at a hospital that will perform the procedure at the time of the C-section or immediately after birth.

A patient in the process of miscarrying who needs medical intervention to protect against hemorrhage and infection should know about all the standards of treatment options, including surgical options and where she can go to get such care.

Women of reproductive age should be given complete information of all appropriate contraceptive options for avoiding unintended pregnancy. All of what I have described is the standrad of care within my specialty. SB 1564 will assure that patients seeking care at religious institutions also get this standard of care information.

It's important, as has been mentioned, that this proposal still allows my colleagues in Illinois in refuse care based on religious objections, but they have to do so in accordance with procedures

designed to protect the patient, make sure that the patient gets information about her condition and treatment options – information she's entitled to.

The existing law only speaks to the needs of the doctor who has the religious objection. THis b ill will add the needs of doctors who want to give full information to patients but work in religious hospitals, and most importantly, the essential needs of the patients.

SB 1564 simply brings Illinois law in line with established medical ethics, medical ethics that I learned at my Catholic medical school, that requires healthcare providers to take into account patients' interests when the provider is asserting a religious objection. In this way, every patient can act according to his or her own conscience, just as readily as the physician can. As a physician who cares for Illinois patients everyday, I cannot stress enough the importance of this bill. On behalf of myself as a physician and on behalf of the Illinois section of the American College of OBGYNS, I strongly urge this committee to support SB 1564.

**Chair:** Thank you, and thank you Mindy for sharing your story. Are there opponents with oral testimony?

Are there questions of the proponents at this time?

The Chair recognizes Representative Breen.

**Breen:** Thank you, Madame Chairman. I just want to get the scope of the bill straight. As a representative, as I understand it, this law will regulate all doctors' offices, not just hospitals, but it's all doctors' offices across the state, is that right?

Woman (Quinlan?): Yes

**Breen:** And that would include as well – I, I see dispensaries on the list – is that, so pharmacies are also included?

**Chaiten:** Ahh, not really

**Breen:** I think under the HEALTHCARE RIGHT OF CONSCIENCE ACT, which we know applies to pharmacies, I believe that this also – they're considered healthcare facilities-

**Chaiten:** The bill talks about providing, um, correct medical information, and I don't think that pharmacies are in a position to, um, explain medical information to their patients.

**Breen:** Because they wouldn't't-

Another Woman [NAME]?: So yeah, basically, Illinois law, common law and statutory law creates certain duties for different kinds of healthcare providers – duties that they owe their patients. So pharmacists owe their clients, their patients, a certain kind of duty. If those healthcare providers are seeking the special protections that Illinois law already provides under the HEALTHCARE RIGHT OF CONSCIENCE ACT, not to meet everyone of those duties, not to perform a particular kind of care, not to administer a particular type of drug, then they have to do so in accordance with protocols that are designed to ensure that the patient will get what they need, and the specifics of the protocols that are listed here, that this is language that was drafted by the Catholic Conference, by the Illinois State Medical Society, and by the Catholic Health Association, sets a floor, sets a minimum, but obviously what we're talking about and what the bill says is that , within that duty, if you're seeking an out from the HEALTHCARE RIGHT OF CONSCIENCE ACT, you need to adhere to a protocol that your healthcare facility has designed that ensures that the patient will get the information they need, about how they access that care.

Breen: The question was- does it apply to pharmacies-

**Chaiten:** Right-

**Breen**: So it does apply to pharmacies?

**Chaiten**: Pharmacists, if pharmacists are – if pharmacies and pharmacists are seeking an exemption under the HEALTHCARE RIGHT OF CONSCIENCE ACT, they will have to do so in accordance with this type of protocol.

**Breen**: Sure. And, and I believe that the Morphits (sp) vs. Blago, and the Morphits vs. Quinn Act, I believe that the ACLU was involved as an amicus in the side of the state in that case, probably. I'm assuming you guys were there. So this could actually impact the holding of the fourth district in the Morphits (sp) vs. Blago case. It could.

**Chaiten**: It would say – so that decision came out of the HEALTHCARE RIGHT OF CONSCIENCE ACT. And that's an important decision. And there, the Illinois Appellate Court read this statute and said, mm-mm. There aren't any protections for patients. This is only protecting healthcare providers. And so, what this bill does is it says that, where those pharmacies want to refuse to return a patient's prescription, they want to refuse to transfer a patient somewhere else, they got to do so in accordance with protocols that are designed to ensure that a patient gets the information they need.

**Breen**: Well, Lori, it doesn't say anything about refusing to return a prescription-

**Chaiten**: Well, that is what they're seeking- what they're doing. You're asking about a factual situation, and I'm answering about a factual situation.

**Breen**: So now we've got the scope. So it's pharmacies, all doctor's offices, hospitals. We've got pregnancy centers confirmed earlier. So how- I want to get to how this bill will be enforced. So the requirement on, I believe on doctors' offices and pregnancy centers – would that be enforced by IDFPR? Is that normally the entity that would regulate a doctor's license, I believe.

**Chaiten**: So the bill does not contain, for example, an enforcement mechanism where a state agency has an obligation to come in and examine the protocols. The way this works is when a healthcare provider is seeking a carve out, an exemption from their duty to their patients, under the HCRA, they only get those special protections that Illinois already provides them, if they deny the care, deny the- the service that they find objectionable, in accordance with protocols that are designed, that were created by the facility in which they work, and are designed to ensure that the patient gets what they need.

**Breen**: And I respectfully disagree with your contention about it being a duty, but who enforces this law?

**Chaiten**: So, if the provider denies care, denies information, doesn't tell the patient that they have certain treatment options, and the patient is harmed, the patient could sue the provider for malpractice. Today, as we sit here, they have a defense under the HEALTHCARE RIGHT OF CONSCIENCE ACT.

**Breen:** Wait – wait – sue for malpractice for not-?

**Chaiten**: for not giving full options, for not telling the patient that they could, for ex- if they're miscarrying at 18 weeks, and they don't tell them that one of their options is to terminate that pregnancy, and that patient becomes infected and loses her future fertility, as we sit here today, arguably, that provider gets protections under the HEALTHCARE RIGHT OF CONSCIENCE ACT. What we want to see is that there be protocols in place that ensure that the patient gets that information. And if they don't, that patient has a cause of action against that provider.

**Breen**: Wait, wait, under the existing-

**Chaiten**: – IDPR has a disciplinary mechanism, but what we are doing is saying that, "yes, you get to refuse, you get to adhere to your religous beliefs, but your patient cannot be harmed as a result of it."

**Breen**: Just to be clear then, IDFPR could take action against a, a healthcare provider, a doctor in, I believe – they regulate doctors, and I'm not sure who regulates nurses and other medical professionals.

**Chaiten**: We have statutes that regulate healthcare providers, and for example under section 22 of the medical practice act, if a healthcare professional behaves in an unprofessional manner, there is a very long list of things that define them as unprofessional, then IDFPR can step in. If IDFPR steps in-

(Breen trying to talk)

**Chaiten** continues: If they adhere to the protocols that this bill would require, then they cannot be disciplined. They still get the protections that the HEALTHCARE RIGHT OF CONSCIENCE ACT allows.

**Breen**: But only if they adhere to protocols.

**Chaiten**: If they do not adhere to protocols, and their refusal harmed a patient, then, their – potential, I mean it depends on the facts of the case, of course, but there are those mechanisms. That's how medical practice is governed in Illinois. All we're saying is that patients whose doctors and nurses who object, get to have the same protections that other patients have.

**Breen**: Well, again, though, we're just trying to figure out how this – without a specific enforcement clause, I'm presuming, then, that IDFPR would promulgate rules to enforce this particular law, and then, I mean – hospitals are governed by the department of public health…

**Chaiten**: You can presume all you want. I can't say that – what I am saying to you that the HEALTHCARE RIGHT OF CONSCIENCE ACT today doesn't have those rules. The HEALTHCARE RIGHT OF CONSCIENCE ACT is a statute that creates raw protectins and exemptions for healthcare providers. All this bill does is it says: You get those protections, but your patient also has to be protected.

**Breen**: Again – the reason –

**Chaiten**: And so, the way that the healthcare right of conscience

**Chair**: Thank you very much for the very spirited-

**Breen**: I just want to ask my question and get a quick answer.

**Chair**: Please make sure we're speaking one at a time

**Breen**: The reason I'm asking, Madame Chairman, is that Senator Biss on the floor in the Senate said that corrective action would be taken if a facility or provider didn't follow this law, or this bill, and so I'm worried – what is that corrective action? Because we're not hearing a clear statement of what is the corrective action?

**Chaiten**: So the clear statement is what I said previously: Illinois law creates duties of healthcare providers to their patients. The HEALTHCARE RIGHT OF CONSCIENCE ACT as it exists today, allows healthcare providers to not adhere to all of those duties. This bill says: you get those special protections that Illinois law has created for you under the HEALTHCARE RIGHT OF CONSCIENCE ACT, but you only get them if you've adhered to a protocol that's designed to ensure that your patient isn't harmed. And I'm paraphrasing, I'm not speaking the whole thing.

**Breen**: Just so – I want to be clear. What the contention is, is that there is a duty under the current – there is a duty under one set of Illinois law – the medical practice act – to provider either ref- well, or there is a common law duty –

**Chaiten**: There is a common law and the standard of care –

**Breen**: To either provide an abortion, refer for an abortion, or do information for an abortion, and then the HEALTHCARE RIGHT OF CONSCIENCE ACT has exemptions to that, and without those exemptions applying, then that is the base duty.

**Chaiten**: This bill is not about providing abortion or referring for abortion, or participating in abortion. This bill is about the standard of care that doctors have to adhere to in order to not be committing malpractice, in order to be treating their patients appropriately. And so, depending on the context in which a patient comes to a doctor, and depending on that patient's needs, the standard of care would dictate the kind of care that the patient gets. The doctor gets to refuse to provide that care, but this bill says the patient gets the information they need so they don't suffer harm as a result. So I'm not – I'm really not going to let you put words in my mouth.

**Breen**: Well again, we're trying to figure out, and you raised the issue of Pregnancy Centers. Usually those are technicians or nurses who are doing the work. Everybody keeps talking about doctors, but I'm really worried about nurses and technicians who are in a setting where – they don't want to hand a list of local abortion clinics to a particular client who asks for it.

**Chaiten**: and there is absolutely nothing about this bill that requires them to hand a list of local abortion clinics. What I'll say about pregnancy centers is that they vary dramatically in what they do and how they hold themselves out. But if you look at, for example the website of – I think it's called – Lifetime Medical Center here in Springfield, their website says: "Come to us! We give all options, counseling. We will talk to you about all of your options." So that they're objection today is that they don't want to talk about abortion, how is it that they're meeting their duty to patients when they hold themselves out as healthcare providers who are saying that they're going to give all options counseling. In terms of if they don't provide the care, what this bill says is that they have a choice. And again, this is language that came from the Catholic Conference. They can either refer – which we know that some providers do – they can transfer, which many of the Catholic hospitals said they will do with a miscarrying patient, or if they aren't comfortable doing any of those things, they can provide written information about other providers who they reasonably believe may provide the care they're denying. And keep in mind, that can simply be: "there's an OBGYN practice down the street that offers full service care." They can talk to you, they can counsel you, they can facilitate your access to care that we won't provide.

**Breen**: And just – we

**Chair**: I'm sorry to interject. I know you may have more questions. We still have oppositional testimony, and we also have other members of the committee who have questions for this particular panel.

**Breen**: And, Madame Chairman, I'm just trying to figure out, because we're hearing different answers here, and I want to understand, when you say "reasonably believe may" that is the language of providing information, and you've stated, well "I can send you to a gynecological practice that has full service, so I know that they will include abortion amongst their services."

**Chaiten**: That is not what I said.

**Breen**: Well, you said "full service," so I assume what you mean by that is that they will provide abortions. Again, I can't hand you a list –

**Chaiten**: Well, they will refer for abortion, or they will talk to the patient about all of their options. And if the patient says "I choose termination," they will assist that patient in – they will facilitate access to that care. That is the healthcare that is being denied. Not only does the CPC not provide abortion, but they won't refer for abortion. THey won't facilitate access to abortion or to whatever other care they disapprove of. If they say "You know what, there's a doctor down

the road you can go to." That doctor might in fact help that patient understand what her treatment options are and where she can go to get that care.

**Chair**: Thank you very much, Lori. In the interest of time, and in the spirit of the intention of the bill, we're going to move for – we're going to allow Representative Jesiel to ask her question. Obviously, termination of pregnancy is one of many healthcare options that might be available to a woman and her reproductive health, so let's move forward to Representative Jesiel.
25:25

**Representative Jesiel:** Thank you, Madame Chair. Question for sponsor, or possibly the attorney – ACLU attorney. I'm just wondering if this bill also provides firstly for any of the ASTCs or PSTCs that provide for pregnancy termination services. Are those facilities required conversely to provide alternatives for pro-life?

**Chaiten**: They are required – they are healthcare facilities. They are doctors and nurses and other healthcare providers, and the healthcare facility. They have duties just like other healthcare providers do under Illinois law to make sure that they get informed consent from their patients. And as I said in my testimony, that includes talking about risks, benefits, and alternatives. So yes, in fact, and in fact, they do, if a patient comes in and they're not sure, and they want to have that conversation, and they decide in the end that they don't want to terminate their pregnancy, they will assist them in accessing care elsewhere. They will refer them to somebody who can provide prenatal care, etc. So yes, this, if this is not, again, it's not a bill about abortion. If you have a system in place in Illinois that sets up these duties for how healthcare providers offer their patients care. We're just making sure that all patients get that.

Jesiel: Okay. I just wonder if – question for the sponsor. Would you be willing to amend this bill to include that these types of surgical centers – Planned Parenthood, PSTCs – provide, that required to provide? Because you're saying that they may or they do, but could you require that they provide that kind of information, would you-?

**Chaiten**: They, they already come within the definition of a healthcare facility under the HEALTHCARE RIGHT OF CONSCIENCE ACT and elsewhere in Illinois laws. They're already covered. If your concern is that – I mean, pregnancy crisis centers aren't mentioned in the bill, either. So, the only – it's just says medical doctors, nurses.

**Jesiel**: You know, the only point I'm making is that, if we're going to require people who, by conscience are objecting to having to provide some of that information, perhaps there could be the other consideration on the other end – to provide as a matter of treatment or an option of treatment for pro-life services, or ways to not terminate or carry to term-

**Gabel**: We can look at it. I – I – you know, we can talk about it. Um, there's just a time crunch. So it may be putting it in the record, but we can talk about it.

**Chair**: Are there other questions for the proponents? We still need to get to the opponents. Thank you very much. (inaudible talking)

And, as the opponents come forward, um, let's please be mindful of the time that we take, um, in times of testimony and I ask that repr- that members of the committee also be mindful of the time they take for questions. Thank you.

**Chair**: So, please state your name and your position:

**Anna Paprocki:** Thank you. I'm Anna Paprocki. I'm an attorney with Americans United for Life. And I thank you for the opportunity to speak with you today. I'm not only speaking to you today in my capacity as a lawyer with AUL, but also as a woman and a patient in Illinois. The reach of this bill is very broad. It does, as we've heard, impact crisis pregnancy centers.

There's over 30 medicalized pregnancy help centers, crisis pregnancy centers, that are healthcare facilities that will be required under this bill to participate by giving information about abortion providers. They're forced to violate their core mission. These centers exist to offer women hope and alternatives to abortion, but under this bill, they, at minimum, have to provide in writing a list of providers they reasonably believe will provide the service they object to. So, a generalized list is not acceptable, a generalized list of OB's wouldn't be acceptable. They have to reasonably believe that these providers provide abortion. So, it violates their core mission. There isn't – it doesn't – it's not acceptable to their core mission to find someone else in their facility. These facilities exist to offer women alternatives to abortion. Now, Ms. Swank's story is very sad. This bill does not address Ms. Swank's story. It goes far beyond that. Illinois law already does – already requires the transfer of requested medical records. Illinois law – the conscience law itself explicitly states that doctors have the duty to inform their patients about their condition, prognosis, and risks, and doctors have to comply with emergency care standards. This bill goes much further than that, and requires all healthcare facilities to promote and facilitate abortions for any reason and at any stage of pregnancy.

Ms. Swank's story, as sad as it is, does not justify requiring crisis pregnancy centers to advertise for abortion clinics. It is also – it's not just that policy – it is a clear violation of federal law. There's a bipartisan letter from members of the Illinois federal delegation explaining the violations of the Cook-Snow amendment, the Hyde-Weld amendment, and the Church amendment. The Cook-Snow amendment, for example – long standing federal law – conditions Illinois' federal funding on assurance that this state won't discriminate against healthcare entities in positions that object not to just referring for abortion, but also if they refuse to make arrangements for abortion.

And this bill-

**Woman interjects:** I'm sorry, Madame Chair, I need to leave, but I would like to ask a question…

**Chair:** Ok, the roll is already open, and she would like to have the opportunity, so Representative Flowers.

**Flowers:** I need clarity. Right now, how is this bill violating your – the current law, in regards to your right of conscience?

**Paprocki**: To mine personally? Well, as a patient in Illinois, I seek care at an OB that –

**Flowers**: Ok, I'm sorry, not your right – as a doctor. How is this violating the current law?

**Paprocki**: I think my OBGYN's practice is a perfect example. So I go to Downers Grove OBGYN. I choose to go there because they are authentically pro-life, because they in no way refer or arrange for abortion. And that's consistent with – and I choose to drive a distance to go see them – and –

**Flowers**: Ok, wait a minute, let me just – because – and that's your choice. But if I were to go there, and under your scenario, that doctor could refuse to care for me because of this, under your scenario.

**Paprocki**: No, actually, the Illinois HEALTHCARE RIGHT OF CONSCIENCE ACT in no way allows a doctor to discriminate against a patient. It allows a doctor to refuse to participate in a service that violates his or her conscience. So it would not, based on grades, based on lifestyle, would not allow-

**Flowers**: If I needed the service, if I needed the service, and if meant my life, see the difference – this is my concern about this legislation. A doctor take a [sic] oath to do no harm, and so, in this business, there are certain things that you will have to do because you never know what the

situation of the patient's gonna be. So, for a doctor to know that my life might be, my life is in this doctor's hands, and because of his right of conscience, he could refuse my care. Fine! Can you just tell me where I can go to get help?

**Paprocki**: Well, the Illinois Conscience Law already requires doctors to comply – it's explicit that doctors have to comply with emergency medical standards. There's not-

**Flowers**: Let's pretend like there's not an emergency. Let's pretend like I just need this information. Let me tell you my conflict, okay? Back in 1999, I passed the patient, the patient's bill of rights to remove gag orders from doctors, because back in those days, the HMO's were prohibiting doctors from telling patients about their pre-existing conditions, and some of them died as a result of that. So I'm asking you, are – is this leaving the gag orders on doctors that will not be able to tell me if you don't want to do it, where can I go?

**Paprocki**: No, doctors can tell you, if it doesn't violate their conscience, there's no – nothing in this, the HCRA-

**Flowers**: But it might violate their conscience, but it would be the right thing to do in regards to doing no harm to the patient.

**Paprocki**: But, but a doctor who takes an oath to do no harm – and many Catholics and non-Catholics alike believe that abortion harms not only the baby who is going to be killed in this, but also the women. So, what this law does is it actually forces a lot of doctors to violate what they believe they've took with the Hippocratic oath to do no harm to their patients in promoting and facilitating a procedure that harms them and their child.

**Chair**: Ok, thank you –

**Flowers**: Well, this bill is – I have not read – I know what the bill implies. But abortion clinics and abortions is not in this legislation, so I have to deal with the language that's here. So, with all due respect, I would like to be recorded as voting yes.

**Chair**: Ok, thank you, Representative Flowers. And, uh, Representative Andrade and Wallace are both voting in favor of SB1564.

Please continue with your testimony. Thank you.

**Paprocki**: Yeah, well, and I just on that – I just want to go back to the violations of federal law that were misconstrued earlier. It is very clear how this violates the Cook-Snow amendment, Church amendment, and the Hyde-Weld amendment, and I know you've all received a letter from the Illinois federal delegation – a bipartisan letter explaining those violations. The stakes are very high with the loss – potential loss of all federal funding, including but not limited to the federal chair of medicaid, um, but there's also free speech concerns with this. Federal courts have already struck down similar requirements on pregnancy centers, and that would subject the state to costly litigation about free speech concerns.

And I did just want to – again, um, and you know, I'm sorry that Representative Flowers had to leave us, and just reiterate that this denies me my choice to see a provider that authentically and wholly respects life. My doctor's office, I think is a prime example of who is impacted by this bill. There would be new duties imposed on them to have – to provide, um, you know, written referrals or in- get the information, and that denies me my opportunity that I'm blessed to have in my area. It denies me my choice.

**Debbie Shulz:** My name is Debbie Shulz, and I'm the founder and executive director of Lifetime Pregnancy Help Center here in Springfield, and I am honored to be here to present opposition to SB 1564. I want to tell a story about one of our clients. Bri came in on a summer, warm afternoon, with her mother. She had already had a positive home test, and she said that when she read that result, she felt paralyzed. She then went to Planned Parenthood to have that result

confirmed. And, uh, at that time she had not told her parents yet, but she felt like she had to have an abortion. And the reason why was because, Bri was a good student. She was involved in her highschool poms, and in her show choir. This was her senior year, and she was looking forward to all the adventures and promises that come along with senior year. She was also anticipating going away to college the next Fall and being able to live an independent life. But she felt like being pregnant unexpectedly was going to hinder those dreams. So she did tell her mother, and being adopted and coming from a large family, uh, her biological mother chose birth for all of her children.

But yet, Bri was to the point of desperation, where she could only think about her senior year. Her mom encouraged her to come to Lifetime, and so I sat down with Bri and I talked to her about all of her options. I talked to her about adoption, I talked to her about parenting, I talked to her about abortion. I gave her factual information about abortion procedures, about the risks involved with abortion – psychologically, physically, emotionally, relationally, spiritually. And I also talked to her about my personal testimony, of how abortion affected me 20 years – when I was 20 years old. That abortion decision has affected me the rest of my life.

Bri left that day, still wanting to have an abortion overwhelmed by her circumstances, but at least she had information. She was determined that she was going to do her own research. She went online, and she read about other teens and their responses to abortion that they had and the regrets that they felt. But she was sure that that wouldn't be her reaction. She felt very anxious, because she knew that the time was short on making this abortion decision. She came back to Lifetime, and I again shared with her in more detail the actual procedures, the risks, and in more detail how abortion has impacted my life.

She later shared with me that the conversations that she had at Lifetime those two times, as well as, uh, visiting with her doctor, that she realized what the right thing was to do for her. She had her first ultrasound, and she didn't expect to fall in love like she did. Hearing that heartbeat and seeing the tiny body move was truly a miracle. That was a defining turning point in her decision. She stayed in. "That was my baby, I've chosen life for my baby."

She graduated from high school in October, she enrolled in Barber College, she continued working throughout her pregnancy, even though it was very difficult going through this journey all alone.

On February 7th, her baby girl arrived, delivered at 9lbs 12.5 oz. Bri stated that she felt overwhelmed, but not by regretting her decision, but by knowing that her life had just changed forever.

And this is a quote: "Aniah is now five years old, and it is amazing to look into her eyes and see what a blessing Lifetime Pregnancy Help Center was at such a crucial time in my life. My decision has never been second-guessed, and I could not be more satisfied with the outcome."

Bri is one of thousands of mothers who visit pregnancy centers every single year throughout Illinois, seaching for answers, looking for hope, looking for someone who cares. Since Lifetime opened six years ago, we have served over 1300 clients. Many of those joining our "earn while you learn" program, resulting in over 3800 client visits. This bill would require pregnancy center workers to violate our core mission, by referring mothers for abortions, for distributing information on where to obtain abortion.

It would also force us to discuss the so-called "benefits" of abortion. This directly tramps on our rights of conscience as healthcare providers and our religious beliefs. Abortions destroy a human life, the most vulnerable in our society, and can bring devastating effects on the mother and

family, as I personally have experienced. And Lifetime and other pregnancy centers throughout the state cannot have any part in promoting that destruction. Thank you so much.

**Chair**: Thank you. As the roll's already open, I would like to add Representative Ammons as a yes vote.

Are there any questions?

Recognizing Representative Fine.

**Rep Fine:** Good morning. Uh – good morning. Thank you for being here today. Listening to your story, it sounded to me like you were arguing in favor of the bill, because you said that this young lady came to you and you told her what her options were, and then she was able to make her decision. So I think the key word here, is people know their options. And, to me, my understanding of this legislation is that it's not just for pregnancy options. What if I go to the doctor, and the doctor thinks, well, "I wouldn't do this for my kid, so I'm not going to tell you that you can do it for yours."

I think what you're doing by opposing this legislation is limiting my choices to decide what's best for me and my family when it comes to either my rights as a woman, or my rights for my children, or if something happens to one of my family members.

Um, this, uh – this same situation could happen – what if you have a family member who's in the hospital on the brink of death, and the doctor says to you, "well, you could, you know, let them – we could stop feeding them, or we could give them medications to ease their pain." That should be my choice, but I need to know what those choices are. And I think this is very important legislation to explain to me what my choices are as a patient. And if I'm in denied right of that knowledge, I think it would just be wrong. So I thank you for bringing forward this bill.

**Shulz**: If I may address that clarification – that we do offer the information, because we do believe it's very important that everyone be able to make an informed decision. We're not there to tell anyone what to do. The difficulty in this bill is that we'd be required to refer our clients to get an abortion, a written referral where they can get an abortion. That's a referral, and that completely goes against our right of conscience. That's where the conflict for me as a pregnancy center, comes in. I can't speak to the other health issues. Maybe Anna can.

**Chair**: Would, um, Representative Gabel – is that the -?

**Gabel**: – a referral – it says that they do have to provide them in writing with – the exact language is – to a – they will have to provide in writing – written information to the patient about other healthcare providers who they reasonably believe may offer the healthcare services, the healthcare facility, physician, or health personnel refues to permit, perform, or participate in because of a conscience-based objection. So they would, as we've talked about earlier, they could give – she could – a paper with one name on it. This an OBGYN – they may have information on what you're seeking. They do not have to have a list of abortion clinics, absolutely not, as we've said, they have to provide a name of some provider – healthcare provider that they reasonably believe, um, uh, may, uh, offer or have more information about this. I mean, uh, you know, and I'm, I'm very happy that the woman made the right choice for her, and it's – it's, uh, a beautiful story. And to me the key in that whole story was that the woman had her options and could decide what to do.

**Paprocki**: And I just want to clarify – and you read the language, but it says "you reasonably believe may offer" not "or refer" so you have to reasonably believe that these are abortion-providing healthcare providers, so that is –

**Gabel**: – that is not true

**Paprocki**: Or any – but use abortion as an example, since this is where there are a lot of – where the rubber meets the road. There's a lot of conscientious objection to abortion. So this is a very concrete example where we're going to see conscience violations, but going to your question, just very quickly. I think that even talking about how crisis pregnancy centers, pregnancy help centers – how they talk about abortion. They do talk about abortion, so in some ways, again, it's – you're, what your point, I think – with your question. Her testimony illustrates that there isn't a problem that abortion isn't being talked about. The sticking points in this are, are that you have to talk about benefits of abortion, so what does that mean? And also, the written referral or giving information on where to obtain abortions.

**Chaiten**: Can I just briefly respond to that?

**Chair**: I'm sorry – I'm gonna allow you to do that as well. And we also have Representative Cassidy with a question. But when we speak about risk, benefits, um, harm, no harm, we're talking in a – in the most objective, scientific manner, in terms of medical terminology, not necessarily if you have an abortion this will greatly benefit you. It is if you're at risk and this pregnancy needs to be terminated, the benefit would be your life will be saved, or you will not get infection. Um, and yes, there are many other conscious [sic] – um, there are many other issues that might be a result of conscious [sic] objective. I mean, there are some religious beliefs that blood transfusions should not be allowed. But, if I am bleeding out, should I not be allowed to have access to that? So just trying to allow this conversation to shift away from being – it only being about abortion, because this bill covers way more medical situations, maybe more medical issues that people may or may not object to due to the doctor's own religious beliefs.

Um – Lori, and then we'll go to Representative Cassidy. Let's move a little more quickly.

**Chaiten**: Well, thank you, 'cause that just took away one of the things I wanted to talk about – about the benefits, that a patient who is at risk for harm needs to understand the treatment option will help them. So thank you for that. I want to very briefly, and I'm happy to talk to anybody afterwards if necessary, but I want to be clear. This written piece of infor- this written document is not a referral – does not require a referral. It says that they reasonably believe may offer the healthcare service that the healthcare facility, physician, or healthcare personnel refuses to permit, perform, or participate in on conscience grounds.

So, if I'm a crisis pregnancy center, and one of the things I refuse to participate in is I won't refer for abortion, that's something I won't do, but I have to make sure I'm sending that patient somewhere else where I reasonably believe they may have a fuller discussion about other places where the person could access care. That's why the OBGYN down the road works in that context. This isn't a referral, it's not a requirement for referral, and again, it is only what's required in order to avoid liability in case the patient is harmed because you didn't give them what they needed.

**Chair**: Thank you. Representative Cassidy.

**Cassidy**: Lori, to that point, and they may sound a little silly, especially we've hardly use them anymore, but could this reasonably be the "O" page from the Yellow Pages? Here are all the Obstetricians in the city?

**Chaiten**: So, I would like to think that a healthcare professional wouldn't just hand the Yellow Pages-

**Cassidy**: Well, we'd hope they'd do better than that, but in theory-

**Chaiten**: In theory, if they have a reasonable belief – they look at their community's Yellow Pages, and they know which ones will in fact have a full conversation about where a person might go for the care that they need, then, give the Yellow Pages with a check mark if that's

what needed, but make sure the patient doesn't leave in the dark. This is about the patients really just not knowing where to turn.

**Cassidy**: My point is simply that we're not demanding that they do exhaustive research, and – interview and all of that. We're simply making sure that they provide some options and alternatives.

**Chaiten**: And that was, in fact, the language used by the folks who were representing the Catholic Conference. When we were talking about this language, they said: "We don't want to have to get out the research on who's gonna do it." But they were willing to say – if we have a reasonable belief that when we send the patient on, they'll get what they need without us needing to be a part of it, that will work. So, reasonably believe that they may offer the care in terms of participating in, referring that's being denied.

**Cassidy**: Thank you. As someone who had to be born in a different state than my family lived in because of the restrictions of the only hospital in my hometown and my mother's medical situation, I fully appreciate what we're trying to accomplish here. Please add me as a sponsor if I'm not already.

**Chair**: Thank you. Do we have any other questions? Representative Breen.

**Breen**: Yes, Ma'am. I wanted to ask you a question: Do you believe in good conscience, that a Christian can hand someone a list of, for a woman seeking an abortion. Can a Christian in good conscience hand that woman a list of places that you believe will offer that woman an abortion?

**Shulz**: No.

**Breen**: So, if that's true, then your pregnancy center may shut down if this bill passes.

**Chair**: Ok. Thank you for everyone who has testified. I'm going to briefly share a story of a very close friend of mine – in fact, my very best friend. Um, going through a divorce, had her reproductive options available to her. She had the mirena, the most recent IUD, inserted after the birth of her fourth child. Again, she was going through a divorce and didn't want to bring any more children into the marriage. The mirena ruptured her uterus – she had to have an invasive surgery to have that piece of material removed, and in between the removal of the mirena and going onto another longterm birth control option, she became pregnant again. Um, various abusive complications with the relationship, in terms of refusal of sexual intercourse with the person she was married to, but that's a whole 'nother story.

She became pregnant again, and she was worried, because after having recently had that surgery, and having recently had a hole in her uterus, how could she continue this pregnancy?

She went to her doctor to find out what she could best do. Her doctor did involve the right of consciousness [sic] and said that "I cannot, um, tell you, you know, what additional things." After about three and a half weeks, she was alternately able to see a provider who was able to assist her, and she learned that the developing embryo, or fetus at that point, had attached to a blood clot. Had this pregnancy gone to term – and the heart rate was low at that point, anyway. And her life was at risk, and those weeks of waiting and waiting, she may have very well left her four children without a mother, and so…I just share that story because we talk so much about abortion and termination of pregnancy, and then we had Mindy share her awful story, and I went into labor with my son at 28 weeks.

Um, and so, I think we have to detach this from the moral, pro-life, or pro-choice, or what have you, but what is right for the life of the patient. Will the patient survive? Will the patient be unharmed by, um, whatever the decisions that the healthcare providers are going to make? And if the answer is, the patient will not go unharmed, so in other words, if the patient will be harmed, we have to allow them to seek medical attention from someone who will save them from

infection, from whatever harm it will be. And we don't need to do that in a way that burdens our conscience.

As the roll is already open, I will vote yes. And, we'll continue to take the roll.

Gabel – yes

Cassidy – yes

Demmer – no

Fine – yes

Jesiel – no

Soto – yes

Stewart – no

Bellock – no

Breen – "And because existing law already covers, according to what Ms. Chaiten said, the situations that have been dealt with, in particular the one that was just related by the chairman, and because it would shut down the state's pregnancy centers, I vote no."

Chair: Thank you. With there being 8 voting in favor, 4 [sic] voting opposed, and 0 voting present, SB1564 will be favorably reported to the House Floor.