# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-cv-50310 |
| v. | ) ) ) | Hon. Rebecca R. Pallmeyer |
| BRYAN A. SCHNEIDER, et al., | ) ) | Magistrate Judge Lisa A. Jensen |
| Defendant. | ) ) | |
| RONALD L. SCHROEDER, et al., | ) ) | |
| Plaintiffs, | ) ) | Case No. 17-cv-04663 |
| v. | ) ) ) | Hon. Rebecca R. Pallmeyer |
| BRYAN A. SCHNEIDER, et al., | ) ) | Magistrate Judge Lisa A. Jensen |
| Defendant. | ) ) | |

**BRIEF OF AMICI CURIAE AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, ILLINOIS ACADEMY OF FAMILY PHYSICIANS, *ET AL.*, IN <u>OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT</u>**

**INTEREST OF AMICI CURIAE**

Amici are organizations and physicians committed to supporting autonomy, independent decision-making, respectful treatment, excellent medical care, and access to quality reproductive healthcare, for everyone. Amici have a particular interest in this case because they are or act on behalf of physicians committed to providing the best medical care they can to all their patients, and because some of them participated in the legislative process that led to the amendments to the Health Care Right of Conscience Act. A full list of amici is attached as Exhibit 1.

**ARGUMENT**

Illinois law and professional ethics require physicians and other health care professionals to adhere to a standard of care. Under that standard, medical professionals must give patients all relevant information about their medical circumstances and the risks, benefits, and alternatives of their medical treatment. Without this information, patients cannot give informed consent, a central tenet of medical law and ethics. In general, when a patient suffers an injury because a health care professional fails to impart information consistent with the standard of care, the medical professional is subject to tort liability and professional discipline.

In 1977, Illinois adopted the Health Care Right of Conscience Act, 745 ILCS 70/1, *et seq*., ("HCRCA"), which accommodates the religious beliefs of health care providers by immunizing them from liability or discipline when they refuse to provide treatment that violates their conscience. All too often, religious health care facilities, physicians and other medical professionals have taken the HCRCA as license to withhold standard of care information at the expense of their patients' health and autonomy. When this happens, patients suffer actual harms. This brief describes real-life examples of patients who suffered such harm—like a patient who bled for weeks and finally had to collect pads filled with blood to prove that her pregnancy was

1

sufficiently life threatening to justify its termination.

For decades, health care providers argued that the HCRCA protected them from liability and professional discipline for withholding standard of care information. Illinois courts agreed that the HCRCA gave health care providers[1] absolute immunity even when their conscience-based refusals of health care injured a patient. Finally, in 2016, the Illinois General Assembly amended the statute with a narrow set of protections for patients. The bill's proponents consulted with diverse stakeholders and responded to the concerns of religious organizations to produce a bill that protected patient health while continuing to protect the free exercise of religion. Plaintiffs' lawsuits aim to disrupt this delicate balance.

## I. RELIGIOUS REFUSALS OF HEALTH CARE CAN CAUSE SERIOUS HARM TO PATIENTS.

Unlimited immunity from liability for conscience-based refusals of medical care may inflict serious physical and emotional injuries on patients. These harms are compounded when health care professionals refuse to follow the legally and ethically mandated standard of care. That standard requires medical professionals to tell patients what they need to know in order to make informed decisions about their health care, including information about a patient's medical condition, the risks and benefits of particular treatment options, and how to obtain that treatment.

### A. Illinois patients have suffered actual harm from religious refusals of care.

The following examples of Illinoisans illustrate the serious physical and emotional trauma patients may suffer when doctors or hospitals refuse to provide standard of care information or treatment on religious grounds.

---

[1] For purposes of this Brief, "providers" refers collectively to health care facilities, physicians, and other health care personnel, as those terms are defined in the HCRCA, 745 ILCS 70/3. The HCRCA amendments apply to all of these persons and entities.

2

**Mindy Swank**[2]

In 2009, 20 weeks into her second pregnancy, Mindy Swank's water broke prematurely, and she went to her local hospital. There, doctors told her that the fetus would not survive the pregnancy due to severe fetal anomalies. She could terminate the pregnancy, or wait to miscarry. Since a miscarriage could cause life-threatening hemorrhaging and infection and destroy her capacity to have children in the future, she asked her doctors to terminate her pregnancy.

Mindy learned that her doctors would not help her because the hospital adhered to the Ethical and Religious Directives for Catholic Health Care ("ERDs"),[3] which prohibit abortions. The hospital would help end Mindy's pregnancy only if she was already infected and hemorrhaging. Mindy tried to get care elsewhere, but her insurance would not cover the procedure because the hospital refused to provide adequate records showing that the procedure was medically necessary.

Mindy waited until she woke up bleeding a few weeks later. She went to a different hospital this time, but it turned out to be another Catholic health care facility also bound by the ERDs. The doctors told her that she "was not sick enough for them to induce labor and help end the pregnancy." The doctors told Mindy to come back if she bled more or had a fever. No one offered to help Mindy find a secular health care facility where she could end her pregnancy. Nor did they present her with any options other than waiting to get sick enough to justify ending the pregnancy under the ERDs.

---

[2] *See NIFLA v. Schneider*, Case No. 16-cv-50310, Dkt. 92-4, Pls.' Stm't of Undisputed Facts, Ex. C, Illinois State House: Human Services Committee Hearing on SB 1564, May 13, 2015 ("Pls.' Ex. C") at 4–5, testimony of Mindy Swank.

[3] United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care, Sixth Ed.* (June 2018), http://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf.

3

Mindy repeatedly returned to the hospital over the next five weeks, as she suffered increasingly painful, heavy bleeding. At 27 weeks, she woke up severely hemorrhaging. To prove that she was sick enough to be treated, she brought all of the pads and clothing she had bled through to the hospital. After weighing the bloody pads against an empty one, doctors were finally convinced that there was enough blood to justify terminating the pregnancy.[4] Mindy gave birth to a baby boy who never gained consciousness. She spent the next three hours watching him struggle for breath until he died in her arms.[5]

**Melanie Jones**[6]

Melanie Jones, 28, used an intrauterine device, or IUD, for birth control. In December 2008, Melanie slipped and fell in her bathroom. After days of severe pain, cramping, and vaginal bleeding, she found a gynecologist at a Chicago hospital on her insurance company's list of in-network providers. The doctor said that her IUD was "expelled and needed to be removed." The doctor did not remove the IUD, however, because she believed that doing so would violate the ERDs, which the hospital followed. The hospital refused to refer Melanie elsewhere because, it said, "every other hospital in her network" followed the same restrictions.

The hospital did not tell Melanie that as long as the IUD was in place, she was at risk for infection, cervical and uterine lacerations, and scarring. Eventually, Melanie was able to change her insurance and see another doctor. After two weeks of unrelenting pain, bleeding, and humiliation, the IUD was removed in mere seconds.

---

[4] Video: *Extended Interview: Mindy Swank*, Full Frontal with Samantha Bee, TBS (Oct. 27 2016), https://www.youtube.com/watch?time_continue=19&v=9finqZJJNA8.

[5] *Id.*

[6] *See generally* Melanie Jones, *The Religious Directives Are an Assassination on Women's Rights and Women's Character*, BIRTHRIGHT (May 14, 2019), https://www.birthrightfilm.com/news/2019/4/2/the-religious-directives-are-an-assassination-on-womens-rights-and-womens-character; Melanie Jones, *I Needed Treatment, Not Judgment From My Catholic Hospital*, ACLU (Aug. 30, 2016), https://www.aclu.org/blog/reproductive-freedom/religion-and-reproductive-rights/i-needed-treatment-not-judgment-my.

**Angela Valavanis**[7]

When Angela Valavanis was pregnant with her second child, she gave her obstetrician a birth plan. Under the plan, if Angela needed a caesarean section, she would undergo a tubal ligation at the same time to prevent future pregnancies. Obstetricians frequently perform these procedures together to avoid the risks associated with a second surgery.[8]

Angela's labor lasted three days, culminating in an emergency C-section. Angela reminded the doctor that she wanted a tubal ligation, but was told that she could not have one because the hospital's ERDs barred the procedure unless medically necessary. After spending three days at the hospital, this was the first she had heard about any potential limitations on her care. Angela underwent the C-section surgery without the tubal ligation. Two years later, she still had not undergone a tubal ligation because she did not want to endure another surgery.[9]

**Darolyn Lee**[10]

Darolyn Lee did not want children, so she used a long-acting birth control implant. When the implant was due for replacement, she called her Medicaid Managed Care Organization ("MCO") to ask about having it replaced.[11] The MCO gave her the name of the provider nearest to her home, a Catholic hospital. Darolyn called the hospital and asked for an appointment to

---

[7] *See generally* Berry-Jester, Anna Maria, et al., *Why Religious Health Care Restrictions Often Take Patients By Surprise,* FIVETHIRTYEIGHT (Aug. 2, 2018), https://fivethirtyeight.com/features/why-religious-health-care-restrictions-often-take-patients-by-surprise.

[8] Debra B. Stulberg, et al., *Tubal Ligation in Catholic Hospitals: A Qualitative Study of Ob-Gyns' Experiences*, 90 CONTRACEPTION 422 (2014), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4154979/pdf/nihms-593764.pdf.

[9] Emmy Weikert, *Woman Denied Tubal Ligation Moments Before Surgery*, POPCULTURE (Aug. 11, 2015), https://popculture.com/trending/2015/08/11/woman-denied-tubal-ligation-moments-before-surgery-.

[10] *See generally* Charge of Discrimination, Charge No. 2018CP2109, Ill. Dep't of Human Rights (Mar. 29, 2018), https://www.aclu-il.org/sites/default/files/field_documents/lee_charge_of_discrimination.pdf.

[11] Although Darolyn's denial of care occurred after the 2016 HCRCA Amendments, they demonstrate the type of everyday harm in the form of delays in care to which patients may be subject.

5

replace her birth control implant. When she arrived for her appointment, she told the receptionist that she was there to have her birth control replaced. She saw a primary care provider, who told Darolyn that she could not replace her birth control, but did not explain why. Instead, she told her to make an appointment with the hospital's obstetrics and gynecology department for contraceptive services. The provider also told Darolyn that having babies is a beautiful experience and that all women "should be required" to have children.

As instructed, Darolyn made an appointment to see an obstetrician-gynecologist at the hospital, telling the person on the phone that she needed her birth control replaced. When she arrived, she also told the receptionist the purpose of her visit. In the exam room, the medical practitioner told Darolyn that she did not "do birth control," but could perform a pap smear instead. Darolyn declined. The hospital never explained why it refused to give her the health care she requested. Instead, it delayed Darolyn's care by more than two weeks, shamed her for not wanting to become pregnant, and wasted hours of her time—an hour's bus travel for each appointment plus time spent making and attending the appointment.

These four accounts demonstrate why the State must place reasonable limits on immunity for conscience-based refusals of health care.

### B. Refusal to provide medical information is often as harmful as refusal to provide a particular medical procedure.

Many of the injuries described above would not have happened or would have been less severe if the doctors had given their patients basic information under the standard of care. That is why health care providers offering reproductive health services must "impart accurate and unbiased information," including all "scientifically accurate and professionally accepted

6

characterizations of reproductive health services," tailored to the patient's needs.[12] Withholding such information may cause delays, which may increase the risks of a particular treatment, decrease its effectiveness, or—in the case of time-sensitive treatments such as emergency contraception and abortion—foreclose it altogether.[13]

For example, Angela did not know that her hospital would reject her birth plan until it was too late. Had someone told her this up front, she could have given birth elsewhere. Similarly, Mindy did not know that her hospital would refuse to terminate her pregnancy to preserve her health until her life and future fertility were already at risk. She was unable to receive treatment elsewhere because the hospital refused to release relevant medical information. In Melanie's case, the hospital would not give her information about where she could have her IUD removed, and failed to explain the risks of leaving the device in place. Darolyn told hospital personnel that she wanted to have her birth control replaced every time she scheduled, checked in for, and attended an appointment. Yet no one told her that the hospital would not provide this treatment. Instead, they brought her in for two humiliating appointments without ever providing the medical care she sought.

Incidents like these are not isolated. Many patients are unaware of the scope of the restrictions on care in religiously affiliated hospitals.[14] Many patients also lack feasible alternatives. According to a 2016 report, one in six (16.6 percent) acute care hospital beds in the

---

[12] Am. Coll. of Obstetricians and Gynecologists, Committee on Ethics, *The Limits of Conscientious Refusal in Reproductive Medicine* (Nov. 2007, *reaff'd* 2019) https://www.acog.org/-/media/Committee-Opinions/Committee-on-Ethics/co385.pdf.

[13] Mark R. Wicclair, *Conscientious Objection in Health Care: An Ethical Analysis* 105 (Cambridge University Press 2011).

[14] Debra Stulberg, et al., *Women's Expectation of Receiving Reproductive Health Care at Catholic and Non Catholic Hospitals*, 51 PERSPECTIVES ON SEXUAL AND REPRODUCTIVE HEALTH 119 (Sep. 2019).

United States were in Catholic hospitals.[15] In Illinois, the proportion is far greater, 29.5 percent.[16] Forty-six Catholic hospitals, including one in Illinois, were the sole providers of short-term acute hospital care for people living in their geographic regions.[17] The pervasiveness of religiously affiliated hospitals, combined with the limited networks of many insurance plans, contribute to the widespread incidence of harms like those described above.

### C. Patients risk similar harms at crisis pregnancy centers.

While *amici* cannot speak to Plaintiffs' specific practices, many crisis pregnancy centers ("CPCs") withhold crucial information about their services. For example, for years, CPCs have purchased advertisements from search engines like Google that appear when a user searches for a term like "abortion clinic."[18] Google recently updated its policies to add the labels "provides abortions" or "does not provide abortions," to such ads, based on the advertiser's certification.[19] Anti-abortion groups reacted with fury, since the new policy makes it harder to "reach abortion minded women, a group that would normally never set foot inside a pro-life center."[20]

Misleading tactics go beyond advertising. According to multiple reports, once patients are in the door, many CPCs use a common set of tactics to limit patients' reproductive health options, including using "false information about abortion risks, misleading data on birth control,

---

[15] Lois Uttley, et al., *Growth of Catholic Hospitals and Health Systems,* MERGERWATCH at 1 (2016), http://www.mergerwatch.org/storage/pdf-files/MW_Update-2016-MiscarrOfMedicine-report.pdf.
[16] *Id.* at 5.
[17] *Id.* at 5–6.
[18] NARAL Pro-Choice Am., *Crisis Pregnancy Centers Lie: The Insidious Threat to Reproductive Freedom* 4 (2015), https://www.prochoiceamerica.org/wp-content/uploads/2017/04/cpc-report-2015.pdf [hereinafter "NARAL report"].
[19] Google, *Update to Healthcare and medicines policy: Abortion* (June 2019), https://support.google.com/adspolicy/answer/9297839.
[20] Brittany Raymer, *Google Is Taking Planned Parenthood's Side When It Comes to Abortion Advertisements*, THE DAILY CITIZEN (May 29, 2019), https://dailycitizen.focusonthefamily.com/google-is-taking-planned-parenthoods-side-when-it-comes-to-abortion-advertisements.

8

and emotionally manipulative counseling."[21] Some CPCs invent or exaggerate health risks of abortion, a procedure that is far safer than carrying a pregnancy to term.[22] For example, one study found that CPC staff would "routinely tell young women that abortions increase a woman's risk of contracting breast cancer by as much as 80%,"[23] despite evidence from the medical community firmly establishing that no link exists between the two.[24] Some CPCs also try to delay access to abortion care, often by manipulating women into other medical services and exaggerating the likelihood of miscarriage in early pregnancy.[25] In other situations, some CPCs completely ignore standard of care requirements and provide false or misleading information about contraception, fertility, and even the medical condition of a fetus.[26]

\* \* \*

Because so many medical professionals' failed to follow the standard of care when refusing treatment for conscience-based reasons, the General Assembly recognized that the existing HCRCA regime endangered patient health and autonomy. Instead of repealing the statute altogether, however, the legislature amended it to preserve the religious accommodation while ensuring that patients make informed decisions about their health care.

---

[21] S. Malia Richmond-Crum and Melissa Kleder, NARAL PRO-CHOICE MARYLAND FUND, THE TRUTH REVEALED: MARYLAND CRISIS PREGNANCY CENTER INVESTIGATIONS 5 (2008) https://maryland.prochoiceamericaaffiliates.org/wp-content/uploads/sites/11/2018/04/crisispregnancycenterreport.pdf.

[22] NARAL report, *supra* note 18, at 7–9.

[23] Richmond-Crum & Kleder, *supra* note 21, at 3.

[24] Melbye Mads, et al., *Induced Abortion and the Risk of Breast Cancer*, 336 NEW ENG. J. OF MED. 81 (1997) https://www.nejm.org/doi/full/10.1056/NEJM199701093360201.

[25] Richmond-Crum & Kleder, *supra* note 21, at 8. ("Thirty percent of women naturally miscarry, so there was no point in rushing to get an abortion . . .")

[26] *Id.* at 6 (Most CPCs do not provide information about or referrals for contraception; however in two investigations, the CPCs that did discuss contraceptives provided inaccurate information "stating that condoms have a 35% failure rate and that birth control pills will cause infertility and cancer."); Jennifer Carnig, *Abortion's foes resort to deception: What I found when I went to a crisis pregnancy center*, N.Y. DAILY NEWS (Nov. 5, 2010), https://www.nydailynews.com/opinion/abortion-foes-resort-deception-found-crisis-pregnancy-center-article-1.453393.

## II. MEDICAL PROVIDERS AND RELIGIOUS STAKEHOLDERS WORKED TOGETHER TO MITIGATE HARM TO PATIENTS AND PRESERVE RELIGIOUS LIBERTY IN THE HCRCA AMENDMENTS.

The proponents of S.B. 1564, which amended the HCRCA,[27] worked with diverse medical associations to achieve a balance between religious exercise and patient needs. They took pains to address the concerns of religious health care professionals. Due to this inclusive process, prominent medical and religious associations that had expressed religious liberty concerns withdrew their objections to the final bill.[28]

### A. As written and as interpreted by the courts, the original Health Care Right of Conscience Act allowed religious objections to trump patient health.

As written, the original HCRCA gave broad civil and criminal immunity to health care professionals who refused to provide medical treatment that violated their conscience. In 2012, an appellate court interpreted the HCRCA to make the right of religious refusal absolute, and the health of patients irrelevant. *Morr-Fitz, Inc. v. Quinn*, 976 N.E.2d 1160, 1175–76 (Ill. App. 4th 2012). The case arose from a 2005 administrative rule that, as ultimately amended, required pharmacies to make all FDA-approved medicines available to patients.[29] The rule did not include a religious exemption, but did allow the pharmacy to transfer the prescription to a different pharmacy upon the request of the patient. Three pharmacies challenged the rule and its amendments, claiming that they violated the HCRCA. One of the pharmacy owners testified: "his faith prevented him from selling emergency contraception and also from permitting his

---

[27] S.B. 1564, 99th Gen. Assemb., Reg. Sess. (Ill. 2016) (enacted) (amending 745 ILCS 70/1, *et seq.*).

[28] Victoria Fuller, *When Care and Conscience Conflict: Compelled Speech in the Amendment to the Illinois Health Care Right of Conscience Act,* 42 S. ILL. U. L.J. 297, 300 (2018) https://law.siu.edu/_common/documents/law-journal/articles-2018/winter-2018/9%20-%20Fuller.pdf ("SB 1564 was characterized by Senator Biss as a compromise between the Catholic Conference, the Catholic hospitals, the Medical Society, the American Civil Liberties Union, and Planned Parenthood.").

[29] In its original form, the rule applied only to emergency contraceptives. It was amended twice in the course of the litigation. *Morr-Fitz, Inc. v. Quinn*, 976 N.E.2d at 1165–66.

10

stores to stock the drugs or participating in a system through which he would transfer the prescription to another store to be filled." *Morr-Fitz, Inc. v. Quinn*, 976 N.E.2d at 1167.

The Secretary of the Illinois Department of Financial and Professional Regulation testified that the Department had promulgated the rule "to promote the health and well-being of residents" and "to establish a regulatory framework that would protect access to medications for all Illinois residents." *Id.* at 1168. The court, however, rejected the notion that the executive branch was "permitted to weigh the interests of women who seek emergency contraceptives against those of pharmacists. . . ." *Id.* at 1171. The court refused to consider patient health even to the modest degree allowed by Illinois Religious Freedom Restoration Act, under which the government may burden religious exercise only if doing so is the "least restrictive means" to further a "compelling government interest." *Id.* (quoting 775 ILCS 35/15). Rather, health care providers' religious prerogatives had complete primacy over the interests of patients.

Under this absolutist reading of the HCRCA, the State was powerless to address the harms that patients like Mindy, Melanie, and Angela suffered due to conscience-based refusals of health care without amending the statute itself.

**B. The Illinois legislature had ample evidence of the harms caused by the HCRCA.**

When the Illinois General Assembly considered S.B. 1564, it was well aware of the harms caused by religious refusals. The General Assembly heard from patients like Mindy Swank. She told both the Senate Judiciary Committee and the House Human Services Committee how a hospital put her life at risk and caused her weeks of severe pain—at a time when she was already grieving for the inevitable loss of her baby. Mindy publicly relived this trauma twice so no one else would have to go through such an ordeal. She emphasized that in order to make informed choices, patients need thorough, accurate information about their treatment options and prompt access to care.

11

The General Assembly also heard from Dr. Maura Quinlan, a board-certified OB/GYN, Master of Public Health in Maternal and Child Health Policy, and the then Chair of the Illinois Section of the American College of Obstetricians and Gynecologists ("ACOG").[30] Dr. Quinlan described seeing patients who came to her after a religious health care institution refused to provide them with healthcare or information about treatment options. These patients trusted that each doctor would provide them with complete and accurate information. They did not know that Illinois law put the religious rights of health care providers above their ethical responsibilities to and the rights of patients. Other physicians, patients and medical groups testified to the General Assembly about the danger of leaving patients in the dark as to their condition and treatment options.

The General Assembly also heard from the bill's sponsors, who spoke to its purpose. Senator Daniel Biss emphasized that S.B. 1564 was an opportunity for the legislature to bring the law into balance by including reasonable expectations to protect patients in Illinois.[31] Representative Robyn Gabel explained that "the notion that patients should be able to count on their health care providers to give them complete and accurate information about their medical condition and treatment options should not be controversial," adding "Illinois patients deserve this much."[32]

### C. The Amendments enjoyed broad support because they carefully balanced religious liberty with medical ethics and patient health.

Proponents of S.B. 1564 strove to protect patient health and autonomy while preserving health care professionals' freedom of conscience to the greatest extent possible. With that goal

---

[30] Pls.' Ex. C at 5–6, testimony of Dr. Maura Quinlan.
[31] Senate Floor Debate Transcript, 99th Gen. Assemb., Reg. Sess. (Ill. Apr. 22, 2015) at 192, http://www.ilga.gov/Senate/transcripts/Strans99/09900031.pdf.
[32] House Floor Debate Transcript, 99th Gen. Assemb., Reg. Sess. (Ill. May 25, 2016) at 52, http://www.ilga.gov/house/transcripts/htrans99/09900136.pdf.

12

in mind, stakeholders—including religious health care providers—consulted on the bill and negotiated a consensus that balanced medical ethics, the rights of patients, and the rights of health care providers.[33]

Sponsors and supporters of the bill consulted with medical organizations[34] to incorporate principles of medical ethics—particularly the fundamental principle of informed consent—into S.B. 1564.[35] In her testimony, Dr. Quinlan explained that, as written and enforced, the HCRCA ran contrary to a doctor's basic ethical obligation to provide patients with the information they need in order to understand their medical condition, consider treatment options, and obtain care.[36] The HCRCA's broad protections allowed providers to deny a patient care and refuse to inform them properly about their treatment options, while depriving them of legal remedy. S.B. 1564 would ensure "that the same standard of care applies when health care providers object to providing care on religious grounds."[37] This necessitates a "discussion between a doctor and a patient include the risks, the benefits and the alternatives of the patient's treatment options."[38] Requiring such a discussion would "bring Illinois law in line with established medical ethics."[39]

The bill's supporters also consulted with a number of Catholic and traditionally conservative organizations when drafting and advocating for the legislation.[40] Notably, both

---

[33] Pls.' Ex. C at 3–4, testimony of Lorie Chaiten.
[34] These included ACOG, Illinois Physicians for Reproductive Choice, and the Illinois Academy of Family Physicians.
[35] *See generally* Am. Med. Ass'n Council on Ethical and Judicial Affairs, Code of Medical Ethics Opinion 2.1.1: Informed Consent, https://www.ama-assn.org/delivering-care/ethics/informed-consent; ACOG, Code of Professional Ethics of the American College of Obstetricians and Gynecologists (2018), https://www.acog.org/About-ACOG/ACOG-Departments/Committees-and-Councils/Volunteer-Agreement/Code-of-Professional-Ethics-of-the-American-College-of-Obstetricians-and-Gynecologists
[36] Pls.' Ex. C at 5, testimony of Dr. Maura Quinlan, *supra* note 30.
[37] Pls.' Ex. C at 3, testimony of Lorie Chaiten, *supra* note 33.
[38] *Id.*
[39] Pls.' Ex. C at 6, testimony of Dr. Maura Quinlan, *supra* note 30.
[40] These included the Illinois Catholic Conference ("ICC"), the Illinois Catholic Health Association ("ICHA"), and the Illinois State Medical Society ("ISMS").

religious and nonreligious medical professionals involved in the process broadly agreed about the standard of care, and did not suggest that S.B. 1564 imposed new duties on providers.[41] Indeed, many religious health care providers already had protocols similar to those in the bill since, like most professionals, they wanted to follow the standards of their profession.[42]

Still, when certain Catholic organizations objected to some of the language of S.B. 1564, supporters of the bill addressed their concerns.[43] For instance, as introduced, the written protocols for conscience-based refusals included referral to a different health care provider upon request of the patient. Catholic health care ethicists and Catholic hospital lawyers objected to this language.[44] After negotiations among the stakeholders, the sponsors edited the bill to provide an alternative to referral, allowing health care providers to invoke a HCRCA defense by simply giving patients information about other health care providers whom they reasonably believe *may* offer the refused health care service. 745 ILCS 70/6.1(3). As the Senate sponsor explained, this change "was meticulously negotiated so that the Catholic hospitals and the Catholic Conference removed their opposition."[45]

Catholic organizations also opposed a protocol that would have ensured that "the refusal will not impair the patient's health by causing delay of or inability to access the refused health

---

[41] ILLINOIS STATE MEDICAL SOCIETY, 2016 UPDATES ON ISMS LEGISLATIVE ACTIVITY IN THE ILLINOIS GENERAL ASSEMBLY 20 (2016), https://www.isms.org/Governmental_Affairs/Legislative_Action_Hub/2016/documents/2016EndofSessionLegislativeReport; Catholic Conference of Illinois, *Agreement reached on conscience rights* (Apr. 16, 2015) https://www.ilcatholic.org/agreement-reached-on-conscience-rights.

[42] Senate Floor Debate Transcript (Apr. 22, 2015), *supra* note 31, at 193. (Senator Nybo to the bill stated: "[M]y understanding from the Catholic Conference is, what you are proposing here is essentially the way the Catholic hospitals operate currently.")

[43] *Id.* ("I want to applaud you for working not only with the Catholic Conference . . . but also . . . the Illinois State Medical Society.").

[44] Catholic Conference of Illinois, *Agreement reached on conscience rights* (Apr. 16, 2015) https://www.ilcatholic.org/agreement-reached-on-conscience-rights; ILLINOIS STATE MEDICAL SOCIETY, *supra* note 41, at 20.

[45] Senate Floor Debate Transcript, 99th Gen. Assemb., Reg. Sess. (Ill. May 31, 2016) at 46, http://www.ilga.gov/senate/transcripts/strans99/09900124.pdf.

care service."[46] Therefore, in the final version, the protocols addressed only *undue* delay—defined as "unreasonable delay that causes impairment of the patient's health"—in providing medical records to the patient or other health care providers. 745 ILCS 70/6.1(4).

Under the amended HCRCA, medical providers may still exert their right of conscience to refrain from providing a particular medical service. The statute now includes a "safe harbor" for such professionals by describing exactly what they must do to protect patient health and avoid liability. They must simply follow ethically mandated standards. The drafting process was a model of inclusivity that considered multiple viewpoints and arrived at language that was acceptable to physicians, patients, and religious interests. Because of this careful balancing, the HCRCA amendments protect both patient health and religious liberty.

## CONCLUSION

For the foregoing reasons, amici respectfully urge that the Plaintiffs' Motion for Summary Judgment be denied.

Dated: December 3, 2019

Respectfully Submitted,

/s/ Rebecca K. Glenberg
*Counsel for Amici Curiae*

Rebecca K. Glenberg
Ameri R. Klafeta
ROGER BALDWIN FOUNDATION OF
  ACLU, INC.
150 N. Michigan Ave., Suite 600
Chicago, IL 60601
(312) 201-9740
aklafeta@aclu-il.org
rglenberg@aclu-il.org

---

[46] S.B. 1564, 99th Gen. Assemb., Reg. Sess. (Ill. 2015) (version as introduced), http://www.ilga.gov/legislation/99/SB/PDF/09900SB1564.pdf; *see also* Catholic Conference of Illinois, *supra* note 44.