**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **NATIONAL INSTITUTE OF FAMILY** ) | |
| **AND LIFE ADVOCATES, d/b/a NIFLA;** ) | |
| **TRI-COUNTY CRISIS PREGNANCY** ) | |
| **CENTER, d/b/a INFORMED CHOICES;** ) | |
| **THE LIFE CENTER, INC., d/b/a TLC** ) | |
| **PREGNANCY SERVICES; and MOSAIC** ) | |
| **PREGNANCY & HEALTH CENTERS,** ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **No. 3:16 C 50310** |
| **BRYAN A. SCHNEIDER, in his official** ) | |
| **capacity as Secretary of the Illinois** ) | **Judge Rebecca R. Pallmeyer** |
| **Department of Financial & Professional** ) | |
| **Regulation,** ) | |
| **Defendant.** ) | |

| | |
|---|---|
| **DOCTOR RONALD L. SCHROEDER,** ) | |
| **1st WAY PREGNANCY SUPPORT** ) | |
| **SERVICES, and PREGNANCY AID SOUTH** ) | |
| **SUBURBS,** ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **No. 17 C 4663** |
| **BRYAN A. SCHNEIDER, Secretary of** ) | |
| **Illinois Department of Financial and** ) | **Judge Rebecca R. Pallmeyer** |
| **Professional Regulation,** ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

In August 2016, then-Governor Rauner signed into law an amendment to the Illinois Healthcare Right of Conscience Act. The amendment, adopted after negotiations with religious groups, directs that healthcare providers provide patients with information about how medical treatments the patients seek might conflict with the medical providers' religious beliefs. In two lawsuits, Plaintiffs, pro-life crisis pregnancy centers and doctors, challenge the amendment as a violation of their First Amendment rights. Plaintiffs contend that the amended Act compels them to speak an objectionable message and burdens the free exercise of their religion. In July 2017, then-Judge Kapala entered a preliminary injunction enjoining Defendant Secretary of the Illinois Department of Financial and Professional Regulation from enforcing the amended law. Plaintiffs

now seek permanent injunctive relief and have moved for summary judgment declaring that the law infringes their First Amendment free speech and free exercise rights. (*See Nat'l Inst. of Family & Life Advocates, et al., v. Schneider*, No. 16 C 50310 (hereinafter "*NIFLA*") [90]; *Schroeder, et al., v. Schneider*, No. 17 C 04663 (hereinafter "*Schroeder*") [67].) The court concludes, however, that genuine disputes of material facts remain and denies the motions from both sets of Plaintiffs.

## BACKGROUND

### I.    Crisis Pregnancy Centers

The *NIFLA* Plaintiffs are three pro-life Illinois nonprofit organizations—Tri-County Crisis Pregnancy Center (d/b/a "Informed Choices"), The Life Center, Inc. (d/b/a "TLC Pregnancy Services"), and Mosaic Pregnancy & Health Centers—and the National Institute of Family and Life Advocates, a faith-based nonprofit incorporated in Virginia with members comprising pro-life healthcare facilities across the nation. (*NIFLA* Pls.' Statement of Material Facts [92] (hereinafter "NPSF") ¶¶ 14–19.) The *Schroeder* Plaintiffs include two pro-life Illinois nonprofits—1st Way Pregnancy Support Services and Pregnancy Aid South Suburbs ("PASS")—and Dr. Ronald Schroeder, who serves as the medical director of Options Now, another pro-life healthcare organization. (*Schroeder* Pls.' Resp. to Def.'s Statement of Facts ("DSF") [144] ¶¶ 13–14.) A goal of the Plaintiff healthcare facilities or crisis pregnancy centers ("CPCs") is to dissuade pregnant women from having abortions. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 14; *Schroeder* Pls.' Resp. to DSF [144] ¶ 17.) Defendant is Deborah Hagan,[1] the Secretary of the Illinois Department of Financial and Professional Regulation ("IDFPR"), the state department responsible for, among other duties, prescribing rules and regulations for professionals, including health care professionals. The IDFPR has the authority to discipline medical professionals, including imposing fines and revoking licenses. (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 4.)

---

[1]    Both sets of Plaintiffs' complaints originally named former Secretary Bryan A. Schneider as a defendant in his official capacity. Secretary Hagan has been substituted as defendant for these cases. FED. R. CIV. P. 25(d).

Secretary Hagan, sued here in her official capacity, is charged with enforcing the law challenged in Plaintiffs' suits. (Def.'s Resp. to *Schroeder* Pls.' Statement of Facts [122] ¶ 1.)

The Plaintiff CPCs all offer a similar set of services to further their pro-life message.[2] They all provide pregnancy tests and ultrasounds. (*NIFLA* Pls.' Resp. to DSF [165] ¶¶ 15–16; *Schroeder* Pls.' Resp. to DSF [144] ¶¶ 15–16.) Plaintiff Dr. Schroeder testified that viewing an ultrasound that shows movement or a heartbeat might change a woman's mind about having an abortion. (Dr. Schroeder Dep., Ex. 12 to DSF, at 154:10–24; *see also* Dr. Anthony Caruso Dep., Ex. 32 to DSF, at 74:17–20 ("The hope is that seeing the baby will help her make a decision to keep the baby.").) Indeed, there is evidence in the record that CPCs' motivations influence the timing for administration of these tests: while Plaintiff Mosaic will not schedule an ultrasound appointment for a "non-abortion-minded" patient until six to eight weeks after her last menstrual period ("LMP"), Mosaic will conduct an ultrasound—as well as a counseling session—as soon as possible for an "abortion-minded" patient. (Ex. 21 to DSF at NIFLA00045.) Likewise, 1st Way will offer an "abortion-minded" patient an ultrasound if she is six to twenty-four weeks since LMP, but will not provide such a test for a patient who is "non-abortion-minded" after fifteen weeks of pregnancy unless she has some other symptoms. (Appointment for Pregnancy Test Policy, Ex. 23 to DSF.) Plaintiff TLC Pregnancy Services takes steps to determine whether the ultrasound has had TLC's desired effect, tracking whether a woman's plans change after seeing a sonogram. (Vivian Maly Dep., Ex. 15 to DSF, at 110:6–12; *see also* Options Now Ultrasound Form, Ex. 30 to DSF (asking sonographers to determine "the patient's abortion vulnerability after the Sonogram").)

The CPCs do also discuss abortion with pregnant women or provide them with materials aimed at discouraging use of the procedure. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 19; *Schroeder*

---

[2]    The Plaintiff CPCs offer a number of other services that are not at issue in the cases before this court. For example, they may provide information about and referrals for adoption; items for babies like diapers, parental and finance classes; and other services for expecting and new parents. (*See* NPSF ¶ 29; Schroeder Compl. [1] ¶¶ 21, 32–33.)

Pls.' Resp. to DSF [144] ¶ 19 ("Plaintiffs provide general information about abortion with the aim of assisting the client/patient to make a decision that would preserve the life of the unborn child.").) CPCs provide women with information about the risks of abortion; they do not review any benefits abortion might offer—either in a patient's particular circumstances or in general. (*NIFLA* Pls.' Resp. to DSF [165] ¶¶ 20–21; *Schroeder* Pls.' Resp. to DSF [144] ¶¶ 20–21.) Risks that CPCs discuss with patients include not only medical risks like excessive bleeding, perforation of the uterus, or not being able to bear children again;[3] CPCs may also tell pregnant women "about the spiritual aspect . . . and the ramifications for future relationships and how they view themselves as a person." (Susan Wilson Dep., Ex. 17 to DSF, at 64:18–65: 1.) As the director of Plaintiff 1st Way tells patients, abortion is "more than just a choice on their part" because it can "affect[ ] you completely physically of course and mentally and spiritually." (Judy Cocks Dep., Ex. 18 to DSF, at 56:5–18.)

The CPCs' communications concerning abortion occur at various stages in the provision of services. Options Now talks to patients about abortion during intake. (Dr. Schroeder Dep., Ex. 12 to DSF, at 82:2–12.) 1st Way provides counseling to women interested in terminating their pregnancy after providing them with other services; as they tell their volunteers, because "we have given her a free service, so we can respectfully and firmly request some of her time to speak with her on this important issue." (Basic Counseling & Dealing with Abortion-Minded Women, Ex. 44 to DSF.) Other CPCs will provide patients with DVDs (*see* Informed Choices DVD Selection/Release Form, Ex. 45 to DSF), and printed handout materials (*see* PASS Abortion Raises Breast Cancer Risk handout, Ex. 54 to DSF) at various times.

---

[3] The magnitude of such risks appears to be at least contested within the medical community. *Amici curiae* American College of Obstetricians and Gynecologists, et al., describe abortion as far safer than carrying a pregnancy to term. (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 9.)

4

The CPCs do not provide obstetrical or gynecological care. If a patient is in need of care from an Ob/Gyn physician, the CPCs refer the patient to see her own doctor, whether or not the CPC staff is aware of who that doctor is or what treatments the doctor provides. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 18; *Schroeder* Pls.' Resp. to DSF [144] ¶ 18.) For example, Informed Choices instructs its sonographers, should they discover an ectopic pregnancy, to direct the patient to go to the emergency room or contact her obstetrician. (Ex. 20 to DSF at NIFLA00020.) The CPCs also maintain lists of physicians to whom they will refer patients who do not already have a relationship with an Ob/Gyn. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 26; *see, e.g.,* Dr. Schroeder Dep., Ex. 12 to DSF, at 134:1–136:24; PASS Primary Care Clinics Form, Ex. 72 to DSF; 1st Way Referrals/Resource Manual, Ex. 61 to DSF.)

As the CPCs advise their patients, the CPCs do not perform abortions. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 28; *Schroeder* Pls.' Resp. to DSF [144] ¶ 28.) The CPCs do not necessarily also make clear their pro-life position, however, nor do they always disclose that one of their goals is to dissuade women from having abortions. For instance, TLC Pregnancy Services, according to its executive director, does not disclose its pro-life policy on its website, verbally, or in advertisements. (Vivian Maly Dep., Ex. 15 to DSF, at 75:1–23.) And although they do not perform abortions, the CPCs do offer other services to women interested in abortions. For example, Options Now's "talking points" for telephone calls instruct that staff tell callers that while Options Now does not perform or refer for abortions, Options Now will provide, free of charge, services that "typically cost between $180 and $200 at other clinics in our area." (Telephone Talking Points, Ex. 34 to DSF, at 3.) Options Now's talking points also direct that staff tell "abortion-minded" women[4] that Options Now will provide free STD tests because "[i]t's also important to make sure you don't have an STD before having an invasive procedure like abortion." (*Id.* at 5.)

---

[4] Options Now also provides the "abortion-minded" telephone talking points to rape victims "concerned about a possible pregnancy and [ ] hastily looking for abortion services or inquiring about [emergency contraception]." (Rape Talking Points/Procedure, Ex. 34 to DSF, at ONHOF20.)

Finally, as they do with respect to abortion, the CPCs provide information and materials about the risks of using contraception (*see* Ex. 57 to DSF), but they do not discuss the benefits of contraception or sterilization and will not refer or transfer a patient to a provider who will provide contraception or perform a sterilization procedure. (NPSF ¶ 34; *Schroeder* Compl. [1] ¶¶ 24, 37.) Similar to their views concerning abortion, Plaintiffs believe there are no benefits to contraception or sterilization and that providing or facilitating the provision of contraception or sterilization would violate their religious beliefs. (NPSF ¶ 34; *Schroeder* Compl. [1] ¶ 1.)

In this litigation, Plaintiffs allege that the CPCs' ability to promote their religiously-motivated pro-life messaging through services like those discussed above are threatened by changes to the Illinois Healthcare Right of Conscience Act adopted in 2016. (*See* NPSF ¶¶ 65–66; *Schroeder* Compl. [1] ¶ 2.) The law will compel them, Plaintiffs assert, to discuss the benefits of treatments they deem objectionable: abortion, contraception, or sterilization. Likewise, under the law, Plaintiffs must facilitate those treatments by providing patients with lists of doctors who provide those services or by transferring or referring patients to them. Both requirements violate Plaintiffs' First Amendment Speech and Free Exercise rights, they claim.

## II.     The HCRCA

The Illinois Healthcare Right of Conscience Act ("HCRCA" or "the Act"), originally enacted in 1977, grants immunity from civil liability and other protections to healthcare providers who have religiously-motivated objections to providing certain forms of treatment. *See* 745 ILCS 70/1, *et seq.*; *id.* § 2 ("It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons . . . ."). Specifically, the pre-2017 HCRCA includes several protections for medical providers who have "conscience objections" to certain treatments. "Conscience" is defined as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life

6

of its possessor parallel to that filled by God among adherents to religious faiths." *Id.* § 3(e). The Act provides:

> No physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel.

*Id.* § 4. A similar provision affords immunity for the owners and operators of healthcare facilities with conscience objections. *Id.* § 9. Moreover, the HCRCA prohibits several forms of discrimination against persons and organizations who have conscience objections to treatments. *Id.* § 5 (prohibiting discrimination in "licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges"), § 7 (prohibiting any employer or "medical training institution" from discriminating against applicants with conscience objections in hiring or admissions decisions), § 8 (prohibiting denial of "aid, assistance or benefits" due to conscience objection), § 10 (discrimination against healthcare facilities with conscience objections), § 11 (denial of aid or benefits to facilities with conscience objections).

Even before the amendments challenged in this suit, however, the HCRCA's protection of medical providers who have conscience objections to certain procedures was not total. Physicians with conscience objections were not freed from any obligation to provide emergency medical services. *Id.* § 6. Importantly, the HCRCA also did not "relieve a physician from any duty, which may exist under any laws concerning current standards, of normal medical practices and procedures, to inform his or her patient of the patient's condition, prognosis and risks." *Id.*

Defendant argues that the pre-2017 HCRCA's broad immunity created obstacles for some patients seeking care. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 5.)[5] The record includes a few recent instances of what Defendant describes as "conscience-based objectors

---

[5] Defendant submitted the same response to the summary judgment motions for both set of Plaintiffs. The document number used refers to the *NIFLA* docket.

failing to obtain informed consent from patients."[6]  (*Id*.)  First, the record includes documents concerning an April 2014 incident in which a neurologist reportedly refused to authorize general anesthesia for a patient seeking an abortion.  (*See* Def.'s Statement of Facts [142] (hereinafter "DSF") ¶ 5.)[7]  In a letter to the patient's Ob/Gyn, the doctor wrote that the patient could suffer "major complications," and he therefore did not authorize "general anesthesia for this patient, especially in regards to an *elective and unnecessary* procedure."  (Ex. 7 to DSF (emphasis added).)  In a letter to the patient herself, however, the neurologist said that while her potential "abortion is thought to be medically necessary," "[t]here is no such thing as a medically necessary abortion."  (Ex. 4 to DSF.)  He told the patient that he has "dealt with many women who were told to have an abortion because either the baby wouldn't live or they would have lasting health problems if they delivered the baby.  In all cases the mom and the baby were fine without any problems whatsoever."  (*Id*.)  The neurologist also warned the patient that "[t]he decision to have an abortion is one that will cause more health problems for you than going through delivery" and that abortion is "[t]he highest risk factor for developing breast cancer in a woman."[8]  (*Id*.)  He also

---

[6]      Both sets of Plaintiffs object to the relevance or materiality of this evidence, but the court considers it because Defendant cites it as evidence of the asserted need for the HCRCA amendments.  The *Schroeder* Plaintiffs also raise hearsay objections to this evidence, but these materials (further discussed below) may be admissible under a hearsay exception, such as FED. R. EVID. 803(4), or may have a nonhearsay purpose—for example, to illustrate the concerns that motivated passage of the HCRCA amendments,  *see Whitford v. Gill*, 218 F. Supp. 3d 837, 894 n.224 (W.D. Wis. 2016) (noting that legislative history was admissible for a nonhearsay purpose because it "provides useful background information on [the law's] path to enactment and on the types of concerns voiced by the legislators"), *vacated on other grounds and remanded*, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018).

[7]      Defendant submitted the same Local Rule 56.1 Statement of Additional Facts in both cases.  The document number used refers to the *NIFLA* docket.

[8]      The assertion that abortion is the highest risk factor for developing breast cancer appears to be unsupported.  *Amici curiae* American College of Obstetricians and Gynecologists, et al., write that "no link exists between" breast cancer and abortion.  (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 9 (citing Melbye Mads, et al., *Induced Abortion and the Risk of Breast Cancer*, 336 NEW ENG. J. OF MED. 81 (1997)).)  An amicus brief filed in support of Plaintiffs' motion for preliminary injunction acknowledges that fewer than half of all studies on the topic have

attached to the email a "model of a baby the same size of the baby that is within you" and concluded by telling her that he "will be praying for [her] to make the right decision." (*Id.*)

Second, in October 2014, the IDFPR received a complaint about CPCs. (*See* DSF ¶ 7.) The complaint alleged that such centers were "claiming to offer information on abortion services but are actually Pro-life (anti-choice) activists in disguise. They are employing bait and switch tactics to falsely lure people in for services they do not offer." (Ex. 8 to DSF at IDFPR001888.) Furthermore, "[t]hey are offering pregnancy tests without a [Clinical Laboratory Improvement Amendments] license and offering Ultrasounds without a physician's orders." (*Id.*) The complaint also included documents suggesting that pro-life organizations had purchased ads on Google to try to direct those searching about abortion to pro-life websites.[9] (*Id.* at IDFPR001892–1900.) It appears, however, that the complainant stopped pursuing that complaint; the IDFPR closed the matter in December 2015. (*Id.* at IDFPR001940.)

Third, the IDFPR received a complaint in March 2015 that accused a licensed clinical professional counselor of refusing to help the complainant come to terms with his sexual orientation because of the counselor's personal beliefs that homosexuality is contrary to the Bible. (Ex. 9 to DSF.) The counselor also refused to help the patient find a therapist who would be willing to help. (*Id.*) The complainant was treated by this counselor for about nine years and felt that the counselor was trying to "brain wash [him] to not be gay." (Ex. 6 to DSF at IDFPR001976.)

---

found any statistically significant association between the two. (Br. of *Amici Curiae* Am. Assoc. of Prolife Obstetricians & Gynecologists, Am. Coll. of Pediatricians, Christian Med. & Dental Assocs., & Heartbeat Int'l, in Supp. of *NIFLA* Pls.' Mot. for Prelim. Inj. [56] at 13 (noting that there have been seventy studies on whether there is an association between abortion and breast cancer, of which fifty-seven found a positive association but in only thirty-four of those were the associations statistically significant).)

[9]    This may not be an isolated issue. *Amici curiae* American ollege of Obstetricians and Gynecologists, et al., explain that CPCs have "for years . . . purchased advertisements from search engines like Google that appear when a user searches for a term like abortion clinic." (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 8.) It appears that Google has taken some measures to counteract the misleading nature of some ads. (*Id.* (noting that Google updated its advertising policy to add a "provides abortions" or "does not provide abortions" label).)

The complainant reported to IDFPR that he suffered two mental breakdowns during the time he was treated by this counselor. (DSF ¶ 11.) Defendant uses this case as an example of how medical professionals with conscience-based objections failed to provide their patients with information about other providers who may offer appropriate or desired treatment. (Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 20.) The case also shows, Defendant asserts, that the improper handling of conscience objections occurred not only in the reproductive health context, undermining Plaintiffs' assertion that the amended HCRCA targeted anti-abortion providers. (*Id.* at 26 n.7.)

Fourth, Defendant asserts that the HCRCA amendments were introduced because Catholic hospitals had been turning away pregnant women while they were having miscarriages. (DSF ¶ 12.) One supporter of the bill testified at a state House of Representatives committee hearing about her experience:

> Weeks into my pregnancy doctors told us that the baby suffered a number of severe anomalies. At 20 weeks as we were coping with that news and trying to understand how our lives would change, my water broke. The doctors told us that the baby was not going to live. We were heartbroken, but our nightmare was just beginning.
>
> When we learned that my water had broken, the doctors told me that waiting to miscarry could lead to hemorrhage and infection. I knew that these complications could threaten not only my future fertility, but also my life. . . .
>
> . . .
>
> The doctors responsible for my care couldn't help me end the pregnancy and avoid these risks to my health. The reason for this is that the hospital operated under religious restrictions imposed by the Catholic Church. They could not provide me the care I needed to keep from getting sick. I could only get help if I was already infected or hemorrhaging.
>
> . . . We attempted to go to a secular hospital a few hours away for help in terminating the pregnancy, but we could not get the procedure covered by our insurance at the hospital, and we could not afford to pay for the services out of pocket.
>
> We understand that the barrier to our insurance covering the procedure resulted from the religious hospital's failure to provide adequate records showing that the procedure was medically necessary. Had the religious hospital made my health information available, our insurance would have provided coverage.

(Ex. 13 to Def.'s Resp. to *NIFLA* Pls.' Statement of Facts [144-13] at 13–15.)  This witness further described how she returned to that hospital several times as a result of her bleeding but was repeatedly denied the care she sought.  (*Id.* at 15–16.)

The Illinois General Assembly made several changes to the HCRCA, effective on January 1, 2017, to narrow the scope of immunity for conscience-based objectors.  Where the law previously recognized that "[i]t is the public policy of the State of Illinois to respect and protect the right of conscience of all persons," the amendments added that "[i]t is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care."  745 ILCS 70/2.  The provision requiring doctors with conscience objections to "inform his or her patient of the patient's condition, prognosis and risks" now says that such a physician must "inform his or her patient of the patient's condition, prognosis*, legal treatment options,* and risks *and benefits of treatment options.*"  *Id.* § 6 (emphasis added).  The amendments also added the following provision:

> § 6.1. Access to care and information protocols. All health care facilities shall adopt written access to care and information protocols that are designed to ensure that conscience-based objections do not cause impairment of patients' health and that explain how conscience-based objections will be addressed in a timely manner to facilitate patient health care services. The protections of Sections 4, 5, 7, 8, 9, 10, and 11 of this Act [which provide protections from liability and against discrimination for providers with conscience objections] only apply if conscience-based refusals occur in accordance with these protocols. These protocols must, at a minimum, address the following:
>
> (1) The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care.
>
> (2) When a health care facility, physician, or health care personnel is unable to permit, perform, or participate in a health care service that is a diagnostic or treatment option requested by a patient because the health care service is contrary to the conscience of the health care facility, physician, or health care personnel, then the patient shall either be provided the requested health care service by others in the facility or be notified that the health care will not be provided and be referred, transferred, or given information in accordance with paragraph (3).
>
> (3) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient

11

> to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.
>
> (4) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall provide copies of medical records to the patient or to another health care professional or health care facility designated by the patient in accordance with Illinois law, without undue delay.

*Id.* § 6.1. In essence, § 6.1 requires all health care facilities to adopt written policies and procedures to ensure that a patient requesting or in need of a particular legal treatment can receive it, despite any conscience objections that a particular medical professional at the facility or the facility itself might have. Facilities or medical professionals who do not comply with these requirements cannot enjoy the immunity from civil and criminal liability or protection from certain forms of discrimination provided elsewhere in the HCRCA. *See id.* §§ 4–5, 7–11.

Plaintiffs assert that the communications mandated by these provisions require them to discuss benefits of treatments to which they have conscience objections—specifically, abortion, contraception, and sterilization. This mandate, Plaintiffs assert, violates their First Amendment free speech and free exercise rights. (*See NIFLA* Compl. [1] ¶ 89; *Schroeder* Compl. [1] ¶ 1.) So too, Plaintiffs insist, does the requirement that they refer a patient to, transfer a patient to, or provide written information to a patient about providers who may offer such treatment options. (*See NIFLA* Compl. [1] ¶ 105; *Schroeder* Compl. [1] ¶ 1.)

### III.  Procedural History

The *NIFLA* Plaintiffs, asserting a number of state-law and federal statutory and constitutional claims, initiated this suit in September 2016, seeking to enjoin the HCRCA's amendments before they took effect. (*See NIFLA* Compl. [1].) In July 2017, Judge Kapala dismissed the state-law claims and some of the federal claims but granted a statewide preliminary injunction against the law's enforcement, reasoning that the law was a content- and viewpoint-

12

based speech regulation and that the law would be unlikely to survive strict scrutiny.[10] (*NIFLA* July 19, 2017 Order [65] at 6–8.) The *Schroeder* Plaintiffs brought their suit in March 2017. (*See Schroeder* Compl. [1].) Judge Kapala likewise dismissed certain claims but denied without prejudice the *Schroeder* Plaintiffs' request for a preliminary injunction in light of the injunction the court had already granted for the *NIFLA* Plaintiffs. (*Schroeder* Oct. 27, 2017 Order [58].)

In December 2017, both cases were stayed pending a decision by the Supreme Court in *National Institute of Life Advocates v. Becerra*, which the Court decided in June 2018. 138 S. Ct. 2361 (2018). Plaintiffs in both cases then moved for summary judgment in January 2019. (*See NIFLA* Pls.' Mot. for Summ. J. [90]; *Schroeder* Pls.' Mot. for Partial Summ. J. [67].) Both cases were reassigned to this court in May 2019 after Judge Kapala took inactive senior status. (*See* Am. Gen. Order 19-007 [117].)[11] Because it will become important to the analysis below, the court also notes that Defendant requested expert discovery in this case as necessary for Defendant's own summary judgment motion (*see* Defs.' Mot. to Align Summ. J. Br. Schedule & Set Remaining Disc. Schedule [123] at 5–7), but the court denied the request pending review of Plaintiffs' motions (June 4, 2019 Mot. Hr'g Tr. [131] at 14:13–17).[12]

## DISCUSSION

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets that burden, the nonmoving party

---

[10] It was Judge Kapala's view that the law was unlikely to survive even intermediate scrutiny. (*NIFLA* July 19, 2017 Order [65] at 9.)

[11] The document number used refers to the *NIFLA* docket.

[12] The document number used refers to the *NIFLA* docket.

then bears the burden of demonstrating that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012). The burden on the nonmovant "is not onerous," *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999), and the court "construe[s] all facts and reasonable inferences in favor of the nonmoving party." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). To defeat the motion, however, the nonmoving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" her position. *Liu*, 191 F.3d at 796. As discussed below, the court concludes that there are genuine disputes of material fact concerning Plaintiffs' Free Speech and Free Exercise claims and therefore denies their summary judgment motions.

## I. Free Speech Claims

### A. Regulation of Content or Conduct

As noted, this case was stayed for several months pending the Supreme Court's resolution of a claim of compelled speech in a similar context: *National Institute of Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"). That case concerned a challenge to a California law that required clinics like CPCs to disseminate particular government-written notices. First, the law required certain licensed clinics providing pregnancy-related services[13] to post the following notice at their facility, distribute it to all patients, or provide it to them at check-in: "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women. To determine whether you qualify, contact the county social services office at [insert the telephone number]." *Id.* at 2369 (quoting Cal. Health & Safety Code Ann. § 123472(a)(1)). The law required that this notice be printed in English and in any other language identified by the state (up to 13 languages in some places). *Id.* Second, California required

---

[13] *See NIFLA*, 138 S. Ct. at 2368–69 (detailing which clinics were subject to or exempt from the first notice requirement).

certain unlicensed clinics providing pregnancy-related services[14] to post conspicuously onsite and provide, with all advertising materials, a notice stating, "This facility is not licensed as a medical facility by the State of California and has no licensed medical provider who provides or directly supervises the provision of services." *Id.* at 2670 (quoting Cal. Health & Safety Code Ann. § 123472(b)(1)). That notice, too, had to be in English and in other languages identified by the state, and the law further specified the size for the onsite posting and the font size to be used in advertisements. *Id.*

The Supreme Court held that both requirements violated the plaintiff CPCs' First Amendment rights. Starting with the licensed-facility notice requirement, the Court characterized it as a "content-based regulation of speech." *Id.* at 2371. "By compelling individuals to speak a particular message," Justice Thomas wrote for the Court, "such notices 'alte[r] the content of [their] speech.'" *Id.* (alteration in original) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). Content-based regulations are subject to strict scrutiny and are therefore presumptively unconstitutional. *See id.*; *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226–27 (2015). The Ninth Circuit, however, had upheld the licensed-facility notice requirement because it regulated only "professional speech," *NIFLA*, 138 S. Ct. at 2371, a category that several circuit courts had recognized as being excluded from strict scrutiny analysis, *see, e.g., Pickup v. Brown*, 740 F.3d 1208, 1227–29 (9th Cir. 2014); *Moore-King v. Cty. of Chesterfield*, 708 F.3d 560, 568–70 (4th Cir. 2013). The Supreme Court rejected the "professional speech" rationale; "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371–72.

Still, the Court did recognize two circumstances in which professional speech is afforded less protection. "First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* at 2372 (citing, e.g., *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*,

---

[14]    *See NIFLA*, 138 S. Ct. at 2369–70 (detailing which clinics were subject to or exempt from the second notice requirement).

471 U.S. 626, 651 (1985)). This exception did not apply to the licensed-facility notice requirement, the Supreme Court observed, because the mandated disclosures were "not limited to 'purely factual and uncontroversial information about the terms under which . . . services will be available.'" *Id.* (quoting *Zauderer*, 471 U.S. at 651). As the Court reasoned, "[t]he notice in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services—including abortion, anything but an 'uncontroversial' topic." *Id.*

The second circumstance in which laws regulating professional speech are afforded more deferential review involve "regulations of professional conduct that incidentally burden speech." *Id.* at 2373. As an example, the Court pointed to its rejection of a First Amendment challenge to a law requiring physicians to obtain informed consent before performing abortions in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992). The law under review in *Casey*, which required doctors to inform patients about state-printed materials, to discuss the unborn child's gestational age, and to advise patients on the risks of both abortion and childbirth, was, "for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure." *Id.* According to the *NIFLA* Court, "[t]he [*Casey*] joint opinion explained that the law regulated speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State." *NIFLA*, 138 S. Ct. at 2373 (quoting *Casey*, 505 U.S. at 884). Unlike the law in *Casey*, the licensed-facility notice requirement under review in *NIFLA* was not an informed-consent law or a regulation of professional conduct that only incidentally burdened speech. *Id.* As Justice Thomas explained:

> The notice does not facilitate informed consent to a medical procedure. In fact, it is not tied to a procedure at all. It applies to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed. If a covered facility does provide medical procedures, the notice provides no information about the risks or benefits of those procedures. Tellingly, many facilities that provide the exact same services as covered facilities . . . are not required to provide the licensed notice. The licensed notice regulates speech as speech.

*Id.* at 2373–74.

Neither circumstance in which professional speech regulations are afforded more deferential review applied to the notice requirement under consideration in *NIFLA*. The Court therefore subjected it to strict scrutiny and concluded that the law was "not sufficiently drawn to achieve" California's one identified interest—"providing low-income women with information about state sponsored services." *Id.* at 2375. In particular, the law was underinclusive because it exempted numerous clinics that serve low-income women and provide a similar set of services as CPCs. *See id.* at 2375–76. And the Court also noted that the state had other means of promoting its interest, such as a public awareness campaign, without burdening speech. *Id.* at 2376.

As for the requirement that the law imposed on unlicensed clinics, the Supreme Court did not determine whether the *Zauderer* standard applied, but noted that the requirement would not satisfy that standard: "Even under *Zauderer*, a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *Id.* at 2377 (quoting *Zauderer*, 471 U.S. at 651). California had not demonstrated that the requirement for unlicensed clinics was justified because it had offered no more than a "purely hypothetical" justification for the law. *Id.* And the requirement was also unduly burdensome: it required covered facilities to post a particular notice verbatim, was directed to "a curiously narrow subset of speakers," applied to all advertising materials, and had to be in as many as thirteen different languages. *Id.* at 2377–78.

In the case before this court, both Plaintiffs and Defendant point to *NIFLA* as supporting their view of the constitutionality of the amended HCRCA. Plaintiffs argue that like the regulations in *NIFLA*, the Illinois law constitutes a content-based regulation because it compels them to speak a particular message, thus altering the content of their speech. *Id.* at 2371. Defendant, on the other hand, contends that the law is merely a regulation of professional conduct, akin to the

informed consent rules upheld in *Casey*.[15]  Plaintiffs challenge two specific requirements of the law: (1) discussing the benefits of abortion, and, if requested, (2) referring a patient to, transferring a patient to, or providing a patient information about providers of abortion.[16]  *See* 745 ILCS 70/6– 6.1.  The court will discuss each requirement in turn.

### 1.  Benefits-Discussion Requirement

Starting with the requirement to discuss the benefits of abortion, the court agrees with Defendant that as in *Casey*, this is a regulation of professional conduct that only incidentally burdens speech.  The Pennsylvania law in *Casey* provided:

---

[15]        Notably, neither side in this case analyzes whether *Zauderer* might apply to any aspect of the amended HCRCA.  *Zauderer* has generally been applied only to commercial speech.  *See, e.g., Amarei v. City of Chi.*, No. 13 C 2805, 2015 WL 725940, at *2–3 (N.D. Ill. Nov. 17, 2015) (discussing *Zauderer*).  The Seventh Circuit has said that considerations for determining whether speech is commercial include whether: "(1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has economic motivation for the speech." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009); *see also Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (noting that these three factors are "just a general framework").  It is not clear whether *NIFLA* suggests that *Zauderer* applies beyond commercial speech, nor is it clear that CPCs are engaged in commercial speech.  The Fourth Circuit previously suggested that the answer to that second question may be yes.  *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283–88 (4th Cir. 2013) (holding that a district court erred in denying the City's request for discovery on whether an ordinance requiring CPCs to make certain disclosures regulated commercial speech).  Of course, the Court may have foreclosed this avenue in noting that California's licensed-facility notice requirement failed *Zauderer* because it required the disclosure of "information about state-sponsored services—including abortion, anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372.  *But see CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("We do not read the Court as saying broadly that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial.  The dispute in *NIFLA* was whether the state could require a clinic whose primary purpose was to oppose abortion to provide information about 'state-sponsored services,' including abortion.  While factual, the compelled statement took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission.  Under these circumstances, the compelled notice was deemed controversial within the meaning of *Zauderer* and *NIFLA*.").

[16]        The *NIFLA* Plaintiffs' brief takes issue with speech regarding abortion (*see NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 5), while the *Schroeder* Plaintiffs' brief challenges the compulsion to speak about contraception and sterilization as well (*see Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2]).  At least at this stage, however, the First Amendment analysis does not differ depending on whether abortion-related speech or sterilization- and contraception-related speech is at issue.  Hence, where the court refers only to abortion, its analysis applies with equal weight to the other two procedures.

> Except in a medical emergency, the statute requires that at least 24 hours before performing an abortion a physician inform the woman of the nature of the procedure, the health risks of the abortion and of childbirth, and the "probable gestational age of the unborn child." The physician or a qualified nonphysician must inform the woman of the availability of printed materials published by the State describing the fetus and providing information about medical assistance for childbirth, information about child support from the father, and a list of agencies which provide adoption and other services as alternatives to abortion. An abortion may not be performed unless the woman certifies in writing that she has been informed of the availability of these printed materials and has been provided them if she chooses to view them.

*Casey*, 505 U.S. at 881. While acknowledging that "the physician's First Amendment rights not to speak are implicated," the joint opinion nonetheless determined that these requirements did not violate that Amendment because they regulated physicians' conduct, not their speech. *Id.* at 884. And as already noted, the Court in *NIFLA*, 138 S. Ct. at 2373, endorsed this conclusion because the Pennsylvania law facilitated informed consent. In contrast, the California law at issue in *NIFLA* required only certain licensed clinics to disseminate advertisements about services offered by the state to every patient (regardless of the patient's health conditions) and those advertisements provided no information about the risks and benefits of any procedure. *See id.* at 2373–74. As the Sixth Circuit has reasoned in a case challenging Kentucky's mandatory ultrasound law, *Casey* and *NIFLA* can be read together to say that an informed-consent statute will not be subject to heightened First Amendment scrutiny "so long as it meets these three requirements: (1) it must relate to a medical procedure; (2) it must be truthful and not misleading; and (3) it must be relevant to the patient's decision whether to undertake the procedure, which may include, in the abortion context, information relevant to the woman's health risks, as well as the impact on the unborn life." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 428–29 (6th Cir. 2019) (noting also that *NIFLA* and *Casey* "clarified that the First Amendment has a limited role to play in allowing doctors to avoid making truthful mandated disclosures related to informed consent").

The requirement that Plaintiffs discuss the benefits of abortion with pregnant patients meets that test. Information about the benefits of terminating a pregnancy clearly relate to a

medical procedure—abortion. Plaintiffs have made no argument that the benefits they must describe are false or misleading;[17] indeed, ensuring that both the risks and the benefits of the treatment are provided will minimize the danger of a woman making a decision on the basis of misleading information.[18] And the benefits of an abortion are, like the risks, obviously relevant to a woman's decision to undergo the treatment.

This benefits-discussion requirement is easily distinguishable from the mandated disclosures in *NIFLA*. Those disclosures provided no actual information about any medical procedures; the licensed-facility notice requirement merely advised women of the availability of certain state-subsidized services. Likewise, whereas the licensed-facility notice had to be provided to all patients, regardless of their medical conditions or the reasons they came to the clinic, *see NIFLA*, 138 S. Ct. at 2372, the court understands the amended HCRCA to require the CPCs to provide information concerning the benefits of abortion only to patients for whom there are such benefits, and to align the benefits discussed with the health and circumstances of each patient. The court does not now delineate the appropriate standard of care and, as discussed below, will permit expert discovery on the issue. The court does conclude at this stage that— unlike the law in *NIFLA*, which did not apply to a large number of clinics offering similar pregnancy services— the benefits-discussion requirement merely imposes an obligation that the standard of care already requires of other medical professionals in other contexts.[19] (*See, e.g.,* AMA Code

---

[17]    "Based on their religious and ethical beliefs," neither set of Plaintiffs believes that abortion has any medical benefits. (*See NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 2–3; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 2.) Plaintiffs have not, however, argued that the procedure lacks medical benefits from a scientific perspective; the court understands the amended HCRCA to require discussion only of these latter benefits.

[18]    *Amici* report that CPCs "invent or exaggerate health risks of abortion." (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 9.)

[19]    The *NIFLA* Plaintiffs urge that no standard of care requires providers to discuss the benefits of all treatment options with their patients. (*See NIFLA* Pls.' Reply [163] at 5–6.) In support, they point to the fact that exemptions like the ones recognized in the HCRCA have been

of Medical Ethics Opinion 2.1.1, Ex. 1 to DSF (noting that a physician should discuss, among other things, "[t]he burdens, risks, and *expected benefits of all options*") (emphasis added).)

Both sets of Plaintiffs insist that this requirement is not tied to informed consent because CPCs do not actually perform abortions. (*See NIFLA* Pls.' Reply [163] at 4–5; *Schroeder* Pls.' Reply [145] at 5–6.) This argument is unconvincing in light of Supreme Court precedent. The informed consent law upheld in *Casey* went far beyond information tied to a procedure that the physician was actually performing; instead, the Pennsylvania law required physicians to discuss the risks of childbirth as well as the availability of information about medical assistance for childbirth, child support from the father, and adoption services. *Casey*, 505 U.S. at 881. If, as Plaintiffs insist, doctors can be required to obtain informed consent only for procedures they actually perform, how could abortion providers be compelled to speak about such topics as paternal child support and adoption services? *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 579 n.8 (5th Cir. 2012) ("Another perspective on this point is to note that under *Casey* and *Gonzales* [*v. Carhart*, 550 U.S. 124 (2007)], what Appellees think is medically necessary does not cabin, under the state's legitimate power, the regulation of medicine, as *Casey* holds."). Mandating the provision of such additional information "is a reasonable measure to ensure an informed choice," *id.* at 883, just like the benefits-discussion requirement. Indeed, it is apparent that a patient would consider the alternatives of pregnancy and childbirth, on the one hand, and termination by way of abortion, on the other, together. Neither decision is likely made in isolation—that is, whether to carry a child to term depends not simply on weighing the costs and benefits of childbirth but considering them in comparison to the

---

in existence for decades and that certain regulations governing the profession postdate the Act. (*Id.*) But the issue is not what standard has been applied to those who have been shielded by the protections of the HCRCA; rather, because Defendant argues that the amendments to that Act were aimed at conforming the standard governing conscience objectors to that regulating everyone else, what matters is the standard of care that governs providers who do not have conscience objections. As further discussed below, the court concludes it cannot decide that issue without the benefit of expert discovery.

costs and benefits of terminating the pregnancy. Underscoring this point is an analogy offered in the *Casey* joint opinion: "We would think it constitutional for the State to require that in order for there to be informed consent to a kidney transplant operation the recipient must be supplied with information about risks to the donor as well as risks to himself or herself." *Id.* at 882–83. In this analogy, a doctor can be required to inform a patient about a procedure she will not undergo and that the physician may not even be the one performing because the decision to receive a kidney transplant may be informed by "consequences that have no direct relation to her health." *Id.* at 882. Ultimately, the court reads *Casey* and *NIFLA* as permitting the state to require CPCs to obtain informed consent in the course of their practice of counseling women to proceed with pregnancy and carry the child to term.

There is disagreement among courts regarding the level of scrutiny to be applied to informed-consent laws, and *NIFLA* did not address whether rational basis or intermediate scrutiny was required.[20] Notably, *Casey* did not identify the appropriate level of scrutiny for the First Amendment challenge, and numerous courts of appeal have therefore upheld informed-consent laws without applying heightened scrutiny. *See EMW*, 920 F.3d at 424 ("[E]ven though an abortion-informed-consent law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosure is truthful, non-misleading, and relevant to an abortion."); *Lakey*, 667 F.3d at 575 ("The [*Casey*] plurality response to the compelled speech claim is clearly not a strict scrutiny analysis. It inquires into neither compelling interests nor narrow tailoring. The three sentences with which the Court disposed of the First Amendment claims are, if anything, the antithesis of strict scrutiny."); *Planned Parenthood of Minn., N.D. & S.D. v. Rounds*, 530 F.3d 724, 734–35 (8th Cir. 2008) (en banc) (noting that the plaintiff could not succeed in its First Amendment claim "unless it can show that the [required] disclosure is either untruthful, misleading, or not relevant to the patient's decision to have an abortion"). *But see Stuart v. Camnitz*, 774 F.3d 238,

---

[20]     The Seventh Circuit does not appear to have addressed this issue either.

250–55 (4th Cir. 2014) (applying intermediate scrutiny). Incidental regulations of speech, however, are usually subject to intermediate scrutiny. *See, e.g., Tagami v. City of Chi.*, 875 F.3d 375, 378–79 (7th Cir. 2017) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)) (explaining that "incidental limitations on First Amendment freedoms" are reviewed under intermediate scrutiny).

The court need not decide which standard applies here because it would deny summary judgment on this issue even if the benefits-discussion requirement is subject to intermediate scrutiny. Intermediate scrutiny asks whether the regulation (1) "promotes a substantial government interest that would be achieved less effectively absent the regulation" and (2) "does not 'burden substantially more speech than is necessary to further' that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 213–14 (1997) ("*Turner II*") (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) ("*Turner I*")). Defendant contends that the benefits-discussion component of the amended HCRCA advances the state's interest in ensuring that patients have all relevant information needed to give informed consent. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 18–19.) The law ensures that physicians who have conscience objections will provide information concerning the benefits of abortion to patients with high-risk pregnancies and to other women who might value that option. Both Plaintiffs insist that the state has no substantial interest in requiring the mandated disclosures because there is no evidence that CPCs' failure to inform women of the benefits of abortion has created any problems for the state. (*See NIFLA* Pls.' Reply [163] at 11–12; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 10.) But "[t]here can be no doubt," the Supreme Court has said, that "the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 731 (1997)) (citing *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (noting that a state has "a legitimate concern for maintaining high standards of professional conduct")). The record supports an inference that CPCs use potentially deceptive tactics to lure women into their facilities by, for example, placing

ads on Google for women searching for information about abortion (*see* Ex. 8 to DSF; Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 8), by not disclosing to potential patients that one of their goals is to discourage women from getting an abortion (*see, e.g.,* Vivian Maly Dep., Ex. 15 to DSF, at 75:1–23), and by using particular talking points and offering special services to "abortion-minded" women (*see, e.g.,* Options Now Telephone Talking Points, Ex. 34 to DSF; Mosaic Telephone Talking Points, Ex. 46 to DSF).  There is also evidence that once in the door, pregnant women are given misleading information about abortion.  (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 8–9 (noting that CPCs use misleading information, provide emotionally manipulative counseling, and exaggerate the medical risks of abortion).)  At a minimum, the court is unwilling to conclude that Defendant has not met his burden of demonstrating that the law promotes a substantial interest until Defendant has been given an opportunity to complete the requested expert discovery.  (*See NIFLA* June 4, 2019 Min. Order [130] (denying request for expert discovery); *Schroeder* June 4, 2019 Min. Order [108] (same).)

As for whether the benefits-discussion requirement burdens more speech than necessary, an important issue of fact remains.  Defendant argues that the rule meets this standard because it mandates only that healthcare professionals having conscience objections provide the same information that others in their field without such objections must already provide under the standard of care.  (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 22.)  As already noted, there is some basis in the record for a finding that professional obligations do require physicians to discuss the benefits of all treatment options.[21]  (*See, e.g.,* AMA Code of Medical Ethics Opinion

---

[21]     The *NIFLA* Plaintiffs point out that the Illinois State Medical Society has said that the "current common law requirement" is that "legal treatment options be mentioned to the patient, but health care professionals should not be required to recommend that patients undergo treatment to which they have a conscientious objection."  (Ex. E to NPSF.)  It is not clear, however,

2.1.1, Ex. 1 to DSF (noting that a physician should discuss, among other things, "[t]he burdens, risks, and *expected benefits of all options*") (emphasis added).) Defendant will need expert discovery for this issue, which is required in Illinois to establish professional standards of care.[22] *See Jones v. Chi. HMO Ltd.*, 191 Ill. 2d 278, 295–96, 730 N.E.2d 1119, 1130 (Ill. 2000). If Defendant's contention about the standard of care proves true, then Plaintiffs are incorrect in asserting that the amended HCRCA is underinclusive because it applies only to conscience objectors. (*See NIFLA* Pls.' Reply [163] at 12; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 10.) That is, this requirement of discussing the benefits of all treatment options would apply to all providers of similar services, unlike the law in *NIFLA*. The *Schroeder* Plaintiffs also contend that the law is overinclusive because it requires conscience objectors to discuss the benefits of treatments that the CPCs' patients may not actually want. (*See Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 12–13.) If the state's substantial interest is in ensuring that all patients be provided with all information necessary to give informed consent, then the requirement is likely not overinclusive. Finally, the court is not persuaded that a public awareness campaign could be a replacement for the benefits-discussion requirement. (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 10 (suggesting that a public awareness campaign is a less restrictive means for the State to present its message).) While the California law in *NIFLA* mandated that licensed clinics advertise government services, this aspect of the amended HCRCA applies to every procedure for which a physician may have a conscience objection and requires information that is patient-specific. The risks and benefits of an abortion will vary depending on individual medical and personal circumstances. A public awareness campaign covering such information would have little practical utility.

---

that discussing the benefits of a procedure is tantamount to recommending it. Regardless, this statement underscores that the applicable standard of care is a fact in dispute.

[22] The court previously declined Defendant's request to depose experts until after the court issued an order on Plaintiffs' summary judgment motions. (*See NIFLA* June 4, 2019 Min. Order [130]; *Schroeder* June 4, 2019 Min. Order [108].)

## 2.    Refer, Transfer, or Provide Information Requirement

The analysis is much the same with respect to the second challenged aspect of the amended HCRCA: that providers with conscience objections to a particular treatment, upon a patient's request, refer the patient to, transfer the patient to, or provide in writing information about other providers who they reasonably believe may offer that treatment. 745 ILCS 70/6.1(3). This aspect of the HCRCA is not squarely an informed consent requirement like the one discussed above because it concerns more than the provision of information about a procedure. *See Xeniotis v. Cynthia Satko, D.D.S, M.S., P.C.*, 2014 IL App (1st) 131068, ¶ 54, 14 N.E.3d 1207, 1213 (1st Dist. 2015) (discussing the elements of a malpractice action based on the doctrine of informed consent). Section 6.1(3) of the amended HCRCA nonetheless bears striking similarities to the law at issue in *Casey*, 505 U.S. at 881, which, as noted above, compelled abortion providers to make available information about adoption agencies and other alternatives to abortion. In fact, while the law in *Casey*, 505 U.S. at 882, required doctors to disclose to a patient information that the joint opinion noted "has no direct relation to her health," § 6.1(3) enables a patient to receive requested services or information about services that are directly tied to her health. Furthermore, this requirement is unlike the licensed-facility notice requirement in *NIFLA*, 138 S. Ct. at 2369, which compelled certain clinics to advertise the availability of government services to *all* patients, whether appropriate for or desired by any of them.

This part of the amended HCRCA is a rule governing the conduct of those working in a regulated profession, akin to preexisting requirements like the obligation, imposed by the pre-2017 version of HRCA, that conscience objectors provide treatment in emergency situations. *See* 745 ILCS 70/6. The court acknowledges that "drawing the line between speech and conduct can be difficult," *NIFLA*, 138 S. Ct. at 2373, and that a doctor's refusal to provide information about abortion providers, as in this case, or to provide an ultrasound to a patient seeking an abortion, as in other cases, *e.g., EMW*, 902 F.3d at 424, may be expressive conduct. But in such cases, "the physician's First Amendment rights not to speak are implicated, but only as part of the

26

practice of medicine, subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884 (citation omitted).

There are remaining issues of fact that prevent the court from determining whether the law satisfies intermediate scrutiny (assuming, without yet deciding, whether that standard applies). As previously noted, that standard calls for consideration of whether the law promotes a substantial government interest and does not burden substantially more speech than necessary. *Turner II*, 520 U.S. at 213–14. Defendant has identified one interest served by this provision: ensuring that patients have access to the safe and legal treatments that they have chosen to undergo. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 18.) The Supreme Court has, in another context, "recognize[d] that the 'State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (quoting *Roe v. Wade*, 410 U.S. 113, 150 (1973)). Ensuring that women who want abortions have easier and earlier access to providers furthers such an interest. In addition, as examples of the problem to be remedied, Defendant points to the neurologist who refused to clear his patient for an abortion and the counselor who rejected his patient's request to be referred to another provider who could help the patient cope with his sexual orientation. (Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 19.) The testimony provided by a supporter of the amendments about the difficulties she encountered at a Catholic hospital when she needed to terminate her pregnancy likewise provides support for Defendant's contention that the law is aimed at a real problem for patients in the state. (*See* Ex. 13 to Def.'s Resp. to *NIFLA* Pls.' Statement of Facts [144-13] at 13–16.). True, as Plaintiffs note, these are just a few examples (which have not been substantiated) and none relates exactly to CPCs or the services they provide. But § 6.1(3) would seem to mitigate the concerns, noted above, that CPCs use potentially misleading tactics to bring women into their facilities and then provide them with misleading information about abortion.

The court is also not convinced that § 6.1(3) burdens substantially more speech than necessary. First, there is some question about the extent to which this requirement actually burdens Plaintiffs. As discussed above, CPCs will refer patients to see their own Ob/Gyn or primary care provider without necessarily knowing who that doctor is or what treatments that doctor provides. And Dr. Schroeder testified that an abortion is necessary for a tubal pregnancy[23] and will make referrals for patients with such high-risk pregnancies without inquiring into whether the providers or hospitals perform abortions. (Dr. Schroeder Dep., Ex. 12 to DSF, at 87:6–10.) Likewise, Informed Choices, one of the *NIFLA* Plaintiffs, tells women with suspected tubal pregnancies to go to their Ob/Gyn or the Emergency Room and that terminating the pregnancy is typically necessary to protect their lives. (*See* Ectopic Precautions, Ex. 20 to DSF at NIFLA00026 ("An unborn baby cannot survive outside the womb, and cannot be put back inside it. To protect the woman's life, the baby, afterbirth, and perhaps the tube are taken out.").)

Second, as with the benefits-discussion requirement, the court cannot determine whether § 6.1(3) is underinclusive without expert discovery. In particular, if doctors who do not perform certain procedures for reasons other than conscience objections are, as Defendant asserts, already subject to a similar requirement to make referrals or provide information about providers to patients upon request, then this amendment to the HCRCA likely is not underinclusive. In any event, application of the law's mandate only to conscience objectors may be justified if conscience objectors are the only or the primary medical providers whose practices generate the concern addressed by that mandate. *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) ("We do not, however, agree that the failure to regulate all speech renders the statute fatally underinclusive. . . . States adopt laws to address the problems that confront them. The First

---

[23]    The *Schroeder* Plaintiffs argued that Dr. Schroeder does not believe that removal of an ectopic pregnancy is an abortion. (*See Schroeder* Pls.' Resp. to DSF [144] ¶ 30.) In reality, although he initially denied that he would consider it an abortion, Dr. Schroeder subsequently acknowledged that removal of an ectopic pregnancy "would be an abortion because you're terminating pregnancy." (Dr. Schroeder Dep., Ex. 9 to *Schroeder* Pls.' Resp. to DSF [144], at 107:11–19.)

Amendment does not require States to regulate for problems that do not exist."). Defendant has not put forth sufficient evidence to support a conclusion on this issue.

Next, as with the benefits-discussion requirement, the court is not persuaded that a public awareness campaign could be an effective replacement for § 6.1(3). This aspect of the amended HCRCA applies only for patients who make a request. And a public campaign is unlikely to be able to provide the patient-specific or local information that providers would be better positioned to provide.

Finally, Plaintiffs insist that § 6.1(3) is not necessary in light of the availability of information over the Internet. (*Schroeder* Pls.' Mot. for Partial Summ. J. [67] at 9.) Again, the court is less certain, even if it were true that all pregnant women have ready and convenient access to the Internet. Like a public awareness campaign, it is far from clear that Internet searches can provide the particular information that a medical professional can. Nor is the Internet always a reliable source of accurate information. Indeed, the notion that the Internet can serve this purpose is arguably undermined by evidence indicating that some CPCs' ads appear in Google searches related to abortion. And for at least some CPCs, the overwhelming majority of their pregnant patients are considering abortion (*see* Sarah Vanderlip Dep., Ex. 19 to DSF, at 70:6–20), which may support an inference that women are visiting such facilities without necessarily being aware of the nature of the services they provide or their mission of discouraging abortions. That the CPCs' clientele consists of persons considering abortion also suggests that the information available over the Internet may not be detailed or comprehensive enough to advance the state's interest in ensuring that pregnant women have access to legal procedures.

### B. Speaker or Viewpoint-Based Regulation

Plaintiffs also challenge the amended HCRCA as a regulation that targets particular speakers or viewpoints. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citation omitted) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions

29

distinguishing among different speakers, allowing speech by some but not others.").  But any regulation of professional conduct that incidentally burdens speech will necessarily be speaker-based—and viewpoint-based, in many cases—because it affects only those operating within the regulated profession.  It is indeed doubtful whether the court needs to consider this issue at all.  *Casey* and subsequent cases like *EMW*, of course, upheld laws targeting the speech of only abortion providers.  And no constitutional infirmity was found for such laws despite the fact that they compelled doctors who perform abortions to convey information that may conflict with their own ideology.  *See Lakey*, 667 F.3d at 576 (quoting *Casey*, 505 U.S. at 871) (reasoning that laws requiring "truthful, nonmisleading, and relevant disclosures" "do not fall under the rubric of compelling 'ideological' speech that triggers First Amendment strict scrutiny" and that such disclosures "may entail not only the physical and psychological risks to the expectant mother facing this 'difficult moral decision,' but also the state's legitimate interests in 'protecting the potential life within her'"); *compare Rounds*, 530 F.3d at 735 (upholding a law requiring abortion providers to instruct women that "the abortion will terminate the life of a whole, separate, unique, living human being"), *with Roe v. Wade*, 410 U.S. 113, 160 (1973) (discussing "the wide divergence of thinking on this most sensitive and difficult question").  In fact, in comparison to these other laws, the amended HCRCA is on firm constitutional ground.  The Sixth Circuit upheld an abortion-specific informed consent and mandatory ultrasound law that may have been designed to discourage abortion.  *See EMW*, 920 F.3d at 446 (emphasis added) ("As a First Amendment matter, there is nothing suspect with a State's requiring a doctor, before performing an abortion, to make truthful, non-misleading factual disclosures, relevant to informed consent, even if those disclosures relate to unborn life and *have the effect of persuading the patient not to have an aborti*on."); *see also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 988 (7th Cir. 2012) ("[T]he government need not be neutral between abortion providers and other medical providers . . . .").  The law at issue in this case instead requires only an even hand: Plaintiffs are required to discuss the benefits of abortion just as

abortion providers are apparently required to discuss its risks.  (AMA Code of Medical Ethics Opinion 2.1.1, Ex. 1 to DSF (a physician should discuss "[t]he burdens, risks, and expected benefits of all options").)  *See NIFLA*, 138 S. Ct. at 2838 (Breyer, J., dissenting) (quoting *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016)) ("[T]he rule of law embodies evenhandedness, and 'what is sauce for the goose is normally sauce for the gander.'"); *cf. McCullen v. Coakley*, 573 U.S. 464, 497 (Scalia, J., concurring in judgment) (criticizing the majority for creating "an entirely separate, abridged edition of the First Amendment applicable to speech against abortion").

In addition, the amended HCRCA—broader than abortion-specific informed consent laws or mandatory ultrasound laws—is not aimed solely at professionals who perform certain operations or work in a particular field of medicine.  *See McCullen*, 573 U.S. at 481 ("The broad reach of a statute can help confirm that it was not enacted to burden a narrower category of disfavored speech.").   This distinguishes the law at issue here with that in *NIFLA*, where four justices in a concurrence wrote that it "appear[ed] that viewpoint discrimination is inherent in the design and structure" of the notice requirements because their underinclusiveness indicated that the statute targeted pro-life CPCs.  *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring).  True, the challenged law here applies only to conscience objectors, but any change to the HCRCA would affect only conscience objectors because the HCRCA grants protections only to conscience objectors.  And the amendments were aimed at rectifying problems created by the breadth of immunity given to conscience objectors.  *Cf. McCullen*, 573 U.S. at 481 (concluding that a law banning certain conduct in front of abortion clinics was content neutral because the state acted "in response to a problem that was, in its experience, limited to abortion clinics"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists.").  Finally, without expert discovery on the standard of care, it is not yet clear that the amended HCRCA requires Plaintiffs to engage in any speech or conduct

31

that other medical professionals without conscience objections are not also already obligated to engage in. Considering the statutory amendment in isolation of the state's other standards governing the medical profession would unreasonably promote form over substance.

* * *

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner I*, 512 U.S. at 641. The court is mindful that from Plaintiffs' perspective, the law compels speech on a message antithetical to their beliefs and thereby contradicts this Free Speech principle. But the court too recognizes that Plaintiffs' patients are no less deserving of this right to decide for themselves what ideas are worth considering and adhering to, and the state may be well within its powers to protect this principle in a context involving "matters of the highest privacy and the most personal nature." *Casey*, 505 U.S. at 915 (Stevens, J., concurring in part and dissenting part).

For the reasons discussed above, Plaintiffs' motions for summary judgment on their Free Speech claims are denied.

### C.    Facial Challenge

As a final defense to Plaintiffs' Free Speech claim, Defendant asserts that Plaintiffs have waived any facial challenge to the amended HCRCA. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 26.) Typically when a law is subject to facial challenge, the court considers whether there are any circumstances in which the law is valid or if, instead, the law lacks any plainly legitimate sweep. *United States v. Stevens*, 559 U.S. 460, 472 (2010). "In the First Amendment context, however, this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 473 (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 n.6 (2008)). An as-applied challenge, in contrast, asserts that "an act is unconstitutional as applied to a plaintiff's specific activities even

32

though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011).

Defendant is right that Plaintiffs' challenge to the HCRCA amendments appears more like an as-applied than a facial challenge. The arguments presented in their summary judgment briefs concern the law's application to CPCs and their personnel; neither set of Plaintiffs has identified a non-CPC context in which the law's enforcement would be unconstitutional. The *Schroeder* Plaintiffs do also contend that the law is overbroad, and overbreadth is a facial attack in the First Amendment context. (*Schroeder* Pls.' Reply [145] at 14.) But their overbreadth argument appears to be simply that the law is overbroad because it applies to them (*see id.*), whereas an overbreadth challenge ordinarily asserts that the law might chill the speech of third parties not before the court. *See Schultz v. City of Cumberland*, 228 F.3d 831, 848 (7th Cir. 2000) ("To avoid chilling the speech of third parties who may be unwilling or unlikely to raise a challenge in their own stead, the overbreadth doctrine in certain circumstances permits litigants already before the court to challenge a regulation on its face and raise the rights of third parties whose protected expression is prohibited or substantially burdened by the regulation.").

That said, the line between a facial challenge and an as-applied challenge is not a bright one. *See Citizens United*, 558 U.S. at 331 (noting that "the distinction between facial and as-applied challenges is not so well defined"); *United States v. Tollefson*, 367 F. Supp. 3d 865, 872 (E.D. Wis. 2019) ("Despite these varying standards, facial and as-applied challenges can overlap conceptually."). What matters is not the label but the relief sought. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). In this case, the *NIFLA* Plaintiffs have requested not only an injunction against enforcement of the HCRCA's amendments against Plaintiffs themselves, but also a declaratory judgment that the law is unconstitutional, relief that would reach beyond their particular circumstances. (*NIFLA* Pls.' Compl. [1] at 31–32.) And though the *Schroeder* Plaintiffs appear to seek relief specific only to them (*see Schroeder* Pls.' Compl. [1] at 24–25), portions of their complaint also relate to the amended HCRCA's application beyond themselves (*see, e.g.,*

*id.* ¶¶ 57, 80–82).  The court therefore declines to hold that Plaintiffs' facial challenges are waived.  *Cf. Citizens United*, 558 U.S. at 330 (expressing skepticism whether, on appeal, "a party could somehow waive a facial challenge while preserving an as-applied challenge").

## II.    Free Exercise Claims

The court now turns to Plaintiffs' claim that the amended HCRCA violates the Free Exercise Clause of the First Amendment.[24]  "[T]he right of free exercise," the Supreme Court explained in *Employment Division v. Smith*, "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"[25]  494 U.S. 872, 879 (1990) (quoting *United States v. Lee,* 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)).  Such a neutral law of general applicability survives constitutional challenge as long as it is supported by some rational basis.  *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).  But a law that is not neutral or generally applicable will be subject to strict scrutiny.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  Defendant contends that the challenged law is neutral and generally applicable, while Plaintiffs insist it is neither.  But underlying that dispute is the parties' disagreement—which was present though less apparent in the Free Speech analysis—about what law is the proper subject of analysis.  For Plaintiffs, the HCRCA amendments are the beginning and end of the court's inquiry; that is, if the changes to the Act adopted in 2016 are neither neutral nor generally applicable, then the amendments themselves should be subject to strict scrutiny.  For Defendant, in contrast, what matters is not

---

[24]    The *NIFLA* Plaintiffs initially asserted claims under the Illinois Religious Freedom Restoration Act, 775 ILCS 35/1 *et seq.*, and the free exercise guarantee in Article I § 3 of the Illinois Constitution.  (*NIFLA* Pls.' Compl. [1] ¶¶ 146–71.)  Those claims were withdrawn.  (*See* July 19, 2017 Order [65] at 3.)

[25]    Earlier this year, the Supreme Court granted a petition for certiorari in which one of the questions presented is "[w]hether *Employment Division v. Smith* should be revisited."  *See* Petition for a Writ of Certiorari, *Fulton v. City of Philadelphia*, No. 19-123 (U.S. July 22, 2019), *cert. granted*, 140 S. Ct. 1104 (2020).

the amended HCRCA in isolation but its place in the state's larger framework governing medical professionals.

Defendant has the better argument. The HCRCA is an accommodation to healthcare providers who have conscience objections; it excuses them from complying with certain regulations and standards that govern the rest of the field. *Smith* concluded that the Free Exercise Clause does not require exemptions from neutral and generally applicable laws. 494 U.S. at 878–79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."). The Court has also upheld the denial of requested exemptions from a law's applicability even where there are other religious exemptions to that law. *See Lee*, 455 U.S. at 259–61 (rejecting a Free Exercise challenge to the lack of a religious exemption from Social Security taxes for employers even though Congress granted such an exemption for the self-employed). Plaintiffs here are not entitled to any religious accommodation and have cited no cases suggesting otherwise. The greater includes the lesser: just as the state need not grant any exemption at all, so it can limit the extent of any accommodation it does offer. Indeed, considering the Act in isolation, as Plaintiffs insist the court should, would mean that religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished without violating the Free Exercise Clause because religious accommodations are, by their very nature, neither neutral nor generally applicable. *Cf. Employment Div. v. Smith*, 494 U.S. at 890 ("Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process."). This could discourage the creation of new accommodations, lest governments fear that they will be powerless to update them in the face of new challenges.

The question then is (i) whether the regulatory framework from which the HCRCA exempts conscience objectors is a neutral and generally applicable law and, if so, (ii) whether the Act's amendments go no further than requiring conformity to that neutral and generally applicable law. There is no suggestion that the state's rules governing the medical profession, such as the

Medical Practice Act, 225 ILCS 60/1 *et seq.*, or the common-law standard of care, is anything other than a neutral and generally applicable law. Nor is there any indication that the amended HCRCA mandates conscience objectors to engage in conduct more burdensome than that expected of medical professionals without such religiously motivated objections. For example, there is some evidence that the standard of care requires doctors to discuss the benefits of all treatment options (*see* AMA Code of Medical Ethics Opinion 2.1.1, Ex. 1 to DSF), and that conscience objectors who decline to make referrals nevertheless "offer impartial guidance to patients about how to inform themselves regarding access to desired services"[26] (AMA Code of Medical Ethics Opinion 1.1.7, Ex. 2 to DSF). And § 6.1's policy concerning the adoption of written access to care and information protocols applies to all health care facilities. 745 ILCS 70/6.1. These issues are not free from dispute, however, and as with respect to Plaintiffs' Free Speech challenges, the court concludes that expert discovery about the standard of care is necessary before the court can resolve this question.

Next, Plaintiffs correctly argue that satisfaction of the *Smith* test is not sufficient for determining whether a law is constitutional. "Facial neutrality is not determinative. . . . Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 534; *see also Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006) (emphasis added) (quoting *Jimmy Swaggart Ministries v. Bd. of Equal of Cal.,* 493 U.S. 378, 384–85 (1990)) ("'[A] regulation neutral on its face may, *in its application*, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of

---

[26]  In fact, as *amici curiae* Physicians for Reproductive Health note, the requirement in § 6.1(3) of the amended HCRCA, which requires only that a conscience objector provide information about healthcare providers "who they may reasonably believe may offer" the objectionable service, may be even more permissive than the AMA standard. (Br. of *Amici Curiae* Physicians for Reproductive Health in Opp'n to *NIFLA* Pls.' Mot. for Summ. J. [159] at 9.)

religion,' in which case there must be 'a compelling governmental interest justif[ying] the burden.'").[27] That is, the court must consider whether the HCRCA's amendments have some discriminatory purpose or regulate Plaintiffs' conduct because that conduct is religiously motivated. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 543 ("The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."). Once again, the court recognizes that the amended Act applies only to those with religiously-motivated objections to certain treatments, but that would be true of any change ever made to a religious accommodation. If the law does no more than bring the regulations of conscience objectors into conformity with that of other medical professionals (again, still a disputed issue), then the amended HCRCA may not be characterized as discriminating against

---

[27] As Plaintiffs and Defendant mention in their briefs, the *Vision Church* opinion stated that "the Free Exercise Clause and [Religious Land Use and Institutionalized Persons Act] provide that, if a facially-neutral law or land use regulation imposes a substantial burden on religion, it is subject to strict scrutiny." 468 F.3d at 996. This was cited in one subsequent Seventh Circuit opinion for the proposition that "our circuit precedent includes a subsequent step after the *Smith* test, namely to consider whether a law 'unduly burdens' the religious practice." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 745 (7th Cir. 2015). That is, *Listecki* suggested that any law causing a substantial burden is subject to strict scrutiny even if it satisfies *Smith*. *See id.* at 745–50 (determining that the portion of the bankruptcy code at issue satisfied strict scrutiny). The Court of Appeals' more recent Free Exercise Clause cases have not included this second step after the *Smith* analysis. *See St. Augustine Sch. v. Evers*, 906 F.3d 591, 596 (7th Cir. 2018); *Ill. Bible Colls. Ass'n*, 870 F.3d at 639–41. Indeed, recent decisions from the Supreme Court make no reference to any such second step. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (suggesting that laws imposing substantial burdens are constitutional if neutral and generally applicable by noting that "while those religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law"); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) (observing that a "valid and neutral law of general applicability" is constitutional where it regulates "physical acts" and does not interfere with the "faith and mission of the church itself"). Recent opinions from courts in this district have likewise not applied this subsequent step after the *Smith* test. *See, e.g., Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 WL 2468194, at *3–4 (N.D. Ill. May 13, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *7–8 (N.D. Ill. May 3, 2020).

religious medical professionals. The law's text and history, discussed *supra* Part II, suggest instead that the legislature adopted the changes due to legitimate concerns about patient access to healthcare and not out of a desire to stifle religiously-motivated conduct. *See, e.g.,* 745 ILSC 70/3 ("It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care."). Plaintiffs have identified nothing in the legislative record intimating that the legislature had illicit motives when it enacted the law. If anything, legislative history shows that the Act's amendments were written to minimize interference with religious teachings. (*See, e.g., Human Servs. Comm. Hearing* (statement of Lorie Chaiten), Ex. 13 to Def.'s Resp. to *NIFLA* Pls.' Statement of Facts [144-13] at 8:11–19 (noting that the bill was drafted through negotiations with Catholic organizations and such groups did not oppose the bill).)

Finally, "[n]eutral and generally applicable laws are still subject to strict scrutiny if (1) the government is allowed to make individualized exemptions from a general requirement, or (2) the claim is a hybrid-rights claim because it triggers additional constitutional rights." *Ill. Bible Colls. Ass'n*, 870 F.3d at 640. Plaintiffs here have not claimed that either exception applies, and the court agrees that neither appears applicable here. The first of these exceptions concerns a situation in which a neutral law of general application provides exemptions for nonreligious reasons but not for religious hardship. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 537–38. The parties here have identified no exemption from the regulatory framework governing medical professionals other than what is available to conscience objectors in the HCRCA. Plaintiffs also do not have a hybrid-rights claim, which originates in *dictum* in Justice Scalia's opinion in *Smith.* 494 U.S. at 881–82 ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . ."). Plaintiffs assert that the amended HCRCA violates the Free Speech Clause, but they have not demonstrated any such violation or even shown that the law warrants anything more than rational basis review in that context as well. "[A] plaintiff

does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." *Ill. Bible Colls. Ass'n*, 870 F.3d at 641 (alteration in original) (quoting *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 765 (7th Cir. 2003)).

The cases that Plaintiffs rely on in support of their Free Exercise claim are distinguishable. The *NIFLA* Plaintiffs cite *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012), for the proposition that some long-established historical religious practices may not be burdened even by a neutral and generally applicable law.  (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 14.)  But that case "concern[ed] government interference with an internal church decision that affects the faith and mission of the church itself," 564 U.S. at 190, whereas this one concerns the regulation of healthcare professionals in their medical practices.  *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) (explaining that while *Hosanna-Tabor* dealt with regulation of internal church operations, *Smith* "concerned government regulation of physical acts").  The *NIFLA* Plaintiffs also point to language from *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018), where the Supreme Court said that "it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion."  But this provides no support for Plaintiffs' claim.  In that same paragraph, the Court also explained that "if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations."  *Id.*  There is no equivalence between compelling a member of the clergy to perform a same-sex marriage ceremony and requiring that medical professionals abide by the regulations and standards governing their chosen field.  As the *Masterpiece Cakeshop* Court put it, "while [ ] religious and philosophical objections are protected, it is a general rule that such

objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.* The *NIFLA* Plaintiffs also cite *Sherbert v. Verner*, 374 U.S. 398, 404 (1963), where the Court said that it is unconstitutional for the government to force one "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." But, of course, the Court repudiated *Sherbert* in *Smith*. *See Holt v. Hobbs*, 574 U.S. 352, 357 (2015).

* * *

Based on the record before the court, Plaintiffs have not shown that the amended HCRCA should be subject to strict scrutiny for burdening their free exercise rights. Because Plaintiffs have identified no reason that the law lacks a rational basis, the court denies their motions for summary judgment on their Free Exercise claim.

## III.    Unconstitutional Conditions

Finally, both sets of Plaintiffs have argued at times that the HCRCA amendments impose an unconstitutional condition on them because, in their view, they can receive the Act's protections only on the condition that they engage in conduct contrary to their Free Speech and Free Exercise rights.  (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 13; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 15.)  "The 'unconstitutional conditions' doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce." *Planned Parenthood of Ind.*, 699 F.3d at 986 (quoting *Libertarian Party of Ind. v. Packard,* 741 F.2d 981, 988 (7th Cir.1984)).  The parties' filings largely failed to distinguish Plaintiffs' claims that the amended HCRCA directly compels them to violate their First Amendment rights from Plaintiffs' claims that the amendments coerce them to give up their constitutional rights by leveraging the Act's protections for conscience objectors.  The court has denied summary judgment on Plaintiffs' direct Free Speech and Free Exercise claims, finding that at the very least, there are remaining

disputes of material fact that prevent the court from holding that Plaintiffs' First Amendment rights have been infringed. Denial of summary judgment is appropriate for any unconstitutional conditions claim they assert as well. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59–60 (2006) ("It is clear that a funding condition cannot be unconstitutional if it could be constitutionally imposed directly."). Because Plaintiffs have not succeeded in demonstrating that the challenged sections of the HCRCA are unconstitutional as applied directly to them, they have necessarily also failed to show that the law's conditional protections are an unconstitutional condition. *Planned Parenthood of Ind.*, 699 F.3d at 986 ("Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for summary judgment (*NIFLA* Mot. for Summ. J. [90]; *Schroeder* Mot. for Partial Summ. J. [67]) are denied.

ENTER:

Dated: September 3, 2020

_____
REBECCA R. PALLMEYER
United States District Judge

41