# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BRYAN A. SCHNEIDER, <br><br> Defendant. | Case No. 16-50310 <br><br> Hon. Iain D. Johnston <br><br> Magistrate Judge Lisa A. Jensen |
| RONALD L. SCHROEDER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BRYAN A. SCHNEIDER, <br><br> Defendant. | Case No. 17-4663 <br><br> Hon. Iain D. Johnston <br><br> Magistrate Judge Lisa A. Jensen |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION TO EXCLUDE EXPERT TESTIMONY

Date: July 11, 2022

Hannah Jurowicz
Sarah J. Gallo
Matthew Chimienti
Elizabeth Morris
*Assistant Attorneys General*
Office of the Illinois Attorney General
100 W. Randolph St., 11th Floor
Chicago, Illinois 60601
(312) 814-3000
H.GroschJurowicz@ilag.gov
Sarah.Gallo@ilag.gov
Matthew.Chimienti@ilag.gov
Elizabeth.Morris@ilag.gov
*Counsel for Defendant*

**INTRODUCTION**

The key factual issue to be decided by this Court at trial is whether the medical standard of care requires health care professionals to provide information about both the risks *and* the benefits of patients' legal treatment options, tailored to patients' needs, and provide timely information on how to access such care. Several opinions by Plaintiffs' three experts provide no reliable assistance to the Court in answering this question. Accordingly, Defendant asks the Court to exclude the following areas of testimony, as listed in Defendant's Exhibit A:

1. Opinions by all three experts as to the availability and accessibility of reproductive health care information and treatment in Illinois;
2. Opinions by Dr. Boles and Dr. Fernandes that plaintiffs do not engage in any misleading or deceptive practices; and
3. Opinions by Dr. Fernandes about his novel concept of "metainformation."

The proffered testimony by Plaintiffs' experts on these topics reaches well beyond the scope of the experts' qualifications, is not supported by sufficient facts or reliable methodology, and is unlikely to assist the trier of fact. Excluding this testimony will streamline expert testimony for disposition of these cases and help ensure that the expert opinions are relevant, reliable, and held to the same rigorous standards as applied in the doctors' professional fields.

**BACKGROUND**

Plaintiffs are health care personnel and crisis pregnancy centers ("CPCs") challenging the 2017 amendments to the Illinois Health Care Right of Conscience Act, 745 ILCS 70/1 *et seq.* ("Conscience Act"). The Conscience Act shields health care personnel from discrimination on the condition that facilities adopt written protocols: (1) "to ensure that conscience-based objections do not…impair[] patients' health"; and (2) "that explain how conscience-based objections will be addressed in a timely manner to facilitate patient health care services." 745 ILCS 70/6.1.

Plaintiffs have sued because they believe the Conscience Act violates their Free Speech

1

and Free Exercise rights. They oppose abortion, contraception, and sterilization.[1] To advance their beliefs, the CPCs strive to persuade patients that these options are fraught with risks and have zero benefits. They portray abstinence from premarital sex and carrying a viable pregnancy to term as always the most beneficial and healthiest decisions, and they feel the Conscience Act hampers their ability to promote this message.

In January 2019, Plaintiffs sought summary judgment. NIFLA Dkt. 90; Schroeder Dkt. 67. On September 3, 2020, the Court denied their motions. *Nat'l Inst. of Family & Life Advocates v. Schneider*, 484 F. Supp. 3d 596 (N.D. Ill. 2020). The Court ruled that expert testimony regarding the applicable standard of care for medical professionals was necessary to assess Plaintiffs' claims: "[W]ithout expert discovery on the standard of care, it is not yet clear that the amended [Conscience Act] requires Plaintiffs to engage in any speech or conduct that other medical professionals without conscience objections are not also already obligated to engage in." *Id.* at 620–21; *see also id.* at 613 n.19, 616, 618.[2]

To address the questions on the standard of care, Defendant retained Dr. Paul Burcher, an obstetrician-gynecologist ("OBGYN") and bioethicist. Plaintiffs retained three experts: Dr. C. Brent Boles, an OBGYN (for Schroeder Plaintiffs); Dr. Daniel James Lee, an OBGYN (for NIFLA Plaintiffs); and Dr. Ashley Fernandes, a pediatrician and bioethicist (for all Plaintiffs).

All of the parties' experts decline to provide abortions based on faith-based objections, and in fact, the parties' experts agree on several opinions about the standard of care. In several instances, however, Plaintiffs' experts venture beyond their expertise and offer unsupported opinions devoid of a sufficient factual basis or sound methodology.

---

[1] All Plaintiffs take issue with speech relating to abortion, while only Schroeder Plaintiffs challenge speech relating to contraception and sterilization. The distinction is not material for this motion.
[2] Plaintiffs moved to certify the summary judgment denial for appeal. NIFLA Dkt. 178; Schroeder Dkt. 156. This Court denied their motions and ordered expert discovery. NIFLA Dkt. 185; Schroeder Dkt. 160.

## LEGAL STANDARD

Plaintiffs must establish by a preponderance of the evidence that each expert opinion meets the standards of Federal Rule of Evidence 702 and the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under Rule 702, an expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As *Daubert* explains, the court acts as gatekeeper to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. In fulfilling this role, the court scrutinizes: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis omitted).

As gatekeeper, the court must assess an expert's qualifications regarding each challenged opinion. *Gayton v. McCoy*, 593 F.3d 610, 617–18 (7th Cir. 2010). Even if an expert is qualified, testimony must be barred if the expert lacks a reliable methodology. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873–74 (7th Cir. 2021). To test whether an expert's underlying reasoning or methodology is scientifically valid, the court may consider the following non-exhaustive factors:

> (1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

*Id*. at 873 (citing *Daubert*, 509 U.S. at 593–94) (internal quotations omitted). The test is flexible, and no one factor is dispositive. *Id*. (citations omitted). The court has a duty to ensure that the

3

proposed expert "employs in the courtroom the same level of intellectual rigor" expected of "an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

## ARGUMENT

Plaintiffs' experts offer several conclusions that reach well beyond the scope of their qualifications, are not supported by sufficient facts or reliable methodology, and are unlikely to assist the trier of fact. Plaintiffs have not and cannot meet Rule 702's requirements to introduce this proffered expert testimony, and therefore the Court should exclude it. Specifically, the Court should exclude Plaintiffs' experts' testimony regarding: (1) the availability and accessibility of reproductive health care information and treatment in Illinois; (2) whether the CPCs engage in misleading or deceptive practices; and (3) Dr. Fernandes's novel theory of "metainformation." Defendant attaches as Exhibit A a list of the experts' statements that should be excluded under these three categories (*see infra*, Sections I–III).

**I. The Court should exclude Plaintiffs' experts' opinions on the availability and accessibility of reproductive health care information and treatment in Illinois**.

All three of Plaintiffs' experts offer inadmissible generalizations that "everybody knows what abortion is" and "knows that abortion is legal." By way of example:

- "[I]t is completely unrealistic…that any woman in America would not know that she can legally obtain an abortion[.]" *See* Boles Rpt., Ex. B at 15.
- "[N]o reasonable patient who is pregnant does not know about the option of abortion[.]" Fernandes Rpt., Ex. D at 18.
- "Q: So you're saying that when you are counseling with a woman you don't need to mention abortion because in your opinion the woman is already aware that abortion exists as an option to her?" "A: Yes." Lee Tr., Ex. G at 135:7–11.

Such sweeping, unreliable assumptions must be excluded. These assertions are unsupported, unfounded, and simply untrue. None of the doctors provide any support or methodology that logically leads to such conclusions. Plaintiffs' experts are not permitted to "testify to any opinion based on general experience." *Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 999 (N.D.

4

Ill. 2001). Their inferences cannot be accepted at face value, but must have some reliable basis.

To the extent these opinions are offered to show that every pregnant person knows abortion is a legal and available option, they must be excluded because the experts offer mere speculation. The experts cannot provide a factual basis or methodology for their conclusions because, as a factual matter, abortion is not a legal and available option for every pregnant person in America. Whether someone can legally get an abortion varies by what state they are in, gestational stage, their reasons for seeking an abortion, their individual health circumstances, whether the procedure must be performed by certain professionals or at certain locations, and myriad other variables.[3] The doctors make no effort to substantiate the claim that all pregnant people in America "know that [they] can legally obtain an abortion," Ex. B at 15, or even all pregnant people in Illinois. Experts cannot rely on "speculation, unsupported assumptions, or conclusory allegations." *Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994). On this basis alone, the opinions should be excluded as unreliable.

In the alternative, to the extent their opinions are being offered to show that many people are generally aware that a pregnancy can be terminated, their opinions should be excluded as unlikely to help the trier of fact. "[I]t is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend." *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) (collecting cases). To the extent the doctors' statements are offered as "common sense" generalizations, they have no value to the factfinder because they are not based on specialized knowledge. Moreover, a vague awareness that a treatment exists is irrelevant to

---

[3] Limitations on the lawfulness and availability of abortions existed at the time of the experts' testimony, and have only increased in recent months in anticipation of and in response to the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. __ (2022), further permitting states to regulate abortion. *See, e.g.,* https://www.guttmacher.org/state-policy/explore/overview-abortion-laws (summarizing abortion law requirements and prohibitions by state) (last accessed July 11, 2022).

5

what is at stake in this case: patients' right to receive guidance from health care professionals on whether a particular option is medically advisable, the risks and benefits of treatment specific to one's condition, and how to access the treatment in a timely way.

### A. Dr. Lee's opinions about accessibility are not based on a reliable methodology.

Dr. Lee makes numerous broad assumptions that patients can easily access abortions, including, for example:

- "Women who did not receive abortions from [his] practice found facilities that did." Lee Rpt., Ex. F at ¶ 22.
- "Individuals who desire abortions in all 50 states and the District of Columbia can simply use the internet to find providers. This practice is so common that researchers use women's internet abortion searches to study the effectiveness of abortion regulations like waiting periods." *Id*. at ¶ 22.
- When asked how a patient would access abortion services, Dr. Lee responded, "I believe all you have to do is [go online and] put in the word abortion provider service." Lee Tr., Ex. G at 154:17–22.

These opinions are based on insufficient data, unsupported inferences, and leaps of faith without an analytical bridge. "Reliable inferences depend on more than say-so." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005).

First, although Dr. Lee has cared for some patients post-abortion, Ex. F at ¶ 21, he has no reliable basis for concluding that all, or even most, of the patients who did not receive an abortion from him were able to receive one elsewhere. *See id*. He admits that he does not track patients "who decided to have an abortion, who didn't have an abortion, or various other symptoms they might have suffered after an abortion." Ex. G at 149:17–22. Dr. Lee's subjective belief is insufficient to support an admissible opinion. *See Daubert*, 509 U.S. at 590.

Second, Dr. Lee's opinion that "individuals who desire abortions" in Illinois "can simply use the internet," Ex. F at ¶ 22, and search "the word abortion provider service" to obtain an abortion, Ex. G at 154:17-22, should be excluded for lack of a sufficient factual basis or reliable

6

methodology. Dr. Lee's opinion is based on a single inapposite journal article[4] and the anecdote that his patients do not ask him to help them research abortion. Ex. G at 155:8–16. Although courts avoid scrutinizing whether factual underpinnings are correct at the *Daubert* stage, the Court, as gatekeeper, has an obligation to determine "whether it was appropriate for [the expert] to rely . . . upon the sources of information which he employed." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011) (quotations omitted). Defendant does not question the findings in the article. Rather, the article is an inappropriate basis for Dr. Lee's conclusion.

The study that Dr. Lee relies upon does not do what he says it does: namely, demonstrate the availability or accessibility of abortions in Illinois or examine the extent to which the internet enables Illinois patients to access care. To the contrary, the study's premise explicitly contradicts Dr. Lee's conclusion: the study recruited people searching online for abortions because online searchers "may have been considering, but ultimately did not or could not access abortion care."[5] Ex. H at 598. Because the study is based on the premise that searching online for abortion does *not* guarantee access to treatment, it cannot reliably be used to show that searching online for "abortion provider service" guarantees access to treatment. *See* Ex. F at ¶ 22; Ex. G at 154:17-22. Dr. Lee's testimony must be excluded because it "fail[s] to bridge the analytical gap." *Gopalratnam*, 877 F.3d at 786 (quotation omitted) (excluding opinion based on two inapposite studies and a safety standard whose "very premise . . . undermines [the expert's] assertion").

Neither Dr. Lee's experience as an OBGYN, where he does not track access to abortion

---

[4] *See* Exhibit H, Iris Jovel, et al., *Abortion Waiting Periods and Decision Certainty Among People Searching Online for Abortion Care*, 137 J. OF OBSTETRICS & GYNECOLOGY (ISSUE 4) 597–605 (2021) (cited in Dr. Lee's Report, Ex. F, at ¶ 22). "The study is based on 10 months of data from August 2017 to May 2018 when 11,552 visits occurred to their study site." Ex. F at ¶ 22 n.1.

[5] Moreover, the nationwide study included approximately, or "at least," 20 people from Illinois who were searching for abortion information online and willing to take extensive online surveys—a small, self-selecting population that is not plausibly representative of patients in Illinois. Ex. H at 598.

7

services, nor his single inapposite source, supplies a sufficient factual basis for his conclusions. His opinions are not based on any discernible or replicable methodology. "Shaky expert testimony may be admissible, assailable by its opponents through cross-examination, but the testimony proffered here is not merely shaky: it is unreliable." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (cleaned up) (citation omitted). Dr. Lee's testimony should be excluded.

**B.     Dr. Boles's similar opinions about availability of information and access to care in Illinois should be excluded.**

**1.     Dr. Boles lacks relevant qualifications to render his opinions.**

Dr. Boles makes numerous inadmissible generalizations, such as:

- "As a result of today's technology, [information about where to get an abortion] is easily and generally available to virtually everyone, and it can easily be obtained by individuals without having to consult a physician." Boles Rpt., Ex. B at 14.
- It is "unrealistic . . . that a woman would be unable to find an abortion provider without assistance from a medical provider" because "[s]uch information is generally available in many forms[.]" *Id*. at 16.
- Information on and access to birth control is "nearly universally available." Boles Tr., Ex. C at 128:15–23.

These conclusions appear to be grounded solely in Dr. Boles's "education, training, and experience," for he cites no other sources. *See* Ex. B at 3. But treating patients in Tennessee does not qualify Dr. Boles to conclude that "virtually everyone" in Illinois can access reproductive health information and services, Ex. B at 14, or that such services are "nearly universally available." Ex. C at 128:15–23. Alternately, to the extent Dr. Boles's conclusions are offered as "common sense," they are not grounded in any specialized knowledge and are therefore not based on expert qualifications. Dr. Boles does not have relevant qualifications to render opinions on patient access to health care in Illinois, and his above opinions should be stricken.

**2.     Dr. Boles uses unreliable methodology.**

Even if Dr. Boles were qualified, "possess[ing] the requisite qualifications does not,

8

without more, provide a sufficient basis for admissibility." *Kirk*, 991 F.3d at 873. Dr. Boles's testimony that information and access to abortion and contraception is available to "virtually everyone" in Illinois should be stricken under *Daubert*'s reliability prong due to insufficient facts and unreliable methodology. *See* 509 U.S. at 590; FED. R. EVID. 702(b)–(d).

Health care availability and access within a geographic area is testable through surveys, statistics, polls, and other data. Yet Dr. Boles did not conduct any research or review any studies on the topic. *See* Ex. C at 81:13–21, 106:10–14. He did not speak with, much less survey, Illinois patients, or cite to any studies on patient health care access. *See, e.g.*, Ex. B at 14, 16.

The sole basis for Dr. Boles's opinions is his professional experience outside Illinois. Under Rule 702, if an expert "is relying solely or primarily on experience, then [he or she] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note to 2000 amendments. Dr. Boles fails this examination at every step.

To support his conclusions that access to abortion information and treatment are "easily and generally available to virtually everyone," Ex. B at 14, Dr. Boles simply relies on the fact that, in his time practicing as an openly pro-life activist and doctor, his patients have not asked him where to find an abortion.[6] He does not explain why this is sufficient to reach his conclusion that abortion can be easily obtained in Illinois, or how this experience reliably applies to prove that patients in Illinois can easily obtain an abortion. *Id.*

Likewise, Dr. Boles's basis and methodology for concluding that contraception and related information are "nearly universally available" are insufficient. Experts cannot rely on "subjective

---

[6] Dr. Boles informs his patients of his religious objections to abortion, Ex. B at 13, and at the CPC where he was medical director, patients were given copies of a book he wrote to persuade people that abortion is wrong. Ex. C at 50:5–14, 51:2–52:13, 267:10–18.

9

belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Yet Dr. Boles does exactly that, basing his opinion on the conjecture that he "never met a woman who doesn't know that birth control is an available option." Ex. C at 129:10–15.

The unreliable nature of Dr. Boles's opinions is underscored by the fact that he failed to "adequately account[] for obvious alternative explanations" to his theory. *Gopalratnam*, 877 F.3d at 780 (quoting Rule 702's advisory committee note). There are obvious alternate explanations for why Dr. Boles's patients have not asked him about where to obtain birth control. As Dr. Boles concedes, patients at his CPC "don't really ask" about contraception because they are "already pregnant" so "[c]ontraception is not an immediate or urgent need." Ex. C at 17:10-18:1. His patients in private practice would have no need ask where to find contraception because Dr. Boles prescribes contraception. *Id*. at 141:18–25; 142:24–143:2. Dr. Boles's subjective beliefs are thus insufficient to support his conclusions about patient access to information and care.

    **C.**    **Dr. Fernandes's similar opinions on accessibility should be excluded because he lacks relevant qualifications and failed to use a reliable methodology.**

The Court should exclude the following related opinions by Dr. Fernandes, including:

- Patients at CPCs "will most likely still receive an abortion, as it is ubiquitous in most urban areas[.]" Fernandes Rpt., Ex. D at 33.
- "[I]nformation . . . on fetal development, the potential risks (death) to an unborn child through abortion, STI treatment and prevention, and social service support" is "readily available outside of the medical setting[.]" *Id*. at 10.
- The benefits of abortion and sterilization are "public knowledge" and "publicly accessible via the Internet, phone book, or library[.]" *Id*. at 18.

Dr. Fernandes does not satisfy *Daubert*'s standards because he is not qualified to make these conclusions, and his opinions lack a sufficient basis or reliable methodology.

    **1.**    **Dr. Fernandes lacks relevant qualifications.**

Dr. Fernandes's experience as a bioethicist and pediatrician in Missouri and Ohio do not qualify him to render an expert opinion on the availability and accessibility of reproductive care

10

in Illinois. Like Dr. Boles, he has demonstrated no specialized "knowledge, skill, experience, training, or education" that would render him qualified to testify as an expert on patients' experiences accessing reproductive health information and treatment in Illinois. FED. R. EVID. 702. Based on this deficiency alone, his conclusions on this topic should be excluded.

### 2. Dr. Fernandes uses an unreliable methodology.

Even if Dr. Fernandes were qualified, his above opinions are unsupported and unreliable under Rule 702(b)–(d). "Where the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact." *Clark v. Takata Corp.,* 192 F.3d 750, 759 (7th Cir. 1999). Dr. Fernandes offers zero explanation, factual basis, citation, methodology, or analysis for his opinions. Due to this complete lack of support, this testimony must be excluded. *Dukes v. Ill. Cent. R.R. Co.*, 934 F. Supp. 939, 949 (N.D. Ill. 1996) (excluding conclusions where doctor provided no factual, scientific, or empirical support).

To the extent Dr. Fernandes is imparting the "common sense" that things can be researched via the internet, a phone book, or a library, his opinion is irrelevant for two reasons. First, it does not draw upon specialized knowledge, as required for an expert opinion. Second, the existence of methods to research health care information is irrelevant without considering whether Illinois patients have ready access to such methods, are literate in using them, and are able to discern and obtain non-misleading information about available service providers.

## II. The Court should strike Dr. Boles's and Dr. Fernandes's testimony on whether Plaintiff CPCs engage in misleading or deceptive practices.

The Court should exclude the following types of testimony:

- "The Plaintiffs in this case have produced all sorts of evidence about how they operate which I have reviewed. That evidence shows that they do not lie or mislead. Rather, they provide truthful information." Dr. Boles Rpt., Ex. B at 35.
- "[T]he faith-based beliefs about abortion of the staff and medical director . . . are not 'hidden' from women who seek their services. On the contrary, a woman who

11

> requests information about abortion from any ['pregnancy resource center' or 'PRC'] are told that the PRC does not provide that procedure, and it is explained why." Dr. Fernandes Rpt., Ex. D at 18–19.
> - Plaintiffs "are trying to help the woman make a good choice and they do not hide the fact that they would like them to choose life for the unborn baby." *Id*. at 4.

These opinions about what the documents show should be excluded because they are based on insufficient facts, unreliable methodology, and are unlikely to aid the trier of fact.

### A. The opinions about CPCs' practices are based on cherry-picked facts and unreliable methodologies.

Dr. Boles's and Dr. Fernandes's opinions that Plaintiff CPCs do not engage in misleading practices should be stricken because they rely on cherry-picked facts and simple say-so. Courts have repeatedly found that "reliance on a one-sided set of facts without considering potentially competing evidence is unreliable as a methodology[.]" *Chen v. Yellen*, No. 3:14-cv-50164, 2021 WL 4192078, at *5 (N.D. Ill. Sept. 15, 2021); *see also Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) (collecting cases).[7]

First, the doctors' opinions are unreliable because they fail to consider or address contrary evidence. "Experts who engage in cherry-picking of the evidence fail to satisfy the scientific method and *Daubert*." *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019). When the Court reviewed evidence about CPCs' practices, the Court determined that "CPCs do not necessarily…make clear their pro-life position…nor do they always disclose that one of their goals is to dissuade women from having abortions." *Schneider*, 484 F. Supp. 3d at 603. The Court further concluded:

> The record supports an inference that CPCs use potentially deceptive tactics to lure women into their facilities by, for example, placing ads on Google for women searching for information about abortion, by not disclosing to potential patients that one of their goals is to discourage women from getting an abortion, and by using particular talking points and offering special services to 'abortion-minded' women.

---

[7] Per the Court's standing order, cases published only on an electronic database are provided at Exhibit J.

12

> There is also evidence that once in the door, pregnant women are given misleading information about abortion.

*Id*. at 615 (citations omitted). In contrast to the Court's analysis of the evidence, Dr. Boles and Dr. Fernandes only offer summary conclusions that the CPCs "do not lie or mislead" without describing any facts to support such conclusions. Ex. B at 35. They fail to respond to, or even acknowledge, any of the facts identified by the Court. "[N]othing in either *Daubert* or the Federal Rules…requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Zenith*, 395 F.3d at 420. The doctors' conclusions are devoid of a sufficient factual basis or reliable methodology and should be excluded.

Moreover, the doctors relied upon a statement of facts written by Plaintiffs and supporting documentation. *See* Statement of Facts, Ex. I. For example, Dr. Boles's sole methodology was to just look at these documents and start writing. Ex. C at 80:24–81:21. Documents "presented in the context of a narrative explaining [a party's] interpretation of the facts" are "an unreliable basis for an expert opinion." *Chen*, 2021 WL 4192078, at *5. Their opinions thus must be excluded.

      **B.**      **Regardless of factual bases or methodology, their opinions should be excluded because they do not aid the trier of fact.**

To be admissible, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). "[E]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *6 (N.D. Ill. July 17, 2014) (citation omitted) (excluding opinions on what documents "showed" as jury was capable of evaluating the evidence without an expert). If special expertise is not required, an expert is "at best offering a gratuitous opinion[.]" *Id*. (citation omitted). Simply reviewing documents and concluding what they show,

13

as the experts did here, is a textbook example of an inadmissible, gratuitous opinion. The Court is fully capable of considering the evidence on the CPCs' practices without expert assistance.

 III.   **Dr. Fernandes's novel conclusions about "metainformation" are unreliable**.

The Court should exclude Dr. Fernandes's testimony on "metainformation," a term he "invented" that is not used in medicine or bioethics. *See* Fernandes Tr., Ex. E, at 79:5–19. The Seventh Circuit has repeatedly "emphasized that experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). "Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Id.* (collecting cases). Dr. Fernandes's theories on "metainformation" fail under virtually every *Daubert* and Rule 702 benchmark.

Without support, Dr. Fernandes defines metainformation as information "necessary" for a patient to "make a later informed decision," but that "precedes the requirements and duties of informed consent—both temporally and morally." Ex. D at 10–11. He submits the following types of opinions:

- "Medical information or metainformation is not medical advice." *Id.* at 8.
- Metainformation is not "medical advice, since it *prepares* the person with a particular perspective that aids in decision-making processes being considered." *Id.* at 10 (emphasis in original).
- "[M]etainformation [is] necessary to make a later informed decision." *Id.* at 11.
- The CPCs only provide "metainformation" to patients. *Id.* at 10.
- Health care providers are "only required to counsel regarding procedures where," among other factors, "medical advice (not medical information or metainformation, as in the case of PRCs) is given[.]" *Id.* at 45.
- Metainformation is "distinguished from medical advice, because it's information that the person needs prior to making a decision that involves medical advice. So it prepares the person with a particular perspective. It's information that you need going in before─that kind of preps the ground for you." *See* Ex. E at 77:23–25; 78:20–79:4.

Dr. Fernandes's concept of metainformation is wholly unsupported by any facts or data. *See* FED. R. EVID. 702(b). Dr. Fernandes cites no studies, publications, or sources in medicine or bioethics for the above. Reliance upon "subjective belief or unsupported speculation" is

14

insufficient. *Daubert*, 509 U.S. at 590. Nor does Dr. Fernandes explain the principles or methods he used to arrive at this novel concept. *See* FED. R. EVID. 702(c). And there is no indication that Dr. Fernandes reliably applied the concept of "metainformation" to the CPCs, since all we have is his unsupported musings. *See id*. at 702(d). Finally, there is no indication that Dr. Fernandes's novel theory is capable of being tested. *See Daubert*, 509 U.S. at 593. There is no "known or potential rate of error" for the theory of "metainformation," nor any established "standards controlling" it. *Id*. at 594. His invented concept has not been "subjected to peer review [or] publication" and is far from "general acceptance" in the relevant scientific or expert community. *Id.* at 593–94.

Dr. Fernandes' concept of "metainformation" is not used in the fields where he has experience, medicine and bioethics. Ex. E at 79:5–19. "[E]ven a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Kirk*, 991 F.3d at 873–74 (cleaned up) (citations omitted). "The purpose of the *Daubert* standard is to ensure that any admitted scientific evidence is reliable; that is, well-grounded in methods and procedures of science." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). Dr. Fernandes's testimony about "metainformation" must be excluded.

## CONCLUSION

For the foregoing reasons, Defendant respectfully asks that the Court exclude the following areas of testimony, as listed in Defendant's Exhibit A:

1. Opinions by all three experts as to the availability and accessibility of reproductive health care information and treatment in Illinois;
2. Opinions by Dr. Boles and Dr. Fernandes that plaintiffs do not engage in any misleading or deceptive practices; and
3. Opinions by Dr. Fernandes about the novel concept of "metainformation."

Date: July 11, 2022 Respectfully submitted,

/s/ *Hannah Jurowicz*

Hannah Jurowicz
Sarah J. Gallo
Matthew Chimienti
Elizabeth Morris
*Assistant Attorneys General*
Special Litigation Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 11th Floor
Chicago, Illinois 60601
(312) 814-3000
H.GroschJurowicz@ilag.gov
Sarah.Gallo@ilag.gov
Matthew.Chimienti@ilag.gov
Elizabeth.Morris@ilag.gov

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2022, I electronically filed the foregoing document with the Clerk of the Court by using the ECF system which will send notification of such filing to all counsel of record.

*/s/ Hannah Jurowicz*
Hannah Jurowicz
Assistant Attorney General