# Exhibit A

Defendant's Proposed Supplemental Findings of Fact

**IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Mario Treto Jr., <br><br> Defendant. | Case No. 16-cv-50310 <br><br> Hon. Iain D. Johnston <br><br> Magistrate Judge Lisa A. Jensen |
| Ronald Schroeder, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Mario Treto Jr., <br><br> Defendant. | Case No. 17-cv-4663 <br><br> Hon. Iain D. Johnston <br><br> Magistrate Judge Lisa A. Jensen |

**DEFENDANT'S PROPOSED SUPPLEMENTAL FINDINGS OF FACT**

Legislative and Regulatory History of the Amendments to the Act

1.      The Illinois Health Care Right of Conscience Act, 745 ILCS 70/1 *et seq.*, (the "Act") was amended amid concerns that patients experiencing miscarriages were being turned away from Catholic hospitals, causing health issues and leaving patients confused as to what medical care was needed. Def. Trial Ex. 57 at IDFPR000352; Def. Trial Ex. 58 at IDFPR000472.[1]

---

[1] A list of the exhibits that Defendant cited and filed in support of this submission can be found in the Appendix at the end of this document.

2.     The amendments to the Act protect "both patients and health care providers when a provider asserts a religious . . . objection to providing a health care service." Def. Trial Ex. 66 at 5:18-21.

3.     During an Illinois House of Representatives Committee Hearing, a constituent testified about her traumatic experience when Catholic hospitals refused to terminate her pregnancy in the midst of a miscarriage, despite experiencing pregnancy complications that threatened her life and fertility. Def. Trial Ex. 66 at 13:8-16:12.

4.     The constituent testified that, for religious reasons, her doctors and hospital would not help her end the pregnancy, refused to provide a referral to another hospital or provider even though the procedure was medically necessary, and did not counsel her about any options "other than waiting to get sick enough for them to help." Def. Trial Ex. 66 at 14:5-15:20.

5.     The constituent testified in favor of amending the Act after she spent five weeks bleeding and being turned away for treatment until her condition qualified as an emergency. Def. Trial Ex. 66 at 15:21-16:12.

6.     At the same hearing, the chair of the Illinois section of the American College of Obstetricians and Gynecologists ("ACOG") testified that she had seen "patients who were not told about all their treatment options because of a hospital's religious directive." Def. Trial Ex. 66 at 16:17-20:8.

7.     Before the Act's amendment, the Illinois Department of Financial & Professional Regulation ("IDFPR") also received complaints alleging that some health care personnel harmed patients by not adhering to the medical standard of care or informing patients of legal treatment options. Def. Trial Exs. 55-56, 61-62.

8.      IDFPR received complaints alleging that patients were harmed when health care personnel with conscience-based objections failed to refer or transfer the patients or provide them written information about other health care providers who they reasonably believe offer the requested treatment. Def. Trial Exs. 55-56, 61-62.

9.      For example, in April 2014, a patient and her obstetrician had this challenge after contacting the patient's neurologist to secure a neurological clearance for general anesthesia, which the obstetrician needed to do based on the patient's medical history. Def. Trial Ex. 55.

10.      The neurologist, who is licensed to practice medicine in Illinois, refused to authorize his patient for general anesthesia for an abortion because he had a conscience-based objection to abortion.  Def. Trial Ex. 56.

11.      The neurologist told his patient that even though her doctor advised her abortion was "thought to be medically necessary[,]…[t]here is no such thing as a medically necessary abortion." Def. Trial Ex. 55.

12.      In October 2014, IDFPR received a complaint alleging that two Illinois crisis pregnancy centers were conducting ultrasounds without a physician's orders and using "bait and switch tactics to lure people in for [medical] services they do not offer."  Def. Trial Ex. 59 at IDFPR001888.

13.      In March 2015, IDFPR received a complaint about a licensed clinical professional counselor who treated the complainant patient for over five years and, based on the counselor's religious beliefs, shamed and criticized the patient for his homosexuality.  Def. Tr. Exs. 60, 62.

14.      The patient told IDFPR that during therapy, he "wanted to talk [about]…coming out of the closet as a gay man," but the counselor "would tell him that he wasn't gay" and "told

[the patient] that he didn't condone it," which "made [the patient] ashamed and hurt him mentally." Def. Trial Ex. 61.

15.     Although the patient asked his counselor for a referral to another counselor who would understand his sexuality, the counselor declined, replying that a referral was unnecessary and that they "were doing fine." Def. Trial Ex. 62 at IDFPR001976.

16.     The patient suffered two mental breakdowns during the course of treatment with the counselor, including one breakdown where the patient had to be placed in a hospital's intensive care unit. Def. Trial Ex. 62 at IDFPR001976, 78.

Mission of the Plaintiff CPCs

17.     Plaintiff CPCs previously provided only material support and other non-medical resources for pregnant individuals and new parents as part of their pro-life mission.  Trial tr. 117:18-118:14; 158:8-159:16; 207:8-14; 215:8-16; 216:1-4; 216:21-217:14; 229:7-10; 252:4-16; 324:9-24; 381:24-382:2.

18.     Plaintiff CPCs each chose to start offering free health care services, like ultrasounds and pregnancy testing, as part of their efforts to prevent pregnant individuals from choosing abortion. Trial tr. 95:17-96:9; 117:18-118:12; 158:21-159:16; 175:14-176:6; 207:8-23; 216:25-217:3; 252:4--16; 326:18-22; Wilson Dep. 147:17-148:13.

19.     Plaintiff TLC provides prenatal care until the 20th week of pregnancy. Trial tr. 175:14-176:5.

20.     Plaintiff CPCs rely on the visuals of the ultrasound itself and the health care provider's diagnoses to try to convince pregnant patients to carry to term and not have an abortion. Trial tr. 126:2-5, 207:8-23, 252:12-16, 323:5-13; 406:21-24.

21.     Some Plaintiff CPCs changed their names after adding medical services to encourage pregnant patients considering abortion to come to their facilities. Trial tr. 117:18-118:14; 158:13-159:16; 160:5-13; 191:10-15; 217:4-14.

22.     Health care personnel who provide ultrasounds are often trained at pro-life organizations, including the National Institute of Family and Life Advocates ("NIFLA"). Trial tr. 163:21-164:2; 325:22-326:5; 386:18-20.

23.     In order to join NIFLA, NIFLA members abide by a standard of care specifically set by NIFLA, including agreeing not to perform or refer for abortions. Trial tr. 164:3-9.

24.     NIFLA provides sample documents, policies, and procedures for its members, including some Plaintiff CPCs, to use. Trial tr. 164:10-18; 352:1-4.

Plaintiff CPC Messaging

25.     Plaintiff CPCs advertise their services through their websites. Trial tr. 128:17-129:3; 166:14-17; 178:15-18; 192:24-193:3; 270:3-10; 382:17-20; Schroeder Trial Ex. 154 at Schroeder_Supp_0038.

26.     Some Plaintiff CPCs use search engine optimization, meaning they pay search engines like Google for their CPC websites to show up in response to internet searches for certain terms, such as "abortion," "clinic," "pregnancy," and "help." Trial tr. 127:21-128:23, 166:18-22.

27.     The purpose of Plaintiff CPCs paying for search engine optimization is to direct individuals who think that they are pregnant to Plaintiff CPCs' websites. Trial tr. 127:21-128:23.

28.     Plaintiff CPCs advertise that their mission is to provide pregnant individuals with complete and accurate information to make a fully informed choice about whether to carry to term or have an abortion. Trial tr. 94:21-25; 159:17-160:2; 160:13-17; 204:8-21, 269:22-271:20, 273:2-10; 369:22-370:4; 381:2-11; Def. Trial Ex. 71 at IDFPR009474; Def. Trial Ex. 38; Schroeder Trial

5

Ex. 154 at Schroeder_Supp_0038; Def. Trial Ex. 69 at IDFPR009432; Def. Trial Ex. 70 at IDFPR009440, 9443; Def. Trial Ex. 71 at IDFPR009460, 9496, 9504; Schroeder Trial Ex. 157-01 at Schroeder_Supp_0050; Schroeder Trial Ex. 157-15 at Schroeder_Supp_0092.

29.    For example, the Options Now website tells potential patients:

    a.    "There's a lot of information about abortion online, making it extremely difficult to sift through what's real, what's not, what to believe and who to trust."

    b.    "This is especially true in Illinois, where laws are not always clear."

    c.    "When you're looking for abortion information, you shouldn't trust just any article you find."

    d.    "Place your trust in a team of licensed medical professionals, who can empower you with factual information so you can truly make the best choice for you."

Schroeder Trial Ex. 154 at Schroeder_Supp_0038.

30.    Plaintiff PASS specifically claims to discuss all options with a patient for purposes of informed consent, so clients can know those options and ask questions about them. Trial tr. 357:7-17.

31.    Plaintiff CPCs do not provide complete information about abortion and do not counsel on any potential benefits abortion may offer a particular patient. Trial tr. 108:3-8; 162:22-25; 182:1-5; 205:1-3; 233:16-21; 326:23-327:13; 380:15-21.

32.    CPCs counsel patients about the risks of abortion, sterilization, and contraception, but not about any benefits of those procedures. Trial tr. 102:5-14; 121:20-122:2; 181:18-182:5; 205:18-206:3; 257:4-9; 258:23-259:2; 264:16-265:22; Def. Trial Ex. 40.

33.     The CPCs believe that counseling patients about the benefits of abortion or informing patients about how to access that care would make it more likely that patients would choose to have an abortion. Trial tr. 123:4-124:15.

34.     At times, Plaintiff CPCs may even overstate the risks associated with abortion to dissuade patients from having one, including exaggerating risks of infection or representing that abortion causes breast cancer. *Compare* Trial tr. 279:13-20 *with* Trial tr. 633:2-24; *Compare* Schroeder Trial Ex. 72 *and* Trial tr. 747:18-749:22 *with* Trial tr. 633:25-635:15; *see also* Def. Trial Ex. 26; Def. Trial Ex. 7 at IDFPR00159.

35.     Educational materials containing medical information must be approved by the CPC's medical director before being provided to patients. Trial tr. 106:25-108:2; 184:3-11; 310:16-311:18; Schroeder Trial Ex. 114 at ONMedPP-006.

Plaintiff CPCs Target Individuals Seeking Abortions

36.     For some of the Plaintiff CPCs, many patients visit for some kind of abortion counseling. Trial tr. 138:3-14; 163:5-9; 224:9-225:7; 359:14-21; 393:18-24.

37.     Plaintiff CPCs aim to attract pregnant patients who are in crisis and vulnerable. Trial tr. 119:3-5, 158:16-20; 171:8-12; 191:6-9; 223:12-17, 266:4-267:23; 268:12-21, 309:20-310:1; 352:8-353:4; 395:14-396:1; Def. Trial Ex. 20 at 6; Def. Trial Ex. 71 at IDFPR009486-87.

38.     Plaintiff CPCs' free prenatal ultrasounds also attract pregnant patients seeking an abortion who have limited financial means, and who may require an ultrasound to have an abortion. Trial tr. 137:4-138:9; Def. Trial Ex. 20 at 6; Def. Trial Ex. 69 at IDFPR009427, 35-36, 9427; NIFLA Trial Ex. 17 at NIFLA 00056; NIFLA Trial Ex. 7 at Sec. 4, p. 12 (PDF p. 7); Schroeder Trial Ex. 157-17 at Schroeder_Supp_0097.

39.     For example, Options Now tells patients and potential patients that the pregnancy tests and ultrasounds that the CPCs offer are "medical services you will need prior to having the abortion as well as [providing] factual information about abortion costs and procedures." Schroeder Trial Ex. 84 at ONHOF-005. *See also* Def. Trial Ex. 69 at IDFPR009427; Def. Trial Ex. 71 at IDFPR009486-87; NIFLA Trial Ex. 17 at NIFLA 00056.

40.     However, Options Now restricts what medical information can be given in writing to ultrasound patients if that information may be used to obtain an abortion. Schroeder Trial Ex. 104 at ONHOF-292.

41.     Plaintiff Mosaic parks its mobile health care unit next to a Planned Parenthood, which intercepts pregnant individuals going to Planned Parenthood for health care services such as abortion. Trial tr. 113:22-114:17; 137:4-138:9.

42.     Plaintiff Focus began as the second location away from its first center, First Way Life Center, to attract patients considering abortion. Trial tr. 217:4-14.

43.     Plaintiff CPCs determine if pregnant patients are "abortion-vulnerable" (at risk of considering an abortion) or "abortion-minded" (have decided they would like to have an abortion) to convince them not to have an abortion, regardless of their personal medical history or circumstances. Trial tr. 106:5-20; 126:14-127:20; 166:25-167:12; 250:16-20; 252:4-16; 356:16-357:17; 393:25-394:5; Schroeder Ex. 37 at FOCUS-073021-010; Wilson Dep. 128:1-129:2; Def. Trial Ex. 27.

44.     CPCs may characterize a pregnant person as "abortion vulnerable" if she has an "apparent medical condition that will affect her pregnancy." Trial tr. 393:25-394:5; Schroeder Trial Ex. 89 at ONHOF-038; Wilson Dep. 132:23-133:17; Wilson Dep. Exs. 6-7.

45.     A CPC may automatically consider a patient "abortion vulnerable" if she is under age 18. Schroeder Trial Ex. 89 at ONHOF-038.

46.     In phone calls with pregnant individuals, some Plaintiff CPCs employ talking points to convince those considering abortion to come to their offices for health care services. Trial tr. 126:21-127:9; NIFLA Trial Ex. 46; Schroeder Trial Ex. 84 at ONHOF-008.

47.     For example, at Options Now, if someone states that they have decided to have an abortion, Options Now tells the potential patient, "There are other risks that you should be aware of and so for your safety, we recommend having a pre-abortion consultation that will help you determine important criteria about your abortion decision." Schroeder Trial Ex. 84 at ONHOF-007.

48.     Some Plaintiff CPCs collect data to determine whether their staff were able to dissuade patients from having abortions. *See, e.g.*, Trial tr. 208:3-10; Def. Trial Exs. 19-21; Def. Trial Exs. 10-11; Wilson Dep. Exs. 6-7.

49.     Plaintiff Options Now tracks the patients' intentions for the pregnancy after the ultrasound is provided to determine if the patient is still at risk for having an abortion. Def. Trial Ex. 39.

Patient Experience at Plaintiff CPCs

50.     Health care personnel perform health care services at the Plaintiff CPCs. Trial tr. 96:24-97:16; 154:24-155:5; 165:9-24; 169:12-15; 177:22-178:9; 189:5-190:1; 202:10-25; 231:5-

6; 231:18-232:5; 320:15-321:16; 326:23-327:13; 363:15-22; 386:5-8; 397:12-15; Def. Trial Ex. 71 at IDFPR009460, 9487; Schroeder Trial Ex. 157-01 at Schroeder_Supp_0050.

51.    Plaintiff CPCs' health care services include prenatal ultrasounds performed by health care personnel. Wilson Dep. 88:2-16; Trial tr. 95:17-19; 119:10-12; 165:9-19, 165:22-24;189:14-20; 189:24-190:1; 231:5-6; 320:15-321:5; 370:22-371:9; 385:25-386:8.

52.    Before performing an ultrasound, health care personnel ask pregnant patients questions regarding their medical history, such as whether they have a history of preeclampsia or eclampsia. Trial tr. 154:24-155:5, 336:4-10, 360:9-18-362:4.

53.    These prenatal ultrasounds are either transvaginal—in which an ultrasound wand is inserted in the vagina of the patient—or abdominal. Trial tr. 322:13-16, 388:2-389:2.

54.    CPCs' ultrasound procedures for patient care change in part based on whether a patient intends to carry to term or is perceived by the CPC to be at risk of choosing an abortion. Trial tr. 253:13-254:9; Def. Trial Ex. 32; Schroeder Trial Ex. 129 at ONUSPP_003, 005; Schroeder Trial Ex. 130.

55.    For example, Options Now's ultrasound policy changes the timeframe of when they encourage a patient to have to have an ultrasound based on whether the patient intends to carry to term or is perceived by the CPC to be at risk of choosing an abortion or "abortion vulnerable." Schroeder Trial Ex. 129 at ONUSPP_003, 005; Schroeder Trial Ex. 130.

56.    Plaintiff CPCs' health care personnel conduct pregnancy options counseling with patients, often in conjunction with a prenatal ultrasound. Trial tr. 121:10-23, 183:23-25, 202:10-19, 231:15-232:22, 326:23-327:17, 357:2-17; Def. Trial Ex. 68 at IDFPR009417, 9424; Def. Trial Ex. 70 at IDFPR009443.

57.     Plaintiff CPCs typically do not advise pregnant patients about any medical risks of carrying their pregnancies to term. Trial tr. 112:25-113:1, 124:17-21, 326:23-327:17.

58.     If the ultrasound does not successfully convince the patient to carry to term, Options Now sonographers are directed to try to schedule a second ultrasound with the patient. Schroeder Trial Ex. 104 at ONHOF-292.

Qualifications of Dr. Paul Burcher

59.     Dr. Paul Burcher completed medical school at the University of Arizona, completed his residency in obstetrics and gynecology ("OB/GYN") at the University of Rochester, and has been practicing as an OB/GYN since 1991. Trial tr. 571:14-21; 575:15-18.

60.     In his OB/GYN practice, Dr. Burcher counseled pregnant patients about their medical options and has delivered approximately 6,000 babies. Trial tr. 575:19-25.

61.     Dr. Burcher also has a Ph.D. in philosophy with a concentration in ethics from the University of Oregon and completed a clinical ethics fellowship at the University of Chicago. Trial tr. 571:14-21.

62.     He is currently the OB/GYN residency director and heads the bioethics committee at WellSpan York Hospital, a seven-county hospital system in Pennsylvania. Trial tr. 571:22-572:9.

63.     Dr. Burcher has published in the fields of medical ethics and obstetrics and gynecology, including on the subjects of informed consent and doctor-patient communication. Trial tr. 576:1-9.

Ethical Foundations of the Standard of Care

64.     The medical standard of care consists of both clinical and ethical standards of care, which are "intertwined in the sense that you have to uphold both sides of that equation to remain within the [medical] standard of care." Trial tr. 582:23-583:2.

65.     General ethical principles govern the entire medical profession. Trial tr. 415:1-11; 582:5-8.

66.     The central approach to biomedical ethics is the "principlist theory," or the principles of autonomy, beneficence, nonmaleficence, and justice. Trial tr. 581:11-582:4.

67.     The principles of autonomy, beneficence, nonmaleficence, and justice apply for all medical care. Trial tr. 582:5-8.

68.     Patient autonomy allows a patient is to make a medical decision by understanding all the salient options and their risks and benefits. Trial tr. 583:11-584:6.

69.     Patient autonomy is a central tenet of biomedical ethics. Trial tr. 581:11-14; 583:11-584:6.

70.     Patient autonomy is not the same thing as doing whatever the patient requests in that it is filtered through medical standards of care. Trial tr. 585:7-23.

71.      While patients have a right to refuse care, their ability to make requests is limited in cases where the request is not medically appropriate. Trial tr. 585:7-586:10.

72.     Beneficence is acting in the good of the patient, or to benefit the patient. Trial tr. 622:3-623:17.

73.     Nonmaleficence is the reduction of harm. Trial tr. 622:3-623:17.

74. Generally accepted principles of medical ethics are espoused in *Principles of Biomedical Ethics* by Beauchamp and Childress, the seminal text of bioethics in America. Trial tr. 574:16-22.

75. Health care personnel utilize resources like the American Medical Association Code of Ethics as an easier, more easily indexed reference that is similar to *Principles of Biomedical Ethics*. Trial tr. 592:22-593:3.

76. The AMA Code of Ethics are not binding professional or legal standards, but they provide a normative set of guidelines within the medical profession that health care professionals consult to inform their practice. Trial tr. 425:23-425:14; 592:14-593:20; 611:15-612:5.

77. Health care personnel use the AMA Code of Ethics as a standard set of digestible guidelines for clinical practice and for biomedical ethics. *See, e.g.,* Trial tr. 44:11-45:2, 49:3-8; 425:23-425:14; 435:7-436:9, 437:9-24; 592:14-593:20; 595:17-596:16; 606:3-607:4; 611:15-612:5; 614:25-615:21; 616:4-7; 618:11-620:4; 769:9-771:6.

78. Committee opinions issued by the American College of Obstetricians and Gynecologists ("ACOG") are ethical guidelines that contribute to the ethical standard of care for OBGYNs. Trial tr. 597:5-12.

Patient Trust in Health Care Personnel

79. "The relationship between a patient and a physician is based on trust." Trial Tr. 769:24-770:6; NIFLA Trial Ex. 32(a) at AMA 1.1.1.

80. The doctor-patient relationship "gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others." Trial Tr. 770:7-13; NIFLA Trial Ex. 32(a) at AMA 1.1.1.

81. Patients have the right to "[b]e advised of any conflicts of interest their physician may have in respect to their care." Trial Tr. 771:3-6; NIFLA Trial Ex. 32(a) at AMA 1.1.3.

82. Medical information is available online, but may be incorrect, misleading, or not relevant to a particular patient. Trial tr. 68:10-21; 643:3-14.

83. Patients rely on physicians to filter medical information that is accurate and contextualized to their condition. Trial tr. 643:3-644:15.

84. Doctors are "obligated to use sound medical judgment on the patients' behalf." Trial Tr. 770:14-17; NIFLA Trial Ex. 32(a) at AMA 1.1.1.

85. Patients have the right to "[b]e able to expect that their physician will cooperate in coordinating medically-indicated care with other health care professionals." Trial Tr. 770:18-22; NIFLA Trial Ex. 32(a) at AMA 1.1.3.

86. "[T]he health and wellbeing of patients depends on a collaborative effort between patient and physician in a mutually respectful alliance." Trial tr. 63:5-10; 770:23-771:2; NIFLA Trial Ex. 32(a) at AMA 1.1.3.

87. A patient needs all relevant information for their specific context to make the best decision for themselves based upon their values and their circumstance. Trial tr. 62:6-11; 596:5-16.

88. "Patients have the right to receive information, ask questions about treatments so that they can make well considered decisions about care." NIFLA Ex. 32(b) at 2.1.1; Trial Tr. 593:21-594:19, 596:5-16, 598:17-599:7.

89. Withholding relevant medical information from a patient violates patient autonomy because a patient may have relied on that information to make a self-governing decision. Trial tr. 596:5-16.

90. "Except in emergency situations in which a patient is incapable of making an informed decision, withholding information without the patient's knowledge or consent is ethically unacceptable." NIFLA Trial Ex. 32(b) at AMA 2.1.3; Trial tr. 595:17-596:16; 656:24-657:4.

91. "Withholding pertinent medical information from patients in the belief that disclosure is medically contraindicated creates a conflict between the physician's obligations to promote patient welfare and to respect patient autonomy." NIFLA Trial Ex. 32(b) at AMA 2.1.3. Trial tr. 595:17-596:16; 656:24-657:8.

92. When counseling a patient about medical treatment options, even if the health care provider does not offer the treatment options, it would violate the standard of care if the health care provider withheld relevant information during the counseling. Trial tr. 767:20-768:14.

Ethics Related to Medical Options Counseling and Informed Consent

93. "A patient-physician relationship exists when a physician serves a patient's medical needs." Trial tr. 768:21-24; NIFLA Trial Ex. 32(a) at AMA 1.1.1.

94. When a health care provider counsels a patient on medical treatment options that the health care provider does not offer, the counseling serves the patient's medical needs and is a form of health care. Trial tr. 766:25-768:24; 769:4-20.

95. When a health care provider counsels a patient about treatments that the provider does not offer, the health care provider is subject to medical standards of care. Trial tr. 769:4-20.

96. Medical options counseling consists of a health care provider presenting a patient with medically appropriate treatment options for their condition and the risks and benefits of those options specific to the patient. Trial tr. 61:11-62:15, 590:6-25.

97. Medical options counseling constitutes part of the overall course of medical care that is provided to the patient. Trial tr. 61:11-17; 516:21-25; 585:3-6; 769:9-16.

98.     Under the medical standard of care, a health care provider filters options to counsel a particular patient using their medical expertise, not their personal values or biases, which the patient may not share. Trial tr. 425:23-426:14; 588:13-589:9; 646:16-25; NIFLA Ex. 32K at NIFLA 01879-80.

99.     A health care provider should also discuss the option of forgoing treatment and the risks and benefits of forgoing treatment in medical options counseling. NIFLA Ex. 32B at NIFLA 01769-70; Trial tr. 599:1-7; NIFLA Ex. 32K at NIFLA 01880.

100.    A health care provider must thoroughly discuss relevant medical treatment options with a patient, and violates the standard of care if they only discuss the risks of a treatment—even if the health care provider has a religious objection to the treatment. Trial tr. 767:25-768:14.

101.    A physician must keep the standard of care in mind and base counseling on the best medical evidence. Trial tr. 62:12-15.

102.    The amendments to the Act are a reiteration of the ethical principles that health care personnel will either counsel on all relevant treatment options or otherwise advise patients on where they can receive unbiased medical counseling. Trial tr. 647:21-651:4.

103.    The provisions of the Act relating to medical records and adopting written protocols are consistent with biomedical ethics and the standard of care. Trial tr. 651:7-24; 652:4-653:1.

104.    Medical options counseling in accordance with the standard of medical care also enables informed consent because it facilitates the patient's authorization to undergo a specific medical intervention. NIFLA Ex. 32B at AMA 2.1.1, NIFLA 01769-70; NIFLA Ex. 32K: ACOG Committee Op. 390 at NIFLA 01879-80; Trial tr. 584:18-23; 593:21-594:19, 602:24-604:12.

105.    When conducted in compliance with the medical standard of care, medical options counseling promotes and protects patient autonomy by disclosing all relevant facts so a patient can

exercise personal choice and informed decision-making. Trial tr. 583:11-585:6; NIFLA Ex. 32K at NIFLA 01879.

106.    Informed consent is the practical application of the concept of autonomy because when the patient has all the facts they are better able to make a self-governed decision. Trial tr. 62:21-63:4; 584:7-23.

107.    Informed consent is not limited to seeking authorization for an imminent medical procedure. Trial tr. 605:2-12; NIFLA Trial Ex. 32(a) at AMA 1.1.7(e).

108.    The concept of informed consent can apply to counseling both about a specific medical intervention by a health care provider or more broadly about different relevant medical options available to a patient, because both involve choosing a treatment option or a plan of care. Trial tr. 603:13-19.

109.    Health care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility. Trial tr. 637:21-639:5.

110.    For example, if a patient requires treatment for an ectopic pregnancy, the physician should describe and explain the risks of an ectopic pregnancy and why treatment is needed. Trial tr. 54:9-11; 54:25-55:3.

111.    Similarly, if an obstetrician determines that a patient would be better suited to see a maternal fetal medicine specialist, the obstetrician should explain those benefits to a patient. Trial tr. 46:4-20.

112.    If a health care provider is unable to counsel about a treatment option, medical ethics dictates that the provider has a duty to refer the patient where they can receive counseling

or provide information about how to find that service. Trial tr. 606:5-607:4; 618:11-24; 696:24-699:10; NIFLA Trial Ex. 32(b) at AMA 1.1.7; NIFLA Trial Ex. 32(d) at NIFLA 01824-25.

113.    If health care personnel can only partially counsel about a treatment option, that provider has a duty to refer the patient so they can receive complete counseling. Trial tr. 620:12-22.

114.    Health care personnel that do not direct a patient to where they can receive counseling violate the medical standard of care. Trial tr. 620:23-621:13.

115.    Disclaimers that health care personnel do not perform a particular procedure or offer a certain treatment is not sufficient to satisfy the standard of care or the obligation to refer. Trial tr. 602:3-19, 621:14-25.

116.    In practice, this means that health care personnel who decline to discuss the risks or benefits of a relevant treatment option based on their own values violate the medical standard of care for their patient. Trial tr. 602:3-19.

117.    The rule of not withholding information applies to all types of patient-physician communication, not just informed consent. Trial tr. 605:13-25.

118.    A health care provider who withholds medical information during medical options counseling that may be relevant to a patient's specific circumstances violates the medical standard of care. Trial tr. 596:5-16, 766:25-768:24; NIFLA Ex. 32B at NIFLA 01771-72.

119.    Health care personnel do not need to counsel a patient about a treatment option if the treatment is not medically appropriate for the specific patient or not appropriate considering the patient's specific circumstances, goals, and values. Trial tr. 599:8-602:2.

Conscientious Objections

120.    The medical standard of care does not vary based on the conscience beliefs of the health care provider, but rather based on the context of the patient. Trial tr. 514:5-10; 583:3-7, 606:3-607:4.

121.    Ethical standards of care state that when doctors exercise conscience objections, doctors still have ethical duties to ensure that patients' rights and health are still protected. Trial tr. 606:5-607:4; 615:9-21; 616:4-617:3; 689:18-690:25; NIFLA Trial Ex. 32(a) at AMA 1.1.7; Def. Trial Ex. 72 (ACOG Committee Op. 390) at IDFPR009520.

122.    If a physician has a conscience objection that impedes objective medical options counseling, that physician must inform the patient. Trial tr. 65:2-6; 621:2-13; 771:3-6; Def. Trial Ex. 72 (ACOG Committee Op. 390) at IDFPR009520.

123.    Similarly, a health care provider must inform a patient of all relevant treatment options, including those to which the provider conscientiously objects. Trial tr. 514:5-10; 614:25-617:3; NIFLA Ex. 32A at AMA 1.1.7, NIFLA 01755-56.

124.    Physicians have an ethical responsibility to place patient welfare above their own self-interest or obligations to others. Trial tr. 684:16-685:11; 770:7-13.

125.    In general, physicians should refer a patient to another physician or institution to provide treatment the physician declines to offer. Trial tr. 615:9-21; 696:24-697:20; NIFLA Trial Ex. 32(a) at AMA 1.1.7; NIFLA Trial Ex. 32(d) at NIFLA 1825; Def. Trial Ex. 72 (ACOG Committee Op. 390) at IDFPR009520.

126.    When a conscience-objecting physician declines to make a referral due to religious beliefs, they "should offer impartial guidance [to the patient] . . . about how to inform themselves

19

regarding access to desired services. NIFLA Trial Ex. 32(a) at AMA 1.1.7; Trial tr. 606:5-607:19; 696:24-697:25.

127.    A health care provider who only discusses risks and not benefits of a particular treatment option is doing more harm to the patient than not discussing a treatment option at all. Trial tr. 602:9-19.

128.    When health care personnel only provide partial counseling that is not patient-centered it "poison[s] the well" for a later, more balanced discussion of risks, benefits, and options with other health care personnel. Trial tr. 602:9-19.

129.    If a health care provider declines to discuss the risks or benefits of a certain treatment based upon the provider's own values, the health care provider violates the standard of care. Trial tr. 602:3-8.

130.    Health care personnel must remain objective and fact-based because they have "so much influence over the patient's decision-making," since "patients listen to and expect their" provider "to have their best interests at heart and to be counseling them in a way that is beneficial to the [patient]." Trial tr. 432:12-24; 591:3-592:9.

131.    Obstructing a patient or not aiding a patient's choice, either by failing to counsel or directing them to relevant information, will very likely delay appropriate patient care. Trial tr. 622:3-623:17.

Benefits of Abortion and Risks of Carrying to Term

132.    The medical definition of abortion is the termination of any pregnancy before 20 weeks. Trial tr. 576:15-18.

133.    Abortions are divided into two categories: a spontaneous abortion (also known as a miscarriage) and an induced abortion. Trial tr. 576:19-577:1.

134.    Some doctors categorize induced abortions based upon the patient's reason to have an abortion: specifically, an abortion for a medical reason or "an elective abortion," when a woman has chosen to have an abortion, though the difference between the two is a gray area. Trial tr. 577:10-578:1.

135.    Two factors to consider when determining whether to counsel on abortion are the patient's reaction about the pregnancy and a review of the patient's medical history to determine, among other things, whether pregnancy is contraindicated to the patient's health. Trial tr. 629:13-630:2.

136.    A discussion of the benefits and risks of abortion in any medical setting is central, because the information assists a patient in deciding whether to continue a pregnancy. Trial tr. 619:4-15.

137.    Terminating a pregnancy can have medical benefits if a pregnant patient is experiencing a medical emergency that risks their life. Trial tr. 65:12-66:8; 79:16-80:11; 623:18-624:1; 628:19-629:6.

138.    There are times when a doctor must induce labor before a fetus is viable. Trial tr. 37:6-10; 86:19-87:11.

139.    Pre-eclampsia, eclampsia, ectopic pregnancy, cervical incompetence, premature rupture of membranes, pulmonary hypertension, dilated descending aorta, heart disease, and pericardium cardiomyopathy are medical conditions that pose significant medical risks, including death, for the pregnant patient. Trial tr. 65:12-66:8; 623:23-625:20.

140.    Patients with conditions that contraindicate pregnancy should be advised about terminating a pregnancy as a relevant treatment option. Trial tr. 66:9-23.

141.    Patients may medically benefit from abortion for important psychological and personal reasons other than physical health. Trial Tr. 629:13-630:21.

142.    The mortality rate for women who carry pregnancy to term is higher than women have an abortion. Trial tr. 640:2-25; 762:23-764:4.

143.    The risk of infection with an abortion is less than 1 or 2 percent, even if the patient has a sexually transmitted infection, because patients are prophylactically given antibiotics before and after the procedure. Trial tr. 633:2-24.

144.    Abortion does not increase the rate of breast cancer. Trial tr. 633:25-634:19; 635:8-13.

145.    Although patients may experience abortion regret, there are greater instances of maternal regret for women who wished to have an abortion but carried to term instead. 635:24-636:20.

Medical Options Counseling for Pregnant Patients

146.    When patients visit a Plaintiff CPC, the visit is medical in substance. Trial tr. 609:24-610:4; Def. Trial Ex. 71 at IDFPR009460, 9487; Schroeder Trial Ex. 157-01 at Schroeder_Supp_0050 (Focus homepage).

147.    For example, where a patient visit includes taking a history, performing a medical procedure (such as an ultrasound), and counseling about the results or medical options, the encourage would be a medical visit. Trial tr. 610:5-10; 688:21-689:12.

148.    In particular, "the decision to establish prenatal care would qualify as a specific medical intervention" in the context of medical options counseling for pregnant patients. Trial tr. 603:3-12.

149.     Even though Plaintiff CPCs do not perform abortions, the medical standard of care does not change because appropriate counseling requires presenting a patient with all relevant treatment options for their circumstances and medical history. Trial tr. 509:14-511:19, 612:11-613:4, 637:21-639:5, 769:9-20.

150.     Nurses and registered diagnostic medical sonographers are engaged in the practice of medicine. Trial tr. 610:25-611:5.

151.     Ultrasound determinations are medical diagnoses. Trial tr. 579:6-9; 731:23-732:20.

152.     Health care personnel at the Plaintiff CPCs also provide pregnancy options counseling, which is subject to the medical standard of care. Trial tr. 195:2-197:1; 516:12-517:9; 609:20-610:24; 769:9-20; Def. Trial Ex. 69 at IDFPR009432-33; Def. Trial Ex. 71 at IDFPR009460, 9487; Schroeder Trial Ex. 157-01 at Schroeder_Supp_0050.

153.     When advising a patient on options for pregnancy management, the standard of care does not change if health care personnel do not perform abortions. Trial tr. 612:11-613:4.

154.     Failing to provide a pregnant patient with information required under the standard of care, the resulting delay in obtaining care can cause the patient to be unable to obtain a surgical abortion due to increased medical risks or cost.  Trial tr. 622:3-623:17.

155.     Failing to discuss the benefits and risks of abortion based on a conscience objection violates patient autonomy and falls beneath the standard of care. Trial tr. 619:23-620:4.

Benefits of contraceptives and sterilization

156.     Oral contraceptives reduce the risk of ovarian cancer, uterine cancer, and endometrial cancer by 50 percent, as well as lowering the risk of anemia and improving skin conditions. Trial tr. 631:17-632:1.

157.     Condoms reduce the risk of sexually transmitted diseases. Trial tr. 631:19-632:1.

158.    Removal of the fallopian tube significantly reduces the risk of ovarian cancer. Trial tr. 632:2-11.

159.    Contraception and sterilization effectively prevent pregnancy, and to state that they have no benefits is empirically wrong. Trial tr. 631:17-632:22; 773:14-21.

<u>Plaintiffs' Experts</u>

160.    Plaintiffs' experts Dr. Lee and Dr. Fernandes personally support the missions and goals of the CPCs. Trial tr. 72:7-16; 541:22-542:9.

161.    Dr. Fernandes testified at trial that it is difficult for him "not to admire the steadfast courage of people who work at crisis pregnancy centers" and that such "centers have provided an unequivocally positive service for vulnerable women." Trial tr. 542:10-16.

162.    In April of 2023, Dr. Fernandes gave remarks at an event for a CPC in strong support of the center's mission. Trial tr. 544:2-20.

163.    Dr. Fernandes was a board member and is currently a trustee of Ohio Right to Life. Trial tr. 543:11-15.

164.    Plaintiffs retained their expert Dr. Boles because of his reputation as a pro-life speaker and author, including speaking at conferences and testifying in front of numerous bodies for pro-life causes. Trial tr. 772:11-25; 775:6-13.

165.    Dr. Boles has written multiple books intended to persuade people not to choose to have an abortion. Trial tr. 773:1-6.

166.    One of Dr. Boles's books describes his proposed strategy for making all "elective induced abortions" illegal, which includes "help[ing] our friends punish our enemies and aveng[ing] ourselves on traitors." Trial tr. 774:7-776:9.

24

**Appendix: Defendant's Exhibit List**

| Exhibit No. to Brief | Trial Exhibit No. | Description |
|---|---|---|
| A | | Defendant's Proposed Supplemental Findings of Fact |
| B | | Response to NIFLA's Supplemental Facts |
| C | | Response to Schroeder's Supplemental Facts |
| 1 | Schroeder 154 | Options Now – Website (Schroeder _Supp_0038) |
| 2 | Def. 71 | Focus Women's Center Website (IDFPR009450 – 9515) |
| 3 | Def. 38 | Options Now Abortion Health and Safety Checklist (ONHOF-094) |
| 4 | Schroeder 114 | Options Now – Policy: Educational Materials (ONMedPP-006) |
| 5 | Schroeder 84 | Options Now – Telephone Talking Points (ONHOF-005-20e) |
| 6 | Schroeder 104 | Options Now – Sonographer Session and Script (ONHOF-291 - 292) |
| 7 | Schroeder 66 | PASS Health Services Cook-Will County (PASS-035-036) |
| 8 | Wilson Dep Excerpts | Susan Wilson Deposition Excerpts (ECF 269-1 - NIFLA Docket) (ECF 234-1 - Schroeder Docket) |
| 9 | Wilson Dep. Ex. 6 | Wilson Dep. Ex. 6 - PASS Pregnancy Test Client Flow Sheet (ECF 269-5 - NIFLA Docket) (ECF 234-5 – Schroeder Docket) |
| 10 | Wilson Dep. Ex. 7 | Wilson Dep. Ex. 7 - PASS Assessment of Abortion Vulnerability (ECF 269-6 - NIFLA Docket) (ECF 234-6 – Schroeder Docket) |
| 11 | Schroeder 89 | Options Now – Advocate Intake Form (ONHOF-037 - 0040) |
| 12 | Schroeder 129 | Options Now Policy: Guidelines and Patient Flow for Ultrasounds (ONUSPP-003-006) |
| 13 | Schroeder 130 | Options Now – Policy Scheduling of Ultrasound Services (ONUSPP-007) |
| 14 | NIFLA 32(a) | AMA Code of Ethics Chapter 1 (NIFLA 01751 – 1768) |
| 15 | NIFLA 32(b) | AMA Code of Ethics Chapter 2 (NIFLA 01769 – 01783) |
| 16 | NIFLA 32K | ACOG Committee Opinion No. 390 (Dec. 2007) (NIFLA 01879 – 80) |
| 17 | Def. 72 | ACOG Committee Opinion No. 385 (Nov. 2007) (IDFPR009516 – 9521) |
| 18 | Def. 55 | Letter from Dr. Thomas Zabiega (Undated) (IDFPR000334) |
| 19 | Def. 56 | Letter from Dr. Thomas Zabiega (Apr. 4, 2014) |

| Exhibit No. to Brief | Trial Exhibit No. | Description |
|---|---|---|
| | | (IDFPR000342) |
| 20 | Def. 57 | IDFPR emails re: SB 1564 – Final Bill Analysis (IDFPR000351 – 355) |
| 21 | Def. 58 | SB 1564 – Final Bill Analysis (IDFPR000471 – 473) |
| 22 | Def. 59 | Complaint re: Care Net Pregnancy Services of DuPage County (IDFPR001884 – 1941) *Added redaction per Court direction at IDFPR01888 |
| 23 | Def. 60 | Complaint/Claim Intake Report re: Bill Syrcle (IDFPR001944) |
| 24 | Def. 61 | IDFPR Investigative Report (Aug. 24, 2016) (IDFPR001958) |
| 25 | Def. 62 | Letter re: Bill Syrcle medical treatment (IDFPR001976 – 1978) |
| 26 | Def. 66 | Human Services Committee Hearing Transcript re: Health Care Right of Conscience Act – Senate Bill 1564 from May 13, 2015 |
| 27 | Def. 11 | Life Choices: Medical History (NIFLA 00196) |
| 28 | Def. 68 | Mosaic Website (IDFPR009416 – 9426) |
| 29 | Def. 69 | Life Choices Website (IDFPR009427 - 9438) |
| 30 | Def. 70 | Options Now/Thrive Metro East website (IDFPR009439 – 9449) |
| 31 | Def. 7 | Unpregnant is not a word pamphlet (NIFLA 00154-162) |
| 32 | Def. 19 | Mosaic's 2016 Impact Report |
| 33 | Def. 20 | Mosaic's 2017 Impact Report |
| 34 | Def. 21 | Mosaic's 2018 Impact Report |
| 35 | Def. 26 | The Truth about Abortion Procedures Brochure (FW-005-FW-006) |
| 36 | Def. 10 | Life Choices Client Intake Form (NIFLA 00190) |
| 37 | Def. 27 | 1st Way Basic Counseling (FW-007) |
| 38 | Def. 39 | Options Now Ultrasound Form (ONHOF-297) |
| 39 | Def. 40 | Options Now Contraception Ed Policy (ONMedPP-007) |
| 40 | NIFLA 7 | Mosaic Informational Booklet on Abortion |
| 41 | NIFLA 17 | Mosaic Telephone Talking Points |
| 42 | NIFLA 32C | Dr. Paul Burcher's Expert Report |
| 43 | Schroeder 157-01 | Focus Website Homepage (Schroeder_Supp_0049 – 0051) |
| 44 | Schroeder 157-15 | Focus Considering Abortion webpage (Schroeder_Supp_0092 – 0094) |

| Exhibit No. to Brief | Trial Exhibit No. | Description |
|:---:|:---:|---|
| 45 | Schroeder 157-17 | Focus types of abortion webpage (Schroeder_Supp_0097 – 0101) |