# Exhibit C

Response to Schroeder's Supplemental Facts

**IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, *et al.*, | Case No. 16-cv-50310 |
| Plaintiffs, | Hon. Iain D. Johnston |
| v. | Magistrate Judge Lisa A. Jensen |
| Mario Treto Jr., | |
| Defendant. | |
| Ronald Schroeder, *et al.*, | Case No. 17-cv-4663 |
| Plaintiffs, | Hon. Iain D. Johnston |
| v. | Magistrate Judge Lisa A. Jensen |
| Mario Treto Jr., | |
| Defendant. | |

**DEFENDANT'S RESPONSE TO SCHROEDER PLAINTIFFS'
PROPOSED FINDINGS OF FACT**

Defendant, Mario Treto, Jr., respectfully submits this following response to Schroeder Plaintiffs' Proposed Findings of Fact.

1. **The Plaintiffs.**

1.      The plaintiffs in 17-cv-04663 are: (1) Dr. Ronald Schroeder, who serves as the volunteer Medical Director for Options-Now/Thrive Metro-East, an Illinois Pregnancy Resource Center (Options-Now/Thrive Metro-East is referred to herein as "Options Now"); (2) Women's Help Services d/b/a Focus Women's Center and d/b/a 1st Way Life Center (referred to herein as "Focus"); and (3) Pregnancy Aid South Suburbs, d/b/a Pregnancy Aid

Illinois (referred to herein as "PASS"). The Plaintiffs (including Dr. Schroeder unless the context indicates otherwise) are collectively referred to herein as "PCs". ECF 232-1, Parties' Joint Stipulations of Facts, ¶ 1. The PCs are Illinois nonprofit corporations and are governed by a board of directors. *Id.* ¶¶ 4-5.

**Defendant's Response:** Undisputed.

## 2. The PCs' Mission.

2.      **The PCs are religiously inspired faith-based organizations.** *Id.* ¶ 6; Trial Tr. 221:2-7 (Cocks); Schroeder Ex 58 (Focus Statement of Faith); Trial Tr. 314:16-315:13 (Schroeder); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 95 (Options Now Patient Assessment & Health History Form Internal); Schroeder Ex. 102 (Options Now Church Reference List); Schroeder Ex. 117 (Options Now Patient Flow in Centers for Pregnancy Test); Schroeder Ex. 122 (Options Now Consent for Services Form); Trial Tr. 347:17-24 and 354:8-23 (Bohlen); Schroeder Ex. 75 (PASS Statement of Faith); Schroeder Ex. 76 (Options Now Statement of Principle); Schroeder Ex. 74 (PASS Orientation Workbook); ECF 234-1, Parties' Deposition Designations for Witness Susan Wilson (hereinafter "Wilson Dep.") 13:1-16:7; 44:16-46:6.

**Defendant's Response:** Undisputed.

3.      **People who agree to collaborate with each of these organizations must agree to abide by the organization's bylaws, policies, and procedures and agree they will promote, not undermine, their mission.** ECF 232-1, Parties' Joint Stipulations of Facts, ¶ 14.

**Defendant's Response:** Undisputed.

4.      **The PCs assist women who believe they may be pregnant and are trying to**

2

**evaluate their situation.** See Trial Tr. 221:2-13 (Cocks), see also Schroeder Ex.157-01 (Focus website home page); Schroeder Ex. 58 (Focus Mission/Vision/Values/Statement of Faith); Trial Tr. 309:17-24; Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 122 (Options Now Consent for Services Form); Trial Tr. 347:17- 24, 352:8-18, 353:19-355:3 and 383:7-384:19 (Bohlen); Schroeder Ex. 149 (PASS website "Services" webpage); Schroeder Ex. 74 (PASS Orientation Workbook); Schroeder Ex. 76 (PASS Statement of Principle).

**Defendant's Response:** Undisputed that Plaintiff CPCs provide free services to people who believe they may be pregnant and are trying to evaluate their situation and medical options.

5.      **The PCs assist women in unplanned pregnancies by providing important information, compassionate counsel, and many forms of support in order to empower them to choose life for their unborn child.** Trial Tr. 226:25-227:9 and 282:17-25 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 58 (Focus Mission/Vision/Values/Statement of Faith); Trial Tr. 323:5-13, 324:16-19, 326:10-22 and 340:25-341:2 (Schroeder); Schroeder Ex.89 (Options Now Advocate Intake Form); Trial Tr. 346:15-19, 347:17-349:4, 357:7-358:8 and 376:4-377:22 (Bohlen); Schroeder Ex. 76 (PASS Statement of Principle); Schroeder Ex. 74 (PASS Orientation Workbook).

**Defendant's Response:** Undisputed that Plaintiff CPCs provide women who have unplanned pregnancies information about their pregnancy options, medical options counseling, and other services with the goal of persuading the women not to have an abortion and to carry their pregnancies to term.

6.      **The PCs inform their intended audience of the assistance they provide on their website and invite women to visit.** ECF 232-1, Parties' Joint Stipulations of Facts, ¶ 40.

**Defendant's Response:** Undisputed.

**3. The Assistance Provided By The PCs to Those Who Visit Them.**

7.      **No one is forced to come to the PCs or accept their help if they find they are not interested in the assistance the PCs offer; they can turn around and walk right out the door.** Trial Tr. 242:16-24 (Cocks); 379:19-380:7 (Bohlen); 312:13-25 (Schroeder).

**Defendant's Response:** Undisputed that no one is physically forced to come to the Plaintiff CPCs or accept their help, and that no one is physically prevented from leaving the Plaintiff CPCs. Plaintiff CPCs use numerous tactics to try to convince pregnant patients who are in crisis or vulnerable to come to the CPC, with the hope that the CPC can then convince the patient not to have an abortion. *See, e.g.,* Def.'s SOF ¶¶ 18-21, 26-29, 31-34, 36-41, 46-47.

8.      **The PCs offer counseling about options available to address an unexpected pregnancy, including information about parenting, adoption, and elective abortion.** Trial Tr. 247:5-8 (Cocks); Schroeder Ex. 157-13 (Focus webpage Abortion Laws); Schroeder Ex. 58 (Focus Statement of Faith); Trial Tr. 324:20-24 and 330:15-19 (Schroeder); Trial Tr. 353:9-16, 357:7-358:8, 360:9-25, 375:20-376:13, 382:24-384:1 and 385:7-17 (Bohlen); Schroeder Ex. 147 (PASS website "Abortion" webpage); Schroeder Ex. 149 (PASS website "Services" webpage); Schroeder Ex. 150 (PASS website "What We Do" webpage); Schroeder Ex. 76 (PASS Statement of Principle); Schroeder Ex. 74 (PASS Orientation Workbook); Wilson Dep. 60:16-61:8; 97:10-20; 160:22-161-13; 163:24-164:15.

**Defendant's Response:** Undisputed.

9.      **Women who come to the PCs are offered publicly available and generally applicable health-related medical information about subjects deemed relevant to them, e.g., pregnancy, stages of fetal development, sexually transmitted diseases, and abortion**

4

**procedures.** This publicly available information is provided via handouts, brochures, or videos. Trial Tr. 232:15-22 (Cocks); Schroeder Ex. 39 (Focus Abortion Procedures); Schroeder Ex. 38 (Focus WC Abortion Trifold Brochure); Schroeder Ex. 40 (Focus Signs and Symptoms of Labor); Schroeder Ex. 43 (Focus Client Education in Prevention, Therapy, & Health Maintenance Care Policy); Schroeder Ex. 51 (Focus Miscarriage Precautions); Schroeder Ex. 52 (Focus Ectopic Precautions); Schroeder Ex. 157-28 (Focus website "Week by Week" webpage); Schroeder Ex.s 157-17 through 157-21 (Focus website "Types of Abortion" webpages); Schroeder Ex.s 157-4 through 157-10 (Focus website "Abortion Pill" webpages); Trial Tr. 310:16-311:1 (Schroeder); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 91 (Options Now Options Packet Abortion Handout); Schroeder Ex. 95 (Options Now Patient Assessment & Health History Form Internal); Schroeder Ex. 96 (Options Now Patient Intake Repeat Pregnancy Test): Schroeder Ex. 97 (Options Now Women's Health Dept. of Human Services Fetal Development); Schroeder Ex. 98 (Options Now Carenet "Before You Decide"); Schroeder Ex. 136 (Options Now Patient Resource & Referral List: Illinois); Schroeder Ex. 107 (Options Now Sonogram Out-take (Ultrasound Form)); Schroeder Ex. 112 (Options Now Volunteer Medical Job Descriptions); Schroeder Ex. 114 (Options Now Educational Materials Policy); Schroeder Ex. 122 (Options Now Consent for Services Form); Schroeder Ex. 135 (Options Now STD Test Letter); Schroeder Ex. 137 (Options Now Carenet - Before You Decide brochure); Trial Tr. 348:14-22; 374:1-375:10; 396:9-397:15 (Bohlen); Schroeder Ex. 71 (PASS Abortion: The Black Woman's Voice); Schroeder Ex. 149 (PASS website "Services" webpage); Schroeder Ex. 65 (PASS Miscarriage/Ectopic Pregnancy Precautions); Schroeder Ex. 68 (PASS Understanding

5

Pregnancy 1st Trimester Care); Schroeder Ex. 70 (PASS The Abortion Pill); Schroeder Ex. 72

(Abortion Raises Breast Cancer Risk); Schroeder Ex. 73 (PASS The First 9 Months).

      **Defendant's Response:** Undisputed that people who come to the Plaintiff CPCs are

offered medical information that contains general knowledge about reproductive health that is

developed by pro-life organizations and approved by the Plaintiff CPCs' medical directors.

Disputed to the extent that Plaintiffs suggest that the medical counseling for a patient is the

equivalent of what can be found online. For example, one Plaintiff CPC tells prospective

patients: "There's a lot of information about abortion online, making it extremely difficult to sift

through what's real, what's not, what to believe and who to trust . . . When you're looking for

abortion information, you shouldn't trust just any article you find. Place your trust in a team of

licensed medical professionals, who can empower you with factual information so you can truly

make the best choice for you." Schroeder Trial Ex. 154 at Schroeder_Supp_0038. *See, e.g.,*

Defendant's Proposed Supplement Findings of Fact ("Def.'s SOF") ¶¶ 51-52, 56, 151[1]; Parties'

Joint Post-Trial Stipulations ("Joint Post-Trial Stips"), ¶ 46.[2] Counseling provided to patients

during medical encounters at CPCs constitutes medical advice. Def.'s SOF ¶¶ 52, 146-147.

      10.    **The medical directors for the PCs review this general medical information to**

**make sure that it is appropriate and accurate.** Trial Tr. 236:24-237:5 (Cocks); Trial Tr.

310:16-311:18 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points);

Schroeder Ex. 114 (Options Now Educational Materials Policy); Trial Tr. 371:7-9; 374:1-21

(Bohlen); Wilson Dep. 29:5-18.

---

[1] Defendant's Proposed Supplemental Findings of Fact is attached to Defendant's Post-Trial
Memorandum of Law as Exhibit A.
[2] The parties' Post-Trial Stipulations of Fact are located at NIFLA Dkt. 267 and Schroeder Dkt.
232.

**Defendant's Response:** Undisputed that the medical directors for the Plaintiff CPCs review medical information before it is given to patients. Disputed as to what is "appropriate and accurate." The evidence shows that medical information and counseling offered by the Plaintiff CPCs is incomplete, filtered, key information is withheld from patients based on the Plaintiff CPCs' religious values, and information is presented in ways calculated to persuade the patients not to have an abortion, not to have premarital sex, and not to choose to undergo sterilization. Def.'s SOF ¶¶ 31-34, 39-40, 54-58; Parties' Joint Pretrial Stipulations ("Joint Pretrial Stips"), ¶¶ 9, 36.[3]

11.    **In addition, the PCs provide women with information about public and private social-welfare assistance programs, e.g., information about and referrals for housing assistance, welfare programs, childcare, professional counseling, legal assistance, employment assistance, and adoption services.** Trial Tr. 228:2-229:6 (Cocks); Schroeder Ex. 42 (Focus Referrals/Resource Management Policy); Schroeder Ex. 41 (Focus Personalized Solutions Assessment); Schroeder Ex.157-22 (Focus website "Adoption" webpage); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script; Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 90 (Options Now Options Packet Adoption "Is Adoptions the Choice for Me?"); Schroeder Ex. 95 (Options Now Patient Assessment & Health History Form Internal); Schroeder Ex. 96 (Options Now Patient Intake Repeat Pregnancy Test): Schroeder Ex. 136 (Options Now Patient Resource & Referral List: Illinois); Schroeder Ex. 107 (Options Now Sonogram Out-take

---

[3] The parties' Joint Pretrial Stipulations of Fact are located at NIFLA Dkt. 255-2, and are also attached as Exhibit A to the Post-Trial Stipulations of Fact.

(Ultrasound Form)); Schroeder Ex. 111 (Options Now Scope of Services Policy); Schroeder Ex.

122 (Options Now Consent for Services Form); Bohlen (Schroeder Ex. 59 PASS Office Form).

    **Defendant's Response:** Undisputed.

    12.    **The PCs provide women with information about topics relating to general health and wellbeing and what can be called "life skills," e.g., information about nutrition, budgeting, parenting, and opportunities for employment.** Trial Tr. 215:8-16 (Cocks); Schroeder Ex. 42 (Focus Referrals/Resource Management Policy); Schroeder Ex. 157-23 (Focus website "Parenting" webpage); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 95 (Options Now Patient Assessment & Health History Form Internal); Schroeder Ex. 96 (Options Now Patient Intake Repeat Pregnancy Test); Schroeder Ex. 136 (Options Now Patient Resource & Referral List: Illinois); Schroeder Ex. 107 (Options Now Sonogram Out-take (Ultrasound Form)); Trial Tr. 347:25-348:22 (Bohlen); Schroeder Ex. 74 (PASS Orientation Workbook).

    **Defendant's Response:** Undisputed.

    13.    **Non-licensed volunteers provide peer-to-peer counseling, emotional support, and share personal advice, often with religious and spiritual content, with the women who visit the PCs. Their goal is to assist the women to evaluate their circumstances and to provide support and information that will help her choose life for her unborn child.** Trial Tr. 215:8-19 (Cocks); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 92 (Options Now Rise: Mind, Body, Spirit Brochure); Schroeder Ex. 95 (Options Now Patient Assessment & Health History Form Internal); Schroeder Ex. 117 (Options Now Patient Flow in Centers for Pregnancy Test); Schroeder Ex. (Options Now 122 Consent for Services Form); Trial Tr. 375:11-377:2

(Bohlen); Schroeder Ex. 59 (PASS Office Use Form); Trial Tr. 385:6-17 (Bohlen); Schroeder Ex. 76 (PASS Statement of Principles); Schroeder Ex. 150 (PASS website "What We Do" webpage); Wilson Dep. 61:9-66:3.

**Defendant's Response:** Undisputed that non-licensed volunteers provide the above services with the goal of persuading pregnant people to carry their pregnancies to term. Disputed to the extent that Plaintiffs attempt to conflate religious and spiritual counseling with medical options counseling, as counseling at Plaintiff CPCs includes discussion patients' medical options and the risks of medical procedures. Def.'s SOF ¶¶ 29, 32, 34, 47.

14. **Non-licensed volunteers do not hold themselves out as licensed healthcare professionals.** Trial Tr. 215:20-25 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 88 (Options Now Consent to Services/Permission to Release Information & Follow-up); Schroeder Ex. 122 (Options Now: Consent for Services Form); Schroeder Ex. 79 (PASS Pregnancy Test Case Intake Forms); Wilson Dep. 123:18-124:17.

**Defendant's Response:** Disputed to the extent that any non-licensed volunteers engage in counseling patients about their medical options, which often occurs in conjunction with the Plaintiff CPC providing the patients with results from medical procedures, such as pregnancy tests, ultrasounds, and STI tests. *See, e.g.,* Def.'s SOF ¶¶ 39, 56. Disputed to the extent that Plaintiffs are making a legal argument that any person who furnishes, or assists in the furnishing of, health care services at the CPC is not a health care personnel governed by the Act. *See* 745 ILCS 70/3 (defining health care personnel); Joint Pretrial Stip. ¶ 12.

15. **The information provided by the PCs is offered to help women confronting an unexpected pregnancy to appreciate that despite her particular circumstances, she can, and should, give birth to her child.** Trial Tr. 278:9-279:10; 221:8-13 (Cocks); Schroeder Ex. 58

(Focus Statement of Faith [especially Vision and Pro-Woman sections]); Trial Tr. 270:15-271:5; 282:17-283:8 (Cocks); Schroeder Ex. 20 (Focus Parenting Questions Trifold Brochure); Schroeder Ex. 19 (Focus Abortion as Your Option); Trial Tr. 323:5-13 (Schroeder)(regarding information seen on Ultrasound); Trial Tr. 326:10-22 (Schroeder); Schroeder Ex. 114 (Options Now Educational Materials Policy); Trial Tr. 358:11-359:2 and 361:1-362:4 (Bohlen); Schroeder Ex. 76 (PASS Statement of Principles); Wilson Dep. 147:17-148:13.

**Defendant's Response:** Undisputed that Plaintiff CPCs offer pregnant patients information designed to discourage abortion and encourage carrying the pregnancy to term, based on the Plaintiff CPCs' religious values and mission. *See, e.g.,* Def.'s SOF ¶¶ 18, 20, 31-34, 40, 54-58; Joint Pretrial Stip. ¶¶ 8-9, 13, 24-25.

16. **The PCs provide women with information about individuals or entities that may be able to provide medical care that is not available at the PCs, when they believe that doing so will promote the health and wellbeing of the women, e.g., primary care, OB-gyn care, prenatal care.** Parties' Joint Stipulations of Facts ¶ 21; Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 41 (Focus Personalized Solutions Assessment); Schroeder Ex. 16 (Focus Referral to McHenry Co. Health Dept.); Schroeder Ex. 17 (Focus Referral to Lake Co. Health Dept.); Schroeder Ex. 18 (Focus Referral to Tri-County Health Dept.); Schroeder Ex. 157-29 (Focus website "Resources" webpage); Trial Tr. 327:18-328:2 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 94 (Options Now Negative Pregnancy Test); Schroeder Ex. 95 (Options Now Patient Assessment & Health History Form Internal); Schroeder Ex. 96 (Options Now Patient Intake Repeat Pregnancy Test); Schroeder Ex. 99 (Options Now Local OB-GYN Listing);

Schroeder Ex. 136 (Options Now Patient Resource & Referral List: Illinois); Schroeder Ex. 103 STD Consent; Schroeder Ex. 105 Ultrasound Consent & Release Form; Schroeder Ex. 106 Discharge for Medical Follow-up; Schroeder Ex. 107 Sonogram Out-take (Ultrasound Form); Schroeder Ex. 111 (Scope of Services Policy); Schroeder Ex. 112 (Options Now Volunteer Medical Job Descriptions); Schroeder Ex. 115 (Options Now RU-486/The Abortion Pill); Schroeder Ex. 119 (Options Now Pregnancy Testing Policy); Schroeder Ex. 122 (Options Now Consent for Services Form); Schroeder Ex. 135 (Options Now STD Test Letter); Schroeder Ex. 136 (Options Now Patient Resource & Referral List: Illinois); Trial Tr. 391:18-392:21(Bohlen); Schroeder Ex. 66 (Health Services Cook/Will County); Trial Tr. 398:6-24 (Bohlen); Schroeder Ex. 62 Medical Services Consent Release Form; Schroeder Ex. 64 Urgent Care Release/Hospital List); Wilson Dep. 79:5-83:18; 153:6-154:10.

**Defendant's Response:** Undisputed that Plaintiff CPCs sometimes provide women with information about individuals or entities which may be able to provide them with medical care, which may include primary care, OB-GYN care, or prenatal care. Joint Pretrial Stip. ¶ 21. However, the CPCs typically refuse to provide information about other health care personnel or facilities that could promote the health and wellbeing of the women if the CPCs believe that those health care personnel or facilities offer medical services or treatments that the CPCs morally oppose. Joint Pretrial Stip. ¶ 9.

17.     **The PCs also provide women material resources that may be helpful, e.g., diapers, baby formula, baby food, baby clothes, car seats, and strollers.** Trial Tr. 215:8-16 (Cocks); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 89 (Options Now Advocate Intake Form); Trial Tr. 368:18-369:2; 377:5-22 (Bohlen).

**Defendant's Response:** Undisputed.

11

4.    **The PCs Offer Free Limited Medical Services.**

18.    **In addition to these non-medical offerings, the PCs provide certain limited medical services free of charge to help women better understand their situation.** Trial Tr. 229:7-10 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 35 Policy Scope of Services; Schroeder Ex. 157-27 (Focus website "Abortion Education" webpage); Trial Tr. (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 88 (Options Now Consent for Services/Permission to Release Information & Follow up); Schroeder Ex. 89 (Options Now Advocate Intake Form); Schroeder Ex. 111 (Options Now Scope of Services Policy); Schroeder Ex. 119 (Options Now Pregnancy Testing Policy); Schroeder Ex. 122 (Options Now Consent for Services Form); Schroeder Ex. 130 (Options Now Policy Scheduling of Ultrasound Services); Schroeder Ex. 133 (Options Now Walk-in Intake Sheet); Trial Tr. 347:25-349:4 (especially 348:10-13); 365:7-369:2 (Bohlen); Schroeder Ex. 76 (PASS Statement of Principle --regarding free of charge); Schroeder Ex. 148 (PASS website "Make an Appointment" webpage); Schroeder Ex. 147 (PASS webpage "I'm Pregnant, Now What?" webpage); Schroeder Ex. 74 (PASS Orientation Workbook); Schroeder Ex. 79 (Pregnancy Test Case Intake Form).

**Defendant's Response:** Undisputed that Plaintiff CPCs provide certain medical services free of charge for patients. Disputed to the extent that this proposed fact characterizes all preceding paragraphs as "non-medical offerings." When health care facilities offer counseling about medical options, and when done in conjunction with the medical procedures they provide for the patients, the counseling is medical in nature and constitutes health care for the patient. Def.'s SOF ¶¶ 93-97,136, 146, 152. Disputed that the Plaintiff CPCs provide these medical services solely "to help women better understand their situation." Plaintiffs have admitted and

testified that their underlying purpose in offering free medical services is to change their patients' minds about having an abortion and convince pregnant patients to carry their pregnancy to term. Def.'s SOF ¶¶ 18, 20. Plaintiffs similarly provide pregnant patients with medical and non-medical information with the purpose of convincing the patients that they "can, and should, give birth to [their] child." *See supra* Schroeder Plaintiffs' Proposed Finding of Fact ¶ 15.

19.     **The PCs offer pregnancy tests.** Trial Tr. 229:7-20 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 35 (Focus Policy Scope of Services); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 119 (Pregnancy Testing Policy); Trial Tr. 361:13-16 (Bohlen); Schroeder Ex. 79 (PASS Preg Test Case Intake Form [includes limitation of services]); Schroeder Ex. 60 (PASS Statement of Self-Administered Pregnancy Test).

        **Defendant's Response:** Undisputed.

20.     **The PCs offer limited obstetric ultrasounds.** Trial Tr. 230:18-23 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 157-25 (Focus website "Ultrasound" webpage); Trial Tr. 314:5-15 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 105 (Options Now Ultrasound Consent & Release Form); Schroeder Ex. 120 (Options Now Guidelines and Patient Flow for Ultrasounds); Schroeder Ex. 121 (Options Now Ultrasound Exams Policy); Schroeder Ex. 126 (Options Now Ultrasound Standing Order; Schroeder Ex. 130 Policy Scheduling of Ultrasound Service); Trial Tr. 363:15-22 (Bohlen); Schroeder Ex. 79 (PASS Pregnancy Test Case Intake Form); Trial Tr. 364:24-365:6 (Bohlen); Schroeder Ex. 62 (PASS Medical Services Consent & Release Form); Schroeder Ex. 63 (PASS Limited OB Ultrasound Instructions & Appointment);

**Defendant's Response:** Undisputed that the Plaintiff CPCs offer obstetric ultrasounds for the medical purposes of establishing viability and gestational age of the fetus. Joint Post-Trial Stip. ¶ 46; Trial Tr. 578:2-579:9. Disputed that the purpose of the ultrasound is not limited to those uses. If Plaintiff CPCs suspect that the pregnant patient is at risk of choosing an abortion, the CPCs provide the ultrasounds and counseling for the purpose of persuading the pregnant patient to carry to term. *See*, *e.g.*, Def.'s SOF ¶¶ 40, 47, 54-58.

21. **Some of the PCs offer limited STD testing and treatment.** Trial Tr. 229:21-230:3 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 74 (PASS Telephone Talking Points); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 103 STD (Options Now Consent); Schroeder Ex. 124 (Options Now Standing Order for Laboratory Tests).

**Defendant's Response:** Undisputed.

22. **The PCs inform their clients that they offer only these limited medical services.** Trial Tr. 225:12-2 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 157-27 (Focus website "Abortion Education" webpage); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 86 (Options Now What You Can Expect from Your Visit with Us); Schroeder Ex. 88 (Options Now Consent for Services/Permission to Release Information & Follow-up); Schroeder Ex. 110 (Options Now Linear Service Model 15 Step Patient Flow Process); Schroeder Ex. 122 (Options Now Consent for Services Form; Schroeder Ex. 133 Walk-In Intake Sheet; Trial Tr. 359:5-360:8 (Bohlen); Schroeder Ex. 62 (PASS Medical Services Consent Release Form [regarding limited ultrasound and no follow-up care]); Schroeder Ex. 63 (PASS Limited OB Ultrasound Instructions & Appointment [regarding limitation on US and need to see Ob-Gyn]); Schroeder Ex. 148 (PASS

14

website "Make an Appointment" web page; Schroeder Ex. 149 (PASS website "Services" web

page; Schroeder Ex. 150 PASS website "What We Do" webpage); Schroeder Ex. 79 (PASS

Pregnancy Test Case Intake); Wilson Dep. 121:15-24.

> **Defendant's Response:** Undisputed that the Plaintiff CPCs inform patients of the

medical services that they provide.  Disputed to the extent that the proposed fact implies that

STD testing and treatment, pregnancy tests, and ultrasounds are the only medical services that

Plaintiff CPCs provide. When health care facilities offer counseling about medical options, the

counseling is medical in nature and a form of health care. Def.'s SOF ¶¶ 93-97,136, 146, 152.

> 23. **The Medical Directors of the PCs put in place policies, procedures, standing orders and protocols governing the delivery of these limited medical services to ensure they are delivered as required by current standards of medical practice and care.** Trial Tr.

229:12-230:3; 236:16-23 (Cocks); Schroeder Ex. 2 (Focus Medical Director Job Description);

Schroeder Ex. 24 (Focus Staff performing Urine Pregnancy Tests); Schroeder Ex. 25 (Focus

Protocol for Pregnancy Testing Standing Order); Schroeder Ex. 26 (Focus Verification of

Positive Pregnancy Test Policy); Schroeder Ex. 27 (Focus Verification of Positive Pregnancy

Test Protocol Standing Order); Trial Tr. 309:10-19; 319:8-320:13 (Schroeder) (regarding

policies and procedures); Schroeder Ex. 104 (Options Now Nurse Ultrasound Scripting);

Schroeder Ex. 111 (Options Now Scope of Services Policy); Schroeder Ex. 113 (Options Now

Medical Professionalism Policy); Schroeder Ex. 120 (Options Now Guidelines and Patient Flow

for Ultrasounds); Schroeder Ex. 121 (Options Now Ultrasounds Exams Policy); Schroeder Ex.

123 (Options Now Pregnancy Test Standing Order); Schroeder Ex. 124 (Options Now Standing

Order for Laboratory Tests); Schroeder Ex. 125 (Options Now Standing Order for STD

Treatment); Schroeder Ex. 126 (Options Now Ultrasound Standing Order); Schroeder Ex. 130

(Options Now Policy Scheduling of Ultrasound Services); Trial Tr. 363:23-364:22 (Bohlen);

Schroeder Ex. 82 (PASS Policy Standing Order Protocol for Ultrasounds); Trial Tr. 351:25-

352:7 (Bohlen); Schroeder Ex. 81 (PASS Policy Standing Order Protocol Verification of Positive

Pregnancy Tests); Schroeder Ex. 80 (PASS Policy Standing Order for Pregnancy Testing); Trial

Tr. 365:18-25; 363:23-364:24 (Bohlen).

**Defendant's Response:** Undisputed that the Medical Directors of Plaintiff CPCs put in

place policies, procedures, standing orders and protocols governing the delivery of the Plaintiff

CPCs' medical services. Disputed to the extent that the Plaintiff CPCs' health care services fall

below the medical standard of care, including, but not limited to, when they: (1) fail to provide

patients with both the risks and benefits of the patients' relevant medical treatment options,

Def.'s SOF ¶¶ 96-99,  (2) withhold medical information based on the health care personnel's or

CPC's religious values, Def.'s SOF ¶¶ 89-92, and (3) fail to provide patients with either a formal

referral or neutral information about where the patient might receive their desired treatment

when requested by the patient, Def.'s SOF ¶ 112.

24.     **The limited medical services are provided by licensed and certified**

**healthcare professionals, i.e., nurses, ultrasound sonographers and doctors, all of whom**

**operate under the policies, procedures, standing orders and protocols approved by the**

**Medical Director.** See Parties' Joint Stipulations of Facts, ¶ 30; Trial Tr. 235:5-6; 275:1-13

(Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 55 (Focus Nurse

Sonographer Job Description); Schroeder Ex. 56 (Focus RDMS Job Description, Staff RN Job

Description); Schroeder Ex. 2 (Focus Medical Director Job Description); Schroeder Ex. 3 (Focus

Nurse Manager Job Description); Trial Tr. 319:4-7; 325:7-326:9 (Schroeder); Schroeder Ex. 93

(Options Now Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 104 (Options

16

Now Nurse Ultrasound Scripting); Schroeder Ex. 110 (Options Now Liner Service Model 15

Step Patient Flow Process); Schroeder Ex. 112 (Options Now Volunteer Medical Job

Description); Schroeder Ex. 113 (Options Now Medical Professionalism Policy); Schroeder Ex.

120 (Options Now Guidelines and Patient Flow for Ultrasounds); Schroeder Ex. 121 (Options

Now Ultrasound Exams Policy); Schroeder Ex. 123 (Options Now Pregnancy Test Standing

Order); Schroeder Ex. 124 (Options Now Standing Order for Laboratory Tests); Schroeder Ex.

125 (Options Now Standing Order for STD Treatment); Schroeder Ex. 126 (Options Now

Ultrasound Standing Order); Trial Tr. (Bohlen) 370:22-371:9; 351:25-352:7; 385:20-387:7; 405:-

406:12; Schroeder Ex. 80 (PASS Standing Order for Pregnancy Testing); Schroeder Ex. 81

(PASS Policy Standing Order Protocol Verification of Positive Pregnancy Tests); Schroeder Ex.

82 (PASS Policy Standing Order Protocol for Ultrasounds); Wilson Dep. 46:19-51:14

     **Defendant's Response:** Undisputed that the Plaintiff CPCs' physicians and health care

personnel—which may include nurses, ultrasound sonographers and doctors—are required by

Plaintiff CPCs to operate under the policies, procedures, standing orders and protocols approved

by the Medical Director. Defendant does not have reason at this time to believe that the CPCs'

health care personnel violate the internal policies and procedures of their respective CPCs.

Disputed to the extent that Plaintiffs are making a legal argument that any other person who

furnishes, or assists in the furnishing of, health care services at the CPC is not health care

personnel. *See* 745 ILCS 70/3 (defining health care personnel); Joint Pretrial Stip. SOF ¶ 12.

     25.    **The PCs require patients to sign informed consent forms before receiving**

**any of the limited medical services the PCs provide.** Trial Tr. 230:9-17 (Cocks); Schroeder

Ex. 53 (Focus Limited Ultrasound Consent Waiver & Release); Trial Tr. 230:4-8 (Cocks);

Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 30 (Focus Test-Treat Consent);

Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 88 (Options Now Consent for Services/Permission to Release Information & Follow-up); Schroeder Ex. 89 (Options Now Advocate Intake Form; Schroeder Ex. 93 Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 103 (Options Now STD Consent); Schroeder Ex. 104 (Options Now Nurse Ultrasound Scripting); Schroeder Ex. 105 (Options Now Ultrasound Consent & Release Form); Schroeder Ex. 117 (Options Now Patient Flow in Centers for Pregnancy Test); Schroeder Ex. 119 (Options Now Pregnancy Testing Policy); Schroeder Ex. 120 (Options Now Guidelines and Patient Flow for Ultrasounds); Schroeder Ex. 121 (Options Now Ultrasound Exams Policy); Schroeder Ex. 122 (Options Now Consent for Services Form); Schroeder Ex. 123 (Options Now Pregnancy Test Standing Order); Schroeder Ex. 124 (Options Now Standing Order for Laboratory Tests); Trial Tr. 364:14-22; 365:22-25 (Bohlen); Schroeder Ex. 62 (PASS Medical Services Consent Release Form).

**Defendant's Response:** Undisputed that Plaintiff CPCs have patients sign consent forms before receiving ultrasounds, pregnancy tests, and STD testing.

**5. The Limited Obstetrical Ultrasounds.**

26. **The limited obstetrical ultrasounds offered by the PCs are provided for the limited purpose of confirming a viable intrauterine pregnancy and estimating the gestational age of the child in utero.** Trial Tr. 230:18-23 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services); Schroeder Ex. 157-25 (Focus website "Ultrasound" webpage); Trial Tr. 314:9-15; 323:5-10 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 86 (Options Now What You Can Expect from Your Visit with Us); Schroeder Ex. 93 (Options Now Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 105 (Options Now Ultrasound Consent Form); Schroeder Ex. 106 (Options Now Discharge for Medical

Follow-up; Discharge for Medical Follow-up); Schroeder Ex. 126 (Options Now Ultrasound

Standing Order); Schroeder Ex. 130 (Options Now Policy Scheduling of Ultrasound Services);

Trial Tr. 363:15-22; 364:24-365:6; 389:3-390:5 (Bohlen); Schroeder Ex. 62 (PASS Medical

Services Consent Release Form);

    **Defendant's Response:** Undisputed that the ultrasounds offered by the Plaintiff CPCs

are used to confirm whether the pregnancy is viable and estimate the gestational age of the fetus.

Disputed that these medical purposes are the sole reasons that the Plaintiff CPCs offer

ultrasounds. Plaintiff CPCs began offering ultrasounds with the goal of convincing pregnant

patients at risk of having an abortion to change their minds and carry to term. Def.'s SOF ¶¶ 18,

20. Although Plaintiff CPCs do not disclose this underlying religious purpose to patients, the

CPCs' ultrasound procedures, medical treatments, and related medical options counseling are

based in part on the religious values of the Plaintiff CPCs rather than medical judgment. *See,*

*e.g.*, Def.'s SOF ¶¶ 31-34, 39-40, 54-58; Joint Pretrial Stip. ¶¶ 9, 36.

    27.    **Specific protocols govern the administration of the limited obstetrical**

**ultrasound and sharing information with the woman.** Trial Tr. 218:10-219:11 (Cocks);

Schroeder Ex. 31 (Focus Ltd OB Ultrasound Policy); Schroeder Ex. 32 (Focus Ltd OB

Ultrasound Standing Order); Schroeder Ex. 48 (Focus Ultrasound Guidelines); Schroeder Ex. 49

(Focus Transabdominal Ultrasound Policy); Schroeder Ex. 50 (Focus Unusual Ultrasound

Policy); Schroeder Ex. 104 (Options Now Nurse Ultrasound Scripting); Schroeder Ex. 112

(Options Now Volunteer Medical Job Descriptions); Schroeder Ex. 113 (Options Now Medical

Professionalism Policy); Schroeder Ex. 121 (Options Now Ultrasound Exams Policy); Schroeder

Ex. 126 (Options Now Ultrasound Standing Order); Schroeder Ex. 131 (Options Now Policy

Ultrasound Exams); Schroeder Ex. 132 (Options Now Policy Unusual Ultrasounds); Trial Tr.

363:23-364:13 and 370:17-372:3 (Bohlen) Schroeder Ex. 82 (PASS Policy Standing Order Protocol for Ultrasounds).

**Defendant's Response:** Undisputed.

28. **The trained and certified sonographer makes an initial reading and sends the sonogram to the doctor who gives a medical diagnosis. (If a doctor performs the ultrasound he or she will give the diagnosis).** Trial Tr. 231:5-14; 236:16-23 (Cocks); Schroeder Ex. 93 (Options Now Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 108 (Options Now Abnormal Ultrasound Letter); Schroeder Ex. 109 (Options Now Ultrasound Letter from Doctor); Schroeder Ex. 112 (Options Now Volunteer Medical Job Descriptions); Schroeder Ex. 120 (Options Now Guidelines and Patient Flow for Ultrasound)s; Schroeder Ex. 121 (Options Now Ultrasound Exams Policy); Schroeder Ex. 126 (Options Now Ultrasound Standing Order); Schroeder Ex. 132 (Options Now Policy Unusual Ultrasounds); Trial Tr. 371:10-372:9 (Bohlen).

**Defendant's Response:** Undisputed.

29. **The PCs contact their medical director by telephone for guidance, if necessary.** Parties' Joint Stipulations of Facts, ¶ 31.

**Defendant's Response:** Undisputed.

30. **If the PRC has reason to believe there is an immediate threat to the health of the woman, e.g., ectopic pregnancy, she is advised to go to the hospital immediately.** Trial Tr. 227:14-22 (Cocks); Schroeder Ex. 37 (Focus Patient Intake Form); Schroeder Ex. 41 (Focus Personalized Solutions Assessment); Schroeder Ex. 4 (Focus Emergencies Sheet); Schroeder Ex. 104 (Options Now Nurse Ultrasound Scripting); Schroeder Ex. 105 (Options Now Ultrasound Consent & Release Form); Schroeder Ex. 106 (Options Now Discharge for Medical Follow-up);

Schroeder Ex. 118 (Options Now Medical Emergencies Policy); Schroeder Ex. 120 (Options Now Guidelines and Patient Flow for Ultrasounds); Schroeder Ex. 126 (Options Now Ultrasound Standing Order); Schroeder Ex. 132 (Options Now Policy Unusual Ultrasounds); Trial Tr. 372:10-20; 390:10-391:7 (Bohlen); Schroeder Ex. 64 (PASS Urgent Care Release/Hospital List); Schroeder Ex. (PASS Miscarriages/Ectopic Precautions); Wilson Dep. 151:1-153:5

**Defendant's Response:** Undisputed.

31.     **The doctor serving as the medical director reviews the findings of the sonographer.** Parties' Joint Stipulations of Facts, ¶ 32; Trial Tr. 236:19-23 (Cocks); Schroeder Ex. 2 (Focus Medical Director Job Description); Schroeder Ex. 93 (Options Now Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 108 (Options Now Abnormal Ultrasound Letter); Schroeder Ex. 120 (Options Now Ultrasound Exams Policy); Schroeder Ex. 132 (Policy Unusual Ultrasounds); Trial Tr. 371:10-372:3 (Bohlen); Wilson Dep. 28:11-23.

**Defendant's Response:** Undisputed.

32.     **The medical directors are usually not on-site. They remotely review the sonographer's ultrasound reading.** Trial Tr. 236:16-23 (Cocks); 370:12-2; 371:16-372:3 (Bohlen); Wilson Dep. 29:19-30:7.

**Defendant's Response:** Undisputed.

33.     **The doctor serving as medical director provides the limited diagnosis, as to whether there is a viable intrauterine pregnancy, to women who receive an ultrasound. Other members of the PRC staff or volunteers at the PRC are not allowed to provide a diagnosis.** Trial Tr. 231:5-14 (Cocks); Trial Tr. 370:22-372:20 (Bohlen); Schroeder Ex. 93 (Options Now Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 109 (Options

Now Ultrasound Letter from Doctor); Schroeder Ex. 132 (Options Now Policy Unusual

Ultrasounds).

**Defendant's Response:** Undisputed that a doctor reviews and confirms ultrasound

diagnoses. Disputed to the extent Plaintiffs suggest that their sonographers are not providing

information to the patients about the results of an ultrasound before a doctor reviews them. *See,*

*e.g.,* Trial tr. 370:5-372:3, 386:5-391:7.

34. **Dr. Schroeder sometimes performs ultrasounds at Options Now, the PRC**

**where he volunteers as medical director.** Trial Tr. 320:15-321:5 (Schroeder).

**Defendant's Response:** Undisputed.

35. **If the ultrasound confirms that the woman is pregnant, she is told that she**

**needs to seek care from a doctor.** Trial Tr. 237:15-19 (Cocks); Schroeder Ex. 41 (Focus

Personalized Solutions Assessment); Trial Tr. 327:18-328:2 (Schroeder); Schroeder Ex. 84

(Options Now Telephone Talking Points); Schroeder Ex. 87 (Options Now Patient Advocate

Session and Script); Schroeder Ex. 93 (Options Now Nurse Session and Script for Pregnancy

Testing); Schroeder Ex. 106 (Options Now Discharge for Medical Follow-up): Schroeder Ex.

109 (Options Now Ultrasound Letter from Doctor); Schroeder Ex. 122 (Options Now Consent

for Services Form); Schroeder Ex. 126 (Options Now Ultrasound Standing Order); Trial Tr.

391:13-393:2 (Bohlen); Schroeder Ex. 66 (PASS Health Services Cook/Will County): Schroeder

Ex. 62 (PASS Medical Services Consent Release Form); Schroeder Ex. 79 (PASS Pregnancy

Test Case Intake Forms); Wilson Dep. 79:5-83:18.

**Defendant's Response:** Undisputed.

**6. STD Testing and Treatment.**

36. **PCs sometimes test for and treat STDs. If the PC offers such services, specific**

**protocols govern provision of such services**. Parties' Joint Stipulations of Facts, ¶ 34; Trial Tr. 229:21-230:8 (Cocks); Schroeder Ex. 28 (Focus Testing Standing Order); Schroeder Ex. 29 (Focus Treatment Standing Order); Schroeder Ex. 113 (Focus Medical Professionalism Policy); Trial Tr. 310:6-15 (Schroeder); Schroeder Ex. 93 (Options Now Nurse Session and Script for Pregnancy Testing); Schroeder Ex. 124 (Options Now Standing Order for Laboratory Tests; Standing Order for STD Treatment; Schroeder Ex. 128 (Options Now Standing Order Form for STD Lab Testing Requisition).

 **Defendant's Response:** Undisputed.

**7. <u>The PCs Do Not Provide Primary or OB-Gyn Care.</u>**

 37. **The doctors who volunteer to help the PCs deliver health care services to people who wish to receive them only provide the limited services offered in collaboration with the PC; the PCs do not provide primary care or prenatal care.** Parties' Joint Stipulations of Facts, ¶ 33; Trial Tr. 237:8-19 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services – no prenatal care); Schroeder Ex. 41 (Focus Personalized Solutions Assessment); Trial Tr. 309:20-310:9, 311:23-312:5 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 103 (Options Now STD Consent); Schroeder Ex. 105 (Options Now Ultrasound Consent & Release Form); Schroeder Ex. 135 (Options Now STD Test Letter); Schroeder Ex. 105 (Options Now Ultrasound Consent & Release Form); Schroeder Ex. 106 (Options Now Discharge for Medical Follow-up); Trial Tr. 391:13-17 (Bohlen); Schroeder Ex. 62 (PASS Medical Services Consent Release Form); Schroeder Ex. 79 (PASS Pregnancy Test Case Intake Forms); Wilson Dep. 79:9-15; 88:2-5; 88:19-89:6; 121:15-24; 122:24-123:11; Wilson Dep Ex. 4 ([also Schroeder Ex. 79] Pregnancy Test Case Intake Form); Wilson Dep. 121:15-24; 132:8-133:17.

**Defendant's Response:** Undisputed as to the Schroeder Plaintiff CPCs and all NIFLA Plaintiff CPCs with the exception of NIFLA Plaintiff TLC, which provides prenatal care until the 20th week of pregnancy. Def.'s SOF ¶ 19.

**8. The Plaintiffs' Positions Regarding Elective Abortion, Elective Sterilization, and Elective Contraception.**

38. **The Plaintiffs view abortion as the elective termination of a viable pregnancy and refer to it as elective abortion.** Trial Tr. 221:24-223:8 (Cocks); Schroeder Ex. 33 (Focus Commitment to Care); Trial Tr. 224:2-225:9 (Cocks); Schroeder Ex. 36 (Focus Helpline Intake Form); Trial Tr. 237:20-22 (Cocks); Schroeder Ex.s 138 - 145 (1st Way website pages disclaiming abortion); Schroeder Ex. 54 (Focus Limitation of Services); Trial Tr. 313:9-314:4 and 333:23-335:12 and 338:7-14 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 88 (Options Now Consent for Services/Permission to Release Information); Schroeder Ex. 122 (Options Now Consent for Services Form); Schroeder Ex. 133 (Options Now Walk-In Intake Sheet); Trial Tr. 353:9-16 and 383:4-384:1 (Bohlen); Schroeder Ex. 147 (PASS website "I'm Pregnant, Now What?" webpage); Schroeder Ex. 76 (PASS Statement of Principle); Schroeder Ex. 74 (PASS Orientation Workbook); Schroeder Ex. 78 (PASS Volunteer/Intern/Educator Agreement); Schroeder Ex. 79 (PASS Pregnancy Test Case Intake Forms); Wilson Dep. 95:11-20; 97:10-20.

**Defendant's Response:** Undisputed.

39. **The PCs do not offer, recommend, or refer for abortion, sterilization, or contraception.** Parties' Joint Stipulations of Facts, ¶ 37.

**Defendant's Response:** Undisputed.

40.     **The PCs tell women who come to them seeking assistance that they do not offer elective abortion, contraception, or sterilization and cannot help them obtain them.** Trial Tr. 224:2-225:7 (Cocks); Schroeder Ex. 36 (Focus Helpline Intake Form); Trial Tr. 225:12-226:14 and 240:22-242:6 (Cocks); Schroeder Ex. 54 (Focus Limitation of Services Form); Schroeder Ex.s 138-145 (1st Way webpages); Schroeder Ex. 157-2 (Focus "Abortion" webpage); Schroeder Ex. 157-15 (Focus website "Considering Abortion" webpage). Schroeder Ex. 84 (Options Now Telephone Talking "Points); Schroeder Ex. 87 (Options Now Patient Advocate Session and Script); Schroeder Ex. 103 (Options Now STD Consent); Trial Tr. 359:5-13 (Bohlen); Schroeder Ex. 59 (PASS Office Form); Trial Tr. 359:22-360:8 and 379:7-18 (Bohlen); Schroeder Ex. 148 (PASS website "Make an Appointment" webpage); Schroeder Ex.147 (PASS website "I'm Pregnant, Now What?" webpage); Schroeder Ex. 79 (PASS Pregnancy Test Case Intake Forms); Schroeder Ex. 84 (PASS Telephone Talking Points).

     **Defendant's Response:** Undisputed that the Plaintiff CPCs typically have written materials, information published on their websites, or information available during intake indicating the Plaintiff CPCs do not provide abortions, contraception, or sterilization. Disputed in that the cited materials do not show that Plaintiffs provide individualized and actual notice to their patients in all circumstances.

41.     **Plaintiffs believe abortion has no benefits**. Parties' Joint Stipulations of Facts, ¶ 8; Trial Tr. 233:15-234:17, 258:22-259:13, 283:9-284:25 and 244:19-245:4 (Cocks); Trial Tr. 313:1-8 and 330:15-17 (Schroeder). Wilson Dep. 61:18-62:1; 65:2-8; 97:7-20; 178:8-20. The Plaintiffs believe that elective abortion has serious negative effects on the health and wellbeing of mothers who choose to terminate the life of their child. Trial Tr. 233:16-234:7 (Cocks); Trial

Tr. 330:15-20 (Schroeder); Trial Tr. 348:23-349:4 and 350:8-16 (Bohlen); Schroeder Ex. 74 (PASS Orientation Workbook); Wilson Dep. 60:10-61:8.

**Defendant's Response:** Undisputed.

42.     **The PCs believe that sex outside of marriage presents risks of harm to the health and well-being (physical, emotional and spiritual) of the human person. Consistent with this view, the PCs' policy is to encourage people who visit them to refrain from sex outside marriage. For this reason, the PCs do not recommend, counsel or refer for sterilization or contraception.** Parties' Joint Stipulations of Facts, ¶ 9. See also, Trial Tr. 237:23-238:19 (Cocks); Schroeder Ex. 58 (Focus Statement of Faith); Schroeder Ex. 44 (Focus Birth Control Policy); Trial Tr. 314:16-315:1 (Schroeder); Schroeder Ex. 135 (Options Now STD Test Letter); Trial Tr. 349:5-350:7 (Bohlen); Schroeder Ex. 74 (PASS Orientation Workbook); Schroeder Ex. 76 (PASS Statement of Principle); Wilson Dep. 95:11-20; 98:21-106:5. The PCs do not offer, recommend, or refer for elective sterilization or contraception. Parties' Joint Stipulations of Facts, ¶ 37. Trial Tr. 237:23-238:19 and 244:19-247:23 (Cocks); Schroeder Ex. 58 (Focus Statement of Faith); Schroeder Ex. 44 (Focus Birth Control Policy); Trial Tr. 314:16-315:1 (Schroeder); Schroeder Ex. 84 (Options Now Telephone Talking Points); Schroeder Ex. 135 (Options Now STD Test Letter); Schroeder Ex. 114 (Options Now Educational Materials Policy); Trial Tr. 372:21-373:25 (Bohlen); Schroeder Ex. 74 (PASS Orientation Workbook); Wilson Dep. 98:21-106:5.

**Defendant's Response:** Undisputed.

**9. The Plaintiffs' Injuries.**

43.     **Requiring Plaintiffs to inform their patients of any purported benefits of**

**abortion would violate their religious beliefs.** Parties' Joint Stipulations of Facts, ¶ 39. See also, Trial Tr. 244:19-247:23 and 292:24-293:10 and 233:16-234:17 (Cocks); Trial Tr. 313:1-8 (Schroeder); Trial Tr. 380:8-381:1 (Bohlen); Schroeder Ex. 74 (PASS Orientation Workbook); Trial Tr. 369:8-21 and 372:21- 373:25 and 380:15-381:1 (Bohlen); Wilson Dep. 95:11-96:23; 97:10-106:5; 163:11-23.

 **Defendant's Response:** Undisputed.

 44. **To require Plaintiffs to facilitate a woman's access to elective abortion by means of providing the information required by Section 6.1(3) would force the Plaintiffs to violate their sincerely held religious convictions. Owing to their religious beliefs that abortion ends a human life, Plaintiffs do not provide, refer for, or otherwise facilitate access to, abortion.** Parties' Joint Stipulations of Facts, ¶ 25.

 **Defendant's Response:** Undisputed.

 45. **The PCs believe that an elective abortion terminates a unique and irreplaceable human life**. See Trial Tr. 230:25-231:4, 237:20-238:4, 241:20-24, 244:19-245:4 (Cocks); Schroeder Ex. 58 (Focus Statement of Faith); Trial Tr. 312:16-313:8 and 330:18-20 (Schroeder); Trial Tr. 380:15-381:1 (Bohlen); Schroeder Ex. 76 (PASS Statement of Principle); Schroeder Ex. 74 (PASS Orientation Workbook); Wilson Dep. 40:22-41:9. The PCs cannot intentionally provide women with information about where to access elective abortion services without violating their conscience. Trial Tr. 227:23-228:1 (Cocks); Schroeder Ex. 35 (Focus Policy Scope of Services); Trial Tr. 222:10-223:8 (Cocks); Schroeder Ex. 33 (Focus Commitment to Care and Competence); Trial Tr. 313:9-314:4 (Schroeder); Trial Tr. 397:23-399:4 (Bohlen); Schroeder Ex. (PASS 76 Statement of Principle); Schroeder Ex. 78 (PASS Volunteer/Intern/Educator Agreement); Wilson Dep. 95:11-96:23; 97:10-106:5; 139:14-140:23.

**Defendant's Response:** Undisputed.

46. **Forcing the PCs to facilitate access to elective sterilization or contraception would require them to violate their sincerely held religious convictions. The PCs cannot in good conscience provide women with information about where they might access elective sterilization services or elective contraception.** Trial Tr. 244:19-247:23 (Cocks); Trial Tr. 372:21-373:20, 347:25-348:9, 349:5-350:7 (Bohlen); Wilson Dep. 98:21-106:5; Def. Ex. 40 (Options Now Policy: Contraception Education); Schroeder Ex. 76 (PASS Statement of Principle); Schroeder Ex. 44 (Focus Birth Control Policy); Schroeder Ex. 33 (Focus Policy: Commitment of Care and Competence).

**Defendant's Response:** Undisputed.

47. **Dr. Schroeder has a sincerely held religious objection to providing medical advice about the benefits of elective abortion and facilitating a women's decision to obtain an abortion. While he does not have a moral objection to elective sterilization or artificial contraception, as medical director of Options Now, he respects and has agreed to follow the organization's values while serving in that capacity. As a result, he does not want to be coerced by the challenged law to recommend or facilitate access to elective sterilization or contraception.** Trial Tr. 314:16-315:13 (Schroeder).

**Defendant's Response:** Undisputed.

48. **Forcing the Plaintiffs to provide patients with information about the benefits" of the legal treatment options at issue here i.e., abortion, contraception, and sterilization.** 75 ILCS 70/6 & 70/6.1(1), **or to provide referrals, transfers, or information about entities who provide abortion, sterilization, or contraception, would coerce the**

28

**Plaintiffs to speak when they do not want to and to deliver a message they do not wish to deliver**.

      **Defendant's Response:** Undisputed that Plaintiffs believe providing disclosures under the Conscience Act would cause them to speak when they do not want to and to deliver a message they do not wish to deliver. Otherwise disputed. Defendant objects that this paragraph constitutes improper arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded.

**10. <u>The Plaintiffs Experts: Education, Training, and Experience.</u>**

      49.    **Dr. Ashley K. Fernandes is an expert in obstetrical and gynecological ("OB-Gyn") care and bioethics. He holds a degree of doctor of medicine (M.D.) and a doctorate in philosophy (Ph.D) focusing on bioethics.** Trial Tr. 412:4-414:12 (Fernandes); Schroeder Ex. 181 (Fernandes C.V.). **Dr. Fernandes provides obstetrical and gynecological ("OB-Gyn") care in his clinical practice. He knows the medical standards of practice and care that apply to OB-Gyn care.** Trial Tr. 414:16-19 (Fernandes). **He also knows the ethical standards of care applicable to OB-Gyn care.** Trial Tr. 414:20-22 (Fernandes). **The latter (ethical) standards are a general set of principles that apply across different medical specificalities, e.g., pediatrics and obstetrics and gynecology.** Trial Tr. 415:1-11 (Fernandes).

      **Defendant's Response:** Undisputed that Dr. Fernandes is a pediatrician who at times provides gynecological care to his patients, Joint Post-Trial Stip. ¶ 43, and that he has a degree of doctor of medicine and a doctorate in philosophy focusing on bioethics. Undisputed that he has been qualified in this case to testify as an expert on general ethical standards of care that apply across different medical specialties, such as pediatrics and obstetrics and gynecology. Disputed

that Dr. Fernandes is an expert in OB-GYN care beyond general ethical standards of care applied in the context of OB-GYN care and the gynecological care that he has sometimes provided as a pediatrician. Dr. Fernandes is a primary care pediatrician, but he is not a board-certified gynecologist, has not completed a gynecological residency, and does not provide ongoing obstetrical care, Trial tr. 503:14-504:8; 505:3-8.

50. **Dr. Daniel James Lee (Lee) is an expert in OB-Gyn.** Trial Tr. 31:14-32:12, 34:19-36:22 (Lee); NIFLA Ex. 34 (Lee C.V.).

**Defendant's Response:** Undisputed.

51. **Dr. C. Brent Boles (Boles) is an expert in OB-Gyn and has extensive experience, including as a clinical instructor of medical students, in obtaining informed consent.** Schroeder Ex. 180 (Boles C.V.); Trial Tr. 726:6-9 (Boles).

**Defendant's Response:** Undisputed.

52. **Conclusion. Based on the factual findings above, this Court finds that the Plaintiffs' experts, Fernandes, Lee and Boles, are qualified to offer expert opinion on current standards of medical practice and care as they relate to the issues in this case.**

**Defendant's Response:** Defendant objects that these are improper arguments, not proposed findings of fact, in violation of the Court's standing order. Undisputed that the Court has already ruled on the parties' *Daubert* motions and has already found all of the parties' experts qualified to offer expert opinions on current standards of medical practice and care as they relate to the issues in this case.

**XI. The clinical and ethical components of the "Standard of Care".**

53.     **Medical/clinical standards of care are based upon objective, empirical evidence gathered through application of the scientific method and collected by a professional body.** Trial Tr. 424:14-19 (Fernandes).

**Defendant's Response:** Undisputed that "medical/clinical" standards of care may be based upon objective, empirical evidence gathered through application of the scientific method and collected by a professional body. Disputed to the extent that Plaintiffs imply that "medical/clinical" standards of care are not also informed by ethical principles. For example, if a surgeon did a well-performed surgery but had failed to ensure that the patient had been counseled on the risks and benefits of the surgery beforehand, the surgeon would still be below the medical standard of care. Trial tr. 582:9-22. The medical standard of care consists of both clinical and ethical standards of care, which are "intertwined in the sense that you have to uphold both sides of that equation to remain within the [medical] standard of care." Trial tr. 582:9-583:2; *see also* Trial tr. 423:10-16.

54.     **Medical ethical standards, on the other hand, are based on the question of what is "good" to be done (what "should" be done) for the patient in a given situation.** Trial Tr. 421:16-422:1, 422:2-8, 423:19-424:15 and 526:6-12 (Fernandes).

**Defendant's Response:** Undisputed that "medical ethical" standards of care may be informed by ethical questions of what is "good" or "should" be done for a patient in a given situation. Disputed to the extent the duties that doctors owe their patients under the standard of care do not vary based on the individual doctor's conscience beliefs. Def.'s SOF ¶ 120. The medical standard of care consists of both clinical and ethical standards of care, which are

31

"intertwined in the sense that you have to uphold both sides of that equation to remain within the [medical] standard of care." Trial tr. 582:9-583:2.

55.     **The question of the good to be done is evaluated outside the framework of science. Science cannot determine what is good.** Trial Tr. 424:14-19 (Fernandes).

**Defendant's Response:** Disputed. Scientific information has a bearing on whether a particular medical decision is "good" for a particular patient. For example, in the context of medical options counseling, scientific information enables patients to determine what is a good decision for them. Trial tr. 584:7-17; NIFLA Ex. 32(b) at AMA 2.1.1. In the context of determining medical and ethical standards of care relevant to this case, science and ethics are not entirely independent or unrelated. Trial tr. 582:9-583:2.

56.     **For this reason, pronouncements about medical ethical standards made by professional bodies are not, and cannot be, dogmatic or conclusive.** Trial Tr. 423:2-6 (Fernandes).

**Defendant's Response:** Undisputed that medical ethical standards of care are not "dogmatic or conclusive." For example, Dr. Burcher testified that he is critical of some interpretations of patient autonomy, yet he still relies heavily the importance of patient autonomy to inform medical and ethical standards of care. *See, e.g.*, Trial tr. 588:2-5:89:9. Defendant further disputes the qualifier of "for this reason" because it is based on Plaintiffs' SOF ¶ 55, which Defendant disputes in part. In the context of determining medical and ethical standards of care relevant to this case, science and ethics are not entirely independent or unrelated. Trial tr. 582:9-583:2.

57. **When judgments differ or are disputed about the good of a particular medical treatment option, more variation in medical practice can be expected.** Trial Tr. 424:9-425:5, 710:25-711:13 (Fernandes).

**Defendant's Response:** Undisputed except insofar as this paragraph denies that variations in medical practice based on conscientious objections can violate ethical principles and the standard of care. Def.'s SOF ¶¶ 120-121, 129, 155.

58. **Ethical standards do not play second fiddle to medical standards; both work in tandem to articulate what is known as the "standard of care."** Trial tr. 722:19-725:9, 422:9-24 (Fernandes).

**Defendant's Response:** Undisputed that the medical standard of care, or what is often referred to as the "standard of care" in this case, consists of both clinical and ethical standards of care, which work in tandem and are "intertwined in the sense that you have to uphold both sides of that equation to remain within the standard of care." Trial tr. 582:9-583:2.

59. **Using the word "care" in the term "standard of care" implies a normative judgment by the doctor that a proposed treatment option is "good" for the patient and therefore constitutes "care".** Trial Tr. 422:9-24, 710:25-711:11.

**Defendant's Response:** Undisputed that standards of care require doctors to use their medical judgment to propose treatment options that could be "good" for the patient. Undisputed that proposing treatment options to a patient constitutes medical care. Disputed that the word "care" in the context of "standard of care" implies that the doctor's personal views of proposed treatment options alter the medical, ethical, or clinical standards of care. Def.'s SOF ¶¶ 120-121, 129.

60. **Understood in its medical and ethical dimensions, the "standard of care" requires each doctor, in light of his or her education, experience, and other information known to him or her, skillfully and ethically to prescribe and deliver a course of treatment or care designed to advance the patient's good.** Trial Tr. 426:3-8 (Fernandes).

**Defendant's Response:** Undisputed that "standard of care" require doctors to use their medical education, experience, and judgment to prescribe and deliver a course of treatment or care designed to advance the patient's good. Disputed with respect to the vagueness of "other information known to him," including to the extent this phrase implies that the doctor's personal views of proposed treatment options alters the medical, ethical, or clinical standards of care. Def.'s SOF ¶¶ 120-121, 129.

## 11. Theories of Ethical Care.

61. **Different theories or approaches, discussed in the following paragraphs, exist to help doctors decide what is medically ethical. No one ethical theory or approach is controlling.** Trial Tr. 711:14-712:10 (Fernandes); See Schroeder Ex. 160 (ACOG Opn. 390) at p.12/22 (noting p. 17/22 (advocating for consideration of various ethical approaches when making ethically justifiable clinical decisions)).

**Defendant's Response:** Undisputed that different theories or approaches exist to help doctors decide what is medically ethical. Disputed to the extent that the principlist approach developed by Beauchamp and Childress, which informs guidelines like the AMA Code of Ethics that helps establish the standard of care, is the predominant and widely-accepted framework of modern biomedical ethics. Def.'s SOF ¶¶ 66, 74-77. Mainstream biomedical ethicists do not disregard the AMA Code of Ethics. Trial tr. 593:8-10.

34

62. **When doctors consider whether a possible medical treatment option is ethically permissible, they may legitimately draw on one or more of the extant ethical theories or approaches.** Trial Tr. 426:15-431:13 (Fernandes).

**Defendant's Response:** Undisputed except to the extent that the principlist approach developed by Beauchamp and Childress, which informs guidelines like the AMA Code of Ethics that helps establish the standard of care, is the predominant and widely-accepted framework of modern biomedical ethics. Def.'s SOF ¶¶ 66, 74-77. Mainstream biomedical ethicists do not disregard the AMA Code of Ethics. Trial tr. 593:8-10.

63. **All the approaches give doctors discretion to balance the various principles or goods in individual cases in order to decide whether a particular medical treatment option is clinically appropriate and ethical.** Trial Tr. 430:25-431:6 (Fernandes).

**Defendant's Response:** Undisputed that all ethical approaches acknowledge that doctors have some discretion to apply ethical principles to individual clinical situations. Disputed to the extent that medical ethics and the standard of care reflect general principles that apply to all healthcare providers. Def.'s SOF ¶¶ 65, 67, 74-75. The standard of care is informed by ethical principles and guidelines issued by professional bodies such as the AMA and ACOG, in addition to a health care provider's clinical judgment regarding the patient's medical history and personal circumstances or choices. Def.'s SOF ¶¶ 76-78, 83. That is, the medical standard of care consists of both clinical and ethical standards of care, which are intertwined. Def.'s SOF ¶ 64. Doctors' permissible discretion to determine whether a particular medical treatment options is clinically appropriate does not vary according to an individual doctor's ethical beliefs. Def.'s SOF ¶¶ 116, 118, 123, 129. For example, as AMA guideline 2.1.3 states, "withholding information without a patient's knowledge or consent is ethically unacceptable," because, as Dr. Burcher explains,

35

"withholding medical information that may be relevant to a patient is just in a very straightforward way a violation of their autonomy because you are withholding information that they may have otherwise have used to make a self-governing decision." Trial tr. 595:17-596:16; NIFLA Trial Ex. 32(b) at AMA guideline 2.1.3.

64. **The discretion to make clinical and ethical judgments resident in each physician underscores the importance of tolerance in medical ethics.** Trial Tr. 430:25-431:6 (Fernandes).

**Defendant's Response:** Undisputed that discretion in making clinical and ethical judgments is important and that tolerance is important in medical ethics. Disputed that physicians can ethically exercise discretion to withhold or alter information or fall below the standard of care based on their personal religious beliefs. Def.'s SOF ¶¶ 116, 118, 123, 129; NIFLA Trial Ex. 32(d) at NIFLA 01824-85; *see also* Trial tr. 606:5-607:4; 615:9-21; 616:4-617:3; 689:18-690:25.

65. **The principlist approach, identified with Beauchamp and Childress, posits that a doctor should consider four principles when deciding whether a treatment is ethical: autonomy, beneficence, nonmaleficence (do no harm) and justice.** Trial Tr. 427:11-19, 431:21-23 (Fernandes).

**Defendant's Response:** Undisputed.

66. **Another theory, associated with Dr. Edmund Pellegrino of Georgetown University, and referred to as the "beneficence in trust approach", requires doctors to consider four goods when treating a patient.** Trial Tr. 427:20-25 (Fernandes).

**Defendant's Response:** Undisputed that Dr. Pellegrino advances this bioethical theory.

36

67. **Under the "beneficence in trust approach", the first good is patient autonomy, the patient's own view of the good.** Trial Tr. 428:1-2 (Fernandes).

**Defendant's Response:** Undisputed.

68. **Under the "beneficence in trust approach", the second is the patient's biomedical or physiological good in view of the pathology suffered by the patient.** Trial Tr. 428:2-5 (Fernandes).

**Defendant's Response:** Undisputed.

69. **Under the "beneficence in trust approach", the third good is the person's human flourishing. (The United Nations calls this good the "biopsychosocial-spiritual aspect.")** Trial Tr. 428:6-10 (Fernandes).

**Defendant's Response:** Undisputed.

70. **Under the "beneficence in trust approach", the fourth good is the patient's spiritual good. Even if not religious, the patient may place his or her spiritual good above the other goods of autonomy, biomedical good, and biopsychosocial good.** Trial Tr. 428:11-18 (Fernandes).

**Defendant's Response:** Undisputed that the "fourth" good under that approach has been characterized as the patient's "spiritual good," and undisputed that under a particular theory of ethics, a patient may choose to place his or her spiritual good above the other goods of autonomy, biomedical good, and biopsychosocial good.

71. **Yet another theory, put forward by the American Board of Internal Medicine (ABIM) in the Charter on Medical Professionalism, posits three pillars of medical professionalism: patient autonomy, altruism, and social justice.** Trial Tr. 428:19-22, 429:23-430:6 (Fernandes).

37

**Defendant's Response:** Undisputed that ABIM posits this bioethical theory.

72. **The ABIM charter asserts that patient autonomy should be paramount but that assertion is necessarily dependent upon the satisfaction of two antecedent conditions: that the patient is not requesting medically inappropriate care, and that the patient's decision is ethical. These caveats to the principle of patient autonomy prevent medicine from becoming a purely transactional and technical discipline.** Trial Tr. 430:8-19 (Fernandes).

**Defendant's Response:** Undisputed that the ABIM charter asserts that patient autonomy should be paramount but that assertion is necessarily dependent upon the satisfaction of two antecedent conditions: that the patient is not requesting medically inappropriate care, and that the patient's decision is ethical. Disputed to the extent that Plaintiff CPCs suggest that doctors may ethically substitute their personal moral beliefs for the patient's and subsequently practice medicine that falls below the medical standard of care. Trial tr. 588:2-589:9; 585:3-587:24.

73. **Still other approaches to medical ethics exist.** See, e.g., Schroeder Ex. 160 (ACOG Opn. 390) at p. 12/22 (noting p. 17/22 (advocating for consideration of various ethical approaches when making ethically justifiable clinical decisions)).

**Defendant's Response:** Undisputed.

74. **The principal ethical theories described (Principlism (Beauchamp and Childres), Pellegrino's "Beneficence in Trust", and the ABIM Charter) all reference patient autonomy.** Trial Tr. 430:21-432:3 (Fernandes).

**Defendant's Response:** Undisputed.

75. **But none of the principal ethical theories claims patient autonomy as the**

**primary value in medical ethics or clinical practice. All three theories require a balancing of values/goods. Pellegrino describes this balancing as between "beneficence-in-trust" and the patient's wishes.** Trial Tr. 431:21-432:9 (Fernandes).

Defendant's Response: Undisputed that the theories do not present patient autonomy as the only value to consider, to the exclusion of other ethical considerations. Disputed to the extent that in particular circumstances some ethical principles are more salient and rise to the top. Trial tr. 666:16-22.

76.    **Even Beauchamp and Childress do not claim that patient autonomy is the dominant principle.** Trial Tr. 431:21-25 (Fernandes).

Defendant's Response: Undisputed.

77.    **The idea that patient autonomy is the primary value in medical ethics or clinical practice, and that the principle of patient autonomy requires doctors to subordinate their ethical views to the desires of their patients, represents an inaccurate and reductionist view of medical ethics and clinical practice.** Trial Tr. 430:21-431:13 (Fernandes).

Defendant's Response: Undisputed that it represents an inaccurate and reductionist view of medical ethics and clinical practice to assert that patient autonomy is the primary value at the exclusion of other principles. Disputed to the extent that in particular circumstances some ethical principles, such as autonomy, are more salient and rise to the top. Trial tr. 666:16-22. When doctors' personal ethical views conflict with a patient's desire to learn about or undergo a medically appropriate treatment option, the doctor must still comply with minimal ethical obligations to support patient autonomy. *See, e.g.,* Def.'s SOF ¶¶ 120-121, 123, 129; NIFLA Trial Ex. 32(d) at NIFLA 01824-85.

39

78.     **The opinion of Defendant's expert Dr. Burcher in support of this reductionist view is not supported in the literature, except for the published views of Dr. Ezekiel Emmanuel. This doctor has also opined that people over the age of 70, and newborns with serious medical issues, should be denied health care because of high cost.** Trial Tr. 746:2-747:7 (Boles); Cf. NIFLA Ex. 37c at 1789 (Defendant's expert, Dr. Paul Burcher, citing Stahl and Emmaneul).

     **Defendant's Response:** Disputed. The proposed fact misrepresents Dr. Burcher's testimony. Dr. Burcher does not have a "reductionist" view of patient autonomy, and he agrees that the four principles of medical ethics are coequal, although some may be more salient than others in specific circumstances. Trial tr. 666:7-22. Dr. Burcher cautions against thinking about patient autonomy as "an absolute [right] to request anything." Trial Tr. 585:3-23, 588:2-590:3. Dr. Burcher testified that doctors have a right to make conscientious objections to requested patient care, but as both Beauchamp and Childress's Principles of Biomedical Ethics and the AMA Code of Ethics emphasize, when doctors do so, there are still limitations and duties that exist to protect patients' rights and autonomy. Trial tr. 606:5-607:25. In addition, Dr. Burcher's views on patient autonomy and doctors' rights to exercise conscientious objections do not rely solely on an article by Dr. Emanual, but instead are supported by Beauchamp and Childress (authors of the preeminent text on biomedical ethics in the country), and AMA Code of Ethics 1.1.7. Trial tr. 618:11-6:20:4.

**12. Role of Professional Organizations: Informing But Not Determining Medical Practice.**

79.     **Ethical standards promulgated by professional organizations do not establish standards of professional conduct, but are intended to guide or inform an individual doctor's ethical judgments. Most standards explicitly state as much.** Trial Tr. 472:21-473:20,

464:9-12 (Fernandes); 32:20-33:19, 33:24-18 (Lee). See also, NIFLA Ex. 32a at 1751 ("The opinions in this chapter are offered as ethics guidance for physicians and are not intended to establish standards of practice or rules of law."); NIFLA Ex. 32b at 1769 (same).

**Defendant's Response:** Undisputed that ethical standards published promulgated by professional organizations do not establish binding professional or legal standards and that standards may state this. Disputed in that Plaintiffs minimize the weight of these guidelines. Standards like the AMA Code of Ethics provide a normative set of guidelines within the medical profession that health care professionals consult to inform their professional conduct that are derived from widely accepted principles of medical ethics. Def.'s SOF ¶¶ 75-78. Physicians and health care personnel use the AMA Code of Ethics as a standard set of digestible guidelines for clinical practice and for biomedical ethics. Def.'s SOF ¶ 77. Mainstream biomedical ethicists do not disregard the AMA Code of Ethics. Trial tr. 593:18-20.

80. **Physicians would be wrong to rely blindly on promulgated ethical standards. Physicians have a professional duty to make their own ethical judgments about the medical treatments they provide to their patients.** Trial Tr. 473:3- 474:4 (Fernandes).

**Defendant's Response:** Undisputed that physicians have a professional duty to make ethical judgments about the medical treatments they provide to patients. Disputed to the extent that physicians whose personal moral views cause them to decline to provide information necessary to patients' informed medical decisions violate rules of medical ethics and the standard of care. Def.'s SOF ¶¶ 88-89, 98, 100, 116, 118.

81. **The danger in blind adherence to promulgated ethical standards is shown by stark medical abuses that have arisen in our history. Standards promulgated by medical associations at certain times promoted injustices such as racial discrimination, forced**

41

sterilization of the supposed "unfit," and race-based eugenics. Trial Tr. 438:16-440:9.
(Fernandes).

Defendant's Response: Undisputed that injustices like racial discrimination, forced
sterilization, and race-based eugenics have existed historically. Disputed to the extent that
Plaintiffs suggest that complying with the Act's requirements to provide patients with
information about both the risks and benefits of their legal treatment options, or assisting patients
in finding legal and medically appropriate treatment amounts to "stark medical abuses." Trial tr.
580:4-7.

82.     Some practitioners still express views that, if accepted, would deny medical
care to vulnerable persons or groups. An example is the opinion of Dr. Ezekiel Emmanuel
that medical care for persons over 70 and newborn infants with serious medical issues
should be curtailed or cut off. Trial Tr. 746:21-747:7 (Boles); Cf. NIFLA Ex. 37c at 1789.

Defendant's Response: Disputed. Plaintiffs' citations do not support the claim that
views of "some practitioners" that would allegedly deny medical care to vulnerable persons or
groups affect the ethical principles or standard of care at issue in this case. The testimony of Dr.
Burcher and the ethical guidelines on which he relied in forming his opinions in this case
reaffirm physicians' obligation to provide adequate care to all patients. Def.'s SOF ¶¶ 79-80, 84,
86; Trial tr. 603:20-604:12.

83.     Because of these dangers, experts in medical ethics such as Dr. Fernandes
teach students to evaluate critically, not blindly accept, ethical standards that are
advanced. Trial Tr. 439:10-440:9, 447:17-21 (Fernandes).

Defendant's Response: Undisputed except to the extent that Defendant disputes the
antecedent paragraphs referenced by the phrase "these dangers."

84. **Tolerating some variation in medical practice also benefits the practice of medicine. Variation has led to reforms, and can be expected to do so in the future. For example, doctors who provide limited medical care at PRCs may influence doctors who now view elective abortion as appropriate medical care to change their minds.** Trial Tr. 439:10-440:9, 483:25, 560:16-563:5 (Fernandes).

**Defendant's Response:** Undisputed that tolerating variation in medical practice benefits the practice of medicine. Disputed that it benefits the practice of medicine when physicians, such as doctors at Plaintiff CPCs, withhold or alter information or fall below the standard of care based on their personal religious beliefs. Def.'s SOF ¶¶ 116, 118, 123, 129; NIFLA Trial Ex. 32(d) at NIFLA 01824-85; *see also* Trial Tr. 606:5-607:4; 615:9-21; 616:4-617:3; 689:18-690:25.

85. **Tolerance as to whether doctors should provide medical advice about particular treatment options, or recommend those options, also allows the medical profession to better serve the needs of the full range of patients who might not be well cared for if variation of treatment is disallowed.** Trial Tr. 459:14-462:10 (Fernandes).

**Defendant's Response:** Undisputed that doctors are expected to use discretion in filtering the information they provide patients about treatment options to ensure that the options are medically appropriate and tailored to the patients' individual circumstances. Disputed that healthcare providers can ethically withhold or alter information or fall below the standard of care based on their personal religious beliefs. Def.'s SOF ¶¶ 116, 118, 123, 129; NIFLA Trial Ex. 32(d) at NIFLA 01824-85; *see also* Trial tr. 606:5-607:4; 615:9-21; 616:4-617:3; 689:18-690:25.

86. **Toleration for different ethical judgments also protects the moral integrity of doctors**. Tr. 492:3–493:16.

**Defendant's Response:** Undisputed that tolerance for different ethical judgments protects the moral integrity of doctors. Disputed in that ethical judgments must be coupled with protections to ensure that conscience objections do not interfere with patient autonomy. Def.'s SOF ¶¶ 120-121, 123-131; Trial tr. 689:21-690:15.

87.    **Treating standards promulgated by professional organizations as binding is a mistake also because: (1) many standards, including medical standards of care, which are promulgated by professional organizations may become quickly outdated,** Trial Tr. 474:15-17 (Fernandes); **(2) some standards have no empirical data to support them, a fact which is particularly true of ethical standards**, Trial Tr. 474:22 (Fernandes); **and (3) medical standards are often contradictory, which, again, is particularly true of ethical standards.** Trial Tr. 474:23-476:16; 474:5-14 (Fernandes).

**Defendant's Response:** Undisputed that ethical standards promulgated by professional organizations do not automatically establish binding professional or legal standards. Disputed in that Plaintiffs minimize the weight of these guidelines. Standards like the AMA Code of Ethics provide a normative set of guidelines within the medical profession that health care professionals consult to inform their professional conduct that are derived from widely accepted principles of medical ethics. Def.'s SOF ¶¶ 75-78. Physicians and health care personnel use the AMA Code of Ethics as a standard set of digestible guidelines for clinical practice and for biomedical ethics. Def.'s SOF ¶ 77. Mainstream biomedical ethicists do not disregard the AMA Code of Ethics. Trial tr. 593:18-20.

88.    **Evidence that standards or opinions promulgated by medical organizations are not binding on physicians is shown by the gap between promulgated medical standards and the actual practices of physicians.** Trial Tr. 480:16-482:19 (Fernandes); 31:12-21 (Lee).

44

**Defendant's Response:** Disputed. Plaintiffs' assertion is unsupported by their citations, which do not identify specific practices or explain what the "gap" may be. Standards like the AMA Code of Ethics provide a normative set of guidelines within the medical profession that health care professionals consult to inform their professional conduct that are derived from widely accepted principles of medical ethics. Def.'s SOF ¶¶ 75-78. Physicians and health care personnel use the AMA Code of Ethics as a standard set of digestible guidelines for clinical practice and for biomedical ethics. Def.'s SOF ¶ 77. Mainstream biomedical ethicists do not disregard the AMA Code of Ethics. Trial tr. 593:18-20.

89.      **One factor that accounts for this gap is that the medical organizations are often controlled by a small group of committee members who base their pronouncements on their own values and do not include dissenting views.** Trial Tr. 479:1-480:15 (Fernandes).

**Defendant's Response:** Disputed for the reasons stated in Defendant's response to the preceding paragraph. Guidelines such as the AMA Code of Ethics reflect widely-accepted ethical principles, including the work of Beauchamp and Childress. Def.'s SOF ¶¶ 74-77.

90.      **In the field of OB-Gyn, the vast majority of practitioners reject the position of the American College of Obstetrics and Gynecology (ACOG) that elective abortion is ethically permissible. They do not accept ACOG's position that the moral status of the unborn child depends on the mother's choice whether to allow her unborn child to live.** Trial Tr. 713:2-715:9 (Fernandes).

**Defendant's Response:** Disputed. ACOG's guidelines recognize the right of conscience objectors to refuse to participate in abortion. Def. Trial Ex. 72 at IDFPR009520. Further disputed to the extent that Plaintiffs incorrectly extrapolate from the fact that a provider does not

45

personally perform abortions to conclude that the provider conscientiously opposes elective abortions or ACOG's position on abortions.

91. **These doctors consider the child *in utero* as a second patient whose life must be considered and cared for.** Trial Tr. 749:24-753:2 (Boles); 37:24-38:2 (Lee).

**Defendant's Response:** Disputed. The record does not establish that doctors who do not perform abortions consider the fetus to be the second patient for the entirety of pregnancy. The prevailing view in medical ethics is that the fetus is only considered to be a patient when it becomes viable or when designated as such by the pregnant patient. Trial tr. 699:13-701:7. Plaintiffs' citations establish only that Dr. Boles and Dr. Lee consider the fetus as a second patient for the entirety of a pregnancy.

92. **These doctors refuse to perform or refer for elective abortions because they believe it would be unethical and improper patient care to do so.** Trial Tr. 476:7-478:10 (Fernandes). **That many practitioners reject ACOG's ethical pronouncements about the moral status of an unborn child supports the view that ACOG's pronouncements do not bind practitioners and thus are not part of the standard of care.** Trial Tr. 480:16-482:19 (Fernandes); 31:12-21 (Lee).

**Defendant's Response:** Disputed to the extent that Plaintiffs incorrectly extrapolate from the fact that a provider does not personally perform abortions to conclude that the provider conscientiously opposes elective abortions or ACOG's position on abortions.

93. **The gap between the pronouncements of professional organizations and actual practice is also present in other areas of medical practice such as contraception, sterilization, and legally authorized assisted suicide.** Trial Tr. 477:6-479:5 (Fernandes).

**Defendant's Response:** Undisputed that some practitioners may disagree with the opinions of particular professional organizations. Disputed to the extent guidelines issued by organizations like the AMA and ACOG are widely relied upon to establish the medical standard of care. Def.'s SOF ¶¶ 75-77. Mainstream biomedical ethicists do not disregard the AMA Code of Ethics. Trial tr. 593:8-10.

**13. Creating the Doctor-Patient Relationship and Determining Its Limitations.**

94.     **Ethical principles inform the creation and performance of the doctor-patient relationship.** Trial Tr. 433:20-434:2 (Fernandes).

**Defendant's Response:** Undisputed.

95. **Current standards of ethical medical care require a doctor to assess the unique circumstances and needs of each patient when providing medical care.** Trial Tr. 50:2-20 (Lee).

**Defendant's Response:** Undisputed.

96.     **Care should be limited to what is within the doctor's scope of clinical practice and the doctor's view of what constitutes ethical medical care.** Trial Tr. 434:3-6, 434:17-20 (Fernandes).

**Defendant's Response:** Disputed. Health care personnel should provide comprehensive medical options counseling that is tailored to the specific needs of the patient, even if the provider does not personally perform a treatment or procedure. Def.'s SOF ¶¶ 100, 109, 115-116, 118. It violates the standard of care for a provider to discuss only the risks but not the benefits of a treatment option based on the provider's personal moral views. Def.'s SOF ¶¶ 121, 123, 127-131.

97.     **The treatment options offered must be medically indicated, within the doctor's scope of practice, and within the doctor's determination of the scope of treatment options that can be offered consistent with ethical medical practice.** Trial Tr. 434:20-435:1, 527:25-528-8, 529:13-530:15 (Fernandes).

**Defendant's Response:** Undisputed that the treatment options presented must be medically indicated and supported by best medical evidence and the standard of care. Disputed to the extent that Plaintiffs state that physicians may ethically limit their medical options counseling to treatment options a physician personally provides or based on the physician's personal moral views. Def.'s SOF ¶¶ 100, 109-111; 115-116; 127-131.

98.     **In seeking to determine an ethical course of treatment for his or her patient, a doctor is bound by his or her own individual conscience. Although the doctor may consult ethical opinions issued by professional organizations for guidance, the doctor is not bound by those opinions.** Trial Tr. 426:3-14 (Fernandes).

**Defendant's Response:** Undisputed that doctors should use their medical experience and training to determine an ethical course of treatment for a patient. Disputed in that doctors' individual consciences do not exempt them from complying with medical standards of care. Def.'s SOF ¶¶ 121, 123,127-131.

99.     **Standards of ethical medical practice allow a doctor to decline a patient or to limit the scope of care (including treatments) he will offer to a patient provided that the reason for doing so is not fundamentally unjust, e.g., a doctor can decline a patient because the doctor lacks the competence to provide a treatment, a treatment is not effective, the**

**patient is requesting a treatment in hope of obtaining an outcome that cannot be achieved by the treatment, or the patient asks for a treatment that would force the doctor to violate his or her deeply held moral values.** Trial Tr. 435:2-10, 435:18-23 (Fernandes).

**Defendant's Response:** Undisputed that doctors can decline a patient because the doctor lacks the competence to provide a treatment, a treatment is not effective, or the patient is requesting a treatment in hope of obtaining an outcome that cannot be achieved by the treatment. Undisputed that a doctor may decline to personally perform a procedure or treatment that violates the doctor's deeply held moral values, but disputed that doctors in that situation are permitted to decline to provide care to the patient in the form of unbiased medical options counseling. Def.'s SOF ¶¶ 121, 123, 127-131.

100. **Under current standards of medical practice and care doctors can decline to perform or facilitate medical treatment where the doctor believes that doing so would be unethical. There are any number of treatments a doctor might decline to provide for ethical reasons, e.g., requests for specific pain medications**. Trial Tr. 442:7-444:5 (Fernandes), elective abortion, Trial Tr.456:14- 459:13 (Fernandes), and artificial contraception, Trial Tr. 459:14-461:14 (Fernandes).

**Defendant's Response:** Undisputed that a doctor may decline to personally perform a procedure or treatment that the doctor believes to be unethical. Disputed that doctors with conscience objections to performing a procedure or treatment are also permitted to decline to provide all other care or facilitate treatment for the patient. Such doctors are required under the standard of care to conduct unbiased medical options counseling and provide information about where the patient can access care. Def.'s SOF ¶¶ 121, 123, 127-131; Def. Trial Ex. 72 at IDFPR009520.

101.     **There are many legitimate reasons that a doctor might decline to treat a patient in addition to ethical objections.** Schroeder Ex. 158 at 158-3 (AMA Principles of Medical Ethics Chapter 1, Opinion 1.1.2(a) and Opinion 1.1.7(b)).

**Defendant's Response:** Undisputed.

102.     **Limits on the doctor's care should be addressed when they arise and become relevant to the doctor-patient relationship by means of an honest discussion between doctor and patient.** Trial Tr. 440:10-442:6 (Fernandes).

**Defendant's Response:** Undisputed that if a physician has a conscience objection that impedes objective medical options counseling, that physician must inform the patient. Trial tr. 65:2-6; 621:2-13; 771:3-6; Def. Trial Ex. Ex. 72 at IDFPR009520.

103.     **The patient can also be informed about limits on the care that a doctor can or will provide via printed forms.** Trial Tr. 444:10-18 (Fernandes). **Current standards of medical practice and care do not require doctors to perform elective abortions.** Trial Tr. 36:25-37:5 (Lee). **The doctors serving as medical directors for the PRCs are free to limit the scope of care the PRCs provide to women who come to the PRCs, and when they do so they are acting consistent with current standards of medical practice and care, in the same way that any doctor may decline or limit health care requested by a patient.** Trial Tr. 737:5-739:20 (Boles).

**Defendant's Response:** Undisputed that patients can be informed about limits on care through printed forms and that the standard of care does not require doctors to perform abortions. Disputed that limitations on care at Plaintiff CPCs are consistent with the standard of care. Disclaimers that a doctor does not perform a particular procedure or offer a certain treatment is not sufficient to satisfy the standard of care with respect to medical options counseling or the

obligation to inform patients about how to access care they have chosen. Def.'s SOF ¶¶ 115-118. Healthcare providers are responsible for ensuring compliance with the standard of care when other individuals or non-professionals provide care under their supervision. Trial tr. 610:11-24.

104. **Medical and ethical standards of care are related in that the very use of the term "care" with respect to a medical option represents an antecedent normative judgment that a treatment option is ethically acceptable.** Trial Tr. 422:9-24, 710:25-711:11 (Fernandes).

**Defendant's Response:** Disputed. The standard of care does not vary according to the individual moral or religious beliefs of each provider. Def.'s SOF ¶ 120. The word "care" in the context of "standard of care" does not imply that the doctor's personal views of proposed treatment options alter the medical, ethical, or clinical standards of care. Def.'s SOF ¶¶ 120-121, 129.

105. **Conclusions: Based on the findings above, this court finds:**

a. **Current standards of medical practice and care are based on the interplay of medical/clinical standards and medical ethical standards. Medical/clinical standards address the range of medical treatments available and the competent provision of those treatments. Ethical standards address whether medical care that is technically possible ought to be provided by the doctor to the patient in light of the ethical values implicated in the doctor-patient relationship. Clinical and ethical standards combine to create current standards of medical practice and care.**

b. **There are a variety of approaches to medical ethics. No one approach is dominant or binding upon doctors. Three important approaches to medical ethics are principlism, beneficence-in-trust, and the ABIM Charter. Each of these**

51

approaches identify patient autonomy as one of several values or principles that doctors should consider when rendering medical care. None of these approaches makes patient autonomy the controlling value or principle.

      c.     **Each of these approaches, principlism, beneficence-in-trust, and the ABIM Charter, recognizes that doctors have their own ethical values and retain those values when they enter the medical profession. Each approach leaves the doctor free to make ethical decisions based on thoughtful consideration of the competing values recognized by each approach. None of the approaches to medical ethics requires doctors to subordinate their personal integrity, including conscientious convictions, to their patients' wishes. All of these approaches recognize the doctor's right to refrain from performing or facilitating conduct that is permitted by clinical standards when doing so would require the doctor to violate his or her conscience.**

      d.     **Ethical codes or pronouncements published by various medical organizations are meant to inform a doctor's judgment. Doctors are not required to follow these codes, and none are binding. The codes themselves indicate that they are not intended to set the standard of care. Each of the codes seeks to address the legitimate concerns of doctors and patients. No code says a doctor must subordinate his or her personal integrity to the patient's wishes. All the codes recognize that doctors should not be required to violate their conscience as a condition of practicing medicine.**

e.     **Current medical standards of care permit doctors to practice**
**medicine in a manner that is consistent with their conscience. Current standards of**
**medical practice and care do not require doctors to renounce their conscientious**
**convictions as a condition of practicing medicine. Current standards of care allow a**
**doctor to refrain from performing or facilitating conduct that is permitted by**
**clinical standards when doing so would require the doctor to violate his or her**
**conscience.**

**Defendant's Response:** Disputed. Defendant objects that these are improper arguments,
not proposed findings of fact, in violation of the Court's standing order. Defendant further
objects that these arguments are not supported by specific citations to the record and should
therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address related
allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided
there.

**Section 6 and Section 6.1 Informed Consent Requirement.**

106.    **Ethical principles inform and shape the process of obtaining informed**
**consent, and do so even when used to eliminate certain options while showing a proper, but**
**not slavish, respect for patient autonomy.** Trial Tr. 444:21-445:21, 446:17-447:12, 462:13-24,
464:20-465:5, 465:6-469:17 (Fernandes); See also, NIFLA Ex. 32b at 1769.

**Defendant's Response:** Undisputed that ethical principles inform and shape the process
of obtaining informed consent, but otherwise disputed. The standard of care for informed consent
and medical options counseling requires prioritizing patient autonomy and does not vary
according to the individual moral or religious beliefs of each provider. Def.'s SOF ¶¶ 95-100,
120.

107.     **Under current standards of medical practice and care, informed consent is a specific conversation directed towards a specific suggested treatment, its benefits, its risk, and its alternatives.** Trial Tr. 726:12-727:17 (Boles).

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

108.     **The process of obtaining informed consent is bounded also by the competence of the doctor to perform a specific procedure or provide certain care and whether doing so would be ethical.** Trial Tr. 445:20-446:1, 447:13-16 (Fernandes); Trial Tr. 728:2-729:13 (Boles); Trial Tr. 462:13-24 (Fernandes).

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial Tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

109.     **The Joint Commission on the Accreditation of Healthcare Organizations ties informed consent to the specific care that is being offered by the doctor.** Trial Tr. 726:23-727:19 (Boles).

**Defendant's Response:** Defendant objects that Dr. Boles's opinions regarding the Joint Commission are inadmissible under Federal Rules of Civil Procedure 26 and 37 for the reasons explained in Defendant's motion to bar this testimony. Schroeder ECF 235. Defendant further disputes this fact. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial Tr.t603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

110. **Under current standards of medical practice and care the duty to obtain informed consent is focused on the specific care being offered.** Trial Tr. 726:12-729:13 (Boles); 53:7-54:23 (Lee).

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial Tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

111. **Standards promulgated by medical organizations recognize that the duty to obtain informed consent is tied to a specific procedure.** See, NIFLA Ex. 32b at 1769 (AMA Opinion 2.1.1 noting: "informed consent to medical treatment is fundamental to both ethics and law. Patients have the right to receive information…about recommended treatments. The process of informed consent occurs when communication between a patient and physician results in the

55

patient's authorization or agreement to undergo a specific medical intervention."); see also, Schroeder Ex. 160 (ACOG Opinion 390) at 12/22 (noting: "informed consent is the willing acceptance of a medical intervention by a patient after adequate disclosure by the physician of the nature of the intervention with its risks and benefits and of the alternatives with their risks and benefits.").

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial Tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

112. **Current standards of ethical medical practice do not require doctors to facilitate informed consent for a course of care or procedure they will not provide**. Trial Tr. 449:4-451:9, 462:13-24, 499:3-502:6 (Fernandes); 48:7-49:20 (Lee).

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

113.    **When a doctor recommends that a patient should seek additional medical care, he or she is not initiating informed consent for that additional medical care.** Trial Tr. 50:21-51:14 (Lee).

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial Tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

114.    **Conclusion: Based on these findings, this Court finds that the doctors serving as medical directors for the PRCs and collaborating with the PRCs to deliver certain limited medical care at the PRCs comply with current standards of medical practice and care when they obtain informed consent for only the limited medical care actually provided at the PRCs.**

**Defendant's Response:** Disputed. Defendant objects that these statements are actually improper arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address related allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided there.

115.    **Current standards of medical practice and care do not require doctors to provide counseling about medical care they will not provide in order to obtain informed**

**consent for care that they will provide.** Trial Tr. 726:12-728:1 (Boles).

     **Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

     116.    **Current standards of medical practice and care do not require a doctor to provide medical advice about legal treatment options the doctor does not believe are ethical.** Trial Tr. 462:13-464:7, 715:10-716:18 (Fernandes); 48:2-6 (Lee).

     **Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

     117.    **Ethical principles, including patient autonomy, do not require doctors to provide medical counseling about options that they believe are immoral.** Trial Tr. 717:10-719:12 (Fernandes).

     **Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-

100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial tr. 603:3-605:25. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

118.     **Forcing doctors to give medical advice for medical treatments they will not provide, on the theory that patient autonomy is the primary factor shaping informed consent, risks: (1) harm to the patient (who may seek treatments that are not good for the patient); (2) harm to the doctor forced to obtain informed consent for a procedure to which the doctor has moral objections (and who is forced to betray his or her values); and (3) harm to the integrity of the medical profession (because it reduces the profession to the level of mere service providers).** Trial Tr. 448:9-449:3, 430:21-431:13, 552:11-553:3 (Fernandes).

**Defendant's Response:** Disputed. Counseling patients about the risks and benefits of appropriate treatment options is required under the standard of care, which prioritizes patient autonomy. Def.'s SOF ¶¶ 94-100. Patients' well-being is protected because counseling about risks and benefits is appropriately limited by the healthcare provider's medical judgment and the patient's needs, but this counseling should not be shaped by the provider's personal or religious beliefs. Def.'s SOF ¶¶ 119, 121, 124, 127-131. A healthcare provider's ability to refuse to perform a treatment to which they conscientiously object protects the providers' rights, while discussing the risks and benefits of appropriate treatment options ensures that patients can make autonomous decisions despite the conscientious objection. Trial tr. 689:21-690:15. The integrity of the medical profession depends on adherence to the standard of care, which requires

59

protecting patient autonomy by discussing the risks and benefits of appropriate treatment options. Def.'s SOF ¶¶ 79-92.

119.    **Current standards of medical practice and care do not require physicians who collaborate with the PRCs for the purpose of delivering specific limited medical services there to comply with the requirements of P.A. 99-690 Section 6.1(1) which purport to require them to provide medical advice about legal treatment options and the risks and benefits of treatment options they do not offer or provide, unless they agree to provide that care to the patient.** Trial Tr. 731:2—734:19 (Boles); 419:8-13 (Fernandes).

**Defendant's Response:** Disputed. To comply with medical ethics and the standard of care, healthcare facilities develop policies that govern facilities' practices to be consistent with ethical requirements. Trial tr. 652:4-653:1. Healthcare providers are responsible for ensuring compliance with the standard of care when other individuals or non-professionals provide care under their supervision. Trial tr. 610:11-24.

120.    **Current standards of medical practice and care require doctors who collaborate with the PRCs in providing specific limited medical services there to provide only the services they have agreed to provide, more specifically, any limited diagnosis from the limited ultrasound they perform and a prognosis to the extent they have agreed to offer a prognosis in connection with the diagnosis.** *Id.* 732:21–734:19 (Boles).

**Defendant's Response:** Disputed. Limitations on the provision of medical services do not affect providers' responsibility to counsel about the risks and benefits of medically appropriate treatment options. Def.'s SOF ¶¶ 120-124. In the context of Plaintiff CPCs, the refusal to provide abortion care does not eliminate or reduce the providers' obligation to provide counseling consistent with the standard of care. Def.'s SOF ¶¶ 149, 153. It violates the standard

of care to only counsel a patient about the risks but not the potential benefits of a medically

appropriate treatment option because of the provider's moral or religious beliefs. Def.'s SOF ¶¶

127-131.

121. **Current standards of ethical medical practice and care do not require**
**physicians who collaborate with the PRCs in providing specific limited medical services**
**there to provide women who accept those services with medical advice about elective**
**abortion.** *Id.* 419:14-19 (Fernandes); 732:14-20 (Boles).

**Defendant's Response:** Disputed. Limitations on the provision of medical services do

not affect providers' responsibility to counsel about the risks and benefits of medically

appropriate treatment options. Def.'s SOF ¶¶ 120-124. In the context of Plaintiff CPCs, the

refusal to provide abortion care does not eliminate or reduce the providers' obligation to provide

medical options counseling consistent with the standard of care. Def.'s SOF ¶¶ 149, 153. It

violates the standard of care to counsel a patient only about the risks but not the potential

benefits of a medically appropriate treatment option because of the provider's moral or religious

beliefs. Def.'s SOF ¶¶ 127-131.

122. **When the physicians who collaborate with the PRCs for the purpose of**
**delivering specific limited medical services at the PRCs provide limited diagnostic**
**information, they are not initiating informed consent for care that other doctors might**
**provide to address the diagnosis.** Trial Tr. 728:2-729:13 (Boles).

**Defendant's Response:** Disputed. Physicians overseeing healthcare facilities are

responsible for ensuring compliance with medical-ethical rules and the standard of care,

including principles of informed consent and patient autonomy. Trial tr. 610:11-24; 652:4-653:1.

Discussions of risks and benefits of medically appropriate treatment options are generally

required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

123. **The doctors who collaborate with the PRCs to provide specific limited medical care at the PRCS, principally a limited obstetric ultrasound, are akin to a radiologist conducting an MRI, whose obligation is to provide the diagnosis agreed upon but does not include the obligation to provide medical advice about treatment options or informed consent for subsequent care that another doctor might provide because of the radiologist's diagnosis.** Trial Tr. 554:16-555:2, 556:1-11, 712:11-713:1 (Fernandes); 726:12-729:13 (Boles).

**Defendant's Response:** Disputed. Physicians overseeing healthcare facilities are responsible for ensuring compliance with medical-ethical rules and the standard of care, including principles of informed consent and patient autonomy. Trial tr. 610:11-24; 652:4-653:1. Discussions of risks and benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

124. **When a doctor recommends that a patient seek additional medical care, he or she is not initiating informed consent for that additional medical care.** Trial Tr. 50:21-51:14 (Lee).

**Defendant's Response:** Disputed. Principles of informed consent apply to conscience-objecting physicians who counsel about procedures they refuse to perform. Def.'s SOF ¶¶ 95-100, 106-109, 118; NIFLA Trial Ex. 32a at 1756; Trial tr. 603:3-605:25. Discussions of risks and

benefits of medically appropriate treatment options are generally required for medical options counseling, including when Plaintiffs are counseling a patient and reviewing the results of the medical procedures performed by Plaintiffs, not only when securing informed consent to perform a certain medical procedure. Def.'s SOF ¶¶ 107-109.

125. **Current standards of ethical practice and care do not require doctors to provide medical advice about legal treatment options.** Trial Tr. 462:11-464:7 (Fernandes).

**Defendant's Response:** Disputed. Principles of medical ethics and the standard of care require doctors to advise patients about appropriate treatment options, which includes legal treatment options. Def.'s SOF ¶¶ 95-100.

126. **Under current standards of medical practice and care doctors can decline to provide medical advice about legal treatment options that they believe are not medically effective or ethical and this principle applies not only to elective abortion but also other legal medical treatments such as stem cell treatments for orthopedic injuries, proton pump inhibitors, accutane for skin acne in young women with a history of unintended pregnancy, or prescribing antidepressants to adolescents, and artificial contraception.** Trial Tr. 465:6-469:17, 459:14-461:14 (Fernandes).

**Defendant's Response:** Disputed. Under principles of medical ethics and the standard of care, doctors may not withhold information about medically appropriate treatment options based on the doctor's personal moral or religious views. Def.'s SOF ¶¶ 89-92, 118, 123-124, 127-129. Abortion, contraception, and sterilization are medically effective treatment options. Def.'s SOF ¶¶ 137-141, 156-159.

127. **Abortion commonly refers to the elective termination of a viable pregnancy.** Trial Tr. 37:3-10, 86:19-87:20 (Lee); see also, 333:23-335:12, 338:7-14 (Schroeder).

**Defendant's Response:** Disputed. The medical definition of abortion is the termination of any pregnancy before 20 weeks. Trial tr. 576:15-18. Abortions are classified as either spontaneous (i.e., a miscarriage) or induced, and induced abortions can be further subdivided into elective abortions and abortions where there is a medical reason for the abortion. Trial tr. 576:19-577:1. The distinction between elective abortions and abortions with medical indications is a gray area rather than a clean dividing line. Trial tr. 577:10-578:1.

128. **Elective abortion is not medically indicated or necessary and as a result a doctor has no obligation to provide medical advice about the procedure or to recommend it simply because it is a legal treatment option.** Trial Tr. 457:14-459:13, 531:20-532:8 (Fernandes); 732:14-20 (Boles); 37:19-21 (Lee).

**Defendant's Response:** Disputed. Abortion is a medically appropriate treatment option for terminating a pregnancy, including but not limited to circumstances in which pregnancy is medically contraindicated. Def.'s SOF ¶¶ 137-141. Doctors are required under the standard of care to counsel patients about the risks and benefits of medically appropriate treatment options, which can include abortion. Def.'s SOF ¶¶ 95-100, 136.

129. **Current standards of ethical medical care do not require a doctor to provide a pregnant patient with medical advice about elective abortion.** Trial Tr. 456:14-459:13 (Fernandes); 37:19-21 (Lee); 721:8-722:15 (Fernandes); 732:14-20 (Boles).

**Defendant's Response:** Disputed. Abortion is a medically appropriate treatment option for terminating a pregnancy, including but not limited to circumstances in which pregnancy is medically contraindicated. Def.'s SOF ¶¶ 137-141. Doctors are required under the standard of care to counsel patients about the risks and benefits of medically appropriate treatment options, which can include abortion. Def.'s SOF ¶¶ 95-100, 136.

130.     **Ethical and clinical considerations also inform the doctor as he or she determines whether claims made in medical studies are sufficiently persuasive to influence the care that the doctor will provide to a patient.** Trial Tr. 484:1-486:11 (Fernandes).

**Defendant's Response:** Disputed. Under principles of medical ethics and the standard of care, doctors may not withhold advice about medically appropriate treatment options based on the doctor's personal moral or religious views. Def.'s SOF ¶¶ 89-92, 118, 123-124, 127-129.

131.     **Doctors need to use their independent clinical and ethical judgment when evaluating studies asserting that medical treatments such as elective abortion provide a medical benefit.** Trial Tr. 486:16-492:2 (Fernandes).

**Defendant's Response:** Undisputed that doctors should use their medical training and experience to evaluate relevant treatment options for a patient. Disputed to the extent Plaintiffs suggest that a physician's moral views supplant the standard of care. Under principles of medical ethics and the standard of care, doctors may not withhold advice about medically appropriate treatment options based on the doctor's personal moral or religious views. Def.'s SOF ¶¶ 89-92, 118, 123-124, 127-129.

132.     **Researchers have leveled serious criticisms about the study claiming that elective abortion provides a benefit because it is substantially safer than childbirth.** Trial Tr. 487:10-490:20 (Fernandes); 742:8-745:13 (Boles); see also, Schroeder Ex. 175 (study laying out these concerns).

**Defendant's Response:** Disputed. Defendant objects that Schroeder Ex. 175 is not in evidence because it constitutes inadmissible hearsay not within any exception, and does not substantively support the proposed fact. Studies show that abortion is safer than childbirth. Def.'s

SOF ¶ 142. Criticisms of these studies, including by Dr. Boles, rest on inaccurate and biased interpretations of the data. Trial tr. 762:23-764:4.

133. **A doctor practicing medicine in conformity with current standards for medical practice and care could evaluate medical studies claiming that elective abortion has medical benefits, conclude that the studies lacked sufficient probative value to provide the basis for his or her clinic practice, and decline to advise a patient about elective abortion as a procedure providing medical benefits.** Trial Tr. 492:3-494:20 (Fernandes); 742:8-745:13 (Boles); see also, Schroeder Ex. 175 & Ex. 177 (Study laying out adverse mental health effects); Schroeder Ex. 161 at p. 1 (AAPLOG statement listing evidence of negative effects of chemical abortion).

**Defendant's Response:** Disputed. Defendant objects that Schroeder Ex. 161 is not in evidence because it constitutes inadmissible hearsay not within any exception. Studies show that abortion is safer than childbirth. Def.'s SOF ¶ 142. It is inconsistent with the standard of care for a doctor to conclude that abortion is globally without benefit because such a conclusion would be empirically false. Def.'s SOF ¶¶ 137-141, 159.

134. **Current standards of care do not require a doctor who does not perform elective abortions to tell a patient about putative benefits of elective abortion.** Trial Tr. 56:8-12 (Lee).

**Defendant's Response:** Disputed. Limitations on the provision of medical services do not affect providers' responsibility to counsel about the risks and benefits of medically appropriate treatment options. Def.'s SOF ¶¶ 120-124. In the context of Plaintiff CPCs, the refusal to provide abortion care does not eliminate or reduce the providers' obligation to provide counseling consistent with the standard of care. Def.'s SOF ¶¶ 149, 153. It violates the standard

66

of care to counsel a patient about the risks but not the potential benefits of a medically appropriate treatment option because of the provider's moral or religious beliefs. Def.'s SOF ¶¶ 127-131.

135. **A significant body of evidence supports the position that elective abortion has serious adverse effects on the mental health of women.** Trial Tr. 458:23-459:13 (Fernandes); 763:12-765:3 (Boles); see also, Schroeder Ex. 174 (medical studies showing adverse impacts); See Schroeder Ex. 175-178.

**Defendant's Response:** Disputed. Defendant objects that Schroeder Ex. 174 does not substantively support the proposed finding of fact. Defendant further objects that Schroeder Exs. 175 through 178 are not in evidence and constitute inadmissible hearsay not within any exception. Studies have found that the incidence of abortion regret is only about 1 to 2 percent, while patients who carried their pregnancies to term have a higher rate of maternal regret. Trial tr. 635:24-636:20.

136. **Medical studies on the issue also provide a sound basis for concluding that induced abortion increases the risk of breast cancer.** Trial Tr. 747:18-749:20 (Boles).

**Defendant's Response:** Disputed. Abortion does not create an increased risk of breast cancer, and the studies suggesting a causal link between abortion and elevated breast cancer risk are flawed. Trial tr. 633:25-634:19. The fact that abortion does not increase breast cancer risk is a settled issue in the medical community. Trial tr. 635:8-13.

137. **A doctor practicing medicine in conformity with current standards for medical practice and care could evaluate medical studies and conclude, based on their education and clinical experience, that elective abortion has no real benefits and many negative effects.** Trial Tr. 42:5-22 (Lee).

**Defendant's Response:** Disputed. It is inconsistent with the standard of care for a doctor to conclude that abortion is globally without benefit because such a conclusion would be empirically false. Trial tr. 632:12-22. Abortion is safer than childbirth and can have numerous medical benefits, including but not limited to circumstances in which pregnancy is medically contraindicated. Def.'s SOF ¶¶ 137-141.

138. **Current standards of ethical medical practice do not require doctors to provide artificial contraception.** Trial Tr. 459:14-461:14 (Fernandes).

**Defendant's Response:** Defendant objects that the cited testimony does not support the proposed fact. Undisputed to the extent that doctors may refuse to provide a procedure to which they have a conscience objection, subject to providing patients with information required under the standard of care. Def.'s SOF ¶¶ 89-91, 112, 118, 120.

139. **Doctors are not providing medical advice when they opine about potential social and economic consequences of giving birth to a child.** Trial Tr. 753:24-754:9 (Boles).

**Defendant's Response:** Disputed. Under the standard of care, medical options counseling should take into account the patient's circumstances, including social and economic circumstances and consequences. Def.'s SOF ¶¶ 87, 118-119, 149. Dr. Lee testified that counseling about medical options requires considering the patient's mental health, emotional health, and social circumstances, because the needs of patients depend on their unique situations and it is important to think of patients holistically. Trial tr. 61:21-62:8.

140. **Under current standards of medical practice and care it is not appropriate for a medical doctor to provide advice about potential social and economic outcomes.** Trial Tr. 758:6-19 (Boles).

**Defendant's Response:** Disputed. Under the standard of care, medical options counseling should take into account the patient's circumstances, including social and economic circumstances and consequences. Def.'s SOF ¶¶ 87, 118-119, 141, 149. Dr. Lee testified that counseling about medical options requires considering the patient's mental health, emotional health, and social circumstances, because the needs of patients depend on their unique situations and it is important to think of patients holistically. Trial tr. 61:21-62:8.

141.     **There are serious methodological flaws in the study cited by Dr. Burcher authored by Foster et al, entitled "Socioeconomic Outcomes of Women Who Receive and Women who are Denied Wanted Abortions in the United States," which relied on data from a research study commonly referred to as the "Turnaway Study."** *Id.* 754:17—758:5.

**Defendant's Response:** Disputed. The Turnaway Study was a large study in which researchers drew conclusions about the rates of abortion regret and maternal regret. Trial tr. 635:24-636:16. Other studies published in prominent medical journals by different scholars drawing on the same Turnaway data found worse overall health for women who carried pregnancies to term as well as a higher likelihood of remaining with a violent domestic partner for women who carried an abortion term. NIFLA Trial Ex. 32c at 8-9.

142.     **Conclusions: Based on these findings, this Court finds the following:**

**a. Under current standards of medical practice and care, the doctors who serve as medical directors for the PRCs and who collaborate with the PRCs to deliver certain limited medical care at the PRCs:**

> **i. Do not have a duty to obtain informed consent for treatments they do not provide;**

> **ii. Are not initiating the process for obtaining informed consent for**

**medical care that might be provided by another medical doctor;**

**iii. Do not have a duty to provide medical advice to the patients to whom they provide limited medical care at the PRCs as required by HCRC Amendments Section 6 or Section 6.1(1) as a general matter.**

**iv. Do not have a duty to provide medical advice about medical care they will not provide, except to the extent they assume that duty to the patient and, in any event;**

**v. Do not have a duty to provide medical advice about treatment options that are legal but not medically indicated;**

**vi. Do not have a duty to provide medical advice about legal treatment options they believe are unethical.**

**Defendant's Response:** Disputed. Defendant objects that these statements are improper arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address related allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided there.

143. **This Court further finds that under current standards of medical practice and care the doctors who serve as medical directors for the PRCs and who collaborate with the PRCs to deliver certain limited medical care at the PRCs:**

**a.** **Do not have a duty to provide medical advice about elective abortion, elective contraception, or elective sterilization;**

**b.** **Must use their independent medical judgment when evaluating medical**

70

studies;

**c.      Could conclude that studies asserting that elective abortion has medical benefits are not persuasive and decide not to advise patients about the putative benefits of elective abortion consistent with current standards of medical practice and care;**

**d.      Could conclude that studies asserting that elective abortion has negative health effects are persuasive and, if they chose to do so, could refuse to advise patients about the putative benefits of elective abortion consistent with current standards of medical practice and care.**

**Defendant's Response:** Disputed. Defendant objects that these statements are improper arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address related allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided there.

144.      **The court further finds that under current standards of medical practice and care the doctors who serve as medical directors for the PRCs and who collaborate with the PRCs to deliver certain limited medical care at the PRCs:**

**a. Do so in compliance with current standards of medical practice and care.**

**b. Have no duty to provide the medical advice required by Section 6 and Section 6.1(1) unless, and only to the extent that, they assume that duty to the patients to whom they provide limited medical care in collaboration with the PRCs.**

**Defendant's Response:** Disputed. Defendant objects that these statements are improper arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address related allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided there.

**15. <u>Sharing Health-Related Medical Information Is Not Providing Medical Advice.</u>**

145. **Providing medical advice is different from providing medical information or information with health-related content. Medical advice is given when a licensed physician provides advice that is specific to the patient being treated by the physician and the treatment is medically indicated.** Trial Tr. 454:14-455:12, 507:15-25, 509:25-514:9, 550:24-552:8 (Fernandes).

**Defendant's Response:** Disputed. Whether or not advice constitutes medical advice depends on whether the advice is given under the auspices of a medical encounter, which requires considering factors such as whether a medical history was taken, a procedure was performed, or counseling occurred. Trial tr. 688:16-689:12. Individuals other than licensed physicians can and do give medical advice. Trial tr. 611:10-612:5; 691:11-13. Providing medical advice consistent with the standard of care can include an obligation to give patients information that the health care provider reasonably believes the patient may already know. Trial tr. 691:14-692:5.

146. **Nurses or technicians performing ultrasounds at the PRCs are not practicing medicine when performing those procedures; they are providing technical services in connection with care offered by the doctor.** Trial Tr. 553:23-554:8 (Fernandes).

**Defendant's Response:** Disputed. Ultrasounds are a medical procedure designed to determine diagnostic facts such as gestational age, due date, viability of the pregnancy, presence or absence of amniotic fluid around the fetus, and location of the placenta. Trial tr. 578:2-15, 579:6-9. Nurses and other medical professionals who perform ultrasounds are engaged in the practice of medicine. Trial tr. 610:25-611:5.

147. **Professional codes addressing a doctor's obligations in the area of providing medical advice do not apply to healthcare professionals such as nurses because those healthcare providers cannot provide medical advice.** Trial Tr. 450:15-25, 451:10-22 (Fernandes).

**Defendant's Response:** Disputed. Codes of medical ethics, including the AMA code, apply to healthcare professionals broadly. Trial tr. 611:15-612:5. Healthcare professionals other than physicians, such as nurses and physical therapists, can and do provide medical advice. Trial tr. 611:10-612:5; 691:11-13.

148. **When nurses working at the PRCs share generally applicable and publicly available health information with women who come to the PRCs, they are not providing medical advice and they are not initiating an informed consent process for medical procedures not provided by the doctors collaborating with the PRCs.** Trial Tr. 452:16-454:13, 494:21-496:6, 546:20-547:12, 719:13-720:9 (Fernandes); 728:2-22, 740:2-741:18 (Boles).

**Defendant's Response:** Disputed. Whether or not advice constitutes medical advice depends on whether the advice is given under the auspices of a medical encounter. This requires considering factors such as whether a medical history was taken, a procedure was performed, or counseling occurred. Trial tr. 688:16-689:12. Individuals other than licensed physicians can and

73

do give medical advice. Trial tr. 611:10-612:5; 691:11-13. Providing medical advice consistent

with the standard of care can include an obligation to give patients information that the health

care provider reasonably believes the patient may already know. Trial tr. 691:14-692:5.

Principles of informed consent apply to medical options counseling that is not seeking

authorization for a physician to perform a given procedure. Def.'s SOF ¶¶ 105-109.

149.     **Conclusions: Based on the findings made thus far the court finds:**

**a. When the PRCs provide generally applicable and publicly available
health-related information they are not providing medical advice.**

**b. When the PRCs provide health-related information they are not initiating
informed consent for possible future medical care that might be sought from
other, non-PRC medical professionals, by the woman to whom they provide the
information.**

**Defendant's Response:** Disputed. Defendant objects that these statements are improper

arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant

further objects that these arguments are not supported by specific citations to the record and

should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address

related allegations with supporting evidence, Defendant's responses and rebuttal evidence are

provided there.

## 16. The 6.1(3) Requirement to Refer, Transfer, or Inform Patients About Medical Providers.

150.     **Referral. In medical practice a "referral" is a formal process by which one
medical doctor refers a patient to another doctor for the purpose of allowing the patient to
obtain medical care that the doctor providing the referral cannot provide.** Trial Tr.

470:14-471:22 (Fernandes); 42:23-43:13 (Lee); 734:20-735:16 (Boles); 36:25-37:5 (Lee).

**Defendant's Response:** Undisputed.

151.     **Current standards of ethical medical practice and care do not require a
doctor to provide a patient with a referral so that a patient can obtain a course of care or
procedure the doctor believes to be morally unacceptable, including elective abortion.** Trial
Tr. 471:14-23, 717:10-719:12 (Fernandes); 734:20-735:16, 736:11-18 (Boles); see also, NIFLA
Ex. 32a at 1755-1756 (AMA Principles of Medical Ethics, Chapter 1, Opinion 1.1.7(f)).

**Defendant's Response:** Disputed. If healthcare personnel are unable to counsel about a
treatment option, medical ethics creates a duty to refer the patient to receive appropriate
counseling. Def.'s SOF ¶¶ 112, 125-126. The cited testimony of Dr. Fernandes concedes that
referrals are required by some professional bodies in the field of medicine and in some clinical
circumstances. Trial tr. 471:14-472:1.

152.     **The American Medical Association (AMA) Principle of Medical Ethics Code
recognizes a doctor's ability not to refer.** Trial Tr. 44:18-46:2, 48:7-49:20 (Lee). See also,
NIFLA Ex. 32a at 1755-1756 (AMA Principles of Medical Ethics, Chapter 1, Opinion 1.1.7(f)).

**Defendant's Response:** Disputed. Plaintiffs' characterization of AMA Code 1.1.7(f) is
incomplete. The Code recognizes that when a physician with deeply held, well-considered
personal belief leads a physician to decline to refer, "the physician should offer impartial
guidance to patients about how to inform themselves regarding access to desired services." *Id.*
Also disputed in that the AMA Code states that in general, physicians should refer a patient to
another physician or institution to provide treatment the physician declines to offer. NIFLA Ex.
32a at 1756. Under the AMA Ethics Code, the ideal is for physicians to make a formal referral.
Trial tr. 697:12-20.

75

153.     **Providing a patient with information about healthcare professionals who may be able to provide medical care a patient may need or has expressed an interest in is not a referral.** Trial Tr. 472:6-14, 545:9-546:19 (Fernandes).

**Defendant's Response:** Undisputed.

154.     **Licensed medical professionals who are not medical doctors do not have a duty to refer under current standards of care.** Trial Tr. 419:25-420:17, 472:2-4 (Fernandes).

**Defendant's Response:** Disputed. Codes of medical ethics, including the AMA code, apply to healthcare professionals broadly. Trial tr. 611:15-612:5. The medical standard of care can apply to individuals providing medical options counseling who are not licensed professionals. Trial tr. 610:11-24.

155.     **Transfer. Under current standards of ethical medical practice a doctor does not have a duty to transfer a patient except in an emergency situation.** Trial Tr. 471:23-472:1 (Fernandes); 735:17-22 (Boles).

**Defendant's Response:** Disputed. Doctors have a duty to transfer patients in some non-emergency situations, including when considering withdrawing from a case. NIFLA Trial Ex. 32a at 1754.

156.     **Licensed medical professionals who are not medical doctors do not have a duty to transfer under current standards of medical practice and care.** Trial Tr. 472:2-7 (Fernandes).

**Defendant's Response:** Disputed. The cited testimony of Dr. Fernandes reflects a duty to transfer in emergency situations. Trial tr. 472:2-7.

157.     **Information About Providers. Current standards of ethical medical practice**

**and care do not require the doctors who collaborate with the PRCs to deliver specific limited medical care at the PRCs to provide women with written information about other healthcare providers they reasonably believe may offer a medical procedure that woman might want to obtain, e.g., an elective abortion.** Trial Tr. 420:25–421:6; 472:15-20 (Fernandes); 735:23–736:6 (Boles).

      **Defendant's Response:** Disputed. Healthcare providers who refuse to provide care that the patient has chosen due to a conscience objection are required to either formally refer the patient or provide impartial guidance for how patients can inform themselves regarding access to desired services. Def.'s SOF ¶¶ 125-126; NIFLA Trial Ex. 32a at 1756; Trial tr. 650:4-20. The written information requirement in the Act is consistent with and less onerous than what is required under the standard of care. Trial tr. 649:6-25. The fact that a facility offers only limited services that do not include certain treatment options does not affect these obligations under the standard of care. Trial tr. 621:14-25.

      158.    **Conclusions: Based on these findings this Court finds that the doctors serving as medical directors of the PRCs and collaborating with the PRCs to deliver certain limited medical care at the PRCs:**

      **a. Comply with current standards of medical practice and care;**

      **b. Have no duty to engage in the conduct required by Section 6.1(3) under current standards of medical practice and care.**

      **Defendant's Response:** Disputed. Defendant objects that these statements are improper arguments, not proposed findings of fact, in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address

related allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided there.

### 17. STATE'S EXPERT DR. BURCHER.

159. **The Defendant's expert at trial was Dr. Paul Burcher.**

**Defendant's Response:** Undisputed.

160. **Dr. Burcher acknowledges that "[a] full explanation of all treatment options and the risks and benefits isn't required by the standard of care in every situation."** Trial Tr. 661:17–20.

**Defendant's Response:** Undisputed.

161. **Dr. Burcher testified that, in his practice, whenever he takes informed consent for a procedure he doesn't perform, he is doing so for care provided by someone else working at the hospital he works for .** Trial Tr. 674:21-25 – 675:1-2.

**Defendant's Response:** Undisputed.

162. **Dr. Burcher agrees that "what is medically appropriate depends on the context," and the medical professional's "medical judgment."** Trial Tr. 653:22-24; 654:9-12.

163. **Dr. Burcher agrees that professional organizations, such as the American College of Obstetricians and Gynecologists (ACOG) and the American Medical Association, do not mandate the standard of care but only provide guidelines.** Trial Tr. 654:13–14, 655: 1-4, 656:3–9.

**Defendant's Response:** Undisputed.

164. **Dr. Burcher agrees that "[a] medical referral is not always required when a physician does not perform a procedure"; and that the standard of care does not "require giving the patient a written list of names of physicians that will actually provide"** the

**procedure.** Trial Tr. 662:3–5; 663:23–664:1.

    **Defendant's Response:** Undisputed that this fact accurately cites Dr. Burcher's

testimony. Disputed to the extent that Dr. Burcher also testified that under these circumstances a

formal referral is ideal. Trial tr. 696:24-697:20. AMA Code 1.1.7(f) recognizes that when a

physician with deeply held, well-considered personal belief leads a physician to decline to refer,

"the physician should offer impartial guidance to patients about how to inform themselves

regarding access to desired services." NIFLA Trial Ex. 32(a).

    165.    **In fact, when Dr. Burcher was working at a Catholic hospital, he provided**

**patients seeking abortion with contact information for a Planned Parenthood facility that**

**did not provide abortions so that this organization could refer the patient to an abortion**

**provider.** Trial Tr. 662:13–663:22.

    **Defendant's Response:** Undisputed.

    166.    **Dr. Burcher testified that he believes his practice of providing patients**

**seeking abortion with information about Planned Parenthood facilities that did not provide**

**abortions was consistent with the standard of care.** Trial Tr. 662:13–663:22.

    **Defendant's Response:** Undisputed.

## 18. <u>OTHER FACTS OF CONSEQUENCE.</u>

    167.    There is no evidence that Illinois Department of Financial and Professional

Regulation ("IDFPR") has received any complaint—formal or informal—against a medical

doctor or other licensed medical professional for failing to discuss abortion, refusing to refer for

abortion, or refusing to provide information on abortion providers.

    **Defendant's Response:** Defendant objects that this is not a proper statement of fact

supported by citations to the record. Disputed. Defendant introduced evidence that IDFPR

received a complaint related to a provider who refused to provide necessary medical information due to a conscientious objection to abortion. Def.'s SOF ¶¶ 9-11. Defendant introduced evidence that IDFPR also received a complaint alleging that two CPCs were using deceptive practices to attract patients seeking services the CPCs did not offer. Def.'s SOF ¶12.

168.    There is not evidence that IDFPR has received any complaint—formal or informal—against a medical doctor or other licensed medical professional for failing to discuss elective sterilization or elective use of artificial contraception.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

169.    At trial the State did not prove that Illinois patients had been harmed because healthcare providers with religious objections to legal treatment options failed to provide medical advice about those legal treatment options with their patients before treatment.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

170.    At trial the State did not prove that the IDFPR had disciplined healthcare professionals because those professionals had harmed a patient by failing to provide medical advice about legal treatment options before treating their patients.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

171.    At trial the State did not prove that Illinois patients had been harmed because healthcare providers with religious objections to legal treatment options had failed to facilitate patient access to healthcare professionals who would provide legal treatments desired by the patients.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

172. At trial the State did not prove that the IDFPR had disciplined healthcare providers with religious objections to legal treatment options because those providers had harmed patients by failing to facilitate the patients access to a healthcare professional who would provide legal treatments desired by the patient.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

173. At trial the Defendant did not prove that the citizens of Illinois were not informed about the legal treatment options at the center of this case, i.e., elective abortion, elective sterilization, and elective contraception.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

174. At trial the Defendant did not prove that the citizens of Illinois were unable to locate individuals or entities that would provide the legal treatments options at the center of this case, i.e., elective abortion, elective sterilization, and elective contraception.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

175. At trial the Defendant did not prove that it had considered alternative means by which the Defendant might inform the citizens of Illinois about the legal treatment options at the center of this case, i.e., elective abortion, elective sterilization, and elective contraception, without coercing speech by healthcare providers with religious objections to these treatment options.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

176.     At trial the Defendant did not prove that it had tested alternative means to make the citizens of Illinois aware of the legal treatment options at the center of this case, i.e., elective abortion, elective sterilization, and elective contraception, and found those methods ineffective.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

177.     At trial the Defendant did not prove that it had considered alternative means by which the Defendant might increase the awareness of the citizens of Illinois about individuals or entities who provide the legal treatment options at the center of this case, i.e., elective abortion, elective sterilization, and elective contraception, without coercing speech by healthcare providers with religious objections to these treatment options.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

178.     At trial the Defendant did not prove that it had tested alternative means to make the citizens of Illinois aware of the legal treatment options at the center of this case, i.e., elective abortion, elective sterilization, and elective contraception, and found those means ineffective.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

179.     At trial the Defendant did not prove that doctors practicing medicine are subject to a special ethical code promulgated by the State of Illinois.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

180.     At trial the Defendant did not prove that current standards of medical practice and care require the Plaintiffs to engage in the speech requirement by P.A. 99-690.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

181.     The State introduced no evidence at trial suggesting that Illinois women are unaware the legal treatment options of elective abortion, elective sterilization, or elective contraception of that right or unable to identify individuals or entities that provide these treatments.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

182.     Several witnesses testified at trial that they had never encountered a woman who was unaware that abortion is a legal treatment option in Illinois and have been able to obtain one if desired. Trial Tr. 40:22–41:7, 77:13–15 (Lee), 101:13–102:4, 133:21–134:2 (Lesnoff), 154:6–154:21 (VanDerLip), 181:11–17 (Maly).

**Defendant's Response:** Disputed. Dr. Lee admitted that he relied upon a study that examined the effectiveness of abortion waiting periods. Trial tr. 69:6-19.  He further admitted that the study did not ask whether Internet access ensures access to abortion. Dr. Lee also admitted that the study was not specific to Illinois. Trial tr. 69:20-70:9. Nor did the study look at the frequency with which individuals use the Internet to find abortion providers or whether individuals who performed Internet searches were able to discern truthful information from misleading information. Trial tr. 70:10-18. The study also did not use any kind of methodology to determine if people who used the Internet were ultimately able to secure abortion care. Trial tr. 70:19-72:2. Dr. Lee further testified that he did not rely on any other research or studies

83

regarding access to reproductive health care in Illinois. Trial tr. 72:3-6. Moreover, Dr. Lee admitted that, despite being a licensed, practicing obstetrician, is not aware of anyone who can competently perform an abortion, yet women would be able to do so on their own without the assistance of a doctor. Trial tr. 67:21-68:3; 68:22-69:5.

Defendant further disputes that Plaintiffs have accurately characterized the testimony of Ms. Lesnoff, Ms. VanDerLip, and Ms. Maly. None of the cited testimony states that the women who come to their facilities were ultimately able to secure an abortion.

183.　The evidence at trial also showed that information concerning how and where to get an abortion in Illinois is readily available over the internet and that the vast majority of Plaintiffs' clients have internet access. Trial Tr. 44:1–7 (Lee), 112:12–21 (Lesnoff), 151:17–152:4 (VanDerLip), 184:17–185:11 (Maly).

**Defendant's Response:** Disputed for the reasons stated in Defendant's response to Schroeder's Proposed Finding of Fact 182.

184.　92.7% of Illinois citizens have internet access at home. NIFLA Ex. 18.

**Defendant's Response:** Undisputed that approximately one in 13 people in Illinois lacked internet access at home as recently as 2019. NIFLA Ex. 18 at 1729.

185.　In over 30 years of practice, the Plaintiffs' expert Lee has never encountered a woman that did not know abortion is an option. Trial Tr. 40:22-23 (Lee).

**Defendant's Response:** Undisputed.

186.　Even those clients that do not have internet access at home can access the internet at public libraries. 99.7% of Illinois public libraries have access to the internet, and 98.1% of those libraries provide internet access to patrons either directly or through a staff intermediary. NIFLA Ex. 19.

**Defendant's Response:** Defendant objects to NIFLA Ex. 19 as inadmissible hearsay not subject to judicial notice for the reasons stated on the record at the final pretrial conference.

187.  For Illinois women with internet access, a google search for "abortion in Illinois," NIFLA Ex. 20, returns over 69 million results, including the following:

a. The City of Chicago's website, which provides information about the legality of abortion in Illinois, links to abortion guides by state, the phone number for an "all-options talkline," and a warning about "crisis pregnancy centers," NIFLA Ex. 23;

b. The website for the ACLU of Illinois, which informs women that "Illinois law ensures that abortion is legal for all people" and includes links to websites to "find an abortion provider" and to find "financial support," NIFLA Ex. 22;

c. The website for Planned Parenthood of Illinois, which includes an option to book an appointment that allows women to put in their zip code to find a nearby abortion provider, NIFLA Ex. 24;

d. A list of clinics in Illinois that provide abortion according to Google maps, NIFLA Ex. 20;

e. A Wikipedia article, a website for Illinois Legal Aid Online, and a FindLaw.com website, all stating that abortion in Illinois is legal, id.;

f. A series of news articles discussing Illinois's legal protections for abortion, id.;

g. An "Illinois Abortion Clinics" website that includes a link to make an appointment, NIFLA Ex. 25

h. The Guttmacher Institute's website, which states that 42,080 abortions were provided at 40 different Illinois facilities in 2017, NIFLA Ex. 20;

i. An "abortion finder" website with a search tool to find a "verified abortion provider" based on the searcher's city or zip code and a link to a list of organizations that provide financial assistance for abortion, NIFLA Ex. 21;

j. A sponsored ad from reproductiverights.org for a map of abortion laws by state, NIFLA Ex. 20;

k. The State's own press release concerning its post-Dobbs protections for reproductive rights and abortion statistics, id.;

l. A Pew Research Center Study issued on April 7, 2021 found that 97% of Americans owned a mobile phone of some kind and 85% of Americans owned a smartphone as of that date. The Pew Study indicates that smartphone ownership for individuals ages 18-29 is 96% and that smartphone ownership for those ages 30-49 is 95%. Schroeder Ex. 162.

m. A Pew Research Center Study issued on August 10, 2022 found that for teenagers (ages 13-17): ninety-five percent (95%) of teenagers have access to a smartphone, ninety percent (90%) have access desktop or laptop computers, and eighty percent (80%) have access to gaming consoles. The study also found that forty-six percent (46%) of teens say that they are online almost constantly. Schroeder Ex. 163.

**Defendant's Response:** Defendant objects to NIFLA Ex. 20 under Federal Rule of Evidence 901 for the reasons stated on the record at the final pretrial conference. Defendant objects to Schroeder Exhibits 162 and 163 as inadmissible hearsay for the reasons explained in Defendant's response to Plaintiffs' motion to admit these exhibits. Defendant also disputes this fact. The cited documents do not support the claim that "Illinois women" in general or any particular Illinois woman would obtain the specific search results listed.

188.    The State introduced no evidence at trial that any of the pregnancy centers use deceptive tactics to lure women into their facilities. On the contrary, each of the pregnancy center Plaintiffs disclose to potential clients that they do not provide or refer for abortion. ECF No. 267, Parties' Joint Post-Trial Stipulations of Fact ¶ 49; Trial Tr. 97:17–98:7 (Lesnoff), 150:13–151:7, 152:9–14, 152:25–153:11 (VanDerLip), 178:21–179:11 (Maly).

**Defendant's Response:** Undisputed that the Plaintiff CPCs disclose that they do not provide or refer for abortions. Defendant objects to the remainder of this proposed finding of fact as improper arguments, not proposed findings of fact, and in violation of the Court's standing order. Defendant further objects that these arguments are not supported by specific citations to the record and should therefore be disregarded. To the extent Plaintiffs' other proposed findings of fact address related allegations with supporting evidence, Defendant's responses and rebuttal evidence are provided there. Defendant introduced evidence that Plaintiff CPCs claim to offer counseling about all medical options, including abortion. Def.'s SOF ¶¶ 28-31.

189.    SB 1564 compels Plaintiffs' speech and burdens their religious beliefs.

**Defendant's Response:** Defendant objects that this is not a proper statement of fact supported by specific citations to the record as required by the Court's standing order.

190.    The Illinois Health Care Right of Conscience Act ("the Act"), 745 Ill. Comp. Stat. 70/1 et seq., protects the ability of health care providers to refuse to provide or assist with treatment options that violate the provider's conscience by preventing civil liability of, discrimination against, or denial of aid or benefits to providers with conscience-based objections.

**Defendant's Response:** Undisputed.

191.    The Illinois General Assembly found that "people and organizations hold different beliefs about whether certain health care services are morally acceptable." Id. 70/2.

87

**Defendant's Response:** Undisputed.

192.     Consequently, the General Assembly intended for the Act "to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care" and "to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions." Id.

**Defendant's Response:** Undisputed.

193.     The Act has been in force since 1977.

**Defendant's Response:** Undisputed.

194.     More recently, Illinois passed P.A. 99-690, which amended the Act to "ensure that patients receive timely access to information and medically appropriate care." Id.

195. P.A. 99-690 went into effect on January 1, 2017, but was enjoined in relevant part by another judge of this Court on July 19, 2017. ECF No. 65, Order at 9–10.

**Defendant's Response:** Disputed in that the injunction entered on July 19, 2017, enjoined the amended Act only insofar as "enforcement would penalize health care facilities, health care personnel, or physicians who object to providing information about health care providers who may offer abortion or who object to describing abortion as a beneficial treatment option." NIFLA ECF 65 at 9-10.

196.     P.A. 99-690 adds section 70/6.1 to the Act, which is at issue in this case.

**Defendant's Response:** Undisputed.

197.     Section 70/6.1 requires "health care facilities" to "adopt written access to care and information protocols that are designed to ensure that conscience-based objections do not cause

impairment of patients' health and that explain how conscience-based objections will be
addressed in a timely manner to facilitate patient health care services." 745 Ill. Comp. Stat.
70/6.1.

**Defendant's Response:** Undisputed.

198. The Act's protections against liability, discrimination, and the denial of aid or
benefits "only apply if conscience-based refusals occur in accordance with these protocols." Id.
These protocols must include four specific provisions. Id.

**Defendant's Response:** Undisputed.

199. First, "[t]he health care facility, physician, or health care personnel shall inform a
patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the
treatment options in a timely manner, consistent with current standards of medical practice or
care." Id. 70/6.1(1) ("the benefits-discussion requirement").

**Defendant's Response:** Undisputed.

200. Second, "[w]hen a health care facility, physician, or health care personnel is
unable to permit, perform, or participate in a health care service that is a diagnostic or treatment
option requested by a patient because the health care service is contrary to the conscience of the
health care facility, physician, or health care personnel, then the patient shall either be provided
the requested health care service by others in the facility or be notified that the health care will
not be provided." Id. 70/6.1(2).

**Defendant's Response:** Undisputed.

201. Third, "[i]f requested by the patient or the legal representative of the patient, the
health care facility, physician, or health care personnel shall" do one of three things. Id. 70/6.1(3)
("the referral requirement"). The objecting health care provider may (1) "refer the patient to," or

(2) "transfer the patient to," or (3) "provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection." Id.

**Defendant's Response:** Undisputed.

202.    Fourth, "[i]f requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall provide copies of medical records to the patient or to another health care professional or health care facility designated by the patient in accordance with Illinois law, without undue delay." Id. 70/6.1(4).

**Defendant's Response:** Undisputed.

203.    The Plaintiffs PCs fall within the definition of "health care facilities" under the Act. 204. The Plaintiffs' medical directors are "physicians" under the Act and that Plaintiffs' nurses, nurse midwives, and physician assistants are "health care personnel" under the Act. Id. ¶¶ 11–12.

**Defendant's Response:** Undisputed.

205.    The Plaintiffs filed and challenge the benefits-discussion requirement and the referral requirement under the Free Speech and Free Exercise Clauses of the First Amendment. ECF No. 1, Complaint.

**Defendant's Response:** Undisputed.

206.    Another judge of this Court issued a preliminary injunction against the benefits-discussion and referral requirements on July 19, 2017. ECF No. 65, PI Order. That injunction remains in place.

**Defendant's Response:** Undisputed.

207.    This Court held a trial on those claims on September 20–22, 2023.

**Defendant's Response:** Undisputed.