# Exhibit 14

NIFLA Trial Exhibit 32(a)
AMA Code of Ethics Chapter 1

# CHAPTER 1: OPINIONS ON PATIENT-PHYSICIAN RELATIONSHIPS

The Opinions in this chapter are offered as ethics guidance for physicians and are not intended to establish standards of clinical practice or rules of law.

*1.1 Responsibilities of Physicians & Patients*

    1.1.1    Patient-Physician Relationships
    1.1.2    Prospective Patients
    1.1.3    Patient Rights
    1.1.4    Patient Responsibilities
    1.1.5    Terminating a Patient-Physician Relationship
    1.1.6    Quality
    1.1.7    Physician Exercise of Conscience
    1.1.8    Physician Responsibilities for Safe Patient Discharge from Health Care Facilities

*1.2 Special Issues in Patient-Physician Relationships*

    1.2.1    Treating Self or Family
    1.2.2    Discrimination and Disruptive Behavior by Patients
    1.2.3    Consultation, Referral & Second Opinions
    1.2.4    Use of Chaperones
    1.2.5    Sports Medicine
    1.2.6    Work-Related & Independent Medical Examinations
    1.2.7    Use of Restraints
    1.2.8    Gifts from Patients
    1.2.9    Use of Remote Sensing & Monitoring Devices
    1.2.10   Political Action by Physicians
    1.2.11   Ethically Sound Innovation in Medical Practice
    1.2.12   Ethical Practice in Telemedicine
    1.2.13   Medical Tourism



*1.1.1 Patient-Physician Relationships*

The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering. The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

A patient-physician relationship exists when a physician serves a patient's medical needs. Generally, the relationship is entered into by mutual consent between physician and patient (or surrogate).

However, in certain circumstances a limited patient-physician relationship may be created without the patient's (or surrogate's) explicit agreement. Such circumstances include:

(a)   When a physician provides emergency care or provides care at the request of the patient's treating physician. In these circumstances, the patient's (or surrogate's) agreement to the relationship is implicit.

EXHIBIT 1

(b) When a physician provides medically appropriate care for a prisoner under court order, in keeping with ethics guidance on court-initiated treatment.

(c) When a physician examines a patient in the context of an independent medical examination, in keeping with ethics guidance. In such situations, a limited patient-physician relationship exists.

*AMA Principles of Medical Ethics: I,II,IV,VIII*

### 1.1.2 Prospective Patients

As professionals dedicated to protecting the well-being of patients, physicians have an ethical obligation to provide care in cases of medical emergency. Physicians must also uphold ethical responsibilities not to discriminate against a prospective patient on the basis of race, gender, sexual orientation or gender identity, or other personal or social characteristics that are not clinically relevant to the individual's care. Nor may physicians decline a patient based solely on the individual's infectious disease status. Physicians should not decline patients for whom they have accepted a contractual obligation to provide care.

However, physicians are not ethically required to accept all prospective patients. Physicians should be thoughtful in exercising their right to choose whom to serve.

A physician may decline to establish a patient-physician relationship with a prospective patient, or provide specific care to an existing patient, in certain limited circumstances:

(a) The patient requests care that is beyond the physician's competence or scope of practice; is known to be scientifically invalid, has no medical indication, or cannot reasonably be expected to achieve the intended clinical benefit; or is incompatible with the physician's deeply held personal, religious, or moral beliefs in keeping with ethics guidance on exercise of conscience.

(b) The physician lacks the resources needed to provide safe, competent, respectful care for the individual. Physicians may not decline to accept a patient for reasons that would constitute discrimination against a class or category of patients

(c) Meeting the medical needs of the prospective patient could seriously compromise the physician's ability to provide the care needed by his or her other patients. The greater the prospective patient's medical need, however, the stronger is the physician's obligation to provide care, in keeping with the professional obligation to promote access to care.

(d) The individual is abusive or threatens the physician, staff, or other patients, unless the physician is legally required to provide emergency medical care. Physicians should be aware of the possibility that an underlying medical condition may contribute to this behavior.

*AMA Principles of Medical Ethics: I,VI,VIII,X*

### 1.1.3 Patient Rights

The health and well-being of patients depends on a collaborative effort between patient and physician in a mutually respectful alliance. Patients contribute to this alliance when they fulfill responsibilities they have, to seek care and to be candid with their physicians.

NIFLA 01752

Physicians can best contribute to a mutually respectful alliance with patients by serving as their patients' advocates and by respecting patients' rights. These include the right:

(a) To courtesy, respect, dignity, and timely, responsive attention to his or her needs.

(b) To receive information from their physicians and to have opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives, including the risks, benefits and costs of forgoing treatment. Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment.

(c) To ask questions about their health status or recommended treatment when they do not fully understand what has been described and to have their questions answered.

(d) To make decisions about the care the physician recommends and to have those decisions respected. A patient who has decision-making capacity may accept or refuse any recommended medical intervention.

(e) To have the physician and other staff respect the patient's privacy and confidentiality.

(f) To obtain copies or summaries of their medical records.

(g) To obtain a second opinion.

(h) To be advised of any conflicts of interest their physician may have in respect to their care.

(i) To continuity of care. Patients should be able to expect that their physician will cooperate in coordinating medically indicated care with other health care professionals, and that the physician will not discontinue treating them when further treatment is medically indicated without giving them sufficient notice and reasonable assistance in making alternative arrangements for care.

*AMA Principles of Medical Ethics: I,IV,V,VIII,IX*

---

### 1.1.4 Patient Responsibilities

Successful medical care requires ongoing collaboration between patients and physicians. Their partnership requires both individuals to take an active role in the healing process.

Autonomous, competent patients control the decisions that direct their health care. With that exercise of self-governance and choice comes a number of responsibilities. Patients contribute to the collaborative effort when they:

(a) Are truthful and forthcoming with their physicians and strive to express their concerns clearly. Physicians likewise should encourage patients to raise questions or concerns.

(b) Provide as complete a medical history as they can, including providing information about past illnesses, medications, hospitalizations, family history of illness, and other matters relating to present health.

(c) Cooperate with agreed-on treatment plans. Since adhering to treatment is often essential to public and individual safety, patients should disclose whether they have or have not followed the agreed-on plan and indicate when they would like to reconsider the plan.

(d) Accept care from medical students, residents, and other trainees under appropriate supervision. Participation in medical education is to the mutual benefit of patients and the health care system; nonetheless, patients' (or surrogates') refusal of care by a trainee should be respected in keeping with ethics guidance.

(e) Meet their financial responsibilities with regard to medical care or discuss financial hardships with their physicians. Patients should be aware of costs associated with using a limited resource like health care and try to use medical resources judiciously.

(f) Recognize that a healthy lifestyle can often prevent or mitigate illness and take responsibility to follow preventive measures and adopt health-enhancing behaviors.

(g) Be aware of and refrain from behavior that unreasonably places the health of others at risk. They should ask about what they can do to prevent transmission of infectious disease.

(h) Refrain from being disruptive in the clinical setting.

(i) Not knowingly initiate or participate in medical fraud.

(j) Report illegal or unethical behavior by physicians or other health care professionals to the appropriate medical societies, licensing boards, or law enforcement authorities.

*AMA Principles of Medical Ethics: I,IV,VI*

### 1.1.5 Terminating a Patient-Physician Relationship

Physicians' fiduciary responsibility to patients entails an obligation to support continuity of care for their patients. At the beginning of patient-physician relationship, the physician should alert the patient to any foreseeable impediments to continuity of care.

When considering withdrawing from a case, physicians must:

(a) Notify the patient (or authorized decision maker) long enough in advance to permit the patient to secure another physician.

(b) Facilitate transfer of care when appropriate.

*AMA Principles of Medical Ethics: I,VI*

### 1.1.6 Quality

As professionals dedicated to promoting the well-being of patients, physicians individually and collectively share the obligation to ensure that the care patients receive is safe, effective, patient centered, timely, efficient, and equitable.

NIFLA 01754

While responsibility for quality of care does not rest solely with physicians, their role is essential. Individually and collectively, physicians should actively engage in efforts to improve the quality of health care by:

(a) Keeping current with best care practices and maintaining professional competence.

(b) Holding themselves accountable to patients, families, and fellow health care professionals for communicating effectively and coordinating care appropriately.

(c) Monitoring the quality of care they deliver as individual practitioners—e.g., through personal case review and critical self-reflection, peer review, and use of other quality improvement tools.

(d) Demonstrating commitment to develop, implement, and disseminate appropriate, well-defined quality and performance improvement measures in their daily practice.

(e) Participating in educational, certification, and quality improvement activities that are well designed and consistent with the core values of the medical profession.

*AMA Principles of Medical Ethics: I,V,VII,VIII*

---

***1.1.7 Physician Exercise of Conscience***

Physicians are expected to uphold the ethical norms of their profession, including fidelity to patients and respect for patient self-determination. Yet physicians are not defined solely by their profession. They are moral agents in their own right and, like their patients, are informed by and committed to diverse cultural, religious, and philosophical traditions and beliefs. For some physicians, their professional calling is imbued with their foundational beliefs as persons, and at times the expectation that physicians will put patients' needs and preferences first may be in tension with the need to sustain moral integrity and continuity across both personal and professional life.

Preserving opportunity for physicians to act (or to refrain from acting) in accordance with the dictates of conscience in their professional practice is important for preserving the integrity of the medical profession as well as the integrity of the individual physician, on which patients and the public rely. Thus physicians should have considerable latitude to practice in accord with well-considered, deeply held beliefs that are central to their self-identities.

Physicians' freedom to act according to conscience is not unlimited, however. Physicians are expected to provide care in emergencies, honor patients' informed decisions to refuse life-sustaining treatment, and respect basic civil liberties and not discriminate against individuals in deciding whether to enter into a professional relationship with a new patient.

In other circumstances, physicians may be able to act (or refrain from acting) in accordance with the dictates of their conscience without violating their professional obligations. Several factors impinge on the decision to act according to conscience. Physicians have stronger obligations to patients with whom they have a patient-physician relationship, especially one of long standing; when there is imminent risk of foreseeable harm to the patient or delay in access to treatment would significantly adversely affect the patient's physical or emotional well-being; and when the patient is not reasonably able to access needed treatment from another qualified physician.

In following conscience, physicians should:

NIFLA 01755

(a) Thoughtfully consider whether and how significantly an action (or declining to act) will undermine the physician's personal integrity, create emotional or moral distress for the physician, or compromise the physician's ability to provide care for the individual and other patients.

(b) Before entering into a patient-physician relationship, make clear any specific interventions or services the physician cannot in good conscience provide because they are contrary to the physician's deeply held personal beliefs, focusing on interventions or services a patient might otherwise reasonably expect the practice to offer.

(c) Take care that their actions do not discriminate against or unduly burden individual patients or populations of patients and do not adversely affect patient or public trust.

(d) Be mindful of the burden their actions may place on fellow professionals.

(e) Uphold standards of informed consent and inform the patient about all relevant options for treatment, including options to which the physician morally objects.

(f) In general, physicians should refer a patient to another physician or institution to provide treatment the physician declines to offer. When a deeply held, well-considered personal belief leads a physician also to decline to refer, the physician should offer impartial guidance to patients about how to inform themselves regarding access to desired services.

(g) Continue to provide other ongoing care for the patient or formally terminate the patient-physician relationship in keeping with ethics guidance.

*AMA Principles of Medical Ethics: I,II,IV,VI,VIII,IX*

---

### 1.1.8 Required Reporting of Adverse Events

Physicians' primary ethical obligation to promote the well-being of individual patients encompasses an obligation to collaborate in a discharge plan that is safe for the patient. As advocates for their patients, physicians should resist any discharge requests that are likely to compromise a patient's safety. The discharge plan should be developed without regard to socioeconomic status, immigration status, or other clinically irrelevant considerations. Physicians also have a long-standing obligation to be prudent stewards of the shared societal resources with which they are entrusted. That obligation may require physicians to balance advocating on behalf of an individual patient with recognizing the needs of other patients.

To facilitate a patient's safe discharge from an inpatient unit, physicians should:

(a) Determine that the patient is medically stable and ready for discharge from the treating facility.

(b) Collaborate with those health care professionals and others who can facilitate a patient discharge to establish that a plan is in place for medically needed care that considers the patient's particular needs and preferences.

If a medically stable patient refuses discharge, physicians should support the patient's right to seek further review, including consultation with an ethics committee or other appropriate institutional resource.

*AMA Principles of Medical Ethics: I,II,VIII*

NIFLA 01756

### *1.2.1 Treating Self or Family*

Treating oneself or a member of one's own family poses several challenges for physicians, including concerns about professional objectivity, patient autonomy, and informed consent.

When the patient is an immediate family member, the physician's personal feelings may unduly influence his or her professional medical judgment. Or the physician may fail to probe sensitive areas when taking the medical history or to perform intimate parts of the physical examination. Physicians may feel obligated to provide care for family members despite feeling uncomfortable doing so. They may also be inclined to treat problems that are beyond their expertise or training.

Similarly, patients may feel uncomfortable receiving care from a family member. A patient may be reluctant to disclose sensitive information or undergo an intimate examination when the physician is an immediate family member. This discomfort may particularly be the case when the patient is a minor child, who may not feel free to refuse care from a parent.

In general, physicians should not treat themselves or members of their own families. However, it may be acceptable to do so in limited circumstances:

(a) In emergency settings or isolated settings where there is no other qualified physician available. In such situations, physicians should not hesitate to treat themselves or family members until another physician becomes available.

(b) For short-term, minor problems.

When treating self or family members, physicians have a further responsibility to:

(c) Document treatment or care provided and convey relevant information to the patient's primary care physician.

(d) Recognize that if tensions develop in the professional relationship with a family member, perhaps as a result of a negative medical outcome, such difficulties may be carried over into the family member's personal relationship with the physician.

(e) Avoid providing sensitive or intimate care especially for a minor patient who is uncomfortable being treated by a family member.

(f) Recognize that family members may be reluctant to state their preference for another physician or decline a recommendation for fear of offending the physician.

*AMA Principles of Medical Ethics: I,II,IV*

### *1.2.2 Discrimination and Disruptive Behavior by Patients*

The relationship between patients and physicians is based on trust and should serve to promote patients' well-being while respecting the dignity and rights of both patients and physicians.

Disrespectful, derogatory, or prejudiced language or conduct, or prejudiced requests for accommodation of personal preferences on the part of either patients or physicians can undermine trust and compromise

NIFLA 01757

the integrity of the patient-physician relationship. It can make individuals who themselves experience (or are members of populations that have experienced) prejudice reluctant to seek care as patients or to provide care as health care professionals, and create an environment that strains relationships among patients, physicians, and the health care team.

Trust can be established and maintained only when there is mutual respect. Therefore, in their interactions with patients, physicians should:

(a) Recognize that disrespectful, derogatory, or prejudiced language or conduct can cause psychological harm to those who are targeted.

(b) Always treat patients with compassion and respect.

(c) Explore the reasons for which a patient behaves in disrespectful, derogatory, or prejudiced ways insofar as possible. Physicians should identify, appreciate, and address potentially treatable clinical conditions or personal experiences that influence patient behavior. Regardless of cause, when a patient's behavior threatens the safety of health care personnel or other patients, steps should be taken to de-escalate or remove the threat.

(d) Prioritize the goals of care when deciding whether to decline or accommodate a patient's request for an alternative physician. Physicians should recognize that some requests for a concordant physician may be clinically useful or promote improved outcomes.

(e) Within the limits of ethics guidance, trainees should not be expected to forgo valuable learning opportunities solely to accommodate prejudiced requests.

(f) Make patients aware that they are able to seek care from other sources if they persist in opposing treatment from the physician assigned. If patients require immediate care, inform them that, unless they exercise their right to leave, care will be provided by appropriately qualified staff independent of their expressed preference.

(g) Terminate the patient-physician relationship only when the patient will not modify disrespectful, derogatory or prejudiced behavior that is within the patient's control, in keeping with ethics guidance.

Physicians, especially those in leadership roles, should encourage the institutions with which they are affiliated to:

(h) Be mindful of the messages the institution conveys within and outside its walls by how it responds to prejudiced behavior by patients.

(i) Educate staff, patients, and the community about the institution's expectations for behavior.

(j) Promote a safe and respectful working environment and formally set clear expectations for how disrespectful, derogatory, or prejudiced behavior by patients will be managed.

(k) Clearly and openly support physicians, trainees, and facility personnel who experience prejudiced behavior and discrimination by patients, including allowing physicians, trainees, and facility personnel to decline to care for those patients, without penalty, who have exhibited discriminatory behavior specifically toward them.

(l) Collect data regarding incidents of discrimination by patients and their effects on physicians and facility personnel on an ongoing basis and seek to improve how incidents are addressed to better meet the needs of patients, physicians, other facility personnel, and the community.

NIFLA 01758

*AMA Principles of Medical Ethics: I,II,VI,IX*

---

### 1.2.3 Consultation, Referral, and Second Opinions

Physicians' fiduciary obligation to promote patients' best interests and welfare can include consulting other physicians for advice in the care of the patient or referring patients to other professionals to provide care.

When physicians seek or provide consultation about a patient's care or refer a patient for health care services, including diagnostic laboratory services, they should:

(a) Base the decision or recommendation on the patient's medical needs, as they would for any treatment recommendation, and consult or refer the patient to only health care professionals who have appropriate knowledge and skills and are licensed to provide the services needed.

(b) Share patients' health information in keeping with ethics guidance on confidentiality.

(c) Assure the patient that he or she may seek a second opinion or choose someone else to provide a recommended consultation or service. Physicians should urge patients to familiarize themselves with any restrictions associated with their individual health plan that may bear on their decision, such as additional out-of-pocket costs to the patient for referrals or care outside a designated panel of providers.

(d) Explain the rationale for the consultation, opinion, or findings and recommendations clearly to the patient.

(e) Respect the terms of any contractual relationships they may have with health care organizations or payers that affect referrals and consultation.

Physicians may not terminate a patient-physician relationship solely because the patient seeks recommendations or care from a health care professional whom the physician has not recommended.

*AMA Principles of Medical Ethics: IV,V,VI*

---

### 1.2.4 Use of Chaperones

Efforts to provide a comfortable and considerate atmosphere for the patient and the physician are part of respecting patients' dignity. These efforts may include providing appropriate gowns, private facilities for undressing, sensitive use of draping, and clearly explaining various components of the physical examination. They also include having chaperones available. Having chaperones present can also help prevent misunderstandings between patient and physician.

Physicians should:

(a) Adopt a policy that patients are free to request a chaperone and ensure that the policy is communicated to patients.

(b) Always honor a patient's request to have a chaperone.

(c) Have an authorized member of the health care team serve as a chaperone. Physicians should establish clear expectations that chaperones will uphold professional standards of privacy and confidentiality.

(d) In general, use a chaperone even when a patient's trusted companion is present.

(e) Provide opportunity for private conversation with the patient without the chaperone present. Physicians should minimize inquiries or history taking of a sensitive nature during a chaperoned examination.

*AMA Principles of Medical Ethics: I,IV*

---

*1.2.5 Sports Medicine*

Many professional and amateur athletic activities, including contact sports, can put participants at risk of injury. Physicians can provide valuable information to help sports participants, dancers, and others make informed decisions about whether to initiate or continue participating in such activities.

Physicians who serve in a medical capacity at athletic, sporting, or other physically demanding events should protect the health and safety of participants.

In this capacity, physicians should:

(a) Base their judgment about an individual's participation solely on medical considerations.

(b) Not allow the desires of spectators, promoters of the event, or even the injured individual to govern a decision about whether to remove the participant from the event.

*AMA Principles of Medical Ethics: I,VII*

---

*1.2.6 Work-Related and Independent Medical Examinations*

Physicians who are employed by businesses or insurance companies, or who provide medical examinations within their realm of specialty as independent contractors, to assess individuals' health or disability face a conflict of duties. They have responsibilities both to the patient and to the employer or third party.

Such industry-employed physicians or independent medical examiners establish limited patient-physician relationships. Their relationships with patients are confined to the isolated examination; they do not monitor patients' health over time, treat them, or carry out many other duties fulfilled by physicians in the traditional fiduciary role.

In keeping with their core obligations as medical professionals, physicians who practice as industry-employed physicians or independent medical examiners should:

(a) Disclose the nature of the relationship with the employer or third party and that the physician is acting as an agent of the employer or third party before gathering health information from the patient.

NIFLA 01760

(b) Explain that the physician's role in this context is to assess the patient's health or disability independently and objectively. The physician should further explain the differences between this practice and the traditional fiduciary role of a physician.

(c) Protect patients' personal health information in keeping with professional standards of confidentiality.

(d) Inform the patient about important incidental findings the physician discovers during the examination. When appropriate, the physician should suggest the patient seek care from a qualified physician and, if requested, provide reasonable assistance in securing follow-up care.

*AMA Principles of Medical Ethics: I*

### 1.2.7 Use of Restraints

All individuals have a fundamental right to be free from unreasonable bodily restraint. At times, however, health conditions may result in behavior that puts patients at risk of harming themselves. In such situations, it may be ethically justifiable for physicians to order the use of chemical or physical restraint to protect the patient.

Except in emergencies, patients should be restrained only on a physician's explicit order. Patients should never be restrained punitively, for convenience, or as an alternate to reasonable staffing.

Physicians who order chemical or physical restraints should:

(a) Use best professional judgment to determine whether restraint is clinically indicated for the individual patient.

(b) Obtain the patient's informed consent to the use of restraint, or the consent of the patient's surrogate when the patient lacks decision-making capacity. Physicians should explain to the patient or surrogate:

   (i) why restraint is recommended;

   (ii) what type of restraint will be used;

   (iii) length of time for which restraint is intended to be used.

(c) Regularly review the need for restraint and document the review and resulting decision in the patient's medical record.

In certain limited situations, when a patient poses a significant danger to self or others, it may be appropriate to restrain the patient involuntarily. In such situations, the least restrictive restraint reasonable should be implemented and the restraint should be removed promptly when no longer needed.

*AMA Principles of Medical Ethics: I,IV*

### 1.2.8 Gifts from Patients

Patients offer gifts to a physician for many reasons. Some gifts are offered as an expression of gratitude

or a reflection of the patient's cultural tradition. Accepting gifts offered for these reasons can enhance the patient-physician relationship.

Other gifts may signal psychological needs that require the physician's attention. Some patients may offer gifts or cash to secure or influence care or to secure preferential treatment. Such gifts can undermine physicians' obligation to provide services fairly to all patients; accepting them is likely to damage the patient-physician relationship.

The interaction of these factors is complex and physicians should consider them sensitively before accepting or declining a gift.

Physicians to whom a patient offers a gift should:

(a) Be sensitive to the gift's value relative to the patient's or physician's means. Physicians should decline gifts that are disproportionately or inappropriately large, or when the physician would be uncomfortable to have colleagues know the gift had been accepted.

(b) Not allow the gift or offer of a gift to influence the patient's medical care.

(c) Decline a bequest from a patient if the physician has reason to believe accepting the gift would present an emotional or financial hardship to the patient's family.

(d) Physicians may wish to suggest that the patient or family make a charitable contribution in lieu of the bequest, in keeping with ethics guidance.

*AMA Principles of Medical Ethics: I,II*

---

*1.2.9 Use of Remote Sensing and Monitoring Devices*

Sensing and monitoring devices can benefit patients by allowing physicians and other health care professionals to obtain timely information about the patient's vital signs or health status without requiring an in-person, face-to-face encounter. Implantable devices can also enable physicians to identify patients rapidly and expedite access to patients' medical records. Devices that transmit patient information wirelessly to remote receiving stations can offer convenience for both patients and physicians, enhance the efficiency and quality of care, and promote increased access to care, but also raise concerns about safety and the confidentiality of patient information.

Individually, physicians who employ remote sensing and monitoring devices in providing patient care should:

(a) Determine whether using one or more such devices is appropriate in light of individual patients' medical needs and circumstances, including patients' ability to use the chosen device appropriately.

(b) Explain how the device(s) will be used in the patient's care and what will be expected of the patient in using the technology, and disclose any limitations, risks, or medical uncertainties associated with the device(s) and data transmission.

(c) Obtain the patient's or surrogate's informed consent before implementing the device in treatment.

Collectively, physicians should:

(d) Support research into the safety, efficacy, and possible non-medical uses of remote sensing and monitoring devices, including devices intended to transmit biometric data and implantable radio frequency ID devices.

(e) Advocate for appropriate oversight of remote sensing and monitoring devices.

*AMA Principles of Medical Ethics: I,III,V*

---

**1.2.10 Political Action by Physicians**

Like all Americans, physicians enjoy the right to advocate for change in law and policy, in the public arena, and within their institutions. Indeed, physicians have an ethical responsibility to seek change when they believe the requirements of law or policy are contrary to the best interests of patients. However, they have a responsibility to do so in ways that are not disruptive to patient care.

Physicians who participate in advocacy activities should:

(a) Ensure that the health of patients is not jeopardized and that patient care is not compromised.

(b) Avoid using disruptive means to press for reform. Strikes and other collection actions may reduce access to care, eliminate or delay needed care, and interfere with continuity of care and should not be used as a bargaining tactic. In rare circumstances, briefly limiting personal availability may be appropriate as a means of calling attention to the need for changes in patient care. Physicians should be aware that some actions may put them or their organizations at risk of violating antitrust laws or laws pertaining to medical licensure or malpractice.

(c) Avoid forming workplace alliances, such as unions, with workers who do not share physicians' primary and overriding commitment to patients.

(d) Refrain from using undue influence or pressure colleagues to participate in advocacy activities and should not punish colleagues, overtly or covertly, for deciding not to participate.

*AMA Principles of Medical Ethics: I,III,VI*

---

**1.2.11 Ethically Sound Innovation in Medical Practice**

Innovation in medicine can range from improving an existing intervention, to introducing an innovation in one's own clinical practice for the first time, to using an existing intervention in a novel way or translating knowledge from one clinical context into another. Innovation shares features with both research and patient care, but is distinct from both.

When physicians participate in developing and disseminating innovative practices, they act in accord with professional responsibilities to advance medical knowledge, improve quality of care, and promote the well-being of individual patients and the larger community. Similarly, these responsibilities are honored when physicians enhance their own practices by expanding the range of techniques and interventions they offer to patients.

Individually, physicians who are involved in designing, developing, disseminating, or adopting innovative modalities should:

(a) Innovate on the basis of sound scientific evidence and appropriate clinical expertise.

(b) Seek input from colleagues or other medical professionals in advance or as early as possible in the course of innovation.

(c) Design innovations so as to minimize risks to individual patients and maximize the likelihood of application and benefit for populations of patients.

(d) Be sensitive to the cost implications of innovation.

(e) Be aware of influences that may drive the creation and adoption of innovative practices for reasons other than patient or public benefit.

When they offer existing innovative diagnostic or therapeutic services to individual patients, physicians must:

(f) Base recommendations on patients' medical needs.

(g) Refrain from offering such services until they have acquired appropriate knowledge and skills.

(h) Recognize that in this context informed decision making requires the physician to disclose:

   (i) how a recommended diagnostic or therapeutic service differs from the standard therapeutic approach if one exists;

   (ii) why the physician is recommending the innovative modality;

   (iii) what the known or anticipated risks, benefits, and burdens of the recommended therapy and alternatives are;

   (iv) what experience the professional community in general and the physician individually has had to date with the innovative therapy;

   (v) what conflicts of interest the physician may have with respect to the recommended therapy.

(i) Discontinue any innovative therapies that are not benefiting the patient.

(j) Be transparent and share findings from their use of innovative therapies with peers in some manner. To promote patient safety and quality, physicians should share both immediate or delayed positive and negative outcomes.

To promote responsible innovation, the medical profession should:

(k) Require that physicians who adopt innovative treatment or diagnostic techniques into their practice have appropriate knowledge and skills.

(l) Provide meaningful professional oversight of innovation in patient care.

(m) Encourage physician-innovators to collect and share information about the resources needed to implement their innovative therapies effectively.

*AMA Principles of Medical Ethics: V,VIII*

NIFLA 01764

*1.2.12 Ethical Practice in Telemedicine*

Innovation in technology, including information technology, is redefining how people perceive time and distance. It is reshaping how individuals interact with and relate to others, including when, where, and how patients and physicians engage with one another.

Telehealth and telemedicine span a continuum of technologies that offer new ways to deliver care. Yet as in any mode of care, patients need to be able to trust that physicians will place patient welfare above other interests, provide competent care, provide the information patients need to make well-considered decisions about care, respect patient privacy and confidentiality, and take steps to ensure continuity of care. Although physicians' fundamental ethical responsibilities do not change, the continuum of possible patient-physician interactions in telehealth/telemedicine give rise to differing levels of accountability for physicians.

All physicians who participate in telehealth/telemedicine have an ethical responsibility to uphold fundamental fiduciary obligations by disclosing any financial or other interests the physician has in the telehealth/telemedicine application or service and taking steps to manage or eliminate conflicts of interests. Whenever they provide health information, including health content for websites or mobile health applications, physicians must ensure that the information they provide or that is attributed to them is objective and accurate.

Similarly, all physicians who participate in telehealth/telemedicine must assure themselves that telemedicine services have appropriate protocols to prevent unauthorized access and to protect the security and integrity of patient information at the patient end of the electronic encounter, during transmission, and among all health care professionals and other personnel who participate in the telehealth/telemedicine service consistent with their individual roles.

Physicians who respond to individual health queries or provide personalized health advice electronically through a telehealth service in addition should:

(a) Inform users about the limitations of the relationship and services provided.

(b) Advise site users about how to arrange for needed care when follow-up care is indicated.

(c) Encourage users who have primary care physicians to inform their primary physicians about the online health consultation, even if in-person care is not immediately needed.

Physicians who provide clinical services through telehealth/telemedicine must uphold the standards of professionalism expected in in-person interactions, follow appropriate ethical guidelines of relevant specialty societies and adhere to applicable law governing the practice of telemedicine. In the context of telehealth/telemedicine they further should:

(d) Be proficient in the use of the relevant technologies and comfortable interacting with patients and/or surrogates electronically.

(e) Recognize the limitations of the relevant technologies and take appropriate steps to overcome those limitations. Physicians must ensure that they have the information they need to make well-grounded clinical recommendations when they cannot personally conduct a physical examination, such as by having another health care professional at the patient's site conduct the exam or obtaining vital information through remote technologies.

NIFLA 01765

(f) Be prudent in carrying out a diagnostic evaluation or prescribing medication by:

   (i) establishing the patient's identity;

   (ii) confirming that telehealth/telemedicine services are appropriate for that patient's individual situation and medical needs;

   (iii) evaluating the indication, appropriateness and safety of any prescription in keeping with best practice guidelines and any formulary limitations that apply to the electronic interaction; and

   (iv) documenting the clinical evaluation and prescription.

(g) When the physician would otherwise be expected to obtain informed consent, tailor the informed consent process to provide information patients (or their surrogates) need about the distinctive features of telehealth/telemedicine, in addition to information about medical issues and treatment options. Patients and surrogates should have a basic understanding of how telemedicine technologies will be used in care, the limitations of those technologies, the credentials of health care professionals involved, and what will be expected of patients for using these technologies.

(h) As in any patient-physician interaction, take steps to promote continuity of care, giving consideration to how information can be preserved and accessible for future episodes of care in keeping with patients' preferences (or the decisions of their surrogates) and how follow-up care can be provided when needed. Physicians should assure themselves how information will be conveyed to the patient's primary care physician when the patient has a primary care physician and to other physicians currently caring for the patient.

Collectively, through their professional organizations and health care institutions, physicians should:

(i) Support ongoing refinement of telehealth/telemedicine technologies, and the development and implementation of clinical and technical standards to ensure the safety and quality of care.

(j) Advocate for policies and initiatives to promote access to telehealth/telemedicine services for all patients who could benefit from receiving care electronically.

(k) Routinely monitor the telehealth/telemedicine landscape to:

   (i) identify and address adverse consequences as technologies and activities evolve; and

   (ii) identify and encourage dissemination of both positive and negative outcomes.

*AMA Principles of Medical Ethics: I,IV,VI,IX*

---

### 1.2.13 Medical Tourism

Medical tourists travel to address what they deem to be unmet personal medical needs, prompted by issues of cost, timely access to services, higher quality of care or perceived superior services, or to access services that are not available in their country of residence. In many instances, patients travel on their own initiative, with or without consulting their physician, and with or without utilizing the services of commercial medical tourism companies. The care medical tourists seek may be elective procedures, medically necessary standard care, or care that is unapproved or legally or ethically prohibited in their home system.

Many medical tourists receive excellent care, but issues of safety and quality can loom large. Substandard surgical care, poor infection control, inadequate screening of blood products, and falsified or outdated medications in lower income settings of care can pose greater risks than patients would face at home. Medical tourists also face heightened travel-related risks. Patients who develop complications may need extensive follow-up care when they return home. They may pose public health risks to their home communities as well.

Medical tourism can leave home country physicians in problematic positions: Faced with the reality that medical tourists often need follow-up when they return, even if only to monitor the course of an uneventful recovery; confronted with the fact that returning medical tourists often do not have records of the procedures they underwent and the medications they received, or contact information for the foreign health care professionals who provided services, asked to make right what went wrong when patients experience complications as a result of medical travel, often having not been informed about, let alone part of the patient's decision to seek health care abroad.

Physicians need to be aware of the implications of medical tourism for individual patients and the community.

Collectively, through their specialty societies and other professional organizations, physicians should:

(a) Support collection of and access to outcomes data from medical tourists to enhance informed decision making.

(b) Advocate for education for health care professionals about medical tourism.

(c) Advocate for appropriate oversight of medical tourism and companies that facilitate it to protect patient safety and promote high quality care.

(d) Advocate against policies that would require patients to accept care abroad as a condition of access to needed services.

Individually, physicians should:

(e) Be alert to indications that a patient may be contemplating seeking care abroad and explore with the patient the individual's concerns and wishes about care.

(f) Seek to familiarize themselves with issues in medical tourism to enable them to support informed decision making when patients approach them about getting care abroad.

(g) Help patients understand the special nature of risk and limited likelihood of benefit when they desire an unapproved therapy. Physicians should help patients frame realistic goals for care and encourage a plan of care based on scientifically recognized interventions.

(h) Advise patients who inform them in advance of a decision to seek care abroad whether the physician is or is not willing to provide follow-up care for the procedure(s), and refer the patient to other options for care.

(i) Offer their best professional guidance about a patient's decision to become a medical tourist, just as they would any other decision about care. This includes being candid when they deem a decision to obtain specific care abroad not to be in the patient's best interests. Physicians should encourage patients who seek unapproved therapy to enroll in an appropriate clinical trial.

NIFLA 01767

(j) Physicians should respond compassionately when a patient who has undergone treatment abroad without the physician's prior knowledge seeks nonemergent follow-up care. Those who are reluctant to provide such care should carefully consider:

(i) the nature and duration of the patient-physician relationship;

(ii) the likely impact on the individual patient's well-being;

(iii) the burden declining to provide follow-up care may impose on fellow professionals;

(iv) the likely impact on the health and resources of the community.

Physicians who are unable or unwilling to provide care in these circumstances have a responsibility to refer the patient to appropriate services.

*AMA Principles of Medical Ethics: IV,V,VI*

NIFLA 01768