# Exhibit 15

NIFLA Trial Exhibit 32(b)
AMA Code of Ethics Chapter 2

**CHAPTER 2: OPINIONS ON CONSENT, COMMUNICATION & DECISION MAKING**

The Opinions in this chapter are offered as ethics guidance for physicians and are not intended to establish standards of clinical practice or rules of law.

*2.1 Informed Consent & Shared Decision Making*

| | |
|---|---|
| 2.1.1 | Informed Consent |
| 2.1.2 | Decisions for Adult Patients Who Lack Capacity |
| 2.1.3 | Withholding Information from Patients |
| 2.1.4 | Use of Placebo in Clinical Practice |
| 2.1.5 | Reporting Clinical Test Results |
| 2.1.6 | Substitution of Surgeon |

*2.2 Decisions for Minors*

| | |
|---|---|
| 2.2.1 | Pediatric Decision Making |
| 2.2.2 | Confidential Health Care for Minors |
| 2.2.3 | Mandatory Parental Consent to Abortion |
| 2.2.4 | Treatment Decisions for Seriously Ill Newborns |
| 2.2.5 | Genetic Testing of Children |

*2.3 Communication with Patients*

| | |
|---|---|
| 2.3.1 | Electronic Communication with Patients |
| 2.3.2 | Professionalism in the Use of Social Media |
| 2.3.3 | Informing Families of a Patient's Death |
| 2.3.4 | Political Communications |
| 2.3.5 | Soliciting Charitable Contributions from Patients |
| 2.3.6 | Surgical Co-Management |

❧

### 2.1.1 Informed Consent

Informed consent to medical treatment is fundamental in both ethics and law. Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care. Successful communication in the patient-physician relationship fosters trust and supports shared decision making.

The process of informed consent occurs when communication between a patient and physician results in the patient's authorization or agreement to undergo a specific medical intervention. In seeking a patient's informed consent (or the consent of the patient's surrogate if the patient lacks decision-making capacity or declines to participate in making decisions), physicians should:

(a) Assess the patient's ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision.

(b) Present relevant information accurately and sensitively, in keeping with the patient's preferences for receiving medical information. The physician should include information about:

    (i) the diagnosis (when known);

    (ii) the nature and purpose of recommended interventions;

**EXHIBIT**

**2**

NIFLA 01769

(iii)   the burdens, risks, and expected benefits of all options, including forgoing treatment.

(c)  Document the informed consent conversation and the patient's (or surrogate's) decision in the medical record in some manner. When the patient/surrogate has provided specific written consent, the consent form should be included in the record.

In emergencies, when a decision must be made urgently, the patient is not able to participate in decision making, and the patient's surrogate is not available, physicians may initiate treatment without prior informed consent. In such situations, the physician should inform the patient/surrogate at the earliest opportunity and obtain consent for ongoing treatment in keeping with these guidelines.

*AMA Principles of Medical Ethics: I,II,V,VIII*

### *2.1.2 Decisions for Adult Patients Who Lack Capacity*

Respect for patient autonomy is central to professional ethics and physicians should involve patients in health care decisions commensurate with the patient's decision-making capacity. Even when a medical condition or disorder impairs a patient's decision-making capacity, the patient may still be able to participate in some aspects of decision making. Physicians should engage patients whose capacity is impaired in decisions involving their own care to the greatest extent possible, including when the patient has previously designated a surrogate to make decisions on his or her behalf.

When a patient lacks decision-making capacity, the physician has an ethical responsibility to:

(a)  Identify an appropriate surrogate to make decisions on the patient's behalf:

(i)   the person the patient designated as surrogate through a durable power of attorney for health care or other mechanism; or

(ii)   a family member or other intimate associate, in keeping with applicable law and policy if the patient has not previously designated a surrogate.

(b)  Recognize that the patient's surrogate is entitled to the same respect as the patient.

(c)  Provide advice, guidance, and support to the surrogate.

(d)  Assist the surrogate to make decisions in keeping with the standard of substituted judgment, basing decisions on:

(i)   the patient's preferences (if any) as expressed in an advance directive or as documented in the medical record;

(ii)   the patient's views about life and how it should be lived;

(iii)   how the patient constructed his or her life story; and

(iv)   the patient's attitudes toward sickness, suffering, and certain medical procedures.

(e)  Assist the surrogate to make decisions in keeping with the best interest standard when the patient's preferences and values are not known and cannot reasonably be inferred, such as when the patient has not previously expressed preferences or has never had decision-making capacity. Best interest decisions should be based on:

     (i)    the pain and suffering associated with the intervention;

     (ii)   the degree of and potential for benefit;

     (iii)  impairments that may result from the intervention;

     (iv)  quality of life as experienced by the patient.

(f)  Consult an ethics committee or other institutional resource when:

     (i)    no surrogate is available or there is ongoing disagreement about who is the appropriate surrogate;

     (ii)   ongoing disagreement about a treatment decision cannot be resolved; or

     (iii)  the physician judges that the surrogate's decision:

         a.   is clearly not what the patient would have decided when the patient's preferences are known or can be inferred;

         b.   could not reasonably be judged to be in the patient's best interest; or

         c.   primarily serves the interests of the surrogate or other third party rather than the patient.

*AMA Principles of Medical Ethics: I,III,VIII*

---

### 2.1.3 Withholding Information from Patients

Truthful and open communication between physician and patient is essential for trust in the relationship and for respect for autonomy. Withholding pertinent medical information from patients in the belief that disclosure is medically contraindicated creates a conflict between the physician's obligations to promote patient welfare and to respect patient autonomy.

Except in emergency situations in which a patient is incapable of making an informed decision, withholding information without the patient's knowledge or consent is ethically unacceptable. When information has been withheld in such circumstances, physicians' should convey that information once the emergency situation has been resolved, in keeping with relevant guidelines below.

The obligation to communicate truthfully about the patient's medical condition does not mean that the physician must communicate information to the patient immediately or all at once. Information may be conveyed over time in keeping with the patient's preferences and ability to comprehend the information. Physicians should always communicate sensitively and respectfully with patients.

With respect to disclosing or withholding information, physicians should:

(a)  Encourage the patient to specify preferences regarding communication of medical information, preferably before the information becomes available.

(b)  Honor a patient's request not to receive certain medical information or to convey the information to a designated surrogate, provided these requests appear to represent the patient's genuine wishes.

NIFLA 01771

(c) Assess the amount of information the patient is capable of receiving at a given time, and tailor disclosure to meet the patient's needs and expectations in keeping with the individual's preferences.

(d) Consult with the patient's family, the physician's colleagues, or an ethics committee or other institutional resource for help in assessing the relative benefits and harms associated with delaying disclosure.

(e) Monitor the patient carefully and offer full disclosure when the patient is able to decide whether to receive the information. This should be done according to a definite plan, so that disclosure is not permanently delayed.

(f) Disclose medical errors if they have occurred in the patient's care, in keeping with ethics guidance.

*AMA Principles of Medical Ethics: I,III,V,VIII*

---

### 2.1.4 Use of Placebo in Clinical Practice

A placebo is a substance provided to a patient that the physician believes has no specific pharmacological effect on the condition being treated. The use of placebo, when consistent with good medical care, is distinct from interventions that lack scientific foundation.

A placebo may still be effective if the patient knows it will be used but cannot identify it and does not know the precise timing of its use. In the clinical setting, the use of a placebo without the patient's knowledge may undermine trust, compromise the patient-physician relationship, and result in medical harm to the patient.

Physicians may use placebos for diagnosis or treatment only if they:

(a) Enlist the patient's cooperation. The physician should explain that it can be possible to achieve a better understanding of the medical condition by evaluating the effects of different medications, including the placebo.

(b) Obtain the patient's general consent to administer a placebo. The physician does not need to identify precisely when the placebo will be administered. In this way, the physician respects the patient autonomy and fosters a trusting relationship, while the patient may still benefit from the placebo effect.

(c) Avoid giving a placebo merely to mollify a difficult patient. Giving a placebo for such reasons places the convenience of the physician above the welfare of the patient. Physicians can produce a placebo-like effect through the skillful use of reassurance and encouragement, thereby building respect and trust, promoting the patient-physician relationship, and improving health outcomes.

*AMA Principles of Medical Ethics: I,III,V,VIII*

---

### 2.1.5 Reporting Clinical Test Results

Patients should be able to be confident that they will receive the results of clinical tests in a timely fashion. Physicians have a corresponding obligation to be considerate of patient concerns and anxieties and ensure that patients receive test results within a reasonable time frame.

When and how clinical test results are conveyed to patients can vary considerably in different practice environments and for different clinical tests. In some instances results are conveyed by the patient's treating physician, in others by other practice staff, or directly by the laboratory or other entity.

To ensure that test results are communicated appropriately to patients, physicians should adopt, or advocate for, policies and procedures to ensure that:

(a) The patient (or surrogate decision maker if the patient lacks decision-making capacity) is informed about when he or she can reasonably expect to learn the results of clinical tests and how those results will be conveyed.

(b) The patient/surrogate is instructed what to do if he or she does not receive results in the expected time frame.

(c) Test results are conveyed sensitively, in a way that is understandable to the patient/surrogate, and the patient/surrogate receives information needed to make well-considered decisions about medical treatment and give informed consent to future treatment.

(d) Patient confidentiality is protected regardless of how clinical test results are conveyed.

(e) The ordering physician is notified before the disclosure takes place and has access to the results as they will be conveyed to the patient/surrogate, if results are to be conveyed directly to the patient/surrogate by a third party.

*AMA Principles of Medical Ethics: II,IV,V*

---

### 2.1.6 Substitution of Surgeon

Patients are entitled to choose their own physicians, which includes being permitted to accept or refuse having an intervention performed by a substitute. A surgeon who allows a substitute to conduct a medical procedure on his or her patient without the patient's knowledge or consent risks compromising the trust-based relationship of patient and physician.

When one or more other appropriately trained health care professionals will participate in performing a surgical intervention, the surgeon has an ethical responsibility to:

(a) Notify the patient (or surrogate if the patient lacks decision-making capacity) that others will participate, including whether they will do so under the physician's personal supervision or not.

(b) Obtain the patient's or surrogate's informed consent for the intervention, in keeping with ethical and legal guidelines.

*AMA Principles of Medical Ethics: I,II,IV,V*

---

### 2.2.1 Pediatric Decision Making

As the persons best positioned to understand their child's unique needs and interests, parents (or guardians) are asked to fill the dual responsibility of protecting their children and, at the same time, empowering them and promoting development of children's capacity to become independent decision makers. In giving or withholding permission for medical treatment for their

children, parents/guardians are expected to safeguard their children's physical health and well-being and to nurture their children's developing personhood and autonomy.

But parents' authority as decision makers does not mean children should have no role in the decision-making process. Respect and shared decision making remain important in the context of decisions for minors. Thus, physicians should evaluate minor patients to determine if they can understand the risks and benefits of proposed treatment and tailor disclosure accordingly. The more mature a minor patient is, the better able to understand what a decision will mean, and the more clearly the child can communicate preferences, the stronger the ethical obligation to seek minor patients' assent to treatment. Except when immediate intervention is essential to preserve life or avert serious, irreversible harm, physicians and parents/guardians should respect a child's refusal to assent, and when circumstances permit should explore the child's reason for dissent.

For health care decisions involving minor patients, physicians should:

(a) Develop an individualized plan of care that will best serve the patient, basing treatment recommendations on the best available evidence and in general preferring alternatives that will not foreclose important future choices by the adolescent and adult the patient will become. Where there are questions about the efficacy or long-term impact of treatment alternatives, physicians should encourage ongoing collection of data to help clarify value to patients of different approaches to care.

(b) Work with parents/guardians to simplify complex treatment regimens whenever possible and educate parents/guardians in ways to avoid behaviors that will put the child or others at risk.

(c) Provide a supportive environment and encourage parents/guardians to discuss the child's health status with the patient, offering to facilitate the parent-child conversation for reluctant parents. Physicians should offer education and support to minimize the psychosocial impact of socially or culturally sensitive care, including putting the patient and parents/guardians in contact with others who have dealt with similar decisions and have volunteered their support as peers.

(d) When decisions involve life-sustaining treatment for a terminally ill child, ensure that patients have an opportunity to be involved in decision making in keeping with their ability to understand decisions and their desire to participate. Physicians should ensure that the patient and parents/guardians understand the prognosis (with and without treatment). They should discuss the option of initiating therapy with the intention of evaluating its clinical effectiveness for the patient after a specified time to determine whether it has led to improvement and confirm that if the intervention has not achieved agreed-on goals it may be discontinued.

(g) When it is not clear whether a specific intervention promotes the patient's interests, respect the decision of the patient (if the patient has capacity and is able to express a preference) and parents/guardians.

(h) When there is ongoing disagreement about patient's best interest or treatment recommendations, seek consultation with an ethics committee or other institutional resource.

*AMA Principles of Medical Ethics: IV, VIII*

### 2.2.2 Confidential Health Care for Minors

Physicians who treat minors have an ethical duty to promote the developing autonomy of minor patients by involving children in making decisions about their health care to a degree commensurate with the child's abilities. A minor's decision-making capacity depends on many factors, including not only chronological age, but also emotional maturity and the individual's medical experience. Physicians also have a responsibility to protect the confidentiality of minor patients, within certain limits.

In some jurisdictions, the law permits minors who are not emancipated to request and receive confidential services relating to contraception, or to pregnancy testing, prenatal care, and delivery services. Similarly, jurisdictions may permit unemancipated minors to request and receive confidential care to prevent, diagnose, or treat sexually transmitted disease, substance use disorders, or mental illness.

When an unemancipated minor requests confidential care and the law does not grant the minor decision-making authority for that care, physicians should:

(a) Inform the patient (and parent or guardian, if present) about circumstances in which the physician is obligated to inform the minor's parent/guardian, including situations when:

    (i) involving the patient's parent/guardian is necessary to avert life- or health- threatening harm to the patient;

    (ii) involving the patient's parent/guardian is necessary to avert serious harm to others;

    (iii) the threat to the patient's health is significant and the physician has no reason to believe that parental involvement will be detrimental to the patient's well- being.

(b) Explore the minor patient's reasons for not involving his or her parents (or guardian) and try to correct misconceptions that may be motivating the patient's reluctance to involve parents.

(c) Encourage the minor patient to involve his or her parents and offer to facilitate conversation between the patient and the parents.

(d) Inform the patient that despite the physician's respect for confidentiality the minor patient's parents/guardians may learn about the request for treatment or testing through other means (e.g., insurance statements).

(e) Protect the confidentiality of information disclosed by the patient during an exam or interview or in counseling unless the patient consents to disclosure or disclosure is required to protect the interests of others, in keeping with ethical and legal guidelines.

(f) Take steps to facilitate a minor patient's decision about health care services when the patient remains unwilling to involve parents or guardians, so long as the patient has appropriate decision-making capacity in the specific circumstances and the physician believes the decision is in the patient's best interest. Physicians should be aware that states provide mechanisms for unemancipated minors to receive care without parental involvement under conditions that vary from state to state.

(g) Consult experts when the patient's decision-making capacity is uncertain.

NIFLA 01775

(h) Inform or refer the patient to alternative confidential services when available if the physician is unwilling to provide services without parental involvement.

*AMA Principles of Medical Ethics: IV*

### 2.2.3 Mandatory Parental Consent to Abortion

In many jurisdictions, unemancipated minors are not permitted to request or receive abortion services without their parents' knowledge and consent. Physicians should ascertain the law in their state on parental involvement to ensure that their practices are consistent with their legal obligations. In many places, the issue of confidentiality for minors who seek an abortion implicates competing ethical concerns apart from the abortion issue itself.

When an unemancipated minor requests abortion services, physicians should:

(a) Strongly encourage the patient to discuss the pregnancy with her parents (or guardian).

(b) Explore the minor patient's reasons for not involving her parents (or guardian) and try to correct misconceptions that may be motivating the patient's reluctance to involve parents. If the patient is unwilling to involve her parents, encourage her to seek the advice and counsel of adults in whom she has confidence, including professional counselors, relatives, friends, teachers, or the clergy.

(c) Explain to the minor patient under what circumstances the minor's confidentiality will be abrogated, including:

(i) life-threatening emergency; or

(ii) when parental notification is required by applicable law.

(d) Try to ensure that the minor patient carefully considers the issues involved and makes an informed decision.

(e) Not feel or be compelled to require a minor patient to involve her parents before she decides whether to undergo an abortion.

*AMA Principles of Medical Ethics: III,IV*

### 2.2.4 Treatment Decisions for Seriously Ill Newborns

Making treatment decisions for seriously ill newborns is emotionally and ethically challenging for both parents and health care professionals. Decisions must take into account the newborn's medical needs; the interests, needs, and resources of the family; and available treatment options. Decision makers must also assess whether the choice made for the newborn will abrogate a choice the future individual would want to make for him- or herself, i.e., whether the choice will undermine the child's right to an "open future." Providing information and other resources to support parents or guardians when they must make decisions about their child's care and future is a key responsibility for physicians and other health care professionals.

Decisions not to initiate care or to discontinue an intervention can be emotionally wrenching in any circumstance, but may be particularly so for a seriously ill newborn. Physicians are in a position to help

parents, families, and fellow professionals understand that there is no ethical difference between withholding and withdrawing treatment—when an intervention no longer helps to achieve the goals of care or promote the quality of life desired for the patient, it is ethically appropriate to withdraw it.

To help parents formulate goals for their newborn's care and make decisions about life-sustaining treatment on their child's behalf, physicians should:

(a)  Inform the parents about available therapeutic options, the nature of available interventions, and their child's expected prognosis with and without treatment.

(b)  Help the parents formulate goals for care that will promote their child's best interests in light of:

   (i)  the chance that the intervention will achieve the intended clinical benefit;

   (ii)  the risks involved with treatment and nontreatment;

   (iii)  the degree to which treatment can be expected to extend life;

   (iv)  the pain and discomfort associated with the intervention; and

   (v)  the quality of life the child can be expected to have with and without treatment.

(c)  Discuss the option of initiating an intervention with the intention of evaluating its clinical effectiveness after a given amount of time to determine whether the intervention has led to improvement. Confirm that if the intervention has not achieved agreed-on goals, it may be withdrawn. Physicians should recognize, and help parents appreciate, that it is not necessary to have prognostic certainty to withdraw life-sustaining treatment, since prognostic certainty is often unattainable and may unnecessarily prolong the infant's suffering.

(d)  Initiate life-sustaining and life-enhancing treatment when the child's prognosis is largely uncertain.

(e)  Adhere to good clinical practice for palliative care when life-sustaining treatment is withheld or withdrawn.

(f)  Provide access to counseling services or other resources to facilitate decision making and to enable parents opportunity to talk with others who have had to make similar decisions.

(g)  Seek consultation through an ethics committee or other institutional resource when disagreement about the appropriate course of action persists.

*AMA Principles of Medical Ethics: I,III,IV,V*

---

### 2.2.5 Genetic Testing of Children

In genetics, the ability to diagnose disease or identify predisposition to disease often precedes the ability to prevent, treat, or ameliorate the condition in question. Genetic diagnosis can carry both benefits and risks for the patient, as well as implications for others to whom the patient is biologically related. Thus, decisions to carry out genetic testing can be challenging for any patient.

Genetic testing of children implicates important concerns about the minor patient's present and future autonomy and best interests. Decisions to test must balance multiple considerations, including likely benefits, the risks of knowing genetic status (including abrogating the child's opportunity to make the

NIFLA 01777

choice about knowing genetic status him- or herself as an adult), features unique to the condition(s) being tested for (such as age of onset), and the availability of effective preventive, therapeutic, or palliative interventions.

With respect to genetic testing of a minor patient, including genetic testing of children being considered for adoption, physicians should:

(a)  Offer diagnostic testing when the child is at risk for a condition for which effective measures to prevent, treat, or ameliorate it are available. As for any medical intervention, the physician should seek the informed consent of the minor patient's parents (or guardian) and engage the patient in decision making at a developmentally appropriate level, in keeping with ethics guidance.

(b)  In general, respect the decision of the patient's parents/guardian about testing when the child is at risk for a condition with pediatric onset for which no effective measures to prevent, treat, or ameliorate the condition are available.

(c)  Attempt to persuade reluctant parents/guardians to consent to testing when there are effective measures to prevent, treat, or ameliorate the condition and, in the physician's judgment, delaying testing would result in irreversible harm to the child.

(d)  Regardless of the source of the testing, help the patient /parent/guardian access appropriate counseling.

(e)  Refrain from offering, providing, or recommending a genetic test:

   (i)  when parents/guardians request testing for a child who is at risk for a condition with adult onset for which no effective measures to prevent, treat, or ameliorate the condition are available. Physicians should inform the parents/guardian about the test and why it is not recommended. When a minor patient seeks genetic testing for such a condition, physicians should condition testing on the patient's developmental status and ability to understand the implications of testing, in keeping with ethics guidance on decisions for minor patients;

   (ii)  when parents/guardians request testing to determine the child's carrier status for a recessive genetic condition and there are no other health implications for the child. Physicians may provide testing when reproductive decisions need to be made on behalf of or by a minor patient, in keeping with ethics guidance;

   (iii)  for the benefit of a family member, unless testing will prevent substantial harm to the individual;

   (iv)  when testing will not serve the child's health interests.

(f)  Seek consultation from an ethics committee or other institutional resource when disagreements about genetic testing persist. If parents unreasonably request or refuse testing of their child, the physician should take steps to change or, if necessary, use legal means to override the parents' choice.

(g)  Encourage parents to share genetic information with the child in a manner appropriate to the child's stage of development.

(h)  Ensure that parents/guardians are aware of findings that are not immediately relevant but will need to be shared later so that the information can be conveyed to the child when it becomes relevant.

*AMA Principles of Medical Ethics: IV*

NIFLA 01778

### 2.3.1 Electronic Communication with Patients

Electronic communication, such as email or text messaging, can be a useful tool in the practice of medicine and can facilitate communication within a patient-physician relationship. However, these channels can raise special concerns about privacy and confidentiality, particularly when sensitive information is to be communicated. When physicians engage in electronic communication they hold the same ethical responsibilities to patients as they do during other clinical encounters. Any method of communication, virtual, telephonic, or in person, should be appropriate to the patient's clinical need and to the information being conveyed.

Email correspondence should not be used to establish a patient-physician relationship. Rather email should supplement other, more personal encounters.

Physicians who choose to communicate electronically with patients should:

(a) Uphold professional standards of confidentiality and protection of privacy, security, and integrity of patient information.

(b) Notify the patient of the inherent limitations of electronic communication, including possible breach of privacy or confidentiality, difficulty in validating the identity of the parties, and possible delays in response. Such disclaimers do not absolve physicians of responsibility to protect the patient's interests. Patients should have the opportunity to accept or decline electronic communication before privileged information is transmitted. The patient's decision to accept or decline email communication containing privileged information should be documented in the medical record.

(c) Advise the patient of the limitations of these channels when a patient initiates electronic communication.

(d) Obtain the patient's consent to continue electronic communication when a patient initiates electronic communication.

(e) Present medical information in a manner that meets professional standards. Diagnostic or therapeutic services must conform to accepted clinical standards.

(f) Be aware of relevant laws that determine when a patient-physician relationship has been established.

*AMA Principles of Medical Ethics: I,IV,VI,VII*

### 2.3.2 Professionalism in the Use of Social Media

The Internet has created the ability for medical students and physicians to communicate and share information quickly and to reach millions of people easily. Participating in social networking and other similar Internet opportunities can support physicians' personal expression, enable individual physicians to have a professional presence online, foster collegiality and camaraderie within the profession, and provide opportunity to widely disseminate public health messages and other health communications. Social networks, blogs, and other forms of communication online also create new challenges to the patient-physician relationship.

Physicians and trainees have an ethical responsibility to weigh a number of considerations when maintaining a presence online:

NIFLA 01779

(a) They should be cognizant of standards of patient privacy and confidentiality that must be maintained in all environments, including online, and must refrain from posting identifiable patient information online.

(b) When using social media for educational purposes or to exchange information professionally with other physicians, follow ethics guidance regarding confidentiality, privacy and informed consent.

(c) When using the Internet for social networking, they should use privacy settings to safeguard personal information and content to the extent possible but should realize that privacy settings are not absolute and that once on the Internet, content is likely there permanently. Thus, physicians should routinely monitor their own Internet presence to ensure that the personal and professional information on their own sites and, to the extent possible, content posted about them by others, is accurate and appropriate.

(d) If they interact with patients on the Internet, they must maintain appropriate boundaries of the patient-physician relationship in accordance with professional ethics guidance, just as they would in any other context.

(e) To maintain appropriate professional boundaries, they should consider separating personal and professional content online.

(f) When they see content posted by colleagues that appears unprofessional they have a responsibility to bring that content to the attention of the individual, so that he or she can remove it and/or take other appropriate actions. If the behavior significantly violates professional norms and the individual does not take appropriate action to resolve the situation, the physician should report the matter to appropriate authorities.

(g) They must recognize that actions online and content posted may negatively affect their reputations among patients and colleagues, may have consequences for their medical careers (particularly for physicians-in-training and medical students), and can undermine public trust in the medical profession.

*AMA Principles of Medical Ethics: I,II,IV*

---

### 2.3.3 Informing Families of a Patient's Death

Informing a patient's family that the patient has died is a duty that is fundamental to the patient-physician relationship. When communicating this event, physicians should give foremost attention to the family's emotional needs and the integrity of the patient-physician relationship.

The following guidelines apply to communicating news of a patient's death:

(a) Any physician informing a patient's family about the patient's death has a responsibility to:

   (i) communicate this information compassionately;

   (ii) disclose the death in a timely manner.

(b) Ordinarily, the treating physician should take responsibility for informing the family. However, it may be appropriate to delegate the task of informing the family to another physician if the other

physician has a previous close personal relationship with the patient or family and the appropriate skill.

(c) Medical students should not be asked to inform family members of a patient's death. Medical students should be trained in communication skills relating to death and dying, and should be encouraged to accompany attending physicians when news of a patient's death is conveyed to family members.

*AMA Principles of Medical Ethics: I,IV*

---

### 2.3.4 Political Communications

Physicians enjoy the rights and privileges of free speech shared by all Americans. It is laudable for physicians to run for political office; to lobby for political positions, parties, or candidates; and in every other way to exercise the full scope of their political rights as citizens. Physicians may exercise these rights individually or through involvement with professional societies and political action committees or other organizations.

When physicians wish to express their personal political views to a patient or a patient's family, the physician must be sensitive to the imbalance of power in the patient- physician relationship, as well as to the patient's vulnerability and desire for privacy. Physicians should refrain from initiating political conversations during the clinical encounter.

Physicians must not allow differences with the patient or family about political matters to interfere with the delivery of professional care.

When expressing political views to a patient or a patient's family, physicians should:

(a) Judge both the intrusiveness of the discussion and the patient's level of comfort before initiating such a discussion.

(b) Discuss political matters only in contexts where conversation with the patient or family about social, civic, or recreational matters is acceptable.

(c) Refrain from conversation about political matters when the patient or family is emotionally pressured by significant medical circumstances.

(d) Work towards and advocate for the reform and proper administration of laws related to health care. Physicians should stay well informed of current political questions regarding needed and proposed reforms.

(e) Stay well informed about needed or proposed policies concerning health care access and quality, medical research, and promoting public health so as to be able to advocate for patients' needs.

*AMA Principles of Medical Ethics: I,VII*

### 2.3.5 Soliciting Charitable Contributions from Patients

Charitable contributions play an important role in supporting and improving a community's health, and physicians are encouraged to participate in fundraising and other solicitation activities.

To sustain the trust that is the foundation of the patient-physician relationship and to reassure patients that their welfare is the physician's primary priority, physicians who participate in fundraising should:

(a)  Assure patients that they need not contribute in order to continue receiving quality care.

(b)  Refrain from directly soliciting contributions from their own patients, especially during clinical encounters.

(c)  Solicit contributions by making information available, for example, in their office reception areas or by speaking at fundraising events.

(d)  Protect patient privacy and confidentiality by not acknowledging that a patient is under the physician's care when approached by fundraising personnel without the prior consent of the patient.

(e)  Obtain permission from the patient before releasing information for purposes of fundraising when the nature of the physician's practice could make it possible to identify the medical services provided or the patient's diagnosis.

(f)  Refer patients or families who wish to make charitable contributions to appropriate information or fundraising personnel.

(g)  Be sensitive to the likelihood that they may be perceived to be acting in their professional role when participating in fundraising activities as a member of the general community.

*AMA Principles of Medical Ethics: IV,VII,VIII*

### 2.3.6 Surgical Co-Management

Surgical co-management refers to the practice of allotting specific responsibilities of patient care to designated clinicians. Such arrangements should be made only to ensure the highest quality of care.

When engaging in this practice, physicians should:

(a)  Allocate responsibilities among physicians and other clinicians according to each individual's expertise and qualifications.

(b)  Work with the patient and family to designate one physician to be responsible for ensuring that care is delivered in a coordinated and appropriate manner.

(c)  Participate in the provision of care by communicating with the coordinating physician and encouraging other members of the care team to do the same.

(d)  Obtain patient consent for the surgical co-management arrangement of care, including disclosing significant aspects of the arrangement such as qualifications of clinicians, services each clinician will provide, and billing arrangement.

(e) Obtain informed consent for medical services in keeping with ethics guidance, including provision of all relevant medical facts.

(f) Employ appropriate safeguards to protect patient confidentiality.

(g) Ensure that surgical co-management arrangements are in keeping with ethical and legal restrictions.

(h) Engage another caregiver based on that caregiver's skill and ability to meet the patient's needs, not in the expectation of reciprocal referrals or other self-serving reasons, in keeping with ethics guidance on consultation and referrals.

(i) Refrain from participating in unethical or illegal financial agreements, such as fee-splitting.

*AMA Principles of Medical Ethics: I,II,IV,V,VI*