# Exhibit 17

Defendant Trial Exhibit 72
ACOG Committee Opinion No. 385 (Nov. 2007)

# ACOG COMMITTEE OPINION

Number 385 • November 2007

## The Limits of Conscientious Refusal in Reproductive Medicine

**Committee on Ethics**

*Reaffirmed 2016*

**ABSTRACT:** Health care providers occasionally may find that providing indicated, even standard, care would present for them a personal moral problem—a conflict of conscience—particularly in the field of reproductive medicine. Although respect for conscience is important, conscientious refusals should be limited if they constitute an imposition of religious or moral beliefs on patients, negatively affect a patient's health, are based on scientific misinformation, or create or reinforce racial or socioeconomic inequalities. Conscientious refusals that conflict with patient well-being should be accommodated only if the primary duty to the patient can be fulfilled. All health care providers must provide accurate and unbiased information so that patients can make informed decisions. Where conscience implores physicians to deviate from standard practices, they must provide potential patients with accurate and prior notice of their personal moral commitments. Physicians and other health care providers have the duty to refer patients in a timely manner to other providers if they do not feel that they can in conscience provide the standard reproductive services that patients request. In resource-poor areas, access to safe and legal reproductive services should be maintained. Providers with moral or religious objections should either practice in proximity to individuals who do not share their views or ensure that referral processes are in place. In an emergency in which referral is not possible or might negatively have an impact on a patient's physical or mental health, providers have an obligation to provide medically indicated and requested care.



**The American College of Obstetricians and Gynecologists**
*Women's Health Care Physicians*

Physicians and other providers may not always agree with the decisions patients make about their own health and health care. Such differences are expected—and, indeed, underlie the American model of informed consent and respect for patient autonomy. Occasionally, however, providers anticipate that providing indicated, even standard, care would present for them a personal moral problem—a conflict of conscience. In such cases, some providers claim a right to refuse to provide certain services, refuse to refer patients to another provider for these services, or even decline to inform patients of their existing options (1).

Conscientious refusals have been particularly widespread in the arena of reproductive medicine, in which there are deep divisions regarding the moral acceptability of pregnancy termination and contraception. In Texas, for example, a pharmacist rejected a rape victim's prescription for emergency contraception, arguing that dispensing the medication was a "violation of morals" (2). In Virginia, a 42-year-old mother of two was refused a prescription for emergency contraception, became pregnant, and ultimately underwent an abortion she tried to prevent by requesting emergency contraception (3). In California, a physician refused to perform intrauterine insemination for a lesbian couple, prompted by religious beliefs and disapproval of lesbians having children (4). In Nebraska, a 19-year-old woman with a life-threatening pulmonary embolism at 10 weeks of gestation was refused a first-trimester pregnancy termination when admitted to a religiously affiliated hospital and was ultimately transferred by ambulance to another facility to undergo the procedure (5). At the heart of each of these examples of refusal is a claim of conscience—a claim that to provide certain services would compromise the moral integrity of a provider or institution.

DEFENDANT'S EXHIBIT 72

In this opinion, the American College of Obstetricians and Gynecologists (ACOG) Committee on Ethics considers the issues raised by conscientious refusals in reproductive medicine and outlines a framework for defining the ethically appropriate limits of conscientious refusal in reproductive health contexts. The committee begins by offering a definition of conscience and describing what might constitute an authentic claim of conscience. Next, it discusses the limits of conscientious refusals, describing how claims of conscience should be weighed in the context of other values critical to the ethical provision of health care. It then outlines options for public policy regarding conscientious refusals in reproductive medicine. Finally, the committee proposes a series of recommendations that maximize accommodation of an individual's religious or moral beliefs while avoiding imposition of these beliefs on others or interfering with the safe, timely, and financially feasible access to reproductive health care that all women deserve.

## Defining Conscience

In this effort to reconcile the sometimes competing demands of religious or moral freedom and reproductive rights, it is important to characterize what is meant by conscience. *Conscience* has been defined as the private, constant, ethically attuned part of the human character. It operates as an internal sanction that comes into play through critical reflection about a certain action or inaction (6). An appeal to conscience would express a sentiment such as "If I were to do 'x,' I could not live with myself/I would hate myself/I wouldn't be able to sleep at night." According to this definition, not to act in accordance with one's conscience is to betray oneself—to risk personal wholeness or identity. Thus, what is taken seriously and is the specific focus of this document is not simply a broad claim to provider autonomy (7), but rather the particular claim to a provider's right to protect his or her *moral integrity*—to uphold the "soundness, reliability, wholeness and integration of [one's] moral character" (8).

Personal conscience, so conceived, is not merely a source of potential conflict. Rather, it has a critical and useful place in the practice of medicine. In many cases, it can foster thoughtful, effective, and humane care. Ethical decision making in medicine often touches on individuals' deepest identity-conferring beliefs about the nature and meaning of creating and sustaining life (9). Yet, conscience also may conflict with professional and ethical standards and result in inefficiency, adverse outcomes, violation of patients' rights, and erosion of trust if, for example, one's conscience limits the information or care provided to a patient. Finding a balance between respect for conscience and other important values is critical to the ethical practice of medicine.

In some circumstances, respect for conscience must be weighed against respect for particular social values. Challenges to a health care professional's integrity may occur when a practitioner feels that actions required by an external authority violate the goals of medicine and his or her fiduciary obligations to the patient. Established clinical norms may come into conflict with guidelines imposed by law, regulation, or public policy. For example, policies that mandate physician reporting of undocumented patients to immigration authorities conflict with norms such as privacy and confidentiality and the primary principle of nonmaleficence that govern the provider–patient relationship (10). Such challenges to integrity can result in considerable moral distress for providers and are best met through organized advocacy on the part of professional organizations (11, 12). When threats to patient well-being and the health care professional's integrity are at issue, some individual providers find a conscience-based refusal to comply with policies and acceptance of any associated professional and personal consequences to be the only morally tenable course of action (10).

Claims of conscience are not always genuine. They may mask distaste for certain procedures, discriminatory attitudes, or other self-interested motives (13). Providers who decide not to perform abortions primarily because they find the procedure unpleasant or because they fear criticism from those in society who advocate against it do not have a genuine claim of conscience. Nor do providers who refuse to provide care for individuals because of fear of disease transmission to themselves or other patients. Positions that are merely self-protective do not constitute the basis for a genuine claim of conscience. Furthermore, the logic of conscience, as a form of self-reflection on and judgment about whether one's own acts are obligatory or prohibited, means that it would be odd or absurd to say "I would have a guilty conscience if she did 'x.'" Although some have raised concerns about complicity in the context of referral to another provider for requested medical care, the logic of conscience entails that to act in accordance with conscience, the provider need not rebuke other providers or obstruct them from performing an act (8). Finally, referral to another provider need not be conceptualized as a repudiation or compromise of one's own values, but instead can be seen as an acknowledgment of both the widespread and thoughtful disagreement among physicians and society at large and the moral sincerity of others with whom one disagrees (14).

The authenticity of conscience can be assessed through inquiry into 1) the extent to which the underlying values asserted constitute a core component of a provider's identity, 2) the depth of the provider's reflection on the issue at hand, and 3) the likelihood that the provider will experience guilt, shame, or loss of self-respect by performing the act in question (9). It is the genuine claim of conscience that is considered next, in the context of the values that guide ethical health care.

## Defining Limits for Conscientious Refusal

Even when appeals to conscience are genuine, when a provider's moral integrity is truly at stake, there are clear-

IDFPR009517

ly limits to the degree to which appeals to conscience may justifiably guide decision making. Although respect for conscience is a value, it is only a prima facie value, which means it can and should be overridden in the interest of other moral obligations that outweigh it in a given circumstance. Professional ethics requires that health be delivered in a way that is respectful of patient autonomy, timely and effective, evidence based, and nondiscriminatory. By virtue of entering the profession of medicine, physicians accept a set of moral values—and duties—that are central to medical practice (15). Thus, with professional privileges come professional responsibilities to patients, which must precede a provider's personal interests (16). When conscientious refusals conflict with moral obligations that are central to the ethical practice of medicine, ethical care requires either that the physician provide care despite reservations or that there be resources in place to allow the patient to gain access to care in the presence of conscientious refusal. In the following sections, four criteria are highlighted as important in determining appropriate limits for conscientious refusal in reproductive health contexts.

### 1. Potential for Imposition

The first important consideration in defining limits for conscientious refusal is the degree to which a refusal constitutes an imposition on patients who do not share the objector's beliefs. One of the guiding principles in the practice of medicine is respect for patient autonomy, a principle that holds that persons should be free to choose and act without controlling constraints imposed by others. To respect a patient's autonomy is to respect her capacities and perspectives, including her right to hold certain views, make certain choices, and take certain actions based on personal values and beliefs (17). Respect involves acknowledging decision-making rights and acting in a way that enables patients to make choices for themselves. Respect for autonomy has particular importance in reproductive decision making, which involves private, personal, often pivotal decisions about sexuality and childbearing.

It is not uncommon for conscientious refusals to result in imposition of religious or moral beliefs on a patient who may not share these beliefs, which may undermine respect for patient autonomy. Women's informed requests for contraception or sterilization, for example, are an important expression of autonomous choice regarding reproductive decision making. Refusals to dispense contraception may constitute a failure to respect women's capacity to decide for themselves whether and under what circumstances to become pregnant.

Similar issues arise when patients are unable to obtain medication that has been prescribed by a physician. Although pharmacist conduct is beyond the scope of this document, refusals by other professionals can have an important impact on a physician's efforts to provide appropriate reproductive health care. Providing complete, scientifically accurate information about options for reproductive health, including contraception, sterilization, and abortion, is fundamental to respect for patient autonomy and forms the basis of informed decision making in reproductive medicine. Providers refusing to provide such information on the grounds of moral or religious objection fail in their fundamental duty to enable patients to make decisions for themselves. When the potential for imposition and breach of autonomy is high due either to controlling constraints on medication or procedures or to the provider's withholding of information critical to reproductive decision making, conscientious refusal cannot be justified.

### 2. Effect on Patient Health

A second important consideration in evaluating conscientious refusal is the impact such a refusal might have on well-being as the patient perceives it—in particular, the potential for harm. For the purpose of this discussion, harm refers to significant bodily harm, such as pain, disability, or death or a patient's conception of well-being. Those who choose the profession of medicine (like those who choose the profession of law or who are trustees) are bound by special *fiduciary duties*, which oblige physicians to act in good faith to protect patients' health—particularly to the extent that patients' health interests conflict with physicians' personal or self-interest (16). Although conscientious refusals stem in part from the commitment to "first, do no harm," their result can be just the opposite. For example, religiously based refusals to perform tubal sterilization at the time of cesarean delivery can place a woman in harm's way—either by putting her at risk for an undesired or unsafe pregnancy or by necessitating an additional, separate sterilization procedure with its attendant and additional risks.

Some experts have argued that in the context of pregnancy, a moral obligation to promote fetal well-being also should justifiably guide care. But even though views about the moral status of the fetus and the obligations that status confers differ widely, support of such moral pluralism does not justify an erosion of clinicians' basic obligations to protect the safety of women who are, primarily and unarguably, their patients. Indeed, in the vast majority of cases, the interests of the pregnant woman and fetus converge. For situations in which their interests diverge, the pregnant woman's autonomous decisions should be respected (18). Furthermore, in situations "in which maternal competence for medical decision making is impaired, health care providers should act in the best interests of the woman first and her fetus second" (19).

### 3. Scientific Integrity

The third criterion for evaluating authentic conscientious refusal is the scientific integrity of the facts supporting the objector's claim. Core to the practice of medicine is a commitment to science and evidence-based practice.

IDFPR009518

Patients rightly expect care guided by best evidence as well as information based on rigorous science. When conscientious refusals reflect a misunderstanding or mistrust of science, limits to conscientious refusal should be defined, in part, by the strength or weakness of the science on which refusals are based. In other words, claims of conscientious refusal should be considered invalid when the rationale for a refusal contradicts the body of scientific evidence.

The broad debate about refusals to dispense emergency contraception, for example, has been complicated by misinformation and a prevalent belief that emergency contraception acts primarily by preventing implantation (20). However, a large body of published evidence supports a different primary mechanism of action, namely the prevention of fertilization. A review of the literature indicates that Plan B can interfere with sperm migration and that preovulatory use of Plan B suppresses the luteinizing hormone surge, which prevents ovulation or leads to the release of ova that are resistant to fertilization. Studies do not support a major postfertilization mechanism of action (21). Although even a slight possibility of postfertilization events may be relevant to some women's decisions about whether to use contraception, provider refusals to dispense emergency contraception based on unsupported beliefs about its primary mechanism of action should not be justified.

In the context of the morally difficult and highly contentious debate about pregnancy termination, scientific integrity is one of several important considerations. For example, some have argued against providing access to abortion based on claims that induced abortion is associated with an increase in breast cancer risk; however, a 2003 U.S. National Cancer Institute panel concluded that there is well-established epidemiologic evidence that induced abortion and breast cancer are not associated (22). Refusals to provide abortion should not be justified on the basis of unsubstantiated health risks to women.

Scientific integrity is particularly important at the level of public policy, where unsound appeals to science may have masked an agenda based on religious beliefs. Delays in granting over-the-counter status for emergency contraception are one such example. Critics of the U.S. Food and Drug Administration's delay cited deep flaws in the science and evidence used to justify the delay, flaws these critics argued were indicative of unspoken and misplaced value judgments (23). Thus, the scientific integrity of a claim of refusal is an important metric in determining the acceptability of conscience-based practices or policies.

### 4. Potential for Discrimination

Finally, conscientious refusals should be evaluated on the basis of their potential for discrimination. Justice is a complex and important concept that requires medical professionals and policy makers to treat individuals fairly and to provide medical services in a nondiscriminatory manner. One conception of justice, sometimes referred to as the *distributive paradigm*, calls for fair allocation of society's benefits and burdens. Persons intending conscientious refusal should consider the degree to which they create or reinforce an unfair distribution of the benefits of reproductive technology. For instance, refusal to dispense contraception may place a disproportionate burden on disenfranchised women in resource-poor areas. Whereas a single, affluent professional might experience such a refusal as inconvenient and seek out another physician, a young mother of three depending on public transportation might find such a refusal to be an insurmountable barrier to medication because other options are not realistically available to her. She thus may experience loss of control of her reproductive fate and quality of life for herself and her children. Refusals that unduly burden the most vulnerable of society violate the core commitment to justice in the distribution of health resources.

Another conception of justice is concerned with matters of oppression as well as distribution (24). Thus, the impact of conscientious refusals on oppression of certain groups of people should guide limits for claims of conscience as well. Consider, for instance, refusals to provide infertility services to same-sex couples. It is likely that such couples would be able to obtain infertility services from another provider and would not have their health jeopardized, per se. Nevertheless, allowing physicians to discriminate on the basis of sexual orientation would constitute a deeper insult, namely reinforcing the scientifically unfounded idea that fitness to parent is based on sexual orientation, and, thus, reinforcing the oppressed status of same-sex couples. The concept of oppression raises the implications of all conscientious refusals for gender justice in general. Legitimizing refusals in reproductive contexts may reinforce the tendency to value women primarily with regard to their capacity for reproduction while ignoring their interests and rights as people more generally. As the place of conscience in reproductive medicine is considered, the impact of permissive policies toward conscientious refusals on the status of women must be considered seriously as well.

Some might say that it is not the job of a physician to "fix" social inequities. However, it is the responsibility, whenever possible, of physicians as advocates for patients' needs and rights not to create or reinforce racial or socioeconomic inequalities in society. Thus, refusals that create or reinforce such inequalities should raise significant caution.

### Institutional and Organizational Responsibilities

Given these limits, individual practitioners may face difficult decisions about adherence to conscience in the context of professional responsibilities. Some have offered, however, that "accepting a collective obligation does not mean that all members of the profession are forced to violate their own consciences" (1). Rather, institutions and

professional organizations should work to create and maintain organizational structures that ensure nondiscriminatory access to all professional services and minimize the need for individual practitioners to act in opposition to their deeply held beliefs. This requires at the very least that systems be in place for counseling and referral, particularly in resource-poor areas where conscientious refusals have significant potential to limit patient choice, and that individuals and institutions "act affirmatively to protect patients from unexpected and disruptive denials of service" (13). Individuals and institutions should support staffing that does not place practitioners or facilities in situations in which the harms and thus conflicts from conscientious refusals are likely to arise. For example, those who feel it improper to prescribe emergency contraception should not staff sites, such as emergency rooms, in which such requests are likely to arise, and prompt disposition of emergency contraception is required and often integral to professional practice. Similarly, institutions that uphold doctrinal objections should not position themselves as primary providers of emergency care for victims of sexual assault; when such patients do present for care, they should be given prophylaxis. Institutions should work toward structures that reduce the impact on patients of professionals' refusals to provide standard reproductive services.

## Recommendations

Respect for conscience is one of many values important to the ethical practice of reproductive medicine. Given this framework for analysis, the ACOG Committee on Ethics proposes the following recommendations, which it believes maximize respect for health care professionals' consciences without compromising the health and well-being of the women they serve.

1. In the provision of reproductive services, the patient's well-being must be paramount. Any conscientious refusal that conflicts with a patient's well-being should be accommodated only if the primary duty to the patient can be fulfilled.
2. Health care providers must impart accurate and unbiased information so that patients can make informed decisions about their health care. They must disclose scientifically accurate and professionally accepted characterizations of reproductive health services.
3. Where conscience implores physicians to deviate from standard practices, including abortion, sterilization, and provision of contraceptives, they must provide potential patients with accurate and prior notice of their personal moral commitments. In the process of providing prior notice, physicians should not use their professional authority to argue or advocate these positions.
4. Physicians and other health care professionals have the duty to refer patients in a timely manner to other providers if they do not feel that they can in conscience provide the standard reproductive services that their patients request.
5. In an emergency in which referral is not possible or might negatively affect a patient's physical or mental health, providers have an obligation to provide medically indicated and requested care regardless of the provider's personal moral objections.
6. In resource-poor areas, access to safe and legal reproductive services should be maintained. Conscientious refusals that undermine access should raise significant caution. Providers with moral or religious objections should either practice in proximity to individuals who do not share their views or ensure that referral processes are in place so that patients have access to the service that the physician does not wish to provide. Rights to withdraw from caring for an individual should not be a pretext for interfering with patients' rights to health care services.
7. Lawmakers should advance policies that balance protection of providers' consciences with the critical goal of ensuring timely, effective, evidence-based, and safe access to all women seeking reproductive services.

## References

1. Charo RA. The celestial fire of conscience—refusing to deliver medical care. N Engl J Med 2005;352:2471–3.
2. Denial of rape victim's pills raises debate: moral, legal questions surround emergency contraception. New York (NY): Associated Press; 2004. Available at: http://www.msnbc.msn.com/id/4359430. Retrieved July 10, 2007.
3. L D. What happens when there is no plan B? Washington Post; June 4, 2006. p. B1. Available at: http://www.washingtonpost.com/wp-dyn/content/article/2006/06/02/AR2006060201405.html. Retrieved July 10, 2007.
4. Weil E. Breeder reaction: does everyone now have a right to bear children? Mother Jones 2006;31(4):33–7. Available at: http://www.motherjones.com/news/feature/2006/07/breeder_reaction.html. Retrieved July 10, 2007.
5. American Civil Liberties Union. Religious refusals and reproductive rights: ACLU Reproductive Freedom Project. New York (NY): ACLU; 2002. Available at: http://www.aclu.org/FilesPDFs/ACF911.pdf. Retrieved July 10, 2007.
6. Childress JF. Appeals to conscience. Ethics 1979;89:315–35.
7. Wicclair MR. Conscientious objection in medicine. Bioethics 2000;14:205–27.
8. Beauchamp TL, Childress JF. Principles of biomedical ethics. 5th ed. New York (NY): Oxford University Press; 2001.
9. Benjamin M. Conscience. In: Reich WT, editor. Encyclopedia of bioethics. New York (NY): Simon & Schuster Macmillan; 1995. p. 469–73.
10. Ziv TA, Lo B. Denial of care to illegal immigrants. Proposition 187 in California. N Engl J Med 1995;332:1095–8.
11. American College of Obstetricians and Gynecologists. Code of professional ethics of the American College of Obste-

IDFPR009520

tricians and Gynecologists. Washington, DC: ACOG; 2004. Available at: http://www.acog.org/from_home/acogcode.pdf. Retrieved July 10, 2007.

12. American Medical Association. Principles of medical ethics. In: Code of medical ethics of the American Medical Association: current opinions with annotations. 2006–2007 ed. Chicago (IL): AMA; 2006. p. xv.
13. Dresser R. Professionals, conformity, and conscience. Hastings Cent Rep 2005;35:9–10.
14. Blustein J. Doing what the patient orders: maintaining integrity in the doctor-patient relationship. Bioethics 1993;7:290–314.
15. Brody H, Miller FG. The internal morality of medicine: explication and application to managed care. J Med Philos 1998;23:384–410.
16. Dickens BM, Cook RJ. Conflict of interest: legal and ethical aspects. Int J Gynaecol Obstet 2006;92:192–7.
17. Faden RR, Beauchamp TL. A history and theory of informed consent. New York (NY): Oxford University Press; 1986.
18. Maternal decision making, ethics, and the law. ACOG Committee Opinion No. 321. American College of Obstetricians and Gynecologists. Obstet Gynecol 2005;106: 1127–37.
19. International Federation of Gynecology and Obstetrics. Ethical guidelines regarding interventions for fetal well being. In: Ethical issues in obstetrics and gynecology. London (UK): FIGO; 2006. p. 56–7. Available at: http://www.figo.org/docs/Ethics%20Guidelines.pdf. Retrieved July 10, 2007.
20. Cantor J, Baum K. The limits of conscientious objection—may pharmacists refuse to fill prescriptions for emergency contraception? N Engl J Med 2004;351:2008–12.
21. Davidoff F, Trussell J. Plan B and the politics of doubt. JAMA 2006;296:1775–8.
22. Induced abortion and breast cancer risk. ACOG Committee Opinion No. 285. American College of Obstetricians and Gynecologists. Obstet Gynecol 2003;102:433–5.
23. Grimes DA. Emergency contraception: politics trumps science at the U.S. Food and Drug Administration. Obstet Gynecol 2004;104:220–1.
24. Young IM. Justice and the politics of difference. Princeton (NJ): Princeton University Press; 1990.

Copyright © November 2007 by the American College of Obstetricians and Gynecologists, 409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the Internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher. Requests for authorization to make photocopies should be directed to: Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400.

The limits of conscientious refusal in reproductive medicine. ACOG Committee Opinion No. 385. American College of Obstetricians and Gynecologists. Obstet Gynecol 2007;110:1203–8.

ISSN 1074-861X

IDFPR009521