# Exhibit 26

Defendant Trial Exhibit 66
Human Services Committee Hearing Transcript
re: Health Care Right of Conscience Act – Senate Bill 1564
from May 13, 2015

                                                                Page 1

1       I L L I N O I S:

2                    STATE HOUSE OF REPRESENTATIVES

3       --------------------------------x

4       AMENDMENT TO THE ILLINOIS HEALTH

                                                  :

5       CARE RIGHT OF CONSCIENCE ACT    :

6       SENATE BILL  1564               :

7       --------------------------------x

8                                        Springfield Illinois

9                                        Wednesday, May 13, 2015

10

11

12

13              HUMAN SERVICES COMMITTEE HEARING

14          The following pages constitute the proceedings

15      held in the above-captioned matter held at the Illinois

16      State House of Representatives, Illinois State Capitol,

17      301 S. 2nd St., Springfield, Illinois, when were

18      present:

19

20

21                                      DEFENDANT'S
                                        EXHIBIT

22                                         66

```
 1                  A P P E A R A N C E S

 2                REP. LITESA WALLACE, CHAIR

 3              REP. ROBYN GABEL, VICE CHAIR

 4                   REP. PETER BREEN

 5                   REP SHERI JESIEL

 6                  REP. MARY FLOWERS

 7                   REP. LAURA FINE

 8                 REP. KELLY CASSIDY

 9                   REP. TOM DEMMER

10                  REP. CYNTHIA SOTO

11                 REP. BRIAN STEWART

12                  REP. JOHN CABELLO

13               REP. JAMIE ANDRADE, JR.

14                  REP. CAROL AMMONS

15               REP. PATRICIA R. BELLOCK

16                    MINDY SWANK

17                    KATIE TOUSMA

18                 CHRIS FORMARKSIS

19                    IDA PHILLIPS

20                 LORIE CHAITEN, ACLU

21     ANNA PAPROCKI, ESQ., AMERICANS UNITED FOR LIFE

22                  GEORGE BROWER
```

```
 1              A P P E A R A N C E S - Continued

 2                       LANCE LECHNER

 3                       LINDA KOWALSKI

 4                       ROBERT HEIZE

 5           RALPH RIVERS, ILLINOIS CITIZENS FOR LIFE

 6                       HEATHER MORENO

 7                       PETER HUIZENGA

 8                       VERONICA PRICE

 9                       CHRISTINA SEIS

10                       KURT WILDER

11      DEBBIE SHULTZ, LIFETIME PREGNANCY HELP CENTER

12                    DR. MAURA QUINLAN

13

14

15

16

17

18

19

20

21

22
```

Page 4

1                    C O N T E N T S

2    PRESENTATION OF SB 1564

                                                      PAGE

3        By Vice Chair Gabel                       5

4

5    TESTIMONY ON SB 1564

6        By Ms. Chaiten, Esq.                       7

7        By Ms. Swank                              13

8        By Dr. Quilan                             16

9        By Ms. Paprocki                           37

10        By Ms. Shultz                            45

11

12

13

14

15

16

17

18

19

20

21

22

```
 1                    P R O C E E D I N G S

 2              CHAIR WALLACE:  The Chair recognizes Rep.

 3   Gabel to present Senate Bill 1564.

 4              VICE CHAIR GABEL:  Thank you very much, Madam

 5   Chair.  So there's been quite a bit of discussion

 6   about, about this bill.  This is the Health Care Right

 7   of Conscience Act that we're making a small

 8   modification to.  I would like to just state for the

 9   record that there has been a lot of misinformation

10   going on around about this bill, so I really want to be

11   perfectly clear.

12              First of all, this bill does not require

13   anyone to perform or participate in an abortion.

14   Secondly, it does not require anyone to refer for an

15   abortion.  And third, it does not require any patient

16   to listen to information about treatment options they

17   object to.

18              So the bill protects both patients and health

19   care providers when a provider asserts a religious or

20   conscientious objection to providing a health care

21   service.  An amendment in the Senate removed that

22   position from the Illinois Catholic Conference, the
```

1    Illinois Catholic Health Association, and the State

2    Medical Society.  It assures that patients will be

3    given information about their medical circumstances and

4    treatment options consistent with the medical standard

5    of care.  This is just basic medical ethics.

6            I would like now to introduce Lorie Chaiten,

7    an attorney with the American Civil Liberties Union,

8    who can talk more about the bill and answer any

9    questions.

10           CHAIR WALLACE:  I'm sorry.  One moment.  Yeah.

11   I'm going to just read in the oral witnesses 'cause we

12   have 341 proponents.  And so we've already introduced

13   Lorie.  There is Mindy Swank and Katie Tousma providing

14   oral testimony.

15           For the opponents.  For the opponents we have

16   1,928 opponents, and so I am asking to just read those

17   who will provide oral testimony and the 1,928

18   proponents, opponents are -- freezing the rep.  Here we

19   go.  Those providing oral testimony who are opposed are

20   Chris Formarksis, Ida Phillips, Anna Paprocki of

21   Americans United for Life, George Brower, Lance

22   Lechner, Linda Kowalski, Robert Heize, Michelle, Ralph

1    Rivera of Illinois Citizens for Life, Heather Moreno,

2    Peter Huizenga, Veronica Price, Christina Seis, Kurt

3    Wilder, and that will be it for oral testimony.  And

4    now I ask that we not to read 800 plus opponents.

5            Thank you, we'll proceed with testimony of the

6    proponents.

7            MS. CHAITEN:  Sorry about that.  Thank you,

8    Madam Chair and the Members of the Committee.  So the

9    Health Care Right of Conscience Act is a law that we're

10   talking about today.  Currently it says that doctors,

11   nurses, and hospitals can refuse to provide care and

12   even information to their patients if they object to

13   doing so on religious grounds.

14           That means that, for example, that if I am a

15   doctor and I have religious objections to providing my

16   patients with contraception, I don't have to do so.

17   Indeed, the current statute says that I don't even have

18   to tell them about their contraceptive options and

19   there are no repercussions.  I cannot be held

20   accountable if my patient is harmed by my refusal to

21   give them all of the information that they need in

22   order to understand their medical circumstances and to

1    make informed medical decisions.

2           This is contrary to the standard of care that

3    governs medical practice in Illinois.  If I have a back

4    problem my doctor might talk to me about surgery as one

5    of my treatment options.  But if there are options

6    short of surgery, for example, a steroid shot, the

7    standard of care would require that my doctor tell me

8    about those options as well.  They cannot simply

9    withhold information from me and be practicing medicine

10   in accordance with the standard of care.

11          Senate Bill 1564 is about making sure that

12   patients get the information they need in accordance

13   with the standard of care.  This is why the Catholic

14   Hospital Association, the Catholic Conference, the

15   State Medical Society, are no longer opposed.  They

16   understand that patients cannot be kept in the dark

17   about their medical circumstances and their treatment

18   options.  This is why we were actually able to

19   negotiate the bill that brings us here today.

20          It's important that you understand what the

21   bill does not do.  Some of the opponents may be

22   confused.  They, there are people saying things like

1   people will be forced to participate in an abortion,

2   but the bill does no such thing.  It makes clear, in

3   fact, that health care providers can refuse to

4   participate in any service they object to on religious

5   grounds.  But when they do so, their patients must

6   still be told about their legal treatment options in

7   accordance with current standards of medical care.

8           What do we mean by legal treatment options?

9   We've heard much about things like genital mutilation.

10  That is not a legal treatment option.  That is not

11  something a doctor would have to talk about with their

12  patient.

13          However, if a pregnant woman's water breaks at

14  an early point in pregnancy when the fetus is not

15  viable and she is at risk of her, her life is at risk,

16  she's at risk for life-threatening infection and

17  hemorrhage, the standard of care requires that she be

18  told about all of her treatment options, including the

19  option of ending her pregnancy to prevent infection, to

20  prevent hemorrhage, and other harm.  This is a legal

21  treatment option.

22          Opponents claim that the bill imposes a new

1    mandate in Illinois law.  They're wrong about that.

2    Illinois law already says that doctors can be sued for

3    malpractice if they fail to get informed consent from

4    their patients, if they fail to give patients

5    information about legal treatment options in accordance

6    with medical standard of care.

7         1564 simply makes clear that the same standard

8    of care applies when health care providers object to

9    providing care on religious grounds.  Their patients

10   must still get the information they need.  Their

11   patients cannot be left in the dark.

12        Opponents complain that they should not have

13   to talk about the benefits of health care they oppose.

14   But the standard of care requires that an informed

15   consent discussion between a doctor and a patient

16   include a discussion of the risks, the benefits, and

17   the alternatives of the patient's treatment options.

18   Health care providers cannot choose to withhold any of

19   that information.

20        If an individual provider does not want to

21   have that conversation with a patient, someone else in

22   their facility can step in and do so.  But the patient

1    cannot be denied important medical information.  They

2    cannot be left in the dark.

3              Opponents claim the bill violates federal law

4    and will deprive Illinois billions of dollars of

5    federal funds.  As six members of the Illinois

6    congressional delegation made clear in their letter to

7    you, these opponents are wrong.  The federal laws

8    they're talking about involve penalties for

9    discriminating against health care providers who refuse

10   to perform, participate, or refer for abortion.  They

11   do some other things as well, but that's the relevant

12   part.

13             Senate Bill 1564 is not about discrimination.

14   It is about ensuring that patients get information when

15   health care providers object to care on religious

16   grounds.  In other words, it's about accommodating

17   religious belief, not discriminating because of it.

18             Indeed, if a health care provider is

19   discriminated against, rather than accommodated under

20   the Health Care Right of Conscience Act, there's an

21   express provision that permits them to pursue a claim

22   of discrimination, a claim for damages.

1           In addition, this bill does not require any

2      health care provider to perform, participate in, or

3      refer for any health care.  Illinois is simply not at

4      risk for losing federal funds because it passes a law

5      that gives patients standard of care information and

6      protects them from harm.

7           Finally, opponents complain that crisis

8      pregnancy centers would have to talk about abortion.

9      If a crisis pregnancy center holds itself out as a

10     health care provider, the medical standard of care

11     applies.  That means that they have to accurately

12     discuss a patient's treatment options with her.  If

13     they don't and the patient suffers harm, they won't be

14     able to use the Health Care Right of Conscience Act to

15     shield themselves from liability.

16          They cannot claim to be providing all options

17     to their patients and then just withhold the

18     information they don't like.  The notion that patients

19     should be able to count on their health care providers

20     to give complete and accurate information about their

21     medical condition should not be controversial.

22          Senate Bill 1564 is a reasonable change in the

1    law that creates important protections for Illinois

2    patients.  I urge you to vote yes on this bill.  Thank

3    you.

4              CHAIR WALLACE:  Thank you very much.  I'd like

5    to note that we're winding down on time in terms of,

6    before session.  So let's make sure that testimony is

7    succinct and factual.  Thank you.

8              MS. SWANK:  Good morning.  My name is Mindy

9    Swank and I am pleased to be with you today.  A few

10   years ago, a few years ago after my first son was born,

11   my husband, Adam, and I were happily expecting our

12   second child.  Unlike my first pregnancy, this

13   pregnancy was not to be easy.

14             Weeks into my pregnancy doctors told us that

15   the baby suffered a number of severe anomalies.  At 20

16   weeks as we were coping with that news and trying to

17   understand how our lives would change, my water broke.

18   The doctors told us that the baby was not going to

19   live.  We were heartbroken, but our nightmare was just

20   beginning.

21             When we learned that my water had broken, the

22   doctors told me that waiting to miscarry could lead to

1    hemorrhage and infection.  I knew that these

2    complications could threaten not only my future

3    fertility, but also my life.  And as the mother of a

4    young son, that worried me.

5           Adam and I prayed together, talked at length,

6    and in the end decided to terminate the pregnancy.  It

7    was a difficult decision for me as someone raised in a

8    conservative and religious home, but my baby was not

9    going to live and my health was at risk.  This was the

10   best decision for my health and for my family.

11          The doctors responsible for my care couldn't

12   help me end the pregnancy and avoid these risks to my

13   health.  The reason for this is that the hospital

14   operated under religious restrictions imposed by the

15   Catholic Church.  They could not provide me the care I

16   needed to keep from getting sick.  I could only get

17   help if I was already infected or hemorrhaging.

18          Adam and I were confused and frustrated.  We

19   attempted to go to a secular hospital a few hours away

20   for help in terminating the pregnancy, but we could not

21   get the procedure covered by our insurance at that

22   hospital, and we could not afford to pay for the

1    services out of pocket.

2              We understand that the barrier to our

3    insurance covering the procedure resulted from the

4    religious hospital's failure to provide adequate

5    records showing that the procedure was medically

6    necessary.  Had the religious hospital made my health

7    information available, our insurance would have

8    provided coverage.  Without any other options, we

9    simply went home to wait.

10             A few weeks later I woke up bleeding.  Adam

11   took me to our local hospital, a hospital that also

12   follows the Catholic health care restrictions.  The

13   doctors there told me that I was not sick enough for

14   them to induce labor and help end the pregnancy.  I was

15   told to monitor my bleeding and temperature and come

16   back if I bled more or if I had a fever.

17             No one offered to help us find somewhere else

18   to go that was not limited by religious restrictions.

19   No one talked to us about options other than waiting to

20   get sick enough for them to help us.

21             Over the next five weeks I went to the same

22   hospital four different times, each time bleeding and

1    seeking care.  At 27 weeks I woke up bleeding a lot

2    more than I had been.  Desperate to prove I was sick

3    enough for them to treat me, I brought to the hospital

4    all the pads and clothing I had bled through.  The

5    doctors decided that I was sick enough to induce

6    delivery.  I gave birth to a baby boy who never gained

7    consciousness and he died within a few hours.

8            No one should ever have to go through this.  I

9    urge you to pass this bill and ensure that other

10   couples will get the information they need to make

11   informed health care decisions and to access the care

12   that they need.  Thanks.

13           CHAIR WALLACE:  Okay.  Rep. Cassidy moves that

14   Senate Bill 1564 do pass and we'd like to open the

15   roll.  Okay, Bellock will be going now.  Thank you.

16   For the record, Bellock is on the roll-list now.

17           DR. QUINLAN:  Good morning.  My name is Maura

18   Quinlan.  I am a board-certified obstetrician with a

19   master's in public health and maternal and child health

20   policy.  I am the chair of the Illinois section of the

21   American College of Obstetricians and Gynecologists,

22   commonly called ACOG, and I am testifying today in

1     support of Senate Bill 1564.

2            Senate Bill 1564's changes to Illinois law are

3     needed to protect patients and providers.  Illinois law

4     currently allows doctors, hospitals, and other health

5     care providers to not give a patient information that

6     conflicts with the provider's religious beliefs.  This

7     is contrary to doctors' basic ethical obligations to

8     deny patients the information patients need in order to

9     understand their medical condition, consider their

10    treatment options, and obtain care.  This is also

11    inconsistent with ACOG's policies which prioritize

12    patient-centered care and autonomous decision making.

13            I have seen patients have to wait for

14    necessary medical care because professionals in a

15    religiously affiliated hospital struggled with whether

16    providing the needed care conflicted with their

17    hospital's religious directives.  I have also seen

18    patients who were not told about all their treatment

19    options because of a hospital's religious directive.

20            By requiring protocols for when health care

21    providers object to providing information and care on

22    religious grounds, Senate Bill 1564 will improve

1    patient access to essential medical information and

2    will reduce confusion and delay in their accessing

3    care.

4              Patients seeking health care should not have

5    to wonder if they're receiving complete information

6    about all of their treatment options.  A patient who

7    delivers or that plans to deliver at a Catholic

8    hospital and wants or needs a tubal ligation needs to

9    be informed about the religious restrictions affecting

10   her care in time for her to ensure that she can deliver

11   at a hospital that will perform the procedure at the

12   time of the C-section or immediately after birth.

13             A patient in the process of miscarrying who

14   needs medical intervention to protect against

15   hemorrhage and infection should know about all the

16   standards of treatment options, including surgical

17   options and where she can go to get such care.

18             Women of reproductive age should be given

19   complete information about all appropriate

20   contraceptive options for avoiding unintended

21   pregnancy.  All of what I have described is the

22   standard of care within my specialty.  Senate Bill 1564

1    will assure that patients seeking care at religious

2    institutions also get this standard of care

3    information.

4          It's important, as has been mentioned, that

5    this proposal still allows my colleagues in Illinois to

6    refuse care based on religious objections, but they

7    have to do so in accordance with procedures designed to

8    protect the patient, to make sure that the patient gets

9    information about her condition and treatment options,

10   the information she's entitled to.

11         The existing law only speaks to the needs of

12   the doctor who has the religious objection.  This bill

13   will add the needs of doctors who want to give full

14   information to patients but work in religious

15   hospitals, and most importantly, the essential needs of

16   the patients.

17         Senate Bill 1564 simply brings Illinois law in

18   line with established medical ethics, medical ethics

19   that I learned at my Catholic medical school that

20   requires health care providers to take into account

21   patients' interests when the provider is asserting a

22   religious objection.  In this way, every patient can

1    act according to his or her own conscience just as

2    readily as the physician can.

3              As a physician who cares for Illinois patients

4    every day, I cannot stress enough the importance of

5    this bill.  On behalf of myself as a physician and on

6    behalf of the Illinois section of the American College

7    of OBGYN, I strongly urge this committee to support

8    Senate Bill 1564.

9              CHAIR WALLACE:  Thank you, and thank you,

10   Mindy, for sharing your story.  Are there opponents

11   with oral testimony?  Are there questions of the

12   proponents at this time?  The Chair recognizes Rep.

13   Breen.

14             REP. BREEN:  Thank you, Madam Chairman.  I

15   just want to get the scope of the bill straight.  And

16   Representative, as I understand it, this law will

17   regulate all doctors' offices, not just hospitals, but

18   it's all doctors' offices across the state.  Is that

19   right?

20             VICE CHAIR GABEL:  Yes.  Anybody practicing

21   medicine.

22             REP. BREEN:  So, and that would include as

1    well -- I, I see dispensaries on the list.  Is that --

2    so pharmacies are also included?

3              VICE CHAIR GABEL:  Not really.

4              REP. BREEN:  I think under the Health Care

5    Right of Conscience Act, which we know applies to

6    pharmacies, I believe that this also, they're

7    considered health care facilities.

8              VICE CHAIR GABEL:  The bill talks about

9    providing correct medical information, and I don't

10   think that pharmacies are in a position to explain

11   medical information to their patients.

12             REP. BREEN:  I think because they wouldn't --

13             MS. CHAITEN:  Yeah.  Basically Illinois law,

14   common law, and statutory law creates certain duties

15   for different kinds of health care providers, duties

16   that they owe their patients.  So pharmacists owe their

17   clients, their patients, a certain, a certain kind of

18   duty.

19             If those health care providers are seeking the

20   special protections that Illinois law already provides

21   under the Health Care Right of Conscience Act, not to

22   meet every one of those duties, not to perform a

1    particular kind of care, not to administer a particular

2    type of drug, then they have to do so in accordance

3    with protocols that are designed to ensure that the

4    patient will get what they need.  And the specifics of

5    the protocols that are listed in here, that this is

6    language that was drafted by the Catholic Conference,

7    by the Illinois State Medical Society, and by the

8    Catholic Health Association, sets a floor.

9              It sets a minimum, but obviously what we're

10   talking about and what the bill says is that, within

11   that duty if you're seeking an out from the Health Care

12   Right of Conscience Act, you need to adhere to a

13   protocol that your health care facility has designed

14   that ensures that the patient will get the information

15   they need about how to access care.

16             REP. BREEN:  The question was does it apply to

17   pharmacies.

18             MS. CHAITEN:  Right --

19             REP. BREEN:  So it does apply to pharmacies?

20             MS. CHAITEN:  Pharmacists, if pharmacists --

21   if pharmacies and pharmacists are seeking an exemption

22   under the Health Care Right of Conscience Act, they

1    will have to do so in accordance with this type of a

2    protocol.

3            REP. BREEN:  Sure.  And, and I believe that

4    the Morr-Fitz vs. Blagojevich and the Morr-Fitz vs.

5    Quinn Act, I believe that the ACLU was involved as an

6    amicus on the side of the state in that case probably.

7    Lorie Ann, I'm assuming you guys were there.  So this

8    would, this would actually impact the holding of the

9    fourth district in the Morr-Fitz vs. Blagojevich case.

10   It could.

11           MS. CHAITEN:  What it would say is that for --

12   so that decision came out under the Health Care Right

13   of Conscience Act.  And that's an important decision

14   because there, the Illinois Appellate Court read this

15   statute and said, uh-mm.  There aren't any protections

16   for patients.  This is only protecting health care

17   providers.

18           And so what this bill does is it says that

19   where those pharmacies want to refuse to return a

20   patient's prescription, they want to refuse to transfer

21   a patient somewhere else, they've got to do so in

22   accordance with protocols that are designed to ensure

1    that a patient gets the information they need.

2                    REP. BREEN:  Well, Lorie, it doesn't say

3    anything about refusing to return a prescription --

4                    MS. CHAITEN:  Well, that is what they're

5    seeking; that is what they're doing.  You're asking

6    about a factual situation.  I'm answering about a

7    factual situation.

8                    REP. BREEN:  And again, so we just -- now

9    we've got the scope.  So it's pharmacies, all doctors'

10   offices, hospitals.  We've had pregnancy centers

11   confirmed earlier.  Now how -- I want to get to how

12   this bill will be enforced.  So the requirement on, I

13   believe on doctors' offices and pregnancy centers,

14   would that be enforced by IDFPR?  That normally is the

15   entity that would regulate a doctor's license, I

16   believe.

17                   MS. CHAITEN:  So the bill does not, does not

18   contain, for example, an enforcement mechanism where a

19   state agency has an obligation to come in and examine

20   the protocols.

21                   The way this works is when a health care

22   provider is seeking a carve-out, an exemption from

1    their duty to their patients under the Health Care

2    Right of Conscience Act, they only get those special

3    protections that Illinois law already provides them if

4    they deny the care, deny the, the service that they

5    find objectionable in accordance with protocols that

6    are designed, that were created by the facility in

7    which they work and are designed to ensure that the

8    patient gets what they need.

9            REP. BREEN:  But then what -- well, and I

10   respectfully disagree with your contention about it

11   being a duty, but who enforces this law?

12           MS. CHAITEN:  So if the provider denies care,

13   denies information, doesn't tell the patient that they

14   have certain treatment options and the patient is

15   harmed, the patient could sue the provider for

16   malpractice.

17           Today as we sit here they have a defense under

18   the Health Care Right of Conscience Act.  If this

19   passes --

20           REP. BREEN:  Wait, wait.  Suing for

21   malpractice for not --

22           MS. CHAITEN:  For not giving full options, for

1    not telling the patient that they could, for, if

2    they're miscarrying at 18 weeks and they don't tell

3    them that one of their options is to terminate that

4    pregnancy, and that patient becomes infected and loses

5    her future fertility, as we sit here today, arguably

6    that provider gets protections under the Health Care

7    Right of Conscience Act.

8            What we want to see is that there be protocols

9    in place that ensure that the patient gets that

10   information.  And if they don't, that patient has a

11   cause of action against that provider.

12           REP. BREEN:  Wait, wait, under the existing --

13           MS. CHAITEN:    And potentially IDFPR has, has,

14   has a disciplinary mechanism, but what we are doing is

15   saying that, yes, you get to refuse, you get to adhere

16   to your religious beliefs, but your patient cannot be

17   harmed as a result of it.

18           REP. BREEN:  Just to be clear then, IDFPR

19   could take action against a, a health care provider, a

20   doctor in, I believe -- they regulate doctors.  I'm not

21   sure who regulates nurses and other licensed medical

22   professionals.

1              MS. CHAITEN:  We have statutes that regulate

2     health care providers, and for example under Section 22

3     of the Medical Practice Act, if a health care

4     professional behaves in an unprofessional manner, which

5     has a very long list of things that define them as

6     unprofessional, then IDFPR can step in.  If IDFPR steps

7     in --

8              REP. BREEN:  But just to be clear --

9              MS. CHAITEN:  -- and they have adhered to the

10    protocols that this bill would require, then they

11    cannot be disciplined.  They still get the protections

12    that the Health Care Right of Conscience Act allows.

13             REP. BREEN:  But only if they adhere to

14    protocols.

15             MS. CHAITEN:  If they do not adhere to

16    protocols and their refusal harmed a patient, then

17    their -- potential, I mean it depends on the facts of

18    the case, of course, but there are those mechanisms.

19    That's how medical practice is governed in Illinois.

20    All we're saying is that patients whose doctors and

21    nurses object get to have the same protections that

22    other patients have.

 1              REP. BREEN:  Well, again now, we're just

 2     trying to figure out how this -- without a specific

 3     enforcement clause, I'm presuming then that IDFPR would

 4     promulgate rules to enforce this particular law, and

 5     then -- I mean hospitals are governed by the department

 6     of public health; is that right?

 7              MS. CHAITEN:  You can presume all you want.  I

 8     can't say that -- what I am saying to you is that the

 9     Health Care Right of Conscience Act today doesn't have

10     those rules, right?  The Health Care Right of

11     Conscience Act is a statute that creates broad

12     protections and exemptions for health care providers.

13     All this bill does is it says you get those

14     protections, but your patient also has to be protected.

15              REP. BREEN:  Again, the reason --

16              MS. CHAITEN:  And so the way that the Health

17     Care Right of Conscience --

18              CHAIR WALLACE:  I'm sorry.  Thank you very

19     much for the very spirited --

20              REP. BREEN:  I just want to ask my question

21     and get a quick answer.

22              CHAIR WALLACE:  -- question and response, but

1    let us make sure that we're speaking one at a time.

2                REP. BREEN:  The reason I'm asking, Madam

3    Chairman, is that Senator Biss on the floor in the

4    Senate said that corrective action would be taken if a

5    facility or provider didn't follow this law, or this

6    bill.  And so I'm worried what is that corrective

7    action?  Because we're not hearing a clear statement of

8    what is the corrective action.

9                MS. CHAITEN:  So the clear statement is what I

10   said previously, and that is that Illinois law creates

11   duties of health care providers to their patients.  The

12   Health Care Right of Conscience Act as it exists today

13   allows health care providers to not adhere to all of

14   those duties.

15               This bill says you get those special

16   protections that Illinois law has created for you under

17   the Health Care Right of Conscience Act, but you only

18   get them if you've adhered to a protocol that's

19   designed to ensure that your patient isn't harmed.  And

20   I'm paraphrasing.  I'm not reading the whole thing.

21               REP. BREEN:  Just so -- I want to be clear.

22   What the contention is, is that there is a duty under

1    the current -- there's a duty under one set of Illinois

2    law, the medical practice act, to provider either --

3    well, or there is a common law duty --

4              MS. CHAITEN:  A common law and the standard of

5    care --

6              REP. BREEN:  -- to either provide an abortion,

7    refer for an abortion, or do information for an

8    abortion.  And then the Health Care Right of Conscience

9    Act has exemptions to that, and without those

10   exemptions applying, then that is the base duty.

11             MS. CHAITEN:  This bill is not about providing

12   abortion, or referring for abortion, or participating

13   in abortion.  This bill is about the standard of care

14   that doctors have to adhere to in order to not be

15   committing malpractice, in order to be treating their

16   patients appropriately.

17             And so depending on the context in which a

18   patient comes to a doctor, and depending on that

19   patient's needs, that standard of care would dictate

20   the kind of care that the patient gets.  The doctor

21   gets to refuse to provide that care, but this bill says

22   the patient gets the information they need so they

1    don't suffer harm as a result.

2            So I'm not -- I'm really not going to let you

3    put words in my mouth.

4            REP. BREEN:  Well, I know, but again, we're

5    trying to figure out, and again you raised the issue of

6    pregnancy centers.  Usually those are technicians or

7    nurses who are the ones who are doing the work.  I know

8    everybody keeps talking about doctors, but I'm really

9    as much worried or more about nurses and technicians

10   who are in a setting where they don't want to hand a

11   list of local abortion clinics to a particular client

12   who asks for it.

13           MS. CHAITEN:  And there is absolutely nothing

14   about this bill that requires them to hand a list of

15   local abortion clinics.  What I'll say about pregnancy

16   centers is they vary dramatically in what they do and

17   how they hold themselves out.  But if you look at, for

18   example, the website of -- I think it's called Lifetime

19   Medical Center here in Springfield.  They, their

20   website says come to us.  We give all-options

21   counseling.  We will talk to you about all of your

22   options.

1              So if that their objection today is that they

2     don't want to talk about abortion, how is it that they

3     are meeting their duty to patients when they hold

4     themselves out as health care providers who are saying

5     that they're going to give all-options counseling?

6              In terms of if they don't provide the care,

7     what this bill says is they have a choice.  And again,

8     this is language that came from the Catholic

9     Conference.  They can either refer, which we know that

10    some providers do; they can transfer, which many of the

11    Catholic hospitals said they will do with a miscarrying

12    patient; or if they aren't comfortable doing any of

13    those things, they can provide written information

14    about other providers who they reasonably believe may

15    provide the care they're denying.

16             And keep in mind, that could simply be there

17    is an OBGYN practice down the street that offers full

18    service care.  They can, they can talk to you.  They

19    can counsel you.  They can facilitate your access to

20    care that we won't provide.

21             REP. BREEN:  And just --

22             CHAIR WALLACE:  I'm sorry to interject.  I

1   know we may have more questions.  We have still

2   oppositional testimony and we also have other members

3   of the committee who have questions for this particular

4   panel.

5           REP. BREEN:  And Madam Chairman, I'm just

6   trying to figure out because we're hearing different

7   answers here, and I want to understand what, when you

8   say reasonably believe may, that is the language of

9   providing information.  And you've stated, well, I can

10  send you to a gynecological practice that has full

11  service so I know that they will include abortion

12  amongst their services.

13          MS. CHAITEN:  That is not what I said.

14          REP. BREEN:  Well, you said a full service,

15  and so full service, I'm assuming what you mean by that

16  is that they will provide abortions.  Again, I can't

17  hand you a list --

18          MS. CHAITEN:  Well, they will refer for

19  abortion, or they will talk to the patient about all of

20  their options.  And if the patient says I choose

21  termination, they will assist that patient in -- they

22  will facilitate access to that care.  That's the health

1    care that is being denied.

2            Not only does the crisis pregnancy center not

3    provide abortion, but they won't refer for abortion.

4    They won't facilitate access to abortion or to whatever

5    other care they disapprove of.  If they say you know

6    what, there's a doctor down the road you can go to,

7    that doctor might, in fact, help that patient

8    understand what her treatment options are and where she

9    can go to get that care.

10           CHAIR WALLACE:  Thank you very much, Lorie.

11   In the interest of time, and in the spirit of the

12   intention of the bill, we're going to move forward.

13   We're going to allow Rep. Jesiel to ask her question.

14           Obviously, termination of pregnancy is one of

15   many health care options that might be available to a

16   woman and her reproductive health.  So let's move

17   forward to Rep. Jesiel.

18           REP. JESIEL:  Thank you, Madam Chair.

19   Question of sponsor and or possibly the attorney, ACLU

20   attorney.  I'm just wondering if this bill also

21   provides conversely for any of the ASTCs or the PTSCs

22   that provide for pregnancy termination services.  Are

1    those facilities required conversely to provide

2    alternatives for pro-life under this bill?

3              MS. CHAITEN:  They are health, they are, they

4    are required -- they're health care facilities.  They

5    are doctors and nurses and other health care providers

6    and they are a health care facility.  They have duties

7    just like other health care providers do under Illinois

8    law to make sure that they get informed consent from

9    their patients.

10             And as I said in my testimony, that includes

11   talking about risks, benefits, and alternatives.  So

12   yes, in fact, and in fact they do, if a patient comes

13   in and they're not sure and they want to have that

14   conversation, and they decide in the end that they

15   don't want to terminate their pregnancy, they will

16   assist them in accessing the care elsewhere.  They will

17   refer them to somebody who can provide prenatal care,

18   etc.

19             So yes, this, this is not -- again, it's not a

20   bill about abortion.  We have a system in place in

21   Illinois that sets up these duties for how health care

22   providers offer their patients care.  We're just making

1    sure that all patients get that.

2              REP. JESIEL:  Okay.  I'm just wondering a

3    question of the sponsor.  Would, would be willing to

4    amend this bill to include that these types of surgical

5    centers – Planned Parenthood, the PSTCs – provide and

6    required to provide?  Because you're saying that they

7    may or they do, but could you require that they provide

8    that kind of information?  Would you be willing to --

9              MS. CHAITEN:  They, they already come within

10   the definition of a health care facility under the

11   Health Care Right of Conscience Act and elsewhere in

12   Illinois laws.  So they're already covered.  If your

13   concern is that -- I mean, pregnancy crisis centers

14   aren't mentioned in the bill either.  So the only --

15   it's just says medical doctor, nurses.

16             REP. JESIEL:  No, the only point I'm making is

17   that if we're going to require people who, by

18   conscience are objecting to having to provide some of

19   that information, perhaps there could be the other

20   consideration on the other end to provide as a matter

21   of treatment or an option of treatment for pro-life

22   services, or ways to not terminate or carry a child to

1        --

2                VICE CHAIR GABEL:  You know, we can talk about

3        it.  There's just a time crunch.  So it may be putting

4        it in the record, but we, we can talk about it.

5                CHAIR WALLACE:  Are there other questions for

6        the proponents?  We still need to get to the opponents.

7        Thank you very much for your testimony.

8                And as our opponents come forward, let's

9        please be mindful of the time that we take in terms of

10       testimony and I ask that, that the members of the

11       committee also be mindful of the time they take with

12       questioning.  Thank you.

13               Please state your name and your position.

14               MS. PAPROCKI:  Thank you.  I'm Anna Paprocki.

15       I'm an attorney with Americans United for Life.  And I

16       thank you for the opportunity to speak with you today.

17       I'm not only speaking today in my capacity as a lawyer

18       with AUL, but also as a woman and a patient in

19       Illinois.

20               The reach of this bill is very broad.  It does

21       as we've heard impact crisis pregnancy centers.

22       There's over 30 medicalized pregnancy help centers,

1    crisis pregnancy centers that are health care

2    facilities that will be required under this bill to

3    participate by giving information about abortion

4    providers.  They're forced to violate their core

5    mission.

6            These centers exist to offer women hope and

7    alternatives to abortion, but under this, this bill

8    they, at minimum, have to provide in writing a list of

9    providers that they reasonably believe will provide the

10   service they object to.  So a generalized list is not

11   acceptable.  A generalized list of OBs wouldn't be

12   acceptable.

13           They have to reasonably believe that these

14   providers provide abortion.  So, so it violates their

15   core mission.  There isn't -- it doesn't -- it's not

16   acceptable to their core mission to find someone else

17   in their facility.  These facilities exist to offer

18   women alternatives to abortion.

19           Now Ms. Swank's story is very sad, but this

20   bill does not address Ms. Swank's story.  It goes far

21   beyond that.  Illinois law already does, already

22   requires the transfer of requested medical records.

1    Illinois law, the conscience law itself explicitly

2    states that doctors have a duty to inform their

3    patients about their condition, prognosis, and risks,

4    and doctors have to comply with emergency care

5    standards.

6            This bill goes much further than that and

7    requires all health care facilities to promote and

8    facilitate abortions for any reason and at any stage of

9    pregnancy.

10           Their, their -- Ms. Swank's story as sad as it

11   is does not justify requiring crisis pregnancy centers

12   to advertise for abortion clinics.  It is also, it's

13   not just bad policy, it is a clear violation of federal

14   law.

15           There's a bipartisan letter from members of

16   the Illinois federal delegation explaining the

17   violations of the Coates/Snow amendment, the

18   Hyde/Weldon amendment, and the Church amendment.  The

19   Coates/Snow amendment, for example, longstanding

20   federal law, conditions Illinois' federal funding on

21   assurance that the State won't discriminate against

22   health care entities and physicians that object not to

1    just referring for abortion, but also if they refuse to

2    make arrangements for abortion.

3           And this bill --

4           CHAIR WALLACE:  Okay, the roll is already open

5    and she would like to have the opportunity.  So Rep.

6    Flowers.

7           REP. FLOWERS:  I need clarity.  Right now how

8    is this bill violating your, the current law, in

9    regards to your right of conscience?

10          MS. PAPROCKI:  To mine personally?  Well, as a

11   patient in Illinois, I seek care at an OB that --

12          REP. FLOWERS:  Okay, I'm sorry, not your right

13   as a doctor.

14          MS. PAPROCKI:  Well, I can actually answer

15   personally too.

16          REP. FLOWERS:  If there was -- how is this

17   violating the current law?

18          MS. PAPROCKI:  So I think my OBGYN practice is

19   actually a perfect example.  So I go to Downers Grove

20   OBGYN.  I choose to go there because they are

21   authentically pro-life, because they in no way refer or

22   arrange for abortion.  And that's consistent with --

1    and I choose to drive a distance to go see them.

2            REP. FLOWERS:  Okay, wait a minute.  Let me,

3    let me just -- because -- and that's your choice.  But

4    if I were to go there and under your scenario, that

5    doctor could refuse to care for me because of this,

6    under your scenario.

7            MS. PAPROCKI:  No, actually the Illinois

8    Health Care Right of Conscience Act in no way allows a

9    doctor to discriminate against a patient.  It allows a

10   doctor to refuse to participate in a service that

11   violates his or her conscience.  So it would not, based

12   on race, based on lifestyle, would not allow --

13           REP. FLOWERS:  If I needed the service, if I

14   needed the service, and if it meant my life -- see the

15   difference -- this is my concern about this

16   legislation.  A doctor take an oath to do no harm.

17           MS. PAPROCKI:  Right.

18           REP. FLOWERS:  And so in this business there

19   are certain things that you'll have to do because you

20   never know what the situation of the patient's going to

21   be.  So for a doctor to know that my life might be, my

22   life is in this doctor's hands, and because of his

1   right of conscience, he could refuse my care.  Fine.

2   Can you just tell me where I can go to get the help?

3             MS. PAPROCKI:  Well, the Illinois Conscience

4   Law already requires doctors to comply -- it's explicit

5   that doctors have to comply with emergency medical

6   standards.  So there's not --

7             REP. FLOWERS:  Let's pretend like it's not an

8   emergency.

9             MS. PAPROCKI:  Right.

10            REP. FLOWERS:  Let's pretend like I just need

11  this information.  Let me tell you my conflict, okay?

12  Back in 1999 I passed the patient, the patient's bill

13  of rights to remove gag orders from doctors because

14  back in those days the HMOs were prohibiting doctors

15  from telling patients about their pre-existing

16  conditions, and some of them died as a result of that.

17            So I'm asking you, are -- is this leaving the

18  gag orders on doctors that will not be able to tell me

19  if you don't want to do it where can I go?

20            MS. PAPROCKI:  No, doctors, doctors can tell

21  you.  If it doesn't violate their conscience, there's

22  no, nothing in this, the Health Care Right of

1     Conscience Act --

2              REP. FLOWERS:  But it might violate their

3     conscience, but it would be the right thing to do in

4     regards to doing no harm to the patient.

5              MS. PAPROCKI:  But, but a doctor who takes an

6     oath to do no harm, and many Catholics and non-

7     Catholics alike believe that abortion harms not only

8     the baby that is going to be killed in this, but also

9     the women.

10              So what this law does is it actually forces a

11     lot of doctors to violate their, what they believe

12     they've took with the Hippocratic Oath of doing no harm

13     to their patients in promoting and facilitating a

14     procedure that harms them and their child.

15              CHAIR WALLACE:  Okay, thank you.

16              REP. FLOWERS:  Well, this bill is not -- I

17     have not read -- I know what the bill implies.  But

18     abortion clinics and abortions is not in this

19     legislation.  So I have to deal with the language

20     that's here.  So with all due respect, I would like to

21     be recorded as voting...

22              CHAIR WALLACE:  Okay, thank you.  Rep. Flowers

1   and Rep. Andrade are both voting in favor of Senate

2   Bill 1564.

3            Please continue with your testimony.

4            MS. PAPROCKI:  Yeah, well, and I just want to

5   say that the, go back to the violations of federal law

6   that were misconstrued earlier.  It is very clear how

7   this violates the Coates/Snow amendment, Church

8   amendment, and the Hyde/Weldon amendment.  And I know

9   you've all received a letter from the Illinois federal

10  delegation, a bipartisan letter explaining those

11  violations.

12           The stakes are very high with the loss,

13  potential loss of all federal funding, including but

14  not limited to the federal share of Medicaid, but

15  there's also free speech concerns with this.  Federal

16  courts have already struck down similar requirements on

17  pregnancy centers and that would subject the State to

18  costly litigation about free speech concerns.

19           And I did just want to -- again, I'm sorry

20  Rep. Flowers had to leave us, but just reiterate that

21  this denies me my choice to see a provider that

22  authentically and wholly respects life.  My doctor's

1    office I think is a prime example of who is impacted by

2    this bill.

3            There would be new duties imposed on them to

4    have, to provide, you know, written referrals or give

5    information.  And that denies me my opportunity that

6    I'm blessed to have in my area.  It denies me my

7    choice.

8            CHAIR WALLACE:  Thank you.  Please state your

9    name.

10           MS. SHULTZ:  My name is Debbie Shultz, and I'm

11   the founder and executive director of Lifetime

12   Pregnancy Help Center here in Springfield.  And I am

13   honored to be here to present opposition to Senate Bill

14   1564.

15           I want to tell a story about one of our

16   clients.  Bri came in on a summer warm afternoon with

17   her mother.  She had already had a positive home test,

18   and she said that when she read that result she felt

19   paralyzed.  She then went to Planned Parenthood to have

20   that result confirmed.  And at that time she had not

21   told her parents yet, but she felt like she had to have

22   an abortion.

1              And the reason why was because Bri was a good

2      student.  She was involved in her high school poms and

3      in her show choir.  This was her senior year and she

4      was looking forward to all the adventures and promises

5      that come along with a senior year.  She was also

6      anticipating going away to college the next fall and

7      being able to live an independent life.  But she felt

8      like being pregnant unexpectedly was going to hinder

9      those dreams.

10             So she did tell her mother, and being adopted

11     and coming from a large family, her biological mother

12     chose birth for all of her children.  But yet Bri was

13     to the point of desperation where she could only think

14     about her senior year.  Her mom encouraged her to come

15     to Lifetime, and so I sat down with Bri and I talked to

16     her about all of her options.

17             I talked to her about adoption.  I talked to

18     her about parenting.  I talked to her about abortion.

19     I gave her factual information about abortion

20     procedures, about the risks involved with abortion,

21     psychologically, physically, emotionally, relationally,

22     spiritually.  And I also talked to her about my

1    personal testimony of how abortion affected me 20

2    years, when I was 20 years old.  That abortion decision

3    has affected me the rest of my life.

4            Bri left that day still wanting to have an

5    abortion, overwhelmed by her circumstances, but at

6    least she had information.  And she was determined that

7    she was going to do her own research.  She went online

8    and she read about other teens and their responses to

9    abortion that they had and the regrets that they felt.

10   But she was sure that that wouldn't be her reaction.

11           She felt very anxious because she knew that

12   the time was short on making this abortion decision.

13   She came back to Lifetime and I again shared with her

14   in more detail the actual procedures, the risks, and in

15   more detail how abortion has impacted my life.

16           She later shared with me that the

17   conversations that she had at Lifetime those two times,

18   as well as visiting with her doctor, that she realized

19   what the right thing was to do for her.  She had her

20   first ultrasound and she didn't expect to fall in love

21   like she did.  Hearing that heartbeat and seeing the

22   tiny body move is truly a miracle.

1            That was a defining turning point in her

2    decision.  She stated that was my baby.  I chose life

3    for my baby.  She graduated from high school in

4    October, she enrolled in Barber College, and she

5    continued working throughout her pregnancy even though

6    it was very difficult going through this journey all

7    alone.

8            On February 7th, her baby girl arrived,

9    delivered at nine pounds, twelve-and-a-half ounces.

10   Bri stated that she felt overwhelmed, but not by

11   regretting her decision, but by knowing that her life

12   had just changed forever.

13           And this is a quote.  "Anaya is now five years

14   old and it is amazing to look into her eyes and see

15   what a blessing Lifetime Pregnancy Help Center was at

16   such a crucial time in my life.  My decision has never

17   been second-guessed and I could not be more satisfied

18   with the outcome."

19           Bri is one of thousands of mothers who visit

20   pregnancy centers every single year throughout Illinois

21   in search for answers, looking for hope, looking for

22   someone who cares.  Since Lifetime opened six years

1    ago, we have served over 1,300 clients.  Many of those

2    joining our earn-while-you-learn program resulting in

3    over 3,800 client visits.

4            This bill would require pregnancy center

5    workers to violate our core mission by referring

6    mothers for abortions or distributing information on

7    where to obtain abortion.  It would also force us to

8    discuss the so-called benefits of abortion.  This

9    directly tramps on our rights of conscience as health

10   care providers and our religious beliefs.

11           Abortion is destroying a human life, the most

12   vulnerable in our society, and can bring devastating

13   effects upon the mother and family, as I personally

14   have experienced.  And Lifetime and other pregnancy

15   centers throughout the state cannot have any part in

16   promoting that destruction.  Thank you so much.

17           CHAIR WALLACE:  Thank you.  As the roll is

18   already open, I would like to add Rep. Ammons as a yes

19   vote.

20           Are there any questions?  Okay.  Recognizing

21   Rep. Fine.

22           REP. FINE:  Good morning.  Thank you for being

1   here today.  Listening to your story it sounded to me

2   like you were arguing in favor of the bill, because you

3   said that this young lady came to you and you told her

4   what her options were, and then she was able to make

5   her decision.  So I think the key word here is people

6   know their options.

7           And to me my understanding of this legislation

8   is it's not just for pregnancy options.  I have

9   children.  What if I go to the doctor and the doctor

10  thinks, well, I wouldn't do this for my kid, so I'm not

11  going to tell you that you can do it for yours.

12          I think what you're doing by opposing this

13  legislation is limiting my choices to decide what's

14  best for me and my family when it comes to either my

15  rights as a woman, or my rights to take care of my

16  children, or if something happens to one of my family

17  members.

18          This, this same situation could happen.  What

19  if you have a family member who's in the hospital on

20  the brink of death and the doctor says to you, well,

21  you could, you know, let them, we could stop feeding

22  them, or we could give them medications to ease their

1    pain?  That should be my choice, but I need to know

2    what those choices are.

3            And I think this is very important legislation

4    to explain to me what my choices are as a patient.  And

5    to deny me the right of that knowledge I think would

6    just be wrong.  So I thank you for bringing forward

7    this bill.

8            MS. SCHULZ:  If I may address that

9    clarification, that we do offer the information because

10   we do believe it's very important that everyone be able

11   to make an informed decision.  We're not there to tell

12   anyone what to do.

13           The difficulty in this bill is that we'd be

14   required to refer our clients to get an abortion.  A

15   written referral of where they can get an abortion,

16   that's a referral and that completely goes against our

17   right of conscience.  That's where the conflict for me

18   as a pregnancy center comes in.  I can't speak on the

19   other health issues.  Maybe Anna can.

20           CHAIR WALLACE:  Rep. Gabel, is that the --

21           VICE CHAIR GABEL:  Well, it's not a referral.

22   It says that they do have to provide them in writing

1    with, the exact language is through a -- they will have

2    to provide in writing, writing information to the

3    patient about other health care providers who they

4    reasonably believe may offer the health care services,

5    the health care facility, physician, or health

6    personnel refuses to permit, perform, or participate in

7    because of a conscience-based objection.

8           So they would, as we've talked about earlier,

9    they could give -- she -- a paper with one name on it.

10   This an OBGYN.  They may have information on what

11   you're seeking.  They do not have to have a list of

12   abortion clinics, absolutely not.  As we've said, they

13   have to provide a name of some health care provider

14   that they reasonably believe may offer or have more

15   information about this.

16          I mean, you know, and I'm, I'm very happy that

17   the woman made the right choice for her, and it's, it's

18   a beautiful story.  And to me the key in that whole

19   story was that the woman had her options and could

20   decide what to do.

21          MS. PAPROCKI:  And I just want to clarify, and

22   you read the language, but it says you reasonably

1    believe may offer not or refer.  So you have to

2    reasonably believe that these are, these are abortion-

3    providing health care providers.  So, so that is --

4              VICE CHAIR GABEL:  That is not true.

5              MS. PAPROCKI:  Or any, but use abortion as an

6    example, since this is where there are a lot of, where

7    the rubber meets the road.  There's a lot of

8    conscientious objection to abortion.  So this is a very

9    concrete example of where we're going to see conscience

10   violations.

11             But going to your question just very quickly.

12   I think, you know, even talking about how crisis

13   pregnancy centers, pregnancy help centers, how they

14   talk about abortion, they do talk about abortion.  So

15   in some ways this is, you know, again, it's -- what

16   your point, I think, with your question, and with her

17   testimony illustrates that there isn't a problem that

18   abortion isn't being talked about.

19             The sticking points in this are, are that you

20   have to talk about benefits of abortion.  So what does

21   that mean?  And then also the written referral or

22   giving information on where to obtain abortions.

1              CHAIR WALLACE:  Okay, thank you.  I didn't --

2              MS. CHAITEN:  Can I just briefly respond to

3      that?

4              CHAIR WALLACE:  I actually was going to -- I'm

5      sorry.  I'm going to, I'm going to allow you to do that

6      as well.  And we also have Rep. Cassidy with a

7      question.

8              But when we start to speak about risk,

9      benefits, harm, no harm, we're talking in a, in the

10     most objective scientific manner in terms of medical

11     terminology, not necessarily if you have an abortion

12     this will greatly benefit you.

13             It is if you're at risk and this pregnancy

14     needs to be terminated, the benefit would be your life

15     will be saved or you will not get infection.  And yes,

16     there are many other conscientious -- there are many

17     other issues that might be a result of conscientious

18     objective.  I mean there are some religious beliefs

19     that blood transfusions should not be allowed.

20             But if I am bleeding out, should I then not be

21     allowed to have access to that?  So just trying to

22     allow this conversation to shift away from it only

 1    being about abortion because this bill covers many more

 2    medical situations, many more medical issues that

 3    people may or may not object to due to the doctor's own

 4    religious beliefs.

 5             Lorie, and then we'll go to Rep. Cassidy.

 6    Let's move a little more quickly.

 7             MS. CHAITEN:  Well, thank you, 'cause that

 8    just took away one of the things I wanted to talk

 9    about, about the benefits that a patient who is at risk

10    for harm needs to understand if a treatment option will

11    help them.  So thank you for that.

12             I want to very briefly - and I'm happy to talk

13    to anybody afterwards if necessary - but I want to be

14    clear.  This written piece of, this written document

15    does not, is not a referral, does not require a

16    referral.  It says that they reasonably believe may

17    offer the health care service that the health care

18    facility, physician, or health care personnel refuses

19    to permit, perform, or participate in on conscience

20    grounds.

21             So if I'm a crisis pregnancy center and one of

22    the things I refuse to participate in is I won't refer

1    for abortion, that's something I won't do, but I have

2    to make sure I'm sending that patient somewhere else

3    where I reasonably believe they may have a fuller

4    discussion about other places where the person could

5    access care.

6              That's why the OBGYN down the road works in

7    that context.  This isn't a referral.  It's not a

8    requirement for referral.  And again, it is only what

9    is required in order to avoid liability if the patient

10   is harmed because you didn't give them what they

11   needed.

12             CHAIR WALLACE:  Thank you.  Rep. Cassidy.

13             REP. CASSIDY:  Lorie, to that point, and this

14   might sound a little silly, especially since we hardly

15   use them anymore, but could this reasonably be the O

16   page from the Yellow Pages?  Here are all the

17   obstetricians in, in the city?

18             MS. CHAITEN:  So I would like to think that a

19   health care professional wouldn't just hand the Yellow

20   Pages --

21             REP. CASSIDY:  Well, we'd hope they'd do

22   better than that, but in theory?

1              MS. CHAITEN:  But in theory if they have a

2      reasonable belief, they look at their community's

3      Yellow Pages, they see who their OBGYNs are, and they

4      know which ones, you know, will in fact have a full

5      conversation about where a person might go for the care

6      that they need, then give the Yellow Pages with a check

7      mark if that's what's needed.

8              But make sure that the patient doesn't leave

9      in the dark.  This is about patients really just not

10     knowing where to turn.

11             REP. CASSIDY:  My point is simply that we're

12     not demanding that they do exhaustive research and

13     interview and all of that.  We're simply making sure

14     that they provide some options and some alternatives.

15             MS. CHAITEN:  And that was, in fact, exactly

16     the language used by the folks who were representing

17     the Catholic Conference when we were talking about this

18     language.  They said we don't want to have to be out

19     there researching who's going to do it.  But they were

20     willing to say -- if we reasonably believe that when we

21     send the patient on, they'll get what they need without

22     us needing to be a part of it, that will work.

1            So reasonably believe may offer the care in

2    terms of participating and referring that's being

3    denied.

4            REP. CASSIDY:  Thank you.  As someone who had

5    to be born in a different state than my family lived in

6    because of the restrictions of the only hospital in my

7    hometown and my mother's medical situation, I fully

8    appreciate what we're trying to accomplish here.

9    Please add me as a cosponsor if I'm not already.

10           CHAIR WALLACE:  Okay.  Do we have any other

11   questions?  Rep. Breen.

12           REP. BREEN:  Yes, ma'am.  I wanted to ask you

13   a question.  Do you believe in good conscience that a

14   Christian can hand someone a list of -- of a woman

15   seeking an abortion, can a Christian in good conscience

16   hand that woman a list of places that you believe may

17   offer that woman an abortion?

18           MS. SHULTZ:  No.

19           REP. BREEN:  So if that's true, then your

20   pregnancy center may shut down if this bill passes.

21           MS. SHULTZ:  Correct.

22           REP. BREEN:  Thank you.

1            CHAIR WALLACE:  Okay.  Thank you for everyone

2       who has testified.  I'm going to briefly share a story

3       of a very close friend of mine, in fact, my very best

4       friend.  Going through a divorce, had her reproductive

5       options available to her.  She had the Mirena, the most

6       recent IUD, inserted after the birth of her fourth

7       child.  Because, again, she was going through a

8       divorce.  She did not want to bring any more children

9       into the marriage.

10           The Mirena ruptured her uterus.  She had to

11      have an invasive surgery to have that, that piece of

12      material removed, and in between the removal of the

13      Mirena and going onto another long-term birth control

14      option she became pregnant again.

15           Various abusive complications with the

16      relationship in terms of refusal of sexual intercourse

17      with the person she was married to, but that's a whole

18      nother story.  She became pregnant again and she was

19      worried because after having recently had that surgery,

20      and having recently had a hole in her uterus, how could

21      she continue this pregnancy.

22           She went to her doctor to find out what she

1     could best do.  Her doctor did invoke the right of

2     conscience and said that I cannot tell you, you know,

3     what additional things.  After about three-and-a-half

4     weeks she ultimately was able to see a provider who

5     would assist her, and she learned that the developing

6     embryo, or fetus at that point, had attached to a blood

7     clot.

8              Had this pregnancy gone to term -- and the

9     heart rate was low at that point anyway.  But her life

10    was at risk and those weeks of waiting and waiting, she

11    may have very well left her four children without a

12    mother.  And so I just share that story because we talk

13    so much about abortion and termination of pregnancy,

14    and then we had Mindy share her awful story, and I went

15    into labor with my son at 28 weeks.

16             And so I think we have to detach this from the

17    moral pro-life or pro-choice, or what have you, but

18    what is right for the life of the patient.  Will the

19    patient survive?  Will the patient be unharmed by

20    whatever the decisions that the health care providers

21    are going to make?

22             And if the answer is the patient will not go

1    unharmed, so in other words if the patient will be

2    harmed, we have to allow them to seek medical attention

3    from someone who will save them from infection, save

4    them from whatever harm it may be.  And we don't need

5    to do that in a way that burdens our conscience.

6              So as the roll is already open, I will vote

7    yes.  And we will continue to take the roll.

8              VICE CHAIR GABEL:  Yes.

9              REP. CASSIDY:  Yes.

10             REP. DEMMER:  No.

11             REP. FINE:  Yes.

12             REP. JESIEL:  No.

13             REP. SOTO:  Yes.

14             REP. STEWART:  No.

15             REP. CABELLO:  No.

16             REP. BREEN:  And because existing law already

17   covers, according to what Ms. Chaiten said, the

18   situations that have been dealt with, in particular the

19   one that was just related by the chairman, and because

20   it would shut down the state's pregnancy centers, I

21   vote no.

22             CHAIR WALLACE:  Thank you.  With there being

1    eight voting in favor, four voting -- oh, five opposed,

2    and zero voting present, Senate Bill 1564 will be

3    favorably reported to the House Floor.

4              (Whereupon, the proceeding was concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    CERTIFICATE OF TRANSCRIBER

2            I, Penny Knight, do hereby certify that this

3    transcript was prepared from audio to the best of my

4    ability.

5

6            I am neither counsel for, related to, nor

7    employed by any of the parties to this action, nor

8    financially or otherwise interested in the outcome of

9    this action.

10                       *Penny Knight*

11

12        5/9/17

13   DATE                        Penny Knight

14

15

16

17

18

19

20

21

22