# Exhibit 42

NIFLA Trial Exhibit 32(C)
Dr. Paul Burcher's Expert Report

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, *et al.*, | | |
| Plaintiffs, | | Case No. 16-50310 |
| v. | | Hon. Iain D. Johnston |
| BRYAN A. SCHNEIDER, | | Magistrate Judge Lisa A. Jensen |
| Defendant. | | |
| RONALD L. SCHROEDER, *et al.*, | | |
| Plaintiffs, | | Case No. 17-4663 |
| v. | | Hon. Iain D. Johnston |
| BRYAN A. SCHNEIDER, | | Magistrate Judge Lisa A. Jensen |
| Defendant. | | |

**EXPERT REPORT OF DR. PAUL BURCHER**

**I.     ASSIGNMENT**

I have been retained by the Office of the Illinois Attorney General and the Illinois Department of Professional and Financial Regulation to provide an expert opinion on whether the Amendments to the Illinois Healthcare Right of Conscience Act (effective January 1, 2017) meet the medical and ethical standards of care.

**II.     QUALIFICATIONS AND BACKGROUND**

I am a board-certified Obstetrician/Gynecologist in an academic role with Wellspan, York Hospital in York, Pennsylvania. I am the Residency Program Director, meaning that I lead a group of physician faculty members who train Ob/Gyn residents in our specialty. My primary role is as an educator, in both clinical medicine and medical ethics. I received a Ph.D in philosophy with a concentration in ethics from University of Oregon. I completed a one-year

**EXHIBIT**

**3**

1

NIFLA 01784

clinical ethics fellowship at University of Chicago from 2014-2015. I have taught medical ethics at an undergraduate, graduate, and post-doctoral level for the last thirteen years. For six years, I directed and co-directed the course Health, Care, and Society at Albany Medical College for medical students. The four-year longitudinal curriculum taught ethics, professionalism, and communication skills. I have over twenty peer-reviewed publications in ethics and have been the co-editor for two books on reproductive ethics. I have led and been on hospital ethics committees my entire career.

As a practicing Ob/Gyn and ethicist, my areas of interest and expertise include reproductive rights, the physician-patient relationship and responsibilities, and informed consent. I am also a practicing Catholic. As a result of my faith, I do not perform elective abortions. My CV is attached as Exhibit A.

### III.    RETENTION AND COMPENSATION

I have prepared this written report *pro bono*. I am being compensated for providing testimony in this matter at the rate of $200/hour.

### IV.    BASIS FOR OPINION AND MATERIAL CONSIDERED

The opinions I provide in this expert report are based on:

- My review of the complaints and the exhibits to the complaints filed in these lawsuits;
- My review of the amendments to the Illinois Healthcare Right of Conscience Act (effective January 1, 2017);
- My review of Judge Rebecca Pallmeyer's written opinion denying Plaintiffs' motions for summary judgment;
- My education, expertise, and experience in the fields described above;
- My review and analysis of the materials cited throughout this report as supporting scholarly evidence, listed in Exhibit B.

### V.    SUMMARY OF OPINION

Respect for patient autonomy has been the pre-eminent principle in modern bioethics since the 1970s. (Gillon, 2003.)  The duty to provide informed consent is a central precept of

2

respecting patient autonomy (Beauchamp and Childress, 2019), and respecting patient autonomy is a central tenet of medical standards of care as well. A properly performed surgery or prescription without appropriate counseling is as much a failure of medical standards as a botched surgery or incorrect prescription. Crucial to the task of providing appropriate counseling is the duty to provide all legal and medically appropriate options to the patient and provide an unbiased accounting of their risks and benefits. (AMA Code of Ethics, 2.1.1, 2017.) In order to meet the medical and ethical standards of care, healthcare providers must put aside their personal or religious beliefs to facilitate a patient-centered encounter that provides this information in a way that allows the patient to make a choice grounded in her life and values, not the provider's. While I will discuss a number of sub-topics related to the central question, the Amendments to the Illinois Healthcare Right of Conscience Act are consistent with modern biomedical ethics and standards of care in clinical practice.

## VI. ANALYSIS

### a. The Medical Standard of Care

#### i. Defining the Standard of Care

The medical standard of care is a core concept in medical practice and training, but it has been more sharply defined in a legal context than a medical one. In medical settings, it is best understood as what obligations a reasonable and competent physician of a given specialty would be expected to have in a given circumstance. (Norrie, 1985.) While legal definitions of standards of care have evolved over time (King, 1975), failing to meet standards of care is one crucial determinant in whether negligence occurred. Standards of care are specialty-specific and also dependent upon the individual patient and her circumstances. For example, it would be inappropriate to perform a hysterectomy on an 18-year-old woman with heavy menstrual periods unless medical therapy had failed, and her bleeding was life-threatening. However, offering and performing a hysterectomy on a 40-year-old woman with troublesome bleeding who failed medical treatment would be entirely appropriate. Clinical practice guidelines play a role in shaping the standard of care, but because these guidelines cannot anticipate every possible clinical scenario, there will be times where the standard of care response will fall outside published specialty guidelines. (Moffett and Moore, 2011.) However, variations from practice guidelines should be grounded in the clinical circumstances, and have a patient-centered reason

NIFLA 01786

for deviation, not one stemming from healthcare provider preferences. This distinction is at the heart of the question being addressed.

Crucial to the obligation to meet the standard of care is obtaining informed consent from the patient. (AMA Code of Ethics, 2.1.1, 2017.) Informed consent is sometimes narrowly viewed as obtaining permission or authorization from the patient before performing a treatment or procedure. (Beauchamp and Childress, 2019.) But it is more generally the type of counseling that a provider should perform when a patient is faced with making a medical decision. A patient receiving counseling regarding an unplanned pregnancy or contraceptive options needs to make an informed choice, one grounded in the medical facts, even if the choice will ultimately lead them to care elsewhere. A limited or biased discussion violates the patient right to autonomous choice because autonomous choice is itself grounded in disclosure of information from the healthcare professional. (Beauchamp and Childress, 2019.)

### ii. Bioethics, Informed Consent, and the Standard of Care

Respecting patient autonomy is central to medical ethics, and informed consent is central to respecting patient autonomy. (Beauchamp and Childress, 2019.) The authors of the central text in American bioethics, *Principles of Biomedical Ethics*, equate informed consent with autonomous choice, and emphasize that disclosure of information must include, "the specific informational needs of the individual person." (Beauchamp and Childress, 2019, p. 125.) Respecting patient autonomy starts with providing a complete, unbiased discussion of all of the potential, legal, and appropriate options for a patient. (AMA Code of Ethics 2.1.1, 2017.) A central concept in proper informed consent is that the discussion is patient-centered, meaning that there is a fiduciary duty to, "pursue the patients' best interests *above all other considerations*." (Macklin and Shepard, 2013, italics added.) In an ethics committee opinion, the American College of Obstetricians and Gynecologists made clear that providers need to recognize their own biases, but also seek to maintain objectivity when counseling patients:

> By encouraging an ongoing and open communication of relevant information (adequate disclosure), the physician enables the patient to exercise personal choice. This sort of communication is central to a satisfactory physician–patient relationship. Unfortunately, discussions for the purpose of educating and informing patients about their health care options are never completely free of the informant's bias. Practitioners should seek to uncover their own biases and endeavor to maintain objectivity in the face of those biases, while disclosing to the patient any personal

4

NIFLA 01787

biases that could influence the practitioner's recommendations. (ACOG CO 390, 2016.)

While it is reasonable to limit the presentation of medical options to a patient based upon their utility or appropriateness in a given circumstance, this should be based upon clinical judgment, not personal values. (Whitney and McCullough, 2007.) For example, consider a physician counseling a patient who just discovered she is pregnant with an unplanned pregnancy. If her first response is joyously asking the physician how soon she should start prenatal care and which vitamin she should take, an exhaustive discussion of all her options would be an inappropriate reading of her response. In contrast, a woman who expresses concern, fear, or disappointment upon hearing that she is pregnant needs a thorough discussion of all of her medical options, including abortion. This discussion must be balanced, non-deceptive, and include the risks and benefits of each choice. (AMA Code of Ethics, 2.1.1, 2017.) As discussed later, each option does have well established risks and benefits which will vary depending upon her health, gestational age, and socio-economic factors. A healthcare provider who is unprepared or unwilling to provide this type of patient-centered counseling has failed to provide informed consent and falls below standards of care.

### iii. Other Biomedical ethical principles

Although respecting patient autonomy is a critical aspect of biomedical ethics, there are three other principles of equal importance that must be considered in ethical medical practice. Two of the remaining three principles, while less central to this discussion, should still be considered individually.

The principle of beneficence is the concept that there is a duty to benefit the patients. (Beauchamp and Childress, 2019.) One area of evolution in thinking regarding this principle is the question of who determines what counts as a benefit—the healthcare provider or the patient. There has been increasing scholarship tilting the locus of determination toward the patient. (Bester, 2020.) For healthcare providers to rule out the possibility that abortion, contraception, and sterilization could offer benefit to any patient is to consistently fail to consider that a patient's sense of benefit could be different than their own.

A similar analysis applies to the principle of nonmaleficence as well. This principle, the duty to reduce risk of harm (Beauchamp and Childress, 2019), must also consider patient perspectives, and as I will discuss later, there is firm empirical evidence that patients who fail to

NIFLA 01788

obtain a desired abortion or appropriate contraception may suffer both medical and socio-economics harms.[1]

### b. Conscience-Based Objections

Generally speaking, a conscience-based objection is when a healthcare provider's personal or religious values conflict with the needs or requests of a patient for a procedure or treatment. (AMA Code of Ethics 1.1.7, 2017.) There is a longstanding right to refuse to participate in treatments that the healthcare provider opposes, provided that the treatment can be obtained through another provider, and the treatment is not an emergency. (Beauchamp and Childress, 2019, p. 43.) The AMA Code of Ethics endorses physician rights of conscience, but physicians with a conscience-based claim are still expected to, "Uphold standards of informed consent and inform the patient of all relevant options for treatment, including options to which the physician morally objects," and, "in general, physicians should refer a patient to another physician or institution to provide treatment the physician declines to offer." (AMA Code of Ethics 1.1.7, 2017.)

In an article published in the *New England Journal of Medicine,* Drs. Stahl and Emmanuel describe the differences between conscientious objection to military service and the rights and responsibilities of physicians who make a conscience-based claim:

> By entering a health care profession, the person assumes a professional obligation to place the well-being and rights of patients at the center of professional practice. This obligation is not unlimited, but exemptions are reserved for cases in which there are substantial risks of permanent injury or death. In a professional context, personal religious convictions are secondary. (2017.)

On the issues of informed consent and duty to refer, they are unequivocal:

> Health care professionals who conscientiously object to professionally contested interventions may avoid participating in them directly, but, as with military conscientious objectors, who are required to perform alternative service, they cannot completely absent themselves from providing these services. Conscientious objection still requires conveying accurate information and providing timely referrals to ensure patients receive care. (2017.)

This position is consistent with the teaching of medical ethics that medical students receive: personal values are superseded by patient need and professional obligations. In a paper,

---

[1] The last of the four bioethics principle, justice, the duty to treat patients in a fair and equitable manner (Beauchamp and Childress, 2019), is less relevant in this issue.

NIFLA 01789

published in *Academic Medicine*, professionalism is defined as, "...the physician's open willingness to subordinate his or her interests to best meet the needs of patients. It manifests the physician's fiduciary relationship with patients and the physician's duty to serve as the patient's advocate. The expectation that a professional will subordinate self-interest has long been a hallmark of professions, and hence is the sine qua non of professionalism." (Swick, 2000.)

### c. Standards of Care in Obstetrics and Gynecology

The same principles, previously discussed, are relevant not only in abortion counseling, but in every counseling session within the practice of medicine and the specialty of obstetrics and gynecology. A patient who wishes to discuss contraceptive options, sterilization, or treatment options for her gynecological complaint must receive complete counseling that includes are all legal and appropriate options in a balanced discussion that includes the risks and benefits of each option presented according to best evidence, not physician preferences, biases or religious and ideological commitments. (AMA Code of Ethics 2.1.1 and 2.1.3, 2017.) This is the standard of care for all informed consent discussions. (Id.)

Ideally, the healthcare provider can guide a patient among choices helping her determine the best option for her and her circumstances. A healthcare provider who guides a patient based upon the provider's religious commitments, when not shared by the patient, is failing in their duty to provide informed consent because they are placing their personal values above the professional value of supporting patient autonomy. This must include supporting a patient choice that the healthcare provider may even have qualms about regarding whether it is actually the best choice for the patient after they have been thoroughly counseled. As the ACOG committee opinion on sterilization describes:

> The goal of sterilization counseling—and counseling more generally—is to adopt a patient-centered approach in which decision making is shared between a patient and her caregiver. Paternalism, in which a physician overrides a patient's autonomy to "protect" her from the consequences of her own decision making, should be avoided. (ACOG CO 695, 2017.)

It is a paternalistic violation of autonomy to withhold information or to "steer" a patient toward a choice grounded in provider preferences, rather than patient values. Similarly, if a physician does not provide a particular treatment option for religious reasons, in general, they must still assist the patient in finding an appropriate provider since their refusal is grounded in a personal commitment rather than a professional judgment. (AMA Code of Ethics, 1.1.7, 2017.)

NIFLA 01790

There is a limited amount of appropriate filtering that a physician can do ethically in their patient counseling. (Whitney and McCullough, 2007.) Delimiting this is the same concept previously discussed—provider filtering can be based upon medical facts (that a particular option is contraindicated for this patient) or already stated patient values. A patient requesting a short-term contraceptive for spacing between children does not need to hear a discussion regarding permanent sterilization. A healthcare provider who refuses to discuss or disclose options that they oppose for religious or personal reasons would be engaging in inappropriate filtering.

In their complaints, the CPCs claim that legally available and medically appropriate options do not need to be discussed because they are judged to globally be without benefit. (NIFLA Complaint, p. 16, para. 89.) This is an empirically testable claim, and it is simply without merit or evidence to support. While the personal benefits of contraception can be attested to by literally millions of women and couples, there are clear medical benefits to individual methods that also should be discussed with patients trying to choose the best option for their life circumstances. For example, oral contraceptives reduce the risk of gynecological cancers (Bosetti et al., 2002), progestin containing IUDs reduce menstrual bleeding and pain (Luukkainen and Toivonen, 1995), and condoms reduce the risk of sexually transmitted infection. (Morris, 1993.) All of these factors are potentially important to any given patient making a choice regarding contraception and should be part of the discussion.

Sterilization is the most common form of contraception employed in the United States by couples, chosen by 36% of American women. (Bartz and Greenburg, 2008.) It has some obvious advantages over other contraceptive methods including very low failure rates and no need for repeated prescriptions. Some women are unable to employ hormonal contraception because of medical conditions or would face serious health risks with becoming pregnant. (Serfaty, 2019, Abbas et al., 2005.) Additionally, tubal ligation (female sterilization) has the long-term health benefit of reducing a woman's risk of ovarian cancer and pelvic infections. (Bartz and Greenburg, 2008.)

It is the pregnant woman who presents for care and counseling, and it is not a contestable claim to state that women do often benefit from receiving an abortion, and likewise can be harmed be failing to obtain one. Carrying a pregnancy to term is fourteen-fold more likely to end in a maternal death than induced abortion for the general population; it can be higher for women with specific risk factors. (Raymond and Grimes, 2012.) Recent research also shows

8

worse overall health over a five-year period for women who carried their pregnancy to term compared to women who chose to have an abortion. (Ralph et al., 2019.)  Roberts et al. found that women who tried to obtain an abortion but failed were more likely to remain with a violent domestic partner. (Roberts et al. 2014.)  Women who sought but were denied an abortion also suffer greater economic hardship and insecurity that lasts for years. (Foster et al., 2018.)  While having a child can be life's greatest joy for many, it is undeniable that some women suffer significant physical and economic harms by continuing an unplanned pregnancy.  Given this set of facts, the decision regarding continuing an unplanned pregnancy must be made in the settings of supportive, patient-centered counseling.  Anything less violates the biomedical principle of nonmaleficence, the duty to reduce harm.  A patient manipulated into carrying a pregnancy she did not anticipate, and may not be physically, emotionally, or financially able to support, may suffer real and lasting harm from the counseling she received.  In effect, this represents a violation of two of the four central principles governing biomedical ethics—respecting patient autonomy and nonmaleficence.

### d.  Professional Obligations of Conscientious Objector Providers

There are several ways for a conscientious objector healthcare provider to carry out his/her duties consistent with the standard of care and medical ethics. One method is to provide evidence-based counseling regarding the risks and benefits of every treatment option appropriate to the patient's circumstances and make referrals for other procedures the objector does not perform. (AMA Code of Ethics, 2.1.1, 1.1.7, 2017.)  As a practicing Catholic and instructor of Ob/Gyn for thirty years, this principle has guided my own practice. Yet it is not the only option. Physicians who feel unable to counsel objectively regarding an option can refer for appropriate counseling from another provider. (Id).[2]

What is not ethical is to claim to be providing a medical service when in fact the provider is failing to provide counseling that is consistent with standards of care.  In this case, the provider's commitments are not primarily medical, and their religious beliefs have usurped the professional obligations of their profession and specialty.  A woman who seeks religiously based counseling can obtain this from a religious leader.  To receive religiously committed counseling from someone claiming to be a medical provider, unless this is explicitly stated and agreed upon

---

[2] As discussed later in Section (f), the Illinois statute allows providers other options, including providing written information on other providers.

NIFLA 01792

by the patient, is deceptive, unethical, and a clear violation of medical practice. As Judge Pallmeyer noted, the State has an interest in upholding the integrity of the medical profession. (Pallmeyer, p. 23.) It is not surprising that the amendments to the statute ensure that medical practice in Illinois is held to the standards of informed consent, and that the duties expected of healthcare providers, like this author, who are conscientious objectors to some medical procedures on religious grounds, still include objective counseling and referral, referral if unable to appropriately counsel, or as specifically laid out by the statute, transferring the patient or providing written information.

### e. Analysis of CPC Practices

As Judge Pallmeyer's opinion notes, CPCs hide their actual mission from the patients who seek out care with them. (Pallmeyer, p. 5.) The name "crisis pregnancy" may draw women who find being pregnant a problem that needs to be addressed, not an unequivocally happy moment in their lives. As noted above, the standard of care dictates that these patients must receive complete and unbiased counseling on all of the legal options for the management of their unplanned pregnancy. This is not what the CPCs provide, as evidenced by their own language in their complaints filed with the court. Their mission is to push a single pregnancy outcome, not to provide a fair discussion of all the options. It is a clear violation of medical standards of care to place provider directed ideological concerns over the autonomous choices of our patients. Autonomous choice must be free of coercion, must be informed, and must be non-manipulative. As the authors of *The Principals of Biomedical Ethics* describe:

> In health care the most common form of manipulation is informational manipulation, a deliberate act of managing information that alters a person's understanding of a situation and motivates him or her to do what the agent of influence intends. Many forms of informational manipulation are incompatible with autonomous decision making. For example, lying, *withholding information*, and misleading exaggeration with the intent to lead persons to believe what is false all compromise autonomous choice. (Beauchamp and Childress, 2019, p. 137, italics added.)

To give just one example that is salient to the question of whether informed consent is possible in these settings, the NILFA Complaint states that the medical services offered, "are germane to NIFLA's purpose, including the purpose to support its pro-life pregnancy center members and enable them to carry out their missions consistent with their pro- life and religious viewpoints." (NIFLA Complaint, p. 13, para. 69.) This ordering of priorities placing the medical

NIFLA 01793

mission subservient to a "religious viewpoint" certainly is sufficient to raise the question whether true informed consent could occur in this setting, and lack of informed consent is itself a significant violation of standards of care. In Dr. Gingrich's portion of the complaint, she specifically objects to describing any possible benefits to abortion. (NIFLA Complaint, p. 16, para. 89-90.) Since there are empirically established benefits to abortion in some instances, both medical and socio-economic (as discussed above), the refusal to discuss these benefits is sufficient to place counseling below professional standards of care.

It is possible for the CPCs to both abide by their conscience-based limitations of care while still meeting the requirements of the statute and amendments. It is not a violation of informed consent precepts for a provider to openly share with a patient their personal values or perspective, as long as the medical aspects of the decision are discussed in an objective, evidence-based, non-deceptive discussion. The CPCs' own description of their mission is to, "…empower women who are or may be pregnant to choose to give birth…" (NIFLA Complaint, p. 8, para. 36.) The use of "empower" here is unintentionally ironic since empowering patients is generally understood as supporting them in decision making grounded in their life, values, and medical circumstances, not the religious convictions of the healthcare provider. Patients can be empowered to make their own best choice even when a provider offers a personal perspective provided the medical aspects of the consent are complete and unbiased.

As Judge Pallmeyer's opinion also describes, the ideological mission of the CPCs' counseling is evident in their omitting discussion of any possible benefits to abortion, and also in their overstatement of abortion risks, including the thoroughly debunked claim that abortions increase the risk of breast cancer. (Reeves et al., 2006.) It is the deviation from evidence-based counseling that places CPCs at risk of failing to meet the medical and ethical standards of care. Having ideological commitments is acceptable provided that they do not interfere with meeting the requirements of adequate informed consent, and referral when necessary. The Statute and Amendments do not actually require direct referral, although both the AMA Code of Ethics and *The Principles of Biomedical Ethics* do support this higher standard. As explained below, the Statute and Amendments are actually more protective of the conscientious objector healthcare provider. CPCs can function under this statute, provided they separate their personal, religious values from the medical counseling required by ethical and legal standards.

NIFLA 01794

### f. The Amendments to the Applicable Statute

In reviewing the requirements on Illinois healthcare providers established by the Statute and amendments, it is clear that the expectations for provider conduct are no greater than, and on this issue of referral, less than expectations taught and embodied in medical schools, medical ethics, standards of care, and specialty organizations. Without requiring referral, the current Statute and amendments are sufficient patient protection to insure that patients receive adequate information to find a provider willing to perform the procedure or treatment of the patient's choice. This codification of profession standards ensures best practices for the patients of the State of Illinois and should not be abrogated. This statute and amendments impose no obligation upon the provider not already expected by medical ethics. The statute protects providers from being required to perform procedures or treatments that they have conscience-based objections to. This is not changed by the Amendments. What has been changed is that providers must meet standards of care. I will address each relevant section of the amended statute in turn.

> Sec. 6.1 Access to care and information protocols. All health care facilities shall adopt written access to care and information protocols that are designed to ensure that conscience-based objections do not cause impairment of patients' health and that explain how conscience-based objections will be addressed in a timely manner to facilitate patient health care services. The protections of Sections 4, 5, 7, 8, 9, 10, and 11 of this Act only apply if conscience-based refusals occur in accordance with these protocols. These protocols must, at a minimum, address the following:

Health care facilities must plan proactively that conscience-based refusal of care or counseling could occur and must have a written plan in place for addressing this. This is important to prevent lapses in ethical standards of care based upon an individual provider's beliefs. By having the rules and protocol for how conscience-based refusals with be addressed, employers have the opportunity to train providers in ethical conscience-based refusal that will still respect patient autonomy and allow the provision of care requested by the patient.

> (1) The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care.

This is a restatement of the elements of informed consent. It is a requirement of the medical profession that providers must be willing and able to separate personal values from

12

medical facts, and it is medical facts that must be presented to achieve informed consent. The Statute with amendments is codifying the principles of biomedical ethics in that it is requiring healthcare providers who are counseling patients to respect patient autonomous choice by providing complete and accurate informed consent counseling in every instance where a patient is trying to choose between differing medical options. This includes, but is not limited to abortion, contraception, and sterilization. The statute is not singling out reproductive health decision-making, but it is a fact that most conscientious objections to healthcare reside in this specialty.

> (2) When a health care facility, physician, or health care personnel is unable to permit, perform, or participate in a health care service that is a diagnostic or treatment option requested by a patient because the health care service is contrary to the conscience of the health care facility, physician, or health care personnel, then the patient shall either be provided the requested health care service by others in the facility or notified that the health care will not be provided and be referred, transferred, or given information in accordance with paragraph (3).

This section upholds the provider's right of conscience. Physicians and other healthcare providers maintain the right to refuse to provide care that is contrary to their personal values, and the Statute and Amendments support this. However, the right of refusal must not impact the patient's right to receive care that she has chosen, so there must be some mechanism for patients to receive this information from a physician or healthcare provider who is otherwise refusing to provide the service.

> (3) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.

While the mainstream bioethics community would favor a duty to refer, the statute and amendments have a different standard. In medical practice, a referral involves direct contact with the physician who the patient is being sent to for additional care, often including making an appointment in the new practice and sending records proactively. The intent of the Statute and amendments is still to ensure that patients who desire a procedure that a healthcare provider does

13

not perform for conscience-based reasons will not be left without some guidance as to how to obtain their informed choice. Another option that would satisfy the Statute and Amendments without providing direct referral would be to have a pre-printed list of providers of the service to give to patients. The Amendments are more protective of conscientious objectors than many mainstream voices in bioethics who would argue that the duty is actual referral to an abortion provider, a course not required by the revised statute. (Dickens and Cook, 2000.)

> (4) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall provide copies of medical records to the patient or to another health care professional or health care facility designated by the patient in accordance with Illinois law, without undue delay.

This is consistent with the AMA Code of Ethics. (3.3.1, 2017.) Health care facilities must maintain complete medical records and must provide them to other providers when requested. Failing to provide medical records can lead to medical errors and lapses in care that can directly harm patients, violating the principle of nonmaleficence (duty to reduce the risk of patient harm).

In conclusion, insisting that healthcare providers place patient interests and values over their own, provide accurate and unbiased information in their informed consent counseling, and help patients find a provider for procedures or treatments that their facility does not perform are all consistent with the standards of medical ethics, both in the academic literature and as it is taught in medical schools throughout this country. For the reasons explained above and throughout this report, the 2017 Amendments to the Illinois Healthcare Right of Conscience Act are consistent with both the standard of medical care and medical ethics. The Amendments are appropriately protective of both provider rights of conscience and patient rights to choose and receive the care they need and expect from medical professionals.

NIFLA 01797

Date: August 16, 2021

_____

Dr. Paul Burcher

NIFLA 01798

**EXHIBIT A**: The Curriculum Vitae of Dr. Paul Burcher

NIFLA 01799

**CURRICULUM VITAE**

Paul Burcher MD, Ph.D
Program Director of Obstetrics and Gynecology Residency
WellSpan, York Hospital
Clinical Associate Professor of Obstetrics and Gynecology
Pennsylvania State University College of Medicine
Drexel University College of Medicine
pburcher@wellspan.org

**EDUCATION**

Ph.D. Philosophy, University of Oregon, Eugene, Oregon, 12/2011
M.A. Philosophy, University of Oregon, Eugene, Oregon, 5/2009
M.D. University of Arizona College of Medicine, Tucson, Arizona, 85/1991
B.A. Boston College, Boston, Massachusetts, 5/1985

**POST-GRADUATE TRAINING**

Residency in Obstetrics and Gynecology, University of Rochester, New York,
7/1991-10/1995

Clinical Ethics Fellowship, University of Chicago, 5/2014 - 7/2015

**AREAS OF SPECIALIZATION**

Obstetrical Ethics, Medical Ethics
Fellow of the American College of Obstetrics and Gynecology, 11/1997-present

**PROFESSIONAL EXPERIENCE (EMPLOYMENT HISTORY AND FACULTY
APPOINTMENTS)**

Obstetrician/Gynecologist, University Primary Care, SUNY Buffalo, Olean New York,
10/1995-7/2002

Director of Residency Education in Obstetrics, SUNY Buffalo, Rural Family
Practice Residency, 10/1995-7/2002

Clinical Assistant Professor, State University of New York, Buffalo, 10/1995-
7/1999

Clinical Associate Professor, State University of New York, Buffalo, 7/1999-
10/2002

Obstetrician/Gynecologist, PeaceHealth Medical Group, 7/2002-10/2011

Director of Obstetrics and Gynecology, PeaceHealth Medical Group, 2005-2008

Clerkship Site Director, Obstetrics and Gynecology Third-Year Medical School Clerkship in Eugene, Oregon Health Sciences University, 7/2007-9/2011

Clinical Assistant Professor, Oregon Health Sciences University, 7/2007-9/2011

Assistant Professor, Albany Medical College, Alden March Bioethics Institute and Department of Obstetrics and Gynecology, 10/2011-11/2014

Associate Professor, Albany Medical College, Alden March Bioethics Institute and Department of Obstetrics and Gynecology, 11/2014-2019

Clerkship Director, Obstetrics and Gynecology Third-Year Medical School Clerkship, Albany Medical College, 7/2015-5/2016

Associate Director of Alden March Bioethics Institute, Albany Medical College, 2/2015-7/2017

Program Director of Obstetrics and Gynecology Residency, Department of Obstetrics and Gynecology, Albany Medical College, 5/2016-7/2017

Program Director of Obstetrics and Gynecology Residency, Department of Obstetrics and Gynecology, WellSpan, York Hospital, 8/2017-present

Clinical Associate Professor of Obstetrics and Gynecology, Drexel University College of Medicine, 7/2018-present.

Clinical Associate Professor of Obstetrics and Gynecology, Pennsylvania State University College of Medicine, 11/2018-present.

## HONORS AND AWARDS

Alpha Sigma Nu, Jesuit Honor Society, 1985

Phi Beta Kappa, 1985

Summa cum laude, 1985

Alpha Omega Alpha, Medical Honor Society, 1990

Outstanding Specialty Teacher 1998, 1999, 2000

Resident Teaching Excellence, 2014, 2015,2016

Association of Professors of Gynecology and Obstetrics (APGO) Excellence in Teaching Award, 2015

NIFLA 01801

Chairman Award for Contributions to Obstetrics and Gynecology Residency, 2015

American College of Obstetrics and Gynecology District II Mentor Award, 2016

## COMMITTEE MEMBERSHIP (PROFESSIONAL COMMITTEES)

*Institutional:*
Chair, Health Inequities Committee, 2019-2020
Quality Assurance Committee, York Hospital, 2019-present
Alternate Member, Institutional Review Board (IRB) York Hospital, 2018-present
Chair, Perinatal Addiction Committee, 2018-2020
Assistant Chair, Ethics Committee, York Hospital, 2017-present
Conference Co-Director, Reproductive Ethics, Albany Medical College, 2016, 2017, 2018, 2019
Chair, Ethics Committee, Albany Medical Center, 2015-2017
Surgical Review Committee, Albany Medical Center, 2013- 2015
Faculty Senate, Albany Medical College, 2013-2015
Co-chairperson, Ethics Committee, Sacred Heart Medical Center, 2008-2011
Ethics Committee Member, Olean General Hospital, 1998-2002

*Local and Regional:*
President, York County Medical Society, 5/2020-present
Pennsylvania Medical Society, House of Delegates, Science and Education Reference Committee Member, 2019
Pennsylvania Medical Society, House of Delegates, Delegate, 2018, 2019
York County Medical Society, Vice President 2018-2019
Human Subjects Review Board, University of Oregon, 2008-2011
Northwest Institute of Conflict Resolution, Board of Directors, 2007-2011

## PROFESSIONAL ORGANIZATIONS
American College of Obstetrics and Gynecology
Association of Professors of Gynecology and Obstetrics
American Society of Bioethics and Humanities
York County Medical Society
Pennsylvania Medical Society

## EDUCATIONAL ACTIVITIES

*Medical Ethics*, 2008-2010. University of Oregon. Course developer and Instructor. Medical Ethics course for undergraduate students. Cross-listed in biology and philosophy.

*Health, Care, and Society*, 2011-2017. Albany Medical College. Course Director and Instructor of longitudinal course for third and fourth-year medical students teaching medical ethics in small group discussion and narrative writing.

NIFLA 01802

*Justice in Health Care,* 2015-2018. Alden March Bioethics Institute, Albany Medical College.  Graduate course in bioethics.

*Vulnerable Populations*, 2013-2016. Alden March Bioethics Institute, Albany Medical College.  Graduate course for clinical ethics fellowship.

*Ob/Gyn Clerkship Ethics*, 2017-2018.  Monthly case-based ethics conference with third-year clerkship students on obstetrics and gynecology rotation using both student cases and hypothetical cases to teach clinical ethics.

## CLINICAL ACTIVITIES (current)

Wellspan York Hospital**.**  Preceptor for Resident Continuity Clinic and Laborist

## BIBLIOGRAPHY

### PEER REVIEWED PUBLICATIONS

Miller William, Burcher Paul, et al. 1990.  AIDS Knowledge and Attitudes Among Adolescents in the Rural Southwest. The Journal of Rural Health.  6:246-255.

Burcher Paul.  2009. The Just Distance: Narrativity, Singularity, and Relationality as the Source of a New Biomedical Principle. The Journal of Clinical Ethics. 20 (4):299-309

Burcher Paul.  2011. Emotional Intelligence and Empathy:  Its Relevance in the Clinical Encounter."  Patient Intelligence. 3:1-6.

Burcher Paul. 2012.  The Non-Compliant Patient:  A Kantian and Levinasian Perspective. The Journal of Medicine and Philosophy. 37(1): 74-89.

Burcher Paul. 2013. The Ulysses Contract in Obstetrics:  A Woman's Choices Before and During Labor.  The Journal of Medical Ethics. 39:27-30.

Burcher Paul, Gabriel Jazmine, Campo-Engelstein Lisa, Kiley Kevin C. 2013 The Case Against CDMR in Labor.  Obstetrics and Gynecology.  122(3): 684-7.

Cheyney Melissa, Everson Courney, Burcher Paul. 2014.  Communicating Across the Home-Hospital Divide in the United States: Narratives of Risk, Fear and Mutual Accommodation. Qualitative Health Research. 24(4): 443-456.

Burcher Paul. 2014. Pimping: Report or Do Nothing. Virtual Mentor:  American Medical Association Journal of Ethics. 16(3): 161-164.

Cheyney Melissa, Burcher Paul, Vedam Saraswathi. 2014. A Crusade against Home Birth. Birth. 41(1):1-4.

Jankowski,Jane and Burcher Paul. 2015. Home Birth of Infant with Anticipated Congenital Anomalies: A Case Study and Ethical Analysis of Provider Obligations. The Journal of Clinical Ethics. 26(1): 27-35.

Burcher Paul. 2015. The Patient-Doctor Relationship: Where Are We Now? University of Toledo Law Review. 46:3.

Campo-Engelstein Lisa, Howland Lauren, Parker Wendy, Burcher Paul. 2015. Scheduling the Stork: Media Portrayals of Women's and Physicians' Reasons for Cesarean Delivery on Maternal Request. Birth. 42(2): 1-8.

Cheyney Melissa, Bovbjerg Marit, Burcher Paul. 2015. Safe for Whom? A Commentary on the Safety of Home Birth. British Journal of Obstetrics and Gynaecology. 122(9): 1235.

Lynch Tara and Burcher Paul. 2015. Periviability: Translating Informed Assent and Non-Dissent to Obstetrics. Ethics and Medicine. 32(1): 31-38.

Keller Nate, Guan Xuan, Wiczulis Alicia, Burcher Paul. 2015. Unexplained Persistent Postpartum Palpitations and Tachycardia Due to Group A Streptococcus: A Case Report. BMC Research Notes. 8:731.

Burcher Paul and Gabriel Jazmine. 2016. There is No Place Like Home: The Limits of Institutional Change and Why Home Birth Remains a Rational Choice. International Journal of Feminist Approaches to Bioethics. 9(1): 149-165.

Burcher Paul, Cheyney Melissa, et al. 2016 Cesarean Birth Regret and Dissatisfaction: A Qualitative Approach. Birth 43(4): 346-352.

Burcher Paul. 2016. Interprofessional Training is Not Optional. Virtual Mentor: American Medical Association Journal of Ethics. 18(9): 898-902.

Burcher Paul. 2018. Beyond Empathy: Teaching Alterity. Canadian Journal of Bioethics. 1(2):18-21.

Horner Claire and Paul Burcher. 2018. A Surrogate's Secrets Are(n't) Safe with Me: Patient Confidentiality in the Care of a Gestational Surrogate. Journal of Medical Ethics. 13(6).

Lynch Tara, Cheyney Melissa, Chan Meredith, Walia Jennifer, Burcher Paul. Temporal Themes in Periviable Birth: A Qualitative Analysis of Patient Experiences. Maternal and child health journal. 2019 Mar 15;23(3):422-30.

NIFLA 01804

Burcher, Paul and Gabriel, Jazmine. 2020. Beneficence in maternity care: Objective aspects of subjective goals. The American Journal of Bioethics, 20(3), pp.88-90.

Burcher, Paul, Hushmendy Shazneen, Chan-Mahon Meredith, Dasani Megan, Crosby Erin. 2020. Unplanned Cesarean Birth:  Can the Quality of Consent affect Birth Experiences?  The American Journal of Bioethics Empirical Bioethics, pp. 1-7.

Burgess Adriane, Breman Rachel, Blankstein, Bradley Dani, Dada Sophia, Burcher Paul. 2020. Pregnant Women's Reports on the Impact of Covid-19 on Pregnancy, Prenatal Care, and Infant Feeding Plans.  The American Journal of Maternal/Child Nursing.

Breman Rachel, Neerland Carrie, Bradley Danielle, Burgess Adriane, Barr Erik, Burcher Paul. 202. Giving Birth during the Covid-19 pandemic, perspectives from a sample of US birthing persons during the first wave:  March-June 2020. Birth.


## BOOKS AND BOOK CHAPTERS

Cheyney, Melissa, Paul Burcher. 2010.  Policy for Increased Collaboration Between Direct-Entry Midwives (DEMS) and Obstetricians for Homebirth Clients.  In Born at Home:  The Biological, Cultural, and Political Dimensions of Maternity Care in the United States.  Wadsworth:  Belmont.

Burcher, Paul. 2014.  The Patient-Doctor Relationship:  A Historical and Philosophical Perspective. Encyclopedia of Human Biology:  Bioethics, 3rd ed. Elsevier: Philadelphia.

La Chance-Adams, Sarah, Paul Burcher. 2014.  Communal Pushing:  Childbirth and Intersubjectivity.  In Feminist Phenomenology and Medicine.  Edited by Kristin Zeiler and Lisa Krall. SUNY Press.

Lynch, Tara, Paul Burcher. 2017.  The Periviable Cesarean Section:  Can a Case be Made for Expanding Beneficence in Decision-Making?  In Reproductive Ethics:  New Challenges and Conversations.  Edited by Lisa Campo-Engelstein and Paul Burcher. Springer.

Campo-Engelstein, Lisa, Paul Burcher (eds). 2017.  Reproductive Ethics:  New Challenges and Conversations.  Springer.

Campo-Engelstein, Lisa, Paul Burcher (eds). 2018.  Reproductive Ethics:  New Ideas and Innovations. Springer.

Burcher, Paul. The Changing Landscape of Cesarean Delivery on Maternal Request. Surgical Ethics. Edited by Peter Angelos.  Springer.  Publication anticipated 2021.

**RESEARCH GRANTS**

York Opioid Collaborative, 2018.  $6000
Support for research on non-opioid pain relief using subcutaneous local anesthetics to reduce post-operative pain in patients with opioid use disorder.

NICHD 1R03HD096094, 2019.  Principle Investigator Marit Bovbjerg.  Grant for research investigating community birth outcomes comparing home birth and birth center intrapartum and neonatal outcomes.


**SPECIALTY ARTICLES (NON-PEER REVIEWED)**

Is It Possible to "Do No Harm?"  ObGyn.net.  July 11, 2013.
http://www.obgyn.net/blogs/ethical-obgyn-it-possible-do-no-harm

Don't Dread the Birth Plan.  ObGyn.net.  September 19, 2013.
http://www.obgyn.net/blogs/ethical-obgyn-don't-dread-birth-plan

Designing Babies.  ObGyn.net.  October 23, 2013.
http://www.obgyn.net/pregnancy-and-birth/ethical-obgyn-designing-babies

When Good Intentions Lead to Unethical Prescriptions:  A Case Against Bedrest.ObGyn.net.  December 12, 2013.
http://www.obgyn.net/pregnancy-and-birth/when-good-intentions-lead-unethical-prescriptions-case-against-bed-rest

Do EMRs Make Clinicians Less Ethical?  ObGyn.net. February 6, 2014.
http://www.obgyn.net/obgyn-ehr/do-emrs-make-clinicians-less-ethical.

Professionalism, Second Opinions, and Keeping Ego Out of Medicine.  ObGyn.net.  March 20, 2014. http://www.obgyn.net/blog/professionalism-second-opinions-and-keeping-ego-out-medicine

Losing Informed Consent.  ObGyn.net. May 29, 2014.
http://www.obgyn.net/pregnancy-and-birth/losing-informed-consent

Refusal of C-Section:  Where Does Your Moral Compass Lead You? ObGyn.net.  June 26, 2014. http://www.obgyn.net/blog/refusal-c-section-where-does-your-moral-compass-lead-you

The Scylla and Charybdis of Medical Ethics.  ObGyn.net.  October 10, 2014.
http://www.obgyn.net/blog/scylla-and-charybdis-medical-ethics

NIFLA 01806

What's an Ethical Response to Home Birth?  ObGyn.net. December 4, 2014.
http://www.obgyn.net/pregnancy-and-birth/whats-ethical-response-home-birth

## SELECTED CONFERENCE AND INVITED PRESENTATIONS

"The Limits of Narrative: A Critique of Narrative Medicine," Medical Humanities Conference, Western Michigan University, 2011.

"The Normative Implications of Liminal Motherhood," American Anthropological Association, San Francisco, Ca. 2012.

"The Ethics of Home Birth and Hospital-based Obstetrics," Alden March Bioethics Institute Conference on Reproductive Ethics, Albany, NY, 2012.

"The Overreaching of Narrative Medicine:  A Dialogical Response," American Society of Bioethics and Humanities Annual Conference, Washington D. C. 2012.

"The Case Against CDMR in Labor," Burcher, Paul, Jazmine Gabriel, Lisa Campo-Engelstein, Kevin C. Kiley. American Society of Bioethics and Humanities Annual Conference, Atlanta, GA. 2013.

"The Ethics of Home Birth and Informed Decision-Making," Ethics Panel, Home Birth Summit, Seattle, Washington, 2014.

"Dissatisfaction Relating to Unplanned Cesarean Sections:  A Qualitative Approach," Brennemann, Kalie, Shazneen Hushmundy and Paul Burcher, Medical Humanities Conference, Western Michigan University, 2014.

"The Case against Cesarean Delivery on Maternal Request in Labor," Burcher, Paul and Lisa Campo-Engelstein, Feminist Approaches to Bioethics, Mexico City, Mexico, 2014.

"The Patient-Doctor Relationship:  Where are We Now?" University of Toledo Health Law Symposium, Toledo, Ohio, 2014.

"Home Birth Midwives and Obstetricians:  A Case for the Duty to Collaborate." American Society for Bioethics and Humanities, San Diego, California, 2014.

"There is No Place Like Home." Jazmine Gabriel, Paul Burcher.  American Society for Bioethics and Humanities, San Diego, California, 2014.

"Barriers to Communication between Obstetricians and Midwives."  New York State Perinatal Association, Albany, New York, 2015.

"Teaching Ethics in the Clinical Clerkships of Medical School: A Case-Based Approach using Student Narratives."  Paul Burcher, Wayne Shelton.  American Society of Bioethics and Humanities, Houston Texas, 2015.

"Periviable Maternal Decision-Making:  Optimizing Patient and Physician Communication."  Paul Burcher, Tara Lynch. American Society of Bioethics and Humanities, Houston Texas, 2015.

"Pro-Choice but Not This Choice:  The Case Against Sex Selection Abortion." Reproductive Ethics.  Albany Medical College, Alden March Bioethics    Institute, Albany, New York, 2016.

"Cesarean Delivery on Maternal Request:  Did We Let Birth Choice Override Safety?" Reproductive Ethics Seminar, University of Chicago, Chicago, Illinois, 2016.

Keynote Speaker, "Cesarean Delivery on Maternal Request" and "Shared Decision Making in Obstetrics and Gynecology," Cross Cultural Perspectives on Decision Making in Medicine and Surgery, University of Chicago Beijing and Hong Kong, Peking Union Medical College, Beijing and Hong Kong, China, 2017.

"A Surrogate's Secrets Are(n't) Safe with Me:  Patient Confidentiality in the Care of a Gestational Surrogate."  Claire Horner, Paul Burcher.  American Society of Bioethics and Humanities, Kansas City, Missouri, 2017.

"Midwifery and Medical Ethics:  Negotiating the Balance between Patient Autonomy and Professional Obligations."  Paul Burcher. American College of Nurse Midwives, Region 1 Annual Meeting, Kinston, New York, 2017.

"The Physician Wellness Movement and Burn Out:  Are We Doing Kegels When the Patient Needs a Sling?"  Paul Burcher.  Grand Rounds, Albany Medical Center. Albany, New York, 2018.

"The Physician Wellness Movement and Burn Out:  Are We Doing Kegels When the Patient Needs a Sling?"  Paul Burcher.  ACOG District 2 Annual Meeting, New York, New York, 2019.

"Resilience and Remembrance in the U.S. Birth Experience:  How Women Navigate the clinical and Social Challenges of U.S. Hospital Birth. Panel Presentation. Moderator: Paul Burcher.  Speakers:  Paul Burcher, Melissa Cheyney, Lauren Diskin, Sarah Edwards.  American Society of Bioethics and Humanities Annual Meeting, Pittsburgh, Pennsylvania, 2019.

NIFLA 01808

NIFLA 01809

**EXHIBIT B**: References

Abbas, Amr E., Steven J. Lester, and Heidi Connolly. "Pregnancy and the cardiovascular system." *International Journal of Cardiology* 98, no. 2 (2005): 179-189.

Bartz, Deborah, and James A. Greenberg. "Sterilization in the United States." *Reviews in Obstetrics and Gynecology* 1, no. 1 (2008): 23.

Beauchamp, Tom, James Childress. *Principles of Biomedical Ethics, 8th edition*. Oxford University Press, New York. 2019.

Bester, Johan Christiaan. "Beneficence, interests, and wellbeing in medicine: What it means to provide benefit to patients." *The American Journal of Bioethics* 20, no. 3 (2020): 53-62.

Bosetti, Cristina, Eva Negri, Dimitrios Trichopoulos, Silvia Franceschi, Valerie Beral, Anastasia Tzonou, Fabio Parazzini, Stefano Greggi, and Carlo La Vecchia. "Long-term effects of oral contraceptives on ovarian cancer risk." *International Journal of Cancer* 102, no. 3 (2002): 262-265.

*Code of Medical Ethics: AMA*. American Medical Association. USA. 2017.

Committee on Ethics, American College of Obstetricians and Gynecologists, 390, reaffirmed 2016.

Committee on Ethics, American College of Obstetricians and Gynecologists, 695, 2017.

Dickens, Bernard M., and Rebecca J. Cook. "The scope and limits of conscientious objection." *International Journal of Gynecology & Obstetrics* 71, no. 1 (2000): 71-77.

Foster, Diana Greene, M. Antonia Biggs, Lauren Ralph, Caitlin Gerdts, Sarah Roberts, and M. Maria Glymour. "Socioeconomic outcomes of women who receive and women who are denied wanted abortions in the United States." *American Journal of Public Health* 108, no. 3 (2018): 407-413.

Gillon, Raanan. "Ethics needs principles—four can encompass the rest—and respect for autonomy should be "first among equals"." *Journal of Medical Ethics* 29, no. 5 (2003): 307-312.

Swick, Herbert M. MD Toward a Normative Definition of Medical Professionalism, *Academic Medicine*: June 2000 - Volume 75 - Issue 6 - p 612-616.

King Jr, Joseph H. "In Search of a Standard of Care for the Medicial Profession: The Accepted Practice Formula." *Vand. L. Rev.* 28 (1975): 1213.

Luukkainen, Tapani, and Juhani Toivonen. "Levonorgestrel-releasing IUD as a method of contraception with therapeutic properties." *Contraception* 52, no. 5 (1995): 269-276.

NIFLA 01810

Macklin, Ruth, and Lois Shepherd. "Informed consent and standard of care: what must be disclosed." *The American Journal of Bioethics* 13, no. 12 (2013): 9-13.

Moffett, Peter, and Gregory Moore. "The standard of care: legal history and definitions: the bad and good news." *Western Journal of Emergency Medicine* 12, no. 1 (2011): 109.

Norrie, Kenneth McK. "Medical negligence: who sets the standard?." *Journal of Medical Ethics* 11, no. 3 (1985): 135-137.

Ralph, Lauren J., Eleanor Bimla Schwarz, Daniel Grossman, and Diana Greene Foster. "Self-reported physical health of women who did and did not terminate pregnancy after seeking abortion services: a cohort study." *Annals of Internal Medicine* 171, no. 4 (2019): 238-247.

Raymond, Elizabeth G., and David A. Grimes. "The comparative safety of legal induced abortion and childbirth in the United States." *Obstetrics & Gynecology* 119, no. 2 (2012): 215-219.

Reeves, Gillian K., Sau-Wan Kan, Tim Key, Anne Tjønneland, Anja Olsen, Kim Overvad, Petra H. Peeters et al. "Breast cancer risk in relation to abortion: Results from the EPIC study." *International Journal of Cancer* 119, no. 7 (2006): 1741-1745.

Roberts, Sarah CM, M. Antonia Biggs, Karuna S. Chibber, Heather Gould, Corinne H. Rocca, and Diana Greene Foster. "Risk of violence from the man involved in the pregnancy after receiving or being denied an abortion." *BMC Medicine* 12, no. 1 (2014): 1-7.

Serfaty, D. "Update on the contraceptive contraindications." *Journal of Gynecology Obstetrics and Human Reproduction* 48, no. 5 (2019): 297-307.

Stahl, Ronit Y., and Ezekiel J. Emanuel. "Physicians, not conscripts—conscientious objection in health care." *New England Journal of Medicine* 376, no. 14 (2017): 1380-1385.

Morris, B. A. "How safe are safes? Efficacy and effectiveness of condoms in preventing STDs." *Canadian Family Physician* 39 (1993): 819.

Whitney, Simon N., and Laurence B. McCullough. "Physicians' silent decisions: because patient autonomy does not always come first." *The American Journal of Bioethics* 7, no. 7 (2007): 33-38.

NIFLA 01811