**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 16 CV 50310 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| Ronald Schroeder, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 17 CV 4663 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OF DECISION</u>

This Memorandum of Decision contains the Court's findings of fact and conclusions of law under Rule 52(a). The Court will separately enter Rule 58 judgment orders in each case.[1] The Court concludes that Public Act 99-690 Section 6.1(1), in exchange for a liability shield, compels speech, requiring a discussion about the risks and benefits of childbirth and abortion. That compelled discussion violates the First Amendment. Section 6.1(1) isn't a doctrinally qualifying informed consent

---

[1] The Court thanks counsel for all the Parties for their work in these cases. Without doubt, the subject matter of this litigation can result in intemperate language and behavior. But throughout the Court's involvement with this case, counsel have been courteous and professional among themselves and with the Court. What's more, the Court appreciates the quality of the presentations and filings by all counsel. Thank you. X

1

statute, and the compelled speech isn't "incidental" to conduct. However, unlike Section 6.1(1), Section 6.1(3) doesn't compel speech. Instead, Section 6.1(3) merely regulates professional conduct, instructing clinicians, upon request, to either refer or transfer a patient to another physician, or at least provide her with a list of potential providers. These types of conduct regulations don't implicate the First Amendment's Speech clause. And because Section 6.1(3) returns conscientious objectors to their earlier, generally applicable liability exposure, it doesn't violate the Free Exercise Clause either. So, the Court finds Section 6.1(3) constitutional. Constitutionally, to obtain the liability shield, the State can't require medical professionals to discuss with patients what the State believes are the benefits of abortions; however, if patients request abortions, at a minimum, the State can require medical professionals to provide information of other medical professionals whom they reasonably believe might perform abortions.

**INTRODUCTION**

Before launching into the legal analysis, the Court is compelled underscore the narrow legal and factual issues in this case.

First, as described in more detail later, the legislative evidence presented to the Illinois General Assembly in support of Public Act 99-690[2] was underwhelming. Nevertheless, in its wisdom, the State of Illinois sought to address a perceived

---

[2] A note on citations: As discussed shortly, Public Act 99-690 amended the Health Care Right of Conscience Act ("HCRCA"). Public Act 99-690 encompasses Section 6.1(1) and 6.1(3). When the Court refers to the amendment generally, it uses "Public Act 99-690." It otherwise identifies the particular section (e.g. 6.1(1) or 6.1(3)) at issue. Citations to the Illinois Code (ILCS) refer to the HCRCA.

problem, which it has every right to do in support of the public's health, safety, and welfare. It is not this Court's role to judge the wisdom of a public act. Instead, the Court's limited function is to determine whether Public Act 99-690 is constitutional, in whole or in part.

Second, a preliminary injunction enjoining enforcement of Public Act 99-690 has been in place for nearly a decade. Despite the General Assembly's determinations and the State's assertions that—absent Public Act 99-690—the health of women was in grave peril, no evidence has been presented to this Court that supports that concern. Dkt. 48 at 26–27. Despite extensive summary judgment briefing and a three-day bench trial, no evidence was presented showing that a single woman's health was compromised because Public Act 99-690 was enjoined.

Third, the lack of this evidence should not be surprising. Public Act 99-690 amended the HCRCA to limit its use as an affirmative defense in civil and criminal proceedings. This factual scenario is highly unusual and rarely (if ever) occurs. Indeed, the Parties cited no instances in which this aspect of the HCRCA has been litigated, and the Court was unable to find a single reported case involving this aspect of the HCRCA.

Fourth, the lack of evidence of women's health being imperiled but for Public Act 99-690 is unsurprising because the HCRCA provides no protections for health care professionals who fail to treat emergencies. 745 ILCS 70/6 ("Nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care."); 745 ILCS 70/9

3

("Nothing in this Act shall be construed so as to relieve a physician, health care personnel, or a health care facility from obligations under the law of providing emergency medical care."). Health care professionals who fail to treat pregnant women in a medical emergency find no quarter in the HCRCA, regardless of the amendments contained in Public Act 99-690.

None of the foregoing should be interpreted as minimizing the constitutional issues at stake in this litigation, the role of the State to address perceived concerns about public health, safety, and welfare, or a woman's access to medical care. Instead, the Court notes that its decision is cabined to the statutory scheme at issue and the HCRCA and its subsequent amendments.

## I. BACKGROUND

### A. *Parties*

This case involves two sets of plaintiffs: the National Institute of Family and Life Advocates ("NIFLA") Plaintiffs and the Schroeder Plaintiffs. NIFLA is a religious organization comprised of member pregnancy centers from across the country. NIFLA dkt. 275-2. ¶ 1.[3] The NIFLA Plaintiffs also include three individual Illinois pregnancy centers. *Id.* The Schroeder Plaintiffs include Dr. Ronald Schroeder, the volunteer medical director at Options-Now/Thrive Metro-East, as well as two other pregnancy centers. Schroeder dkt. 236-1 ¶ 1.[4]

---

[3] The Court cites 16-cv-50310 as "NIFLA" and 17-cv-04663 as "Schroeder."
[4] For this decision's purposes, the two sets of Plaintiffs and the Pregnancy Centers' work are essentially identical. So, unless otherwise noted, the Court simply refers to them as "Plaintiffs," and assumes they're all engaged in the same activities.

Defendant is the Director of the Illinois Department of Financial and Professional Regulation. The action is brought against that individual in the individual's official capacity. The current Director—and therefore, Defendant—is Mario Treto Jr. Rather than call out the latest person to hold this office, the Court will simply refer to the Defendant as "the State." The Court is mindful that some adherents of the Eleventh Amendment might be shocked at this approach. But they'll get over it. It's just a label for purposes of this decision.

B.      *The Health Care Right of Conscience Act (HCRCA)*

As the Court previously mentioned, Public Act 99-690 purports to amend the HCRCA. Since its enactment in 1977, the HCRCA has addressed many issues, including prohibiting discrimination and providing a right of action if discrimination occurs. Relevant to this action, the HCRCA provides an affirmative defense against civil and criminal liability. 745 ILCS 70/4, 70/9. Section 4 of the HCRCA contains one of the affirmative defenses:

> No physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel. 745 ILCS 70/4.

Section 9 of the HCRCA contains the other provision providing a defense:

> No person, association, or corporation, which owns, operates, supervises, or manages a health care facility shall be civilly or criminally liable to any person, estate, or public or private entity by reason of refusal of the health care facility to permit or provide any particular form of health care service which violates the facility's conscience as documented in its ethical guidelines, mission statement,

5

constitution, bylaws, articles of incorporation, regulations,
or other governing documents.  745 ILCS 70/9.

In 2016, the General Assembly held hearings regarding the HCRCA because of concerns raised by Illinois residents regarding their health care treatment.

C.       *Legislative History of Amendments to the HCRCA*

Relating to the issues raised in this case, the legislative support for Public Act 99-690 was sparce.  Only two examples have been identified.  First, there appear to be two letters from an anesthesiologist who refused to provide his services when abortions were performed.  Second, there was heartbreaking testimony from a witness about her treatment during a pregnancy that was not viable.  But nothing in the challenged provisions (what would become Section 6.1(1) and Section 6.1(3)) would have remedied any of problems highlighted by these two examples, because Public Act 99-690 neither requires conscientious objectors to personally perform abortion services nor excuses them from facilitating emergency treatment.

Following these hearings, by way of Public Act 99-690, Illinois amended the HCRCA in several ways.  First, Illinois added a provision identifying the public policy for the HCRCA and presumably the amendments to the HCRCA.  According to the amendments, "[i]t is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care."  Second, the amendments added the definition of "undue delay," which "means unreasonable delay that causes impairment of the patient's health."  Third, the amendments added to the list of duties of medical "practices and care" not relieved by the immunity provided by the HCRCA, specifically identifying the duty to inform

6

patients of "legal treatment options" and "benefits of treatment options." Fourth, the amendments to the HCRCA made two significant additions—one entitled "access to care and information protocols" and the other entitled "permissible acts related to access to care and information protocols." Access to care and information protocols are the important parts.

The amendments adding the protocols provision to Section 6.1 are the crux of this litigation. Section 6.1 requires all health care facilities to adopt protocols that allegedly would ensure that conscience-based objections did not impair patients' health. Critically, the affirmative defenses contained in Section 4 and Section 9 of the HCRCA "only apply if conscience-based refusals occur in accordance with these protocols." The consequence being that for physicians, health care personnel, and persons, associations, or corporations that own, operate, supervise, or manage a health care facility to receive the benefits of the affirmative defense, they are forced to comply with the requirements of Public Act 99-690. Their conscience-based actions are unprotected unless they comply with Illinois' mandates in Public Act 99-690, which require physicians to "inform," "give[] information" to, "refer," or "transfer" patients when they are unable to act or provide information to a patient because of a "conscience-based objection."

To obtain the immunity protections, the protocols minimally need to address the requirements of Section 6.1(1) and Section 6.1(3). The Plaintiffs challenge both provisions. Under Section 6.1(1), health care facilities, physicians, and health care personnel are mandated to inform a patient of, among other things, "legal treatment

options, and the risks and benefits of the treatment options in a timely manner." Under Section 6.1(3), if requested by a patient or a patient's representative, health care facilities, physicians, and health care personnel must take one of three actions: (a) refer the patient, (b) transfer the patient, or (c) provide written information about other health care providers who they reasonably believe may offer the service that the facility, physician, or personnel can't provide because of a conscience-based objection. Note a critical difference between Section 6.1(1) and Section 6.1(3): the former mandates speech regardless of anything else; whereas, the latter requires actions when prompted by a patient.

The amendment regarding "permissible acts" allows a health care facility to require physicians and health care personnel working at the facility to comply with the protocols. In full, this amendment states, "[n]othing in this Act shall be construed to prevent a health care facility from requiring that physicians or health care personnel working in the facility comply with access to care and information protocols that comply with the provisions of this Act." 745 ILCS 70/6.2.

Fifth, as to liability, the HCRCA's amendments added that a health care facility is not relieved from providing emergency medical care under the HCRCA. Stated differently, the HCRCA—which is an immunity statute—explicitly doesn't provide any immunity when physicians, health care personnel, or health care facilities fail to meet their legal obligations to provide emergency medical care. 745 ILCS 70/9.

8

D.      *Procedural History of the Litigation*

This litigation started in 2016, when the NIFLA Plaintiffs filed an action in this Court. The Schroeder Plaintiffs then filed an action in the Eastern Division of the Northern District of Illinois, which was consolidated with the NIFLA action in this Court. On July 19, 2017, then-Judge Fredrick Kapala entered a preliminary injunction, enjoining the State from enforcing Public Act 99-690.

On December 15, 2017, based on an unopposed motion, the Court stayed both actions pending the Supreme Court's ruling in *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). Following the Supreme Court's decision, the Plaintiffs asserted that the decision supported their position and the preliminary injunction. The State asserted that *Becerra* "provided some guidance" but was not "dispositive."

After then-Judge Kapala took inactive status, the actions were assigned to then-Chief Judge Rebecca Pallmeyer. The Plaintiffs moved for summary judgment, seeking permanent injunctive relief. They contended that Public Act 99-690 violated their rights to free speech and to free exercise of religion under the First Amendment. On September 3, 2020, Judge Pallmeyer denied the summary judgment motions, concluding that "genuine disputes of material facts remain[ed]." Dkt. 176. In doing so, Judge Pallmeyer found "that expert discovery about the standard of care [was] necessary before the court [could]" resolve the litigation. Dkt. 176 at 36.

Following Judge Pallmeyer's ruling on summary judgment, three events occurred. First, the undersigned was confirmed by the United States Senate and received a commission, resulting in these actions being transferred. Second, the

9

Parties engaged in expert discovery per Judge Pallmeyer's order. Third, following expert discovery, the Court held a three-day bench trial.

## II.     FACTUAL FINDINGS

### A.          *Pregnancy Centers' Work*

Pregnancy Centers ("Pregnancy Centers") are pro-life clinics that will not perform or refer for an abortion. NIFLA dkt. 282-1 ¶ 23. The Pregnancy Centers generally offer free ultrasounds, pregnancy testing, STI testing and treatment. *See* NIFLA dkt. 275-2 ¶¶ 2–15. At least one Pregnancy Center offers "abortion pill reversals." *Id.* ¶ 5. The Pregnancy Centers also provide material assistance to pregnant women and engage in "pregnancy options" and "post-abortion" counseling. *Id.* That counseling includes discussion about the risks of abortion, but it doesn't include a benefits discussion, because the Pregnancy Centers don't believe any benefits exist. *Id.*; NIFLA dkt. 282-1 ¶¶ 31–32. They further believe that counseling about abortion benefits would encourage the procedure. *Id.* ¶ 33. The Pregnancy Centers "rely on the visuals of the ultrasound itself and the health care provider's diagnoses to try to convince pregnant patients to carry to term and not have an abortion." *Id.* ¶ 20. The Parties dispute the extent to which the Pregnancy Centers engage in "medical conduct."

### B.          *Standard of Care and Informed Consent*

On summary judgment, Judge Pallmeyer applied intermediate scrutiny and identified an unresolved factual question: whether Public Act 99-690 "burden[ed] more speech than necessary" and whether secular doctors, upon request, generally

10

transferred, referred, or provided alternative resources. NIFLA dkt. 176 at 23. The State said Public Act 99-690 wasn't overly burdensome because the "standard of care" already required all doctors to discuss a treatment option's benefits and risks. *Id.* at 24. So, the State argued, Public Act 99-690 merely imposed that same standard on the Plaintiffs. *Id.* The Plaintiffs disagreed, claiming that the "standard of care" didn't universally require these types of discussions. *Id.* So, the Plaintiffs contended Public Act 99-690 was underinclusive, applying only to conscientious objectors. *Id.* Judge Pallmeyer ordered a trial to determine what the "standard of care" required.

As discussed later, the Court analyzes the legal issues differently, in a way that turns less on the "standard of care" question. Regardless, a three-day bench trial demonstrated only that, in the abstract, there's no single administrable definition of the standard of care. During that trial, the Parties also discussed "informed consent." Those two issues—standard of care and informed consent—intertwine with one another. However, for later analytical purposes, the Court discusses them separately. All Parties relied on credible and persuasive opinion witnesses. And all Parties agree that any medical organizations pronouncements are only nonmandatory guidelines. NIFLA dkt. 275-2 ¶ 34.

### Standard of Care

The trial testimony was, by and large, consistent with the Parties' briefing: The State argued that Public Act 99-690 simply repeats the professional standards that already bind all health care professionals, while the Plaintiffs argued that the pre-existing standard of care doesn't require a so-called benefits discussion. NIFLA

dkt. 275 at 22; dkt. 271 at 4–8. According to all Parties' retained experts, medical standards of care turn on individualized assessments of a patient's needs, including a woman's medical history, mental health, spirituality, stated goals and expectations, reaction to her pregnancy, the providers' own abilities and expertise, and other factual inquiries. *See e.g.*, Trial Tr. 600:5–13; 629:13–630:21; Trial Tr. 61:6–62:25; *compare* Trial Tr. 431:21–432:9 (Dr. Fernandes encouraging physicians to balance a patient's wishes against other factors) *with id.* at 587:1–25 (Dr. Burcher suggesting patient autonomy is the preeminent principle in modern bioethics). This testimony is unsurprising. Under Illinois law, standard of care depends on the specific factual circumstances presented to the health care professional. *Edelin v. Westlake Comm. Hosp.*, 510 N.E.2d 957, 962 (Ill. App. Ct. 1987). Indeed, Illinois juries are instructed to this effect. Illinois Pattern Jury Instructions, Civil, No. 105.00 (2020). This highly fact-specific inquiry is incompatible with requiring a doctor to discuss so-called benefits with *every* patient—largely because the State never presented evidence that every pregnant woman needs the "thorough[]" discussion that the State tries to impose. NIFLA dkt. 275-1 ¶¶ 90–110.

The State argued that professional organizations create ethical standards of care that encourage health care professionals to provide neutral options counseling and requested abortion referrals. NIFLA dkt. 275 at 5–6. But those standards aren't binding. Trial Tr. 316:8–10; NIFLA dkt. 275-1 ¶¶ 75–78, 106–09.[5] In an amicus brief before the Court, the American College of Obstetrics and Gynecology ("ACOG") cites

---

[5] Like the Pirate's Code, trial testimony established that these standards are more what you'd call "guidelines" than actual rules. https://www.youtube.com/watch?v=WJVBvvS57j0.

its own Code of Professional Ethics, stating that obstetrician-gynecologists must discuss the "risks, benefits, possible complications, and anticipated results" of terminating a pregnancy, and the American Medical Association ("AMA") statement that health care providers "should" present accurate information about "the burdens, risks, and expected benefits of all options." NIFLA dkt. 279 at 3. As the experts testified at trial, ACOG and AMA standards for discussing abortion make no sense when a patient is thrilled to learn of her pregnancy and no reasonable concerns exist for the patient to continue with the pregnancy. Trial Tr. 168:8–13, 629:18–630:2. And, not surprisingly, given the contentious nature of elective abortion, other professional groups have conflicting opinions. *See* Trial Tr. 473:15–475:23. So, all the evidence shows is that the standard of care doesn't require a binding, uniform benefits discussion.

### *Informed Consent*

The Court's best efforts to define "informed consent" were similarly futile. The Parties disagree on the medical definition of "informed consent." According to the Plaintiffs, a doctor's ethical obligations to a specific patient "arise out of the nature of the doctor–patient relationship . . . specifically what has that patient come to the physician for and what is the physician offering to the patient." NIFLA dkt. 271-1 ¶ 28. Accordingly, "[i]nformed consent is the responsibility of the physician who will provide the treatment for which consent is sought, not the referring physician or any other physician." *Id.* ¶ 29. So, according to the Plaintiffs, "a physician need not discuss the risks and benefits of treatments like abortion that they do not personally provide." *Id.* ¶ 30.

13

The State takes a different view. According to the State, "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶ 107. Instead, informed consent can "apply to counseling both about a specific medical intervention by a health care provider or more broadly about different relevant medical options available to a patient, because both involve choosing a treatment option or a plan of care." *Id.* ¶ 108. So, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." *Id.* ¶ 109. According to the State, proper medical care then requires "medical options counseling," in which providers "present[] patients with medically appropriate treatment options for their condition and the risks and benefits of those options." *Id.* ¶ 96. Again, this view makes no sense if the patient is thrilled to learn of the pregnancy and no reasonable medical concerns exist for the patient to continue the pregnancy.

As with the standard of care issue, the witnesses drew their definitions from competing ethical and moral principles. For example, the State says the "*central approach* to biomedical ethics is the 'principalist theory,'" which emphasizes "autonomy, beneficence, nonmaleficence, and justice." *Id.* ¶ 66. But the Plaintiffs stress that some medical professionals—and organizations—adhere to other ethical regimes that balance values differently. *Schroeder* dkt. 236-1 ¶¶ 61–78. So, the Court can't define, in the abstract, a binding, universal definition of "informed consent."

14

## III.  CONCLUSIONS OF LAW

The Court now addresses the legal questions.  It first considers whether either Section 6.1(1) or Section 6.1(3) violates the First Amendment's Free Speech Clause.[6] If warranted, the Court also considers whether either Section violates the Free Exercise Clause.  In making these assessments, this Court recognizes that "[w]here fairly possibl[e], [it] should construe a statute to avoid a danger of unconstitutionality."  *Zbaraz v. Madigan*, 572 F.3d 370, 383 (7th Cir. 2009) (citations omitted); *see Rescue Army v. Mun. Ct.*, 331 U.S. 549, 568–74 (1947).  Further, in addressing the constitutionality of a state statute, a federal court may not formulate a rule of constitutional law broader than is required by the precise facts to which is to be applied.  *United States v. Raines*, 362 U.S. 17, 21 (1960).  And, if a federal court is required to grant injunctive relief, the relief should be no more burdensome than necessary.  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Injunctive relief must be tailored to the scope of the violation and the specific harm established.  *DraftKings Inc. v. Hermalyn*, 118 F. 4th 416, 423 (1st Cir. 2024); *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).

**Unconstitutional Conditions**

The Plaintiffs argue that Public Act 99-690 imposes unconstitutional conditions on the receipt of a public benefit.  Importantly, a state cannot condition the receipt of a public benefit—such as a liability shield—on a citizen surrendering their constitutional rights.  *See Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality

---

[6] The Court only addresses Sections 6.1(1) and (3), because the others aren't contested.  *See* NIFLA dkt. 275 at 9. Section 6.1(2) is not mentioned.  *Id.*

opinion); *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984) ("What a government cannot compel, it should not be able to coerce."). So, the unconstitutional conditions doctrine is a theory of First Amendment liability, not a claim in itself. As discussed more in the Free Exercise section, Public Act 99-690 offers a benefit, namely a liability shield. In making that offer, however, the State can't demand a constitutional violation. So, the threshold question is whether each Section violates the constitution.

**First Amendment Free Speech Claim**

The First Amendment, applicable to the states through the Fourteenth, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I; *Becerra*, 585 U.S. at766. In any challenge to government action that allegedly violates the First Amendment, the first step is to determine whether a particular state-action provision regulates speech (implicating the First Amendment) or conduct (not entitled to First Amendment protections).[7] Next, if the state action regulates speech based on its content, the court applies strict scrutiny, unless a doctrinal exception pulls the state action to a lesser tier of scrutiny. The First Amendment protects both the "right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The Court analyzes Sections 6.1(1) and 6.1(3) in turn.

---

[7] Just as Everlast explained in *What It's Like*, *see* https://genius.com/Everlast-what-its-like-lyrics, where a court starts its analysis—by concluding that the state action regulates speech or regulates conduct—is essentially dispositive. *See Dana's R.R. v. AG*, 807 F.3d 1235, 1242 (11th Cir. 2015) (describing speech conduct determination as being determinative).

A.       *Section 6.1(1)*

The Supreme Court's precedents have "long drawn a line" between speech and conduct.  *Becerra*, 585 U.S. at 769 (collecting cases).  Although, in some circumstances, that line might be "difficult" to draw, *id.*, Section 6.1(1) falls on the speech side.  The provision demands that health care providers "*inform*" patients about the risks and benefits associated with their treatment options.  § 1 (emphasis added).  And the State imagines a "thorough discuss[ion]" between the health care provider and the patient.  NIFLA dkt. 275-1 ¶¶ 90–110 (terming the discussion "counseling").[8]  So, Section 6.1(1) regulates speech, implicating the First Amendment.

Next, the Court considers whether Section 6.1(1) is content-based or content-neutral.  Content-based state actions "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  A statute alters the content of a speaker's speech by compelling individuals to speak a particular message or share particular pieces of information.  *Becerra*, 585 U.S. at 755 (2018).

Section 6.1(1) is a content-based regulation because it governs a health care provider's discussion on pregnancy and abortion.  The state action is especially suspect because it's also view-point discriminatory.  *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023) (citing *Rosenberger*, 515 U.S. 819 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more

---

[8] The Court discusses below whether counseling can be considered "conduct."

17

blatant.").  The Plaintiffs contend that abortion confers no medical benefits.  NIFLA dkt. 271-1 ¶ 18; Schroeder dkt. 236-1 ¶ 41.  It is important to note that the Plaintiffs' definition of abortion basically only encompasses elective abortions (which seems to mean all abortions where there's a viable fetus).  Schroeder dkt. 236-1 ¶ 38.  For example, the Plaintiffs don't argue that terminating an ectopic pregnancy is an "abortion" as they define the term.  *See* Trial Tr. 52:20–53:4.  This view is consistent— albeit perhaps for different reasons—with the fact that even the medical profession doesn't consider terminating an ectopic pregnancy to be an "abortion."  *See Procedural Abortion*, UptoDate.com (Feb. 2025) ("[W]hen a trained health care provider does a procedure to remove the pregnancy *from [a] uterus*.") (emphasis added).  This limited definition of abortion is at least somewhat consistent with the Act, which doesn't provide immunity when health care professionals fail to act in an emergency.  745 ILCS 70/9.

The State disagrees with the Plaintiffs, believing that an abortion (however it is defined) is beneficial in certain circumstances.  Whether the State or the Plaintiffs are correct, however, doesn't factor into this constitutional analysis.  In demanding that health care professionals discuss the benefits (and thereby concede to the State's view), the State makes the providers "instruments" in delivering a particular message.  *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)).

Ordinarily, the First Amendment bars a state from commanding this type of speech, unless it survives strict scrutiny.  This level of scrutiny requires the state to

identify a compelling interest and narrowly tailored means to achieve it. The State says it's entitled to deferential treatment in this case because Section 6.1(1) targets professional conduct and only incidentally implicates speech. The Plaintiffs disagree, arguing that Section 6.1(1) unconstitutionally compels speech. To determine whether Section 6.1(1) receives deferential treatment, the Court considers two First Amendment doctrines: (a) the *Zauderer* commercial speech and (b) the "speech incidental to conduct" exceptions.

a) *Zauderer* Commercial Speech

In limited, narrow circumstances, the government has leeway to regulate speech relating to professional activities. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995). The *Zauderer* exception applies only to "purely factual and uncontroversial information" in commercial advertising. *Becerra*, 585 U.S. at 768–69; *Hurley*, 515 U.S. at 573.

*Zauderer*'s narrow scope doesn't apply to this case for three reasons. First, none of the speech in this case is "commercial" speech. Generally, "[c]ommercial speech is speech that proposes a commercial transaction." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475 (1989); *see also Commerce*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining commerce as the "exchange"—not the free provision—of "goods and services"); *In re Primus*, 436 U.S. 412, 437–38 n. 32 (1978) (finding an attorney

19

engaged in noncommercial speech by advertising free services intended to advance "beliefs and ideas," as opposed to financial gain).

In this case, there's no economic transaction: None of the Pregnancy Centers charge for their services, so there's no financial exchange. *See NIFLA v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023) (This Court made the same conclusion involving largely the same facts, because "there [was] no economic motivation for the speech."). Moreover, "abortion [is] anything but an 'uncontroversial' topic." *Becerra*, 585 U.S. at 769. Ordinary life experiences support that conclusion: Try talking about abortion in public amongst strangers and see what reaction it spawns. Third, as discussed more below, the information Public Act 99-690 requires "in no way relates to the services" that the Plaintiffs provide. *See Becerra*, 585 U.S. at 769. In *Becerra*, the Supreme Court held that the compelled disclosures (information about abortion) weren't "commercial speech," in part because the pregnancy centers didn't provide abortions. That's the same in this case. The Plaintiffs don't provide abortions, so the State can't rely on the *Zauderer* exception to compel speech about the procedure. So, the commercial speech exception won't shield the disclosures from heightened review.

b)      Speech Incidental to Conduct

The First Amendment also permits a state to regulate conduct, even when doing so incidentally burdens speech. Whether the regulation remains "incidental" depends on how to read (and reconcile) *Becerra* and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (*overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)). The Parties excise favorable sentences from one case while

nearly ignoring the other. *See e.g.*, NIFLA Plaintiffs' Table of Authorities, dkt. 275 at 3 (citing *Becerra* "*passim*" and *Casey* once); the State's Table of Authorities, dkt. 271 at 3, (citing *Casey* "*passim*" and *Becerra* twice). The Court also must examine whether and to what extent the Seventh Circuit's decision in *Doe v. Rokita* affects the interpretation of those two cases. 54 F. 4th 518. The Court is duty bound to harmonize all three cases. *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019) ("[W]e must endeavor to interpret our cases in a manner that permits them to coexist harmoniously with overarching and controlling Supreme Court precedent and with each other."); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860 63 (Fed. Cir. 1985) ("Thus, statements in opinions of this court must be read harmoniously with prior precedent, not in isolation.").

In *Casey*, abortion-provider plaintiffs challenged Pennsylvania's law requiring them to provide patients with certain information before performing an abortion. 505 U.S. at 880. Specifically, the law required the physician to discuss the "nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age of the unborn child." *Id.* at 881. Further, the law required the physician to note the availability of state-published materials on child-support assistance, adoption agencies, and other abortion alternatives. *Id.*

The *Casey* plurality didn't evaluate the Pennsylvania law under heightened review. *Id.* Instead, the plurality termed the mandated disclosures an "informed consent requirement." *Id.* It suggested that a state doesn't violate the First Amendment when it requires a doctor to provide "truthful, nonmisleading

21

information about the nature of [a] procedure." *Id.* at 882. Though such requirements implicated the doctor's right not to speak, they did so "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.*

The State is correct that *Casey*'s language gives it some constitutional leeway to enact Section 6.1(1). But the *Casey* decision doesn't stand in isolation. Both the Supreme Court and the Seventh Circuit had more to say.

In *Becerra*, the Supreme Court considered a California statute that required certain pro-life pregnancy centers to display a state-drafted notice regarding abortion availability. *Becerra*, 585 U.S. at 763. The notice had to be "posted in the waiting room, printed and distributed to all clients, or provided digitally at check-in." *Id.*

Rejecting a so-called "professional speech" First Amendment exception, the Supreme Court held that "speech is not unprotected merely because it is uttered by professionals.'" *Id.* at 766. Citing *Casey*, the Court acknowledged that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 769. In doing so, *Becerra* immediately categorized the action at issue in *Casey* as more akin to conduct, rather than speech. Moving forward, the Supreme Court then held *Casey*'s lower standard didn't apply to the California statute. Instead, according to the *Becerra* Court, the law "regulate[d] speech as speech." *Id.* at 770. The *Becerra* Court reasoned that the Pennsylvania statute in *Casey* was an "informed consent" law; whereas, the California statute was "neither an informed consent requirement nor any other regulation of professional conduct." *Id.*

22

Although it didn't overrule *Casey*, *Becerra*'s dicta revealed the Court's dim view of compelled speech, even when it occurs in a medical context. "Doctors help patients make deeply personal decisions, and their candor is crucial," the Court said. *Id.* at 771 (citations omitted). And "[t]hroughout history, 'governments have 'manipulated the content of doctor-patient discourse' to increase state power and suppress minorities." *Id.* (citations omitted). "Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana . . . [but] the people lose when government is the one deciding which ideas should prevail." *Id.* at 772.

***

The Court detours here to discuss "informed consent," for purposes of *Becerra*'s "speech incidental to conduct." *Becerra*, *Casey*, *Rokita*, and other abortion-related cases refer to informed consent. And, as the Parties recognize, this loaded term of art does a decisive amount of work: If a disclosure fits within an "informed consent" statute, *Becerra* deemed it "incidental to professional conduct," and thereby immune from heightened review. Indeed, post-*Becerra*, if a disclosure *isn't* an informed consent statute, few avenues permit deferential review. *But see Rokita infra.* Yet, there's apparently "no[] legal authority reciting the contours of 'informed consent.'" *E.M.W. Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F. 3d 421, 448 (6th Cir. 2019) (Donald, J., dissenting).

The Parties in this case offer conflicting definitions of informed consent. A three-day trial devolved into disagreements about the competing ethical principles underpinning medical practice and which values should be prioritized over others.

23

*See* Trial Tr. 426–35; 603–10.  To the extent the American Medical Association or similar groups adopt a definition, the record demonstrates those are nonbinding guidelines.  NIFLA dkt. 275-2 ¶ 34.  So, under these circumstances, the Court has two options: examine legal precedent and derive a definition from that caselaw or choose between competing experts and trade associations on an issue fraught with scientific, moral, and philosophical controversy.  Some judges take the latter approach, looking to the normative medical definition promulgated by groups like AMA and ACOG.  *See E.M.W.*, 920 F. 3d at 454–55.  (6th Cir. 2019) (Donald, J., dissenting); *Camnitz*, 774 F.3d at 251–53.  A court would then conclude that whatever falls within the medical groups' informed consent definition automatically meets *Becerra*'s "speech incidental to conduct."

But there are significant problems with that approach, an approach this Court refuses to take.  First, that process ultimately nullifies *Becerra*: "Speech isn't unprotected," the *Becerra* Court held, "merely because it's uttered by professionals." Yet if the State or professional groups could tuck the compelled speech under an "informed consent" labeled shield, then they could routinely evade scrutiny.  *See Becerra*, at 755 ("[S]tate labels cannot be dispositive of [the] degree of First Amendment Protection." (cleaned up)).  Further, that approach forces the Court to decide what's constitutional based on the normative, conventional perspectives.  That conflicts with the First Amendment's entire purpose, aiming to protect *"unpopular* ideas [and] information." *See Becerra*, 585 U.S. at 773 (emphasis added).

More importantly, doctors and lawyers are talking past each other. *Becerra* didn't say "informed consent" status alone is a get-out-of-First-Amendment-free card. Instead, *Becerra* held that such provisions are acceptable *because they're incidental to professional conduct*. Indeed, the Supreme Court pointed to the specific informed consent provision at issue in *Casey*. 585 U.S. at 769–70. So, the Court must determine whether the medical definition of informed consent remains incidental to conduct. If the scope of the medical community's definition captures protected speech—i.e. amounts to more than an incidental burden—then it violates the First Amendment. A court can't abdicate its responsibility to determine constitutional protections to trade associations.

Ultimately, when medical experts disagree as to what constitutes "informed consent," the Court can't pick a side. It's not only unqualified do so, but, more importantly, *Becerra* doesn't care about the abstract definition. Instead, the Court examines abortion-related cases to discern some of the contours of informed consent. When "informed consent" meets *those* qualifications, it necessarily satisfies *Becerra*'s "incidental to professional conduct." The Court finds that "informed consent" is incidental to conduct when it meets the following four minimum requirements.

First, informed consent necessarily requires a "medical procedure." The *Becerra* statute wasn't an informed consent provision, because it wasn't "tied to a procedure at all," instead applying to "all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered or performed." *Becerra*, 585 U.S. at 756; *see also Rokita*, 54 F. 4th at 520 (noting that

states may require "informed consent to risky procedures"). That's also consistent with the term "incidental to conduct." If there's not an identifiable procedure—i.e. no conduct—then the informed consent can't latch on to anything.

Second, as the term suggests, an informed consent provision must "afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive," including "the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). *Canterbury v. Spence*, 464 F.2d 772, 781 (D.C. Cir. 1972) (physicians generally must "warn the patient of any risks to his well-being which the contemplated therapy may involve").

So, by definition, a disclosure only qualifies as an informed consent provision if it occurs *before* a patient undergoes a medical procedure. *See Patel*, 620 F. Supp. at 325 ("The doctrine of informed consent requires that *prior to* administering medical treatment . . . .) (emphasis added); *Becerra*, 585 U.S. at 769 (noting that *Casey* required "informed consent *before* they could perform an abortion." (emphasis added); *Karlin v. Foust*, 188 F.3d 446, 454 (7th Cir. 1999) (discussing informed consent before a procedure); *Stuart v. Camnitz*, 774 F.3d 238, 252 (4th Cir. 2014) ("The informed consent process typically involves a conversation between the patient . . . and the physician . . . before the procedure begins."). Both legal and medical dictionaries agree on this fundamental principle of informed consent. *Informed Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A person's agreement to allow something to

happen, made with full knowledge of the risks involved and the alternatives."); *Informed Consent*, STEDMAN'S MED. DICTIONARY ("Voluntary agreement given by a person . . . for participation in a . . . treatment regime . . . after being informed of the purpose, methods, procedures, benefits, and risks.").

Third, to be incidental to conduct, the informed consent provision must substantively relate to the impending medical procedure. In other words, a state can't throw whatever it wants into a compelled disclosure and label it informed consent. Before surgery, the State can't require a doctor to tell her patient that ketchup should never be put on a hotdog. Courts have interpreted that requirement broadly, allowing discussions of such things as adoption and parental support, *Casey*, 505 U.S. at 881, and descriptive ultrasounds, *E.M.W.*, 920 F. 3d 421, 424. (6th Cir. 2019); *but see Camnitz*, 774 F.3d at 252 (holding such ultrasounds don't fit within informed consent). But in all those scenarios, the disclosures aimed to articulate the factual "risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). The relational requirement essentially tracks the "truthful, non-misleading and relevant" standard articulated in *E.M.W.*, 920 F.3d at 424.[9]

---

[9] The State argues that "truthful, non-misleading, and relevant" standard should govern compelled disclosures, like Section 6.1(1). But the State skips a step. The *E.M.W.* court had already concluded that the statute at issue was an informed consent provision. *See* 420 F.3d at 424 ("Even though an *abortion-informed-consent* law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosures is truthful, non-misleading, and relevant to an abortion.") (emphasis added); *id.* at 429 ("[S]uch incidental regulation includes mandated informed-consent requirements, provided that the disclosures are truthful, non-misleading, and relevant."). Moreover, the Court shares some

Fourth, doctrinally, an informed consent provision is incidental to conduct only when it regulates the health care provider performing the identified medical procedure. *See Casey*, 505 U.S. at 881–82 (explaining how the statute applied to the doctor performing the abortion); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 684–85 (discussing what the Court called an "informed consent" statute that regulated the "*physician who is to perform* the abortion") (emphasis added); *E.M.W.*, 920 F.3d at 424 (discussing what the court termed an informed consent provision that "direct[ed] a doctor, prior to performing an abortion"); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (same); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (same). All of those cases are doctrinally consistent with the goal of informed consent that a physician can't operate on a person without the patient's permission. *See Becerra*, at 770 (citing *Chloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (1914) (Cardozo, J.) ("[A] surgeon who performs an operation without his patient's consent commits an assault."). That rationale only carries weight when the operating physician obtains the patient's consent for *that* impending procedure.

The State calls this an "invent[ed]" rule that imposes "a novel limitation" on the State's power. NIFLA dkt. 275 at 15. It's true that neither *Casey* nor those other cases said in exact words that a disclosure is only an informed consent provision when

---

of the *E.M.W.* dissent's concern that *Casey* may have used that language in an undue burden analysis, not a First Amendment one. *Id.* at 449.

it's regulating the procedure-providing doctor. But those were the factual circumstances. And cases must be read and their holdings interpreted in the factual context presented to the court making the decision. *See Pampered Chef v. Alexian*, 804 F. Supp. 2d 765, 782 (N.D. Ill. 2011); *MB Fin. Bank, N.A. v. Walker*, 741 F. Supp. 2d 912, 919 (N.D. Ill. 2010). Indeed, the Supreme Court found *Becerra*'s counterfactual (i.e. a state compelling speech from someone not necessarily performing the medical procedure) unconstitutional. What's more, the State has things backwards. The State cites no case that construes "informed consent" in this type of expansive manner, one that applies "informed consent" to health care providers who never offer the underlying-yet-to-occur procedure. Instead, the *State* breaks doctrinal ground by pioneering a novel definition without authority. In doing so, the State—not the Plaintiffs—are the inventors.

The State notes that *Casey* required the operating physicians to inform women about "subjects far beyond the health care they offered," including paternal child support and adoption. NIFLA dkt. 275 at 12. So, the State asserts, the physician need not provide the triggering medical procedure. *Id.* But the State confuses the necessary and sufficient conditions. If a doctor performs a medical procedure, then a state may require an informed consent disclosure. The doctor must perform a medical procedure for the state to constitutionally compel that disclosure. However, the doctor doesn't need to also perform the procedures (if any) contained within those disclosures. For example, a state may compel a surgeon to inform a patient that

29

surgery will consequentially require physical therapy, even though the surgeon doesn't offer physical therapy.

The State proposes a broader definition of informed consent. It contends that "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶¶ 107–08. Instead, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." NIFLA dkt. 275-1 ¶¶107–08. The State derives that definition from the AMA's Code of Ethics and other professional bodies. *See* NIFLA dkt. 275-1 ¶¶ 75–78, 106–09. The State admits those ethical guidelines are "not binding professional or legal standards, but they provide a normative set of guidelines within the medical profession that health care professional consult to inform their practice." *Id.*[10] The State cites no case in which courts stretch informed consent to apply to doctors who don't perform the impending procedure. The Plaintiffs and their experts disagree with the State, offering a definition similar to the Court's definition. *See* NIFLA dkt. 271 at 3 ("To qualify as an informed consent requirement, a law must be tied to a medical procedure that the regulated parties perform.").

---

[10] To be clear, the Court doesn't doubt that "informed consent" also prizes "patient autonomy" and "self-determination." *Camnitz*, 774 F.3d at 251; *see also Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972) (emphasizing "patients right to self-decision" and determination). But the doctrine still requires certain other predicates to be satisfied for the term to qualify as "speech incidental to conduct." *Camnitz* found that an ultrasound-description requirement fell outside informed consent—essentially because it demanded *too much* information—but the necessary elements discussed above still existed.

The State's definition falls outside *Becerra*'s scope. *Becerra* carved out room for informed consent provisions as incidental to conduct. But that's because they were nearly contemporaneous with and in furtherance of the underlying procedure. "Incidental to conduct" is incompatible with a definition of informed consent that would require doctors to discuss hypothetical medical procedures they won't perform.

So, to summarize: Doctrinally, a statute qualifies as an informed consent provision—and therefore incidental to conduct—when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure.

*\*\*\**

In medical cases, informed consent occupies most of the "speech incidental to professional conduct" universe. *See Becerra*, 885 U.S. at 768 (citing only two examples: the informed consent statute in *Casey* and legal advertising regulations). But *Becerra* leaves some room for non-informed consent qualifying statutes that are nonetheless incidental to professional conduct. *See id.* at 770 (noting that the California statute was "not an informed consent requirement *or any other regulation of professional conduct*."). *Rokita* provides such an example.

In *Rokita*, Indiana regulated the disposal of fetal remains. Specifically, the state required abortion providers (but not women who kept the remains) to dispose of the remains by either burial or cremation. 54 F. 4th 518, 519 (2022). The disposal requirements didn't apply to women who kept the remains themselves. *Id.* The

provider could explain those options after the procedure, and the information didn't aim to inform her consent to a procedure; nor did *Rokita* call the statute an informed consent provision. Two doctors sued, arguing that the First Amendment barred Indiana from requiring them to ask the women to select an option: burial or cremation. *Id.* at 520.

In a brief decision, the Seventh Circuit held Indiana's law constitutional. On the one hand (and as the State highlights), the *Rokita* Court stressed that "states may require medical providers to give truthful notices," including disclosures that enable "informed consent to risky procedures." *Id.* Characterizing *Becerra*, *Rokita* explained that although a "state may not enforce requirements disconnected from medical care,"[11] the state could still demand that "medical professionals alert patients to laws that affect medical choices." *Id.* at 521. That precise language gives states some latitude to demand certain speech, so long as that speech related to "medical choices" or falls within "medical care." But, as the Seventh Circuit has reminded district courts, that sentence must be read in context, including in the context of the facts of the case. *Livingston v. Trustguard Ins.*, 558 Fed. Appx. 681, 683 (7th Cir. 2014) *citing United States v. Costello*, 663 F.3d 1040, 1044 (7th Cir. 2012).[12] The Seventh Circuit's reminder is critical because, as the Plaintiffs emphasize, later language in *Rokita* limits its scope. Characterizing *Becerra*'s characterization of *Casey*, *Rokita* held that "a state may require medical professionals to provide

---

[11] This is the "ketchup on the hot dog" example the Court used previously.
[12] For example, although *Rokita* used the phrase "risky procedures," no risky procedures were implicated under the challenged statute or facts of the case.

information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521.

Reading *Casey*, *Becerra*, and *Rokita* together, the Court derives the following rule:  States may regulate the practice of medicine, but to the extent the regulation implicates speech, to be constitutional, that speech must be "incidental to professional conduct."  *Becerra*, 885 U.S. at 768.  In the medical context, qualifying informed consent provisions will occupy most of the "speech incidental to professional conduct" universe.  But *Rokita* makes clear that there's still room for some other speech-implicating conduct regulations, so long as the speech remains incidental to the underlying conduct.

### *Application to Section 6.1(1)*

With that background, the Court now assesses Section 6.1(1).  It first considers whether the mandated disclosures are "informed consent" provisions, as earlier defined.  It then weighs whether the provisions are otherwise "incidental to conduct."

As discussed above, to secure a liability shield, Section 6.1(1) compels certain speech; namely a discussion about a patient's "condition, prognosis, legal treatment options, and risks and benefits of the treatment options."  NIFLA dkt. 275-1 ¶ 100 (imagining a "thorough[] discuss[ion]" between the provider and the patient; *id.* ¶¶ 90–110 (terming the discussion "counseling").  As discussed, the mandated disclosures don't qualify as commercial speech.  So, the Court subjects it to heightened scrutiny, unless the speech is only incidental to conduct.

*Informed Consent Analysis*

If the disclosures fall under the definition of informed consent, then the *Becerra*, *Casey*, and *Rokita* decisions teach that the disclosures are necessarily incidental to conduct and therefore don't trigger strict scrutiny. Recall that a state action doctrinally qualifies as an informed consent provision when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure. Under Section 6.1(1):

> "The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care."

The Pregnancy Centers engage in some medical-like conduct. They discuss medical histories, maternal health, abortion, and childbirth. In some cases, they administer STI and/or pregnancy tests as well as abortion pill reversals. And the Pregnancy Centers also perform transvaginal and abdominal ultrasounds. None of the Pregnancy Centers themselves perform abortions.

Although the cases on informed consent don't define a "medical procedure," under these facts, the Court is able to identify only two procedures from the list of medical conduct that could possibly anchor an informed consent provision: (i) sonogram/pregnancy test, and (ii) "medical options counseling." The Court considers whether either are qualifying "medical procedures," and, if so, whether the disclosures meet the other qualifications for informed consent.

i) *Ultrasound*

The Pregnancy Centers perform abdominal and transvaginal ultrasounds and conduct pregnancy tests.[13] In doing so, a woman is "assigned a medical professional," and brought to an ultrasound exam room. Tr. 361:12–22. The Court finds these exams to be "medical procedures." And because it's a qualifying medical procedure, the State has leeway to require informed consent for these procedures.

As applied to the Pregnancy Centers, the disclosure's timing doesn't fit the informed consent definition. Section 6.1(1) kicks-in *after* the ultrasound procedure. *See* Section 6.1(1) (the provider must inform the patient of her "condition, prognosis, legal treatment options, and risks and benefits of the treatment options.").[14] These types of discussions could only occur following a pregnancy determination. But after the ultrasound the woman is either "free to go," Trial Tr. 97:13–16, or otherwise discusses her pregnancy options with a nurse or patient advocate. Trial Tr. 155:17–21. At that point, the Pregnancy Centers don't perform an impending medical procedure, so there's nothing that requires the patient's informed consent.

And it's not just a timing issue. There's a relationship disconnect. A prototypical informed consent provision would pertain to the impending procedure's

---

[13] The Court identifies the ultrasound (as opposed to the urine test) as the underlying procedure, because its more invasive nature permits a broader set of disclosures, which in turn maximizes the likelihood that the disclosures are constitutional.

[14] The Plaintiffs contend that the ultrasound doesn't qualify as a medical "diagnosis." But the Court construes it as a diagnostic procedure for these purposes. It blinks reality to assert that an ultrasound performed at a crisis pregnancy center is not performed to obtain images for medical diagnostic purposes. *Diagnostic ultrasound*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

(here an ultrasound) nature, risks, and benefits. To that end, the medical professional might need to inform a woman about the ultrasound's benefits. For example, the medical professional might need to inform the patient that the ultrasound provides an image of the fetus; that it can determine a fetus' age and condition; or that it can identify risky health conditions. And the health care professional might also be compelled to disclose that an ultrasound requires abdominal or vaginal contact; that less invasive procedures, like a urine test, can accomplish some of the same goals; or that an image of a fetus will appear on screen or that the woman may hear certain sounds. That type of information might inform the woman's decision as to whether to undergo the ultrasound procedure.

But the compelled disclosures required by Section 6.1(1) (i.e. the risks and benefits of abortion and childbirth) both occur after the ultrasound and substantively don't relate to that procedure. So, they don't fit within the doctrinal understanding of informed consent statutes.

(ii)    *Medical Options Counseling*

The Court next considers whether the Pregnancy Centers' "medical options counseling" could qualify as a medical procedure that could anchor incidental disclosures. The State groups much of the Pregnancy Centers' activities together, terming them "medical options counseling." And the Plaintiffs admit they engage in this type of counseling. Dkt. 282-1 at 16. The Court understands that to essentially mean a discussion regarding pregnancy status (pregnant or not pregnant) and a woman's associated options (if pregnant, then childbirth or abortion). If all of that

36

counseling itself is a "medical procedure," then the State could regulate that conversation under the theory that the discussion is actually conduct. Put simply, the speech itself is treatment, which would be conduct. Under that kind of reading, the Court wouldn't even need to consider whether particular speech was "incidental" or to a procedure, because the procedure necessarily encompasses the speech. Stated differently, according to the State, "medical options counseling" is conduct, not speech.

There's support for this type of reading. (In the near future, the Supreme Court might have something to say about this type of reading.) In *Tingley v. Ferguson*, the Ninth Circuit considered whether conversion therapy[15] constituted conduct or speech. 47 F.4th 1055. The therapist-plaintiff alleged that Washington's ban on the practice violated his free speech rights. But citing its pre-*Becerra* decision in *Pickup v. Brown*, 740 F. 3d 1208 (2014) the Ninth Circuit held that the therapy constituted conduct and therefore didn't implicate the First Amendment's free speech clause. 740 F.3d at 1221. The *Tingley* court reasoned that the therapy wasn't any less of a medical treatment "merely because [the treatment is] implemented through speech rather than conduct." *See also Chiles v. Salazar*, 116 F. 4th 1178, 1203–09 (10th Cir. 2024) (*cert. granted*, No. 24-539, 2025 U.S. LEXIS 1025 (Mar. 10, 2025)) (upholding a district court's preliminary injunction finding talk therapy a "medical treatment," and therefore "conduct.").

---

[15] "Within the field of psychology, conversion therapy is also known as 'reparative therapy' or 'sexual orientation and gender identity change efforts." 47 F.4th at 1064. Conversion therapy employs counseling and psychotherapy.

But not all circuit courts are on board. The Eleventh Circuit, in *Otto v. City of Boca Raton, Florida*, held that conversion therapy constituted speech. 981 F.3d 854. States couldn't regulate that speech, the *Otto* court held, by relabeling it "conduct." *Id.* at 861. The court recognized that it wasn't "entirely wrong" to characterize speech-based therapy as a "course of conduct." But the *Otto* court stressed that what the enacting governments called a "medical procedure" actually "consist[ed]—entirely—of words." *Id.* at 865. So, the Eleventh Circuit concluded that the First Amendment applied to therapy regulations.

The State says *Otto* doesn't apply. In its view, *Otto* didn't involve a "physician disclosure law of the kind at issue in *Casey* and *Rokita*, which require[d] providers to disclose certain information in connection with the provision of healthcare services." NIFLA dkt. 275 at 23. According to the State, "*Casey* and *Rokita* make clear that giving patients full information to make medical decisions is part of the 'practice of medicine, subject to reasonable licensing and regulation by the state.'" *Id.* (citing *Casey*, 505 U.S. at 884)). As explained above, the Court disagrees with the State's reading, because it largely ignores *Becerra* and sidesteps important language in *Rokita*. The State must either establish that it's solely regulating conduct (without implicating any speech) or otherwise demonstrate that the speech is incidental. Though *Otto*'s holding doesn't help the State demonstrate that therapy is fully conduct, *Tingley*'s and *Salazar*'s could.

But beyond its appearance in a string cite, the State didn't rely on either case. Absent further briefing, the Court isn't willing to say categorically whether all

counseling/therapy constitutes speech or conduct. The Court only concludes that the State hasn't persuaded the Court to adopt *Tingley*/*Salazar*'s reasoning over *Otto*'s. So, the Court can't find that the Pregnancy Centers' "medical options counseling" qualifies as a "medical procedure" for purposes of the *Casey*/*Becerra*/*Rokita* doctrine. And because it's not a "procedure," it doesn't trigger an informed consent analysis.[16]

*Non-Informed Consent Analysis*

Concluding that Section 6.1(1) isn't an informed consent provision, the Court considers whether it's nevertheless incidental to some conduct. *Rokita* underscored that a state action need not qualify as an informed consent provision to be "incidental." So, for example, unlike an informed consent statute, compelled speech could follow a procedure or not need to be provided by the rendering physician at all. If the state is regulating a specific course of conduct, it has leeway to implicate directly related speech.

However, stretching *Rokita* too far ultimately reverts to a *Casey*-only world, one in which the state may regulate the amorphous "practice of medicine." *Becerra* limited the universe in which *Casey* applied, barring disclosures even when they appeared in the pregnancy center's waiting room. It's true that the disclosure doesn't have to qualify as an informed consent statute, but there isn't much space between constitutional informed consent provisions and *Becerra*'s unconstitutional compelled

---

[16] The Court applies strict scrutiny, because Section 6.1(1) is content-based, and not incidental to any recognized medical procedure. What's more, Section 6.1(1) isn't entitled to *Zauderer* deference. So, the Court doesn't see a doctrinal avenue to apply something like intermediate scrutiny. However, the Court notes that Section 6.1(1) would fail intermediate scrutiny on fit, for the reasons discussed below.

materials. The Court finds that Section 6.1(1) doesn't squeeze through that narrow path.

*Rokita* involved a statute regulating the disposal of fetal remains. To that end, after an abortion, a woman could choose to take possession of the fetus or the provider could dispose of it consistent with the statute. *Rokita*, 54 F.4th at 519. So, the provider necessarily had to determine which route the woman wanted to take. This was a binary decision. No discussion was required, let alone the thorough discussion the State contends Public Act 99-690 mandates. What's more, the provider had to speak by asking this question. It didn't otherwise compel any discussion, such as the provider informing the woman of the risks and benefits of each option. *Id.* There was a proximate relationship, both temporally and substantively, between the disclosures in *Rokita* and the medical conduct.[17] Contrastingly, Section 6.1(1) demands a wide-ranging, hypothetical conversation unrelated to any procedure or other medical conduct. Indeed, Section 6.1(1) requires a wide-ranging conversation that might be completely divorced from the reality of the situation; for example, the thrilled patient who is not reasonably likely to encounter medical difficulties because of the pregnancy. What's more, that compelled speech isn't necessary to further future conduct. Any link under those circumstances is far too attenuated to satisfy *Becerra* or *Rokita*. Finding Section 6.1(1) not incidental to conduct, the Court must apply strict scrutiny.

---

[17] Similarly, as discussed below, Section 6.1(3) tethers any cognizable speech to specific conduct.

*Strict Scrutiny Analysis*

When a government restricts or requires speech based on content or viewpoint, the government action must survive strict scrutiny analysis. *Reed*, 576 U.S. at 171. Under this standard, the government must prove that the restrictions or required speech not only furthers a compelling interest but also that they do so in a narrowly tailored way to achieve that goal. *Id.* Restrictions that are underinclusive or overinclusive are not narrowly tailored. Indeed, to be narrowly tailored, the action must eliminate "no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

The State argues that it has a compelling interest in ensuring that conscience-based objections don't impair patients' health. *See* 745 ILCS § 70/6.1. To that end, the State asserts, it must demand that patients "receive accurate, timely information about their treatment options necessary to make autonomous medical choices, as well as reliable information about other providers who offer the care they have chosen." NIFLA dkt. 275 at 21. The Plaintiffs argue that's not a compelling interest because there's no evidence patients lack any information. NIFLA dkt. 282 at 13.

"[T]here can be no doubt," the Supreme Court has said, that "the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 731 (1997) (citing *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (noting that a state has "a legitimate concern for maintaining high standards of professional conduct")). The Court will assume, without deciding, that the State

41

has a compelling government interest, despite the State's failure to affirmatively produce evidence at trial on this requirement.

But Section 6.1(1) fails strict scrutiny because it's fatally overbroad. Section 6.1(1) requires compliance consistent with the "standard of care." Perhaps it's possible—after the fact—to discern the standard of care in a particular interaction. Those after-the-fact determinations occur continually in civil trials across Illinois. But testimony established that, prospectively, it's essentially indefinable. Indeed, the State admitted that "full explanation of all treatment options and the risks and benefits isn't required by the standard of care in every situation." Trial Tr. 661:17–20. Even assuming that, in some non-medically necessary cases, the "standard of care" would require a benefits discussion, the Pregnancy Centers have little guidance on what those situations look like. So, in every situation they'll either risk potential liability or utter compelled speech without furthering *any* interest. Under strict scrutiny, the State carries the burden of establishing the provision is narrowly tailored; it falls far short in this case.[18] So, Section 6.1(3) unconstitutionally compels speech, and therefore the State can't demand such speech in exchange for a liability shield.

B)      *Section 6.1(3)*

The Plaintiffs also challenge Section 6.1(3) on First Amendment Free Speech grounds. This Section requires covered providers to transfer, refer, or tender, upon

---

[18] Because the Court finds that Section 6.1(1) compels speech even when it furthers no interest, the Court doesn't assess the Plaintiffs' argument that it's also underinclusive because it applies to those with conscience objections.

request, a list of medical providers that they reasonably believe will provide abortion services. The Court ultimately concludes that Section 6.1(3) doesn't implicate speech, so it doesn't violate the Free Speech Clause, either facially or as applied to the Plaintiffs. Section 6.1(3) provides:

> If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient to, or (ii) transfer the patient to, or; (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.

Whereas Section 6.1(1) requires health care professionals to *say* something to obtain immunity from civil or criminal liability, Section 6.1(3) explains what covered people and entities must *do* to earn immunity after the triggering event occurs: refer, transfer, or provide written information. As discussed more below, those three options are all conduct; none of them cognizably implicate speech.

Nor do the Pregnancy Centers engage in inherently expressive activities. The Court understands that the Plaintiffs run these Pregnancy Centers for the very sake of communicating pro-life messages. But conduct doesn't become expressive merely because the person engaged therein intended to express an idea. *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Juxtapose the line of cases extending First Amendment protections to inherently expressive conduct—such as dancing, flag burning, or web-design—with a doctor referring a patient to physical therapy.

Stripped of its controversy, the difference is easy to see. Actions like transfers, referrals, or listing potential alternatives aren't inherently creative processes.

Further, the State grants conscientious objectors three different avenues to immunity. In lieu of referring the patient, a health care provider may "transfer the patient" to another facility or provide information about "other health care providers who they *reasonably believe may* offer" the unavailable service. § 6.1(3)(iii) (emphasis added). Most obviously, the option to transfer a patient doesn't implicate speech.[19]

When viewed through the lens of common sense, the Court has no trouble concluding that Section 6.1(3) doesn't implicate protected First Amendment activities. But, in reaching this holding, the Court also relies on trial testimony, persuasive precedent, analogies, common usage of the terms, and legal and medical dictionaries. The Court first acknowledges the uncontested fact that the State intended for Section 6.1(3) to facilitate the provision of medical services. This provision narrowly applies when a patient expressly asks a medical provider for information regarding potential abortion providers. Stated differently, Section 6.1(3) contains an explicit and mandatory trigger that is directly linked to the action. And even then, the provider need only comply if he intends to use the HCRCA as an affirmative defense.

From this narrow and purposeful drafting, the Court deduces that Section 6.1(3) doesn't target speech. And dictionary definitions compel the same conclusion.

---

[19] The Court gives slightly more attention to the referral option because that's what the Parties emphasized. However, Section 6.1(3) provides *three options*, and all three are conduct.

For example, The National Cancer Institute defines "referral" as an act. *Referral*, *Nat. cancer. Inst.* ("In medicine, the act of sending from one health care provider to another . . . ."). Black's Law Dictionary defines the term similarly as "[t]he act . . . of *sending or directing* to another for information, service, consideration, or decision." *Referral*, Black's Law Dictionary (12th ed. 2024) (emphasis added).

What's more, courts around the country have expressly stated that medical providers engage in pure conduct when writing prescriptions. 360 *Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024); *Kory v. Bonta*, No. 24-cv-00001, 2024 U.S. Dist. LEXIS 73845, *11. As with prescriptions, the "key component" of a medical referral is the provision of treatment. *Kory*, 2024 U.S. Dist. LEXIS 73845, *11 (quoting *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1046 (9th Cir. 2000). Prescriptions and referrals are both standard responsibilities among health care providers. They serve clinical—not expressive—goals. Again, contrast the goals of doctors with the goals of dancers. As this analogy shows, referrals aren't protected First Amendment activities.

There's also a trump card for this analysis. The Court finds clear guidance in the Seventh Circuit's decision in *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 629 (7th Cir. 2024). At the heart of *K.C.* were several First Amendment challenges to SEA 480: an Indiana statute banning health care professionals from providing, discussing, or referring minor patients for gender conversion therapy. Indiana and Illinois' referral provisions are two halves of the same whole; one state *restricts* medical referrals for controversial procedures,

45

whereas another state *requires* them. The Seventh Circuit ultimately resolved the First Amendment issues in *K.C.* on other grounds. But, importantly, it reversed the lower court's holding that SEA 480 burdens speech "on its face or in its practical operation." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). To the contrary, the Seventh Circuit suggested that restrictions on referrals are valid regulations of professional conduct. *Id.*

As the *K.C.* court explained, "SEA 480's secondary liability provision burdens speech incidentally because it targets conduct: facilitating the provision of gender transition procedures." *Id.* This logic applies with full force to statutes targeting referrals for any other medical procedure. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson,* 578 U.S. 266, 273 (2016). The First Amendment certainly doesn't discriminate between topics of protected speech. *Otto*, 981 F.3d at 871 (11th Cir. 2020). So, if SEA 480's heavy restrictions on referrals for controversial medical treatment stand, so can their mirror image. *See id.*

*K.C.* and the additional cited authorities compel the Court's conclusion that medical referrals—and so certainly potential resource lists or transfers—are pure conduct, subject to reasonable state regulation. The Plaintiffs disagree. In their view, Public Act 99-690 is subject to strict scrutiny in its entirety because the practice of medicine necessarily implicates speech. Though it's true a few words are often necessary to carry out a course of conduct, words don't automatically turn the conduct into speech. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Consider,

46

for example, the hypothetical in *Schneiderman*, where, by adopting economic regulations, a state incidentally regulates merchants' speech:

> [A New York statute preventing credit card surcharges] is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

Similarly, minimum wage laws don't implicate speech just because they require a supervisor to write a certain number on the check.[20] In these hypotheticals, as in this case, speech is a means to an end. Each regulation holds conduct at its core; limitations on employee speech are only a necessary means of enforcing compliance with the central regulatory scheme. In short, it's not enough to show that Public Act 99-690 implicates the First Amendment broadly. Given the option of severability, the Plaintiffs must show that this section, standing alone, abridges the

---

[20] Contrastingly, minimum wage laws would implicate the First Amendment if they compelled the supervisor to discuss the benefits and downsides of paying certain salaries. That's the difference between Sections 6.1(1) and Section 6.1(3).

covered health care providers' rights not to speak.  They haven't done so.  Section 6.1(3) is a wholesale regulation of professional conduct with no cognizable downstream effects on speech.

Even if the Court took the Plaintiffs at their word that Section 6.1(3) incidentally restricts some cognizable amount of speech, this Section would still be constitutional.  As explained at length already, *Becerra*, *Rokita*, and its progeny allow states to regulate speech incidental to professional conduct, even beyond drafting informed consent disclosures.[21]  *Otto*, 981 F.3d at 865; *360 Virtual Drone Servs. LLC,* 102 F.4th at 273.  In this case, the necessary speech—either writing a list or drafting a referral—bears a direct nexus to the underlying conduct that's necessarily effectuated by speaking or writing.

Ironically, though, the impact on speech is also incidental.  The State's only goal in regulating things like referrals is to facilitate patients' access to their preferred medical treatment.  The State doesn't intend to control the flow of discussion between doctors and patients—nor could it, for that matter.[22]  Nothing in the HCRCA restricts the Plaintiffs' rights to express their own opinions, especially now that the Court finds Section 6.1(1) unconstitutional.

---

[21] No doubt, Section 6.1(3) isn't an informed consent requirement.  Medical referrals only take place after an ultrasound or options counseling (that is, once the patient has confirmed that she is pregnant and decided what to do about it), and a referral isn't directly linked to either qualifying "procedure."  The Court's analysis here essentially duplicates the discussion of Section 6.1(1) as an informed-consent requirement.

[22] Contrastingly, the benefits discussion in Section 6.1(1) wholly regulates the exchange of information between providers and patients.  In that scenario, the State takes the drivers' seat in deciding which ideas should factor into a woman's decision to have an abortion.  In this one, the State exercises its police powers to facilitate a woman's choice only after she's decided for herself.

48

The Court understands the Plaintiffs' position that, while complying with Section 6.1(3), they are required to effectively endorse a course of conduct they find morally abhorrent. That's more of a Free Exercise issue, discussed below. But, in any event, if the Plaintiffs are unhappy with this legislation, "the remedy to be applied is more speech." *United States v. Alvarez*, 567 U.S. 709, 727–28 (2012) (quoting Justice Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 377 (1927)). When meeting the requirements of Section 6.1(3), covered providers may rearticulate their stance on abortion or explain that their conduct is required by the State. Many will. Section 6.1(3) establishes a floor, not a ceiling, of information that must be provided to patients. So, Section 6.1(3) doesn't offend the Plaintiffs' rights not to speak; it's simply a valid exercise of the State's police powers to improve citizens' access to health care by regulating professional conduct. Consequently, the State may require such conduct in exchange for the HCRCA's liability shield.

**Free Exercise Claim**

Because the Court found Section 6.1(3) constitutional on Free Speech grounds, it now considers the Plaintiffs' contention that this Section violates the Free Exercise Clause. The Court recognizes that the peculiar circumstances presented by the facts, the HCRCA, and Public Act 99-690 put it in uncharted waters. As explained earlier, *supra* Part I(C), Public Act 99-690 arises in a unique statutory scheme; it works alongside the HCRCA to "respect and protect the right of conscience" for all heath care providers. 745 ILCS 70/2. The initial version of the HCRCA (now, almost fifty years old) protects conscientious objectors from all liability resulting from their

"refus[al] to act contrary to their conscience." *Id.*[23] But after collecting evidence—albeit minimal—that the HCRCA was *too strong* of a shield, in 2015, the General Assembly amended the HCRCA via Public Act 99-690. This statutory context guides the following discussion of the Plaintiffs' Free Exercise claims.

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Again, the Plaintiffs argue that Section 6.1(3) imposes unconstitutional conditions on their receipt of a public benefit. The Parties agree that the Plaintiffs have a sincere religious practice in refraining from facilitating abortions. NIFLA dkt. 275-2 at 4–5. The trial testimony confirmed this agreement beyond doubt. To end the analysis here, however, "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167 (1878).

The Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). Instead, courts determine the appropriate level of scrutiny by asking if a challenged regulation "targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation . . . ." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S.

---

[23] Note, this part of the HCRCA has remained unchanged since its enactment. *See* P.A. 80-616 § 2; P.A. 90-246 § 5.

520, 531 (1993). Laws that "single out" religious conduct for discriminatory treatment are subject to strict scrutiny. *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 483 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 479 (2017) (Kagan, J., dissenting) (cleaned up). A "neutral law of general applicability," on the other hand, triggers rationality review, "even if [it has] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531.

To avoid burying the lede, the State correctly argues that Public Act 99-690 is a neutral law of general applicability. These "interrelated" requirements forbid the government from selectively imposing burdens only on conduct motivated by religious belief—partly by asking whether "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Id.* at 531, 533; *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015). Public Act 99-690 does no such thing.

Ordinarily, "[t]he minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. 520, 546 (1993). But, for the reasons already given, Section 6.1(3) doesn't fit neatly into the Free Exercise doctrine. Unlike the "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause," *Bowen v. Roy*, 476 U.S. 693, 703 (1986), Public Act 99-690 and the HCRCA expand conscientious objectors' rights to the free exercise of religion by immunizing

them from liability. This context is important. *See In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989). "Considering the Act in isolation, as Plaintiffs insist the [C]ourt should, would mean that religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished without violating the Free Exercise Clause because religious accommodations are, by their very nature, neither neutral nor generally applicable." NIFLA dkt. 176 at 35.

The Court wholeheartedly agrees with Judge Pallmeyer's discussion "about what law is the proper subject of analysis." *Id*. at 34. As she explained, the proper question is whether Public Act 99-690 *and* the HCRCA subject conscientious objectors to "unequal treatment" by imposing additional burdens on conscientious objectors over secular providers. *Lukumi*, 508 U.S. at 542 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987) (Stevens, J., concurring)). Judge Pallmeyer hoped that the statewide "standard of care" may be dispositive; if Public Act 99-690 doesn't impose additional burdens on conscientious objectors, she reasoned, the Amendments must be neutral and generally applicable. NIFLA dkt. 176 at 20. As noted earlier, however, trial testimony made it impossible to prospectively and abstractly establish the standard of care for all providers in all circumstances.[24] *Supra* Part II(B). And, again, that conclusion is unsurprising given

---

[24] Importantly, the Court doesn't decide whether the standards of care do or don't match Section 6.1(3)'s provisions. It's possible that a conscientious objector might fail to comply with Section 6.1(3) and still satisfy the standard of care. As explained more later, the Court only concludes that the Plaintiffs can be called to court to make such a showing, as could anyone else.

that standard of care determinations are specific to the circumstances presented to the health care professional. *See Edelin*, 510 N.E.2d at 962.

So, this Court takes a different route, starting with a hypothetical from before the HCRCA: Two providers—one a conscientious objector and the other secular—both fail to provide a woman with requested information about abortion providers. The conscientious objector refuses because of his sincerely held beliefs. The secular provider doesn't provide the requested information because he's too busy. Both patients sue. Before the HCRCA, both suits could've gone forward, requiring the plaintiff in both cases to show that the health care providers fell below the standard of care.[25] After the HCRCA's enactment, the conscientious objector—but not the secular provider—is wholly protected, regardless of whether the provider's actions fell below the standard of care.

Along comes Public Act 99-690—partially restoring the pre-HCRCA universe. Now, as before, all health care providers are amenable to suit for failure to refer, transfer, or provide written information about potential abortion providers. Relative to each other, the secular provider isn't in any *better* position than before the HCRCA and the conscientious objector isn't any worse for the wear.

---

[25] As Judge Pallmeyer explained, there's no indication that the pre-HCRCA liability regime wasn't neutral and generally applicable. Put differently, absent the HCRCA, it's not necessarily unconstitutional to sue a doctor who didn't meet the standard of care because of her conscientious objection. In any event, the Amendments don't ban any other affirmative defenses.

As this hypothetical shows, the latest Amendments to the HCRCA don't impose additional burdens on conscientious objectors because of their beliefs.[26] It's true that conscientious objectors can no longer rely on the HCRCA's once-expansive immunity. But as discussed previously, conscientious objectors were never constitutionally entitled to those benefits. NIFLA dkt. 176 at 35. The General Assembly was formerly inclined to offer an optional shield and now it isn't. It's not the Court's place to second-guess the wisdom of that decision. *Grand Trunk W. Ry. Co. v. Indus. Comm'n*, 291 Ill. 167, 172 (1919).

In a further attempt to bind the General Assembly to its own generosity, the Plaintiffs suggest that the State passed Public Act 99-690 at least partially "because of" its adverse effect on religious activities. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, n. 24 (1979). They don't support that argument with any evidence of legislative malintent. *Compare Lukumi*, 508 U.S. at 540 (challenged city ordinances were designed to prevent religious activities because city councilmembers viewed the religion as "a sin, 'foolishness,' 'an abomination to the Lord,' and the worship of 'demons'") *with* S.B 1564, 99th Gen. Assemb. 2d Sess. (Ill. 2015) (Public Act 99-690 is designed to ensure that the HCRCA doesn't frustrate women's access to health care). Even if Public Act 99-690 has discriminatory effects in operation, "[a]dverse impact will not always lead to a finding of impermissible targeting."

---

[26] For the mathematically inclined lawyer (if one exists): 0 [what the two providers had pre-HCRCA] + 1 [what the conscientious objector had after the HCRCA] − 1 [what the provider has after P.A. 99-690] = 0. So, the two are once again on equal footing. (In fact, that oversimplifies it because the conscientious objector, unlike the secular provider earns absolute immunity after complying with Section 6.1(3)).

*Lukumi*, 508 U.S. at 535.[27]  "The law's text and history . . . suggest instead that the legislature adopted the changes due to legitimate concerns about patient access to healthcare and not out of a desire to stifle religiously-motivated conduct."  NIFLA dkt. 176 at 38.  So, under the circumstances, Public Act 99-690 is neutral and generally applicable.

Finally, the Plaintiffs urge the Court to apply heightened scrutiny on a "hybrid rights" theory.  NIFLA dkt. 282 at 9–10.  "In *Smith*, the Supreme Court noted that, in cases implicating the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech . . . the First Amendment" may require courts to apply strict scrutiny even to neutral, generally applicable laws.  *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2007) (citing *Smith*, 494 U.S. at 881–82).  Though a plaintiff doesn't need to *succeed* on another First Amendment claim, he "does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right."  *Id.* at 765 (quoting *Miller v. Reed*, 176 F.3d 1202, 1207–08 (9th Cir. 1999)).

The doctrine rests on a teetering foundation.  As Judge Pallmeyer noted, it "originates in [*Smith*'s] dictum."  NIFLA dkt. 176 at 36.  And it's "hard" to "justif[y]

---

[27] Likewise, the Plaintiffs didn't produce any evidence that Section 6.1(3) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 534 (2021).  Depending on the standard of care, health care providers may be liable if they unreasonably delay a woman's access to abortion by failing to transfer, refer, or provide her with written information *for any reason.*

the curious [hybrid rights] doctrine," some circuits essentially abandoning it entirely. *Fulton*, 593 U.S. at 599, 604 (2021) (Alito, J., concurring); *see also Henderson v. Kennedy,* 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that although the regulation does not violate the Free Exercise Clause, and although they have no viable First Amendment claim against the regulation, the combination of two untenable claims equals a tenable one.  But in law as in mathematics zero plus zero equals zero." (citations omitted.)).  "Telling[ly]," the Supreme Court "has never once accepted a 'hybrid rights' claim in the more than three decades since [*Smith*]." *Fulton*, 593 U.S. at 600.  The Seventh Circuit similarly rejected hybrid rights theories in the two cases that considered them.  *See Ill. Bible Coll. Assoc. v. Anderson*, 631, 641 (7th Cir. 2017); *Civil Liberties*, 342 F.3d at 764–65; *see also Maum Meditation House of Truth v. Lake County, Ill.*, 55 F.3d 1081, 1088 (N.D. Ill. 2014) (rejecting application); *Mahwikizi v. Ctr. for Control & Prevention*, 573 F. Supp. 3d 1245, 1253 (N.D. Ill. 2021) (same).

In any event, the Seventh Circuit seems to follow the Ninth in requiring, at minimum, a summary judgment level showing on the non-Free Exercise claim.  *See C.L for Urb. Believers*, 342 F.3d at 765 (rejecting a hybrid rights theory because it "f[oun]d [the other claims] individually lacking the merit necessary to withstand summary judgment").  As to Section 6.1(3), the Plaintiffs' weak Free Speech claims fall short of the summary judgment standard, because the provisions only regulate conduct. The Court found a Free Speech violation in Section 6.1(1), but it severed the sections and assessed the two individually.  It won't now resew them with a tenuous

doctrinal thread. So, the Court doesn't believe the hybrid rights doctrine compels it to apply strict scrutiny to Section 6.1(3).

*Rational Basis Analysis*

Having reached the end of a long front walk, *see Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102 (1998), the Court finds that Section 6.1(3) triggers (and withstands) rational-basis review. Under this test, a court "need only find a reasonably conceivable state of facts that could provide a rational basis for the classification." *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015); *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 602–03 (7th Cir. 2022) (collecting cases). This isn't an onerous test. The law comes to court bearing a strong presumption of validity, and the challengers must negate every conceivable basis which might support it. *Ind. Petroleum Marketers & Convenience Store Ass'n.*, 808 F.3d at 322.

Conceivably, the State has a legitimate interest in facilitating abortions provided by health care professionals to reduce the number of "self-managed abortions" or "self-induced abortions," which are inherently dangerous. Requiring the Plaintiffs to provide the requested information is a rational means of meeting that goal. So, Section 6.1(3) doesn't offend the Free Exercise Clause of the First Amendment.

**CONCLUSION**

Based on these findings of fact and conclusions of law, the Court holds that Section 6.1(1) violates the First Amendment's Free Speech Clause, but that Section

6.1(3) is constitutional. So, the Court grants Plaintiff's request for declaratory and permanent injunctive relief as to Section 6.1(1), finding this provision of Public Act 99-690 is unconstitutional and cannot be enforced. It denies the Plaintiffs' Motion as to Section 6.1(3).

Entered: April 4, 2025

By:_____
Iain D. Johnston
United States District Judge